UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                    :

IN RE SEPTEMBER 11 LITIGATION

------------------------------------------------------------------- X

| | |
|---|---|
| : | 21 MC 101 (AKH) |
| : | This Document Relates To: |
| : | 08 CIV 3719 |
| : | 08 CIV 3722 |

**AVIATION DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT DISMISSING ALL CLAIMS
BY WORLD TRADE CENTER PROPERTIES FOR
THE DESTRUCTION OF WTC 1, 2, 4, AND 5**

CONDON & FORSYTH LLP
Desmond T. Barry, Jr. (DB 8066)
7 Times Square
New York, NY 10036
Telephone: (212) 490-9100
Facsimile: (212) 370-4453
dbarry@condonlaw.com

*Aviation Defendants' Liaison Counsel*

*Of Counsel*:

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
Tracy Burnett
Jacob Stahl

PERKINS COIE LLP
Thomas J. McLaughlin

RICHARDS KIBBE & ORBE LLP
Brian S. Fraser

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Robert A. Atkins

## TABLE OF CONTENTS

I.    Summary of Argument ...................................................................................1

II.   Statement of Undisputed Facts. .....................................................................4

      A.    The Auction Process. .......................................................................4

      B.    WTCP's Insurance Recoveries. .......................................................8

      C.    The Instant Motion. ..........................................................................9

III.  The Aviation Defendants are Entitled to Summary Judgment Dismissing
      All Claims for The Destruction of WTC 1, 2, 4, and 5 .................................10

      A.    Summary Judgment Standard. .........................................................10

      B.    WTCP Is Only Entitled to Recover the Diminution in Fair Market
            Value of Their Interest in WTC 1, 2, 4, and 5 and Is Not Entitled to
            Recover Replacement Costs. ...........................................................11

      C.    Neither of WTCP's Arguments for a Special Exception to New
            York Damages Law Is Availing. ......................................................17

      1.    WTCP's Argument For A Contractual Exception Fails ..........................18

      2.    WTCP's Argument For A Statutory Exception Fails. ............................24

      D.    WTCP Cannot Recover Lost Profits in Addition to Diminution in
            Fair Market Value. ...........................................................................26

      E.    The Fair Market Value of WTC 1, 2, 4, and 5 on September 11,
            2001 Was No More Than $2.8 Billion. ............................................28

      F.    WTCP's Insurance Recoveries Far Exceed the Damages
            Recoverable Under New York Law for WTC 1, 2, 4, and 5. ...................31

IV.   Conclusion .....................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*1833 Assoc. v. Frying Carpets Co., Inc.,*
   594 N.Y.S.2d 121 (N.Y. City Civ. Ct. 1992)........................................................................21

*AT&T Corp. v. Cmty. Network Servs., Inc.,*
   No. 97 Civ. 316, 1999 U.S. Dist. LEXIS 19789 (S.D.N.Y. Dec. 31, 1999)...........................10

*Atlantic Mut. Ins. Co. v. Napa Transp.,*
   399 F. Supp. 2d 523 (S.D.N.Y. 2005)....................................................................................33

*Baptiste v. Laquila-Pinnacle,*
   No. 02 Civ. 5540, 2003 U.S. Dist. LEXIS 13074 (S.D.N.Y. July 30, 2003) ..........................11

*Bessemer Trust Co., N.A. v. Branin,*
   544 F. Supp. 2d 385 (S.D.N.Y. 2008)..................................................................17, 27, 29

*Borthwick v. First Georgetown Sec., Inc.,*
   892 F.2d 178 (2d Cir. 1989)....................................................................................................10

*Bruenn v. Cole,*
   568 N.Y.S.2d 351 (1st Dep't 1991) .........................................................................................22

*Champlain Stone & Sand Co. v. State of New York,*
   123 N.Y.S. 546 (N.Y. Ct. Cl. 1910)........................................................................................27

*Chandler v. Bombardier Capital,*
   44 F.3d 80 (2d Cir. 1994)........................................................................................................34

*Cibro Petroleum Prods., Inc. v. Sohio Alaska Petroleum Co.,*
   602 F. Supp. 1520 (N.D.N.Y. 1985)......................................................................................18

*Cooper v. New York L & W Ry. Co.,*
   106 N.Y.S. 611 (4th Dep't 1907).............................................................................................14

*Deutsch v. Health Ins. Plan of Greater N.Y.,*
   751 F.2d 59 (2d Cir. 1984).......................................................................................................18

*Deutsch v. Nat'l Props., Inc.,*
   19 A.D.2d 823 (1st Dep't 1963) ..............................................................................................15

*E.H. Ogden Lumber Co. v. Busse,*
    86 N.Y.S. 1098 (1st Dep't 1904) .................................................................................12

*Fagan v. Pathe Indus. Inc.,*
    86 N.Y.S.2d 859 (1st Dep't 1949) ..............................................................................15

*Fisher v. Qualico Contracting Corp.,*
    98 N.Y.2d 534 (2002) ...................................................................................... passim

*Gass v. Agate Ice Cream,*
    264 N.Y. 141 (1934) ...............................................................................13, 15, 19

*Gierlinger v. Gleason,*
    160 F.3d 858 (2d Cir. 1998) ......................................................................................33

*Gonzalez v. Bratton,*
    147 F. Supp. 2d 180 (S.D.N.Y. 2001) ......................................................................33

*Grill v. United States,*
    303 F.2d 922 (Ct. Cl. 1962) ......................................................................................29

*Hamilton Bldg. Co. v. Rapid Transit Subway Constr. Co.,*
    180 N.Y.S. 70 (1st Dep't 1920) ...........................................................................12, 15

*Hartshorn v. Chaddock,*
    135 N.Y. 116 (1892) ......................................................................................... passim

*In re World Trade Ctr. Disaster Site Litig.,*
    456 F. Supp. 2d 520 (S.D.N.Y. 2006) ......................................................................25

*Jacobs v. Herrera,*
    No. 8749/01, 2004 WL 1900390 (N.Y. Dist. Ct. Aug. 20, 2004) ..............................23

*Jarvis v. Ford Motor Co.,*
    283 F.3d 33 (2d Cir. 2002) ........................................................................................31

*Jenkins v. Ettinger,*
    55 N.Y. 2d 35 (1982) ......................................................................12, 13, 15, 20

*Johnson v. Broomfield,*
    580 N.Y.S.2d 122 (N.Y. Ct. Cl. 1991) ................................................................22, 23

*Kara Holding Corp. v. Getty Petroleum Mktg, Inc.,*
    No. 99 Civ. 0275, 2004 WL 1811427 (S.D.N.Y. Aug. 12, 2004) ........................12, 15

*Maier-Schule GMC, Inc. v. General Motors Corp.,*
    154 F.R.D. 47 (W.D.N.Y. 1994) ...............................................................................11

*Matter of International Ribbon Mills (Arjan Ribbons),*
    365 N.Y.S.2d 808 (1975)............................................................................................22

*McDermott v. Albany,*
    765 N.Y.S.2d 903 (3d Dep't 2003)............................................................................15

*Mennito v. Town of Wayland,*
    56 N.Y.S.2d 654 (N.Y. Sup. Ct. 1945)..............................................................14, 15

*N.Y. Marine Gen. Ins. Co. v. Tradeline LLC,*
    266 F.3d 112 (2d Cir. 2001).....................................................................................33

*O'Brien Bros., Inc. v. The Helen B. Moran,*
    160 F.2d 502 (2d Cir. 1947).....................................................................................15

*Parker v. Chrysler Corp.,*
    929 F. Supp. 162 (S.D.N.Y. 1996) ..........................................................................10

*R.T. Jones Lumber Co. v. Roen S.S. Co.,*
    270 F.2d 456 (2d Cir. 1959).....................................................................................15

*Sandoro v. Harlem-Genesse Market & Nursery, Inc.,*
    482 N.Y.S.2d 165 (4th Dep't 1984)..............................................................12, 15, 26

*Schonfeld v. Hilliard,*
    218 F.3d 164 (2d Cir. 2000)..........................................................................16, 27, 29

*Scribner v. Summers,*
    138 F.3d 471 (2d Cir. 1998)...............................................................................12, 15

*Sharma v. Skaarup Ship Mgmt. Corp.,*
    916 F.2d 820 (2d Cir. 1990)..........................................................................16, 17, 27

*Silverman v. Comm'r,*
    538 F.2d 927 (2d Cir. 1976).....................................................................................29

*Siradas v. Chase Lincoln First Bank, N.A.,*
    No. 98 Civ 4028, 1999 U.S. Dist. LEXIS 15593 (S.D.N.Y. Sept. 30, 1999) ..........11

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.,*
    467 F.3d 107 (2d Cir. 2006)........................................................................................8

*SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC,*
    No. 01-CV-9291 (S.D.N.Y. Oct. 27, 2004) ...............................................................8

*SRI Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC,*
    No. 01 Civ. 9291, 2005 WL 827074 (S.D.N.Y. Feb. 15, 2005) ..............3, 23, 24, 26

iv

*SRI Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC,*
    No. 01 Civ. 9291, 2006 WL 3073220 (S.D.N.Y. Oct. 31, 2006) ..............................................3

*See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC,* No. 01 Civ. 9291, 2008
    U.S. Dist. LEXIS 44689 (S.D.N.Y. June 10, 2008) ....................................................26

*State of Kansas v. State of Colorado,*
    No. 105, 2000 WL 34508307 (U.S. Aug. 31, 2001)..............................................................32

*Stevens v. State,*
    121 N.Y.S. 402 (N.Y. Ct. Cl. 1909)...................................................................................15

*Strobl v. N.Y. Mercantile Exch.,*
    590 F. Supp. 875 (S.D.N.Y. 1984) .....................................................................................33

*Suitum v. Tahoe Reg'l Planning Agency,*
    520 U.S. 725 (1997).........................................................................................................29

*Teplin v. Nat'l Bank of N. Am.,*
    No. 81 Civ. 2369, 1982 U.S. Dist. LEXIS 10925 (S.D.N.Y. Jan. 7, 1982)............................11

*United States v. Cartwright,*
    411 U.S. 546 (1973).........................................................................................................28

*Victor A. Harder Realty & Constr. Co. v. City of New York,*
    64 N.Y.S.2d 310 (N.Y. Sup. Ct. 1946) ..............................................................................14

*Williams v. Bright,*
    658 N.Y.S.2d 910 (1st Dep't 1997) ....................................................................................25

*World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.,*
    345 F.3d 154 (2d Cir. 2003)...............................................................................................8

## STATUTES

28 U.S.C. § 1961..........................................................................................................................33

Air Transportation Safety and System Stabilization Act § 408(b)(2), 49 U.S.C. §
    40101 (2001)................................................................................................................ passim

Fed. R. Civ. P. 56(c) ...................................................................................................................10

N.Y. C.P.L.R. 4545......................................................................................................................4, 31

The Aviation Defendants[1] submit this Memorandum of Law in support of their Motion for Summary Judgment dismissing all claims by World Trade Center Properties ("WTCP")[2] for the destruction of World Trade Center buildings One ("WTC 1"), Two ("WTC 2"), Four ("WTC 4") and Five ("WTC 5").[3]

## I.    Summary of Argument

WTCP seeks to recover as damages exactly what a century of New York law bars it from recovering in this case: replacement costs and lost profits. Even if WTCP were able to establish the Aviation Defendants' liability for the terrorists' destruction of WTC 1, WTC 2, WTC 4 and WTC 5, its damages would be governed by the same property loss rule that has applied to every other New York property owner for more than 100 years. The measure of damages for injury to real property is the *lesser* of the diminution in market value or the cost of replacement. *Hartshorn v. Chaddock*, 135 N.Y. 116, 122 (1892).

The New York Court of Appeals recently reaffirmed that lost market value and replacement cost are each potential measures of property loss, with "the lower of the two

---

[1]    The Aviation Defendants joining in this motion are: American Airlines, Inc.; AMR Corporation; United Air Lines, Inc.; UAL Corp.; US Airways Group, Inc.; US Airways, Inc.; Delta Air Lines, Inc.; Continental Airlines, Inc.; AirTran Airways, Inc.; Colgan Air, Inc.; Globe Aviation Services Corporation; Huntleigh USA Corp.; ICTS International NV; The Boeing Company; and the Massachusetts Port Authority. US Airways, Inc. and US Airways Group, Inc. join in this motion solely with respect to the PI/WD, PD/BL and WTCP claimants who have signed the stipulation entered in their bankruptcy cases. The Plan Injunction remains in effect for all remaining claims. Continental Airlines, Inc. is a property defendant in the American Airlines Flight 11 Wrongful Death/Personal Injury Litigation only. Delta Air Lines, Inc. is participating in regard to those claims not stayed, enjoined or discharged pursuant to Delta Air Lines, Inc.'s bankruptcy proceedings.

[2]    In this Memorandum, "WTCP" will refer to World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC. These entities are all affiliated with Silverstein Properties, Inc. and have sometimes been referred to in the litigation as the "Silverstein interests."

[3]    This Motion does not address World Trade Center Building Seven ("WTC 7").

figures affording full compensation to the owner." *Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 540 (2002) (emphasis added). Yet WTCP proceeds as if the law were the very opposite from the established "lesser of two" rule. WTCP does not deny that the market value of the destroyed properties is substantially less than the cost to replace them. Nevertheless, WTCP seeks to collect $8.4 billion in alleged replacement costs and an additional $3.9 billion in lost rental income. *See* Statement of Undisputed Facts ("SUF"), at ¶¶ 26-28; Ex. V to the Declaration of Desmond T. Barry, Jr. dated June 20, 2008 ("the Barry Decl."), WTCP Cross-Claim Plaintiffs' Updated Damage Disclosure: 1, 2, 4, and 5 World Trade Center (Apr. 23, 2007).

As a matter of law, neither category of damages is recoverable. The cost to construct an income-producing real estate development is not an injury. It is an investment opportunity. Once WTCP has recovered diminution in fair market value of the destroyed property, it has been put back in the position it was in before September 11, 2001. Were the Court to award WTCP the damages it seeks: (i) the Aviation Defendants would be forced to finance WTCP's construction of a brand-new, vastly different complex worth far more than the buildings destroyed on September 11, 2001; and (ii) WTCP would receive an impermissible double recovery of lost profits. The law forbids such a windfall.

Accordingly, the Aviation Defendants seek the Court's dismissal of WTCP's claims relating to the destruction of WTC 1, 2, 4, and 5 and the entry of an order as follows:

First, as every reported case from *Hartshorn* to *Fisher* has held, the applicable measure of damages for the property loss in this tort action is the lesser of the lost market

2

value or replacement costs.    WTCP's efforts to manufacture an exception from its contract with the Port Authority of New York and New Jersey ("Port Authority") or from the Air Transportation Safety and System Stabilization Act ("ATSSSA") are without foundation in law or logic.    Indeed, WTCP has been rebuffed twice before by courts in this District when it has previously invoked its alleged contractual obligations to the Port Authority in an attempt to enhance the insurance recoveries that would otherwise be available under New York law.    *See SRI Int'l   Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, No. 01 Civ. 9291, 2005 WL 827074, at *5 (S.D.N.Y. Feb. 15, 2005) (rejecting WTCP's claim that it was entitled to coverage for the entire actual time required for reconstruction rather than the hypothetical period in which a replacement could be constructed); *SRI Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, No. 01 Civ. 9291, 2006 WL 3073220, at *5, 13 (S.D.N.Y. Oct. 31, 2006) (rejecting WTCP's argument that alleged lease obligations entitled it to recover from its insurers costs of a "safe, modern" replacement building rather than the costs of replacing the building as it stood on September 11, 2001).

Second, on the undisputed record evidence regarding the valuation of the WTC properties just two months before September 11, 2001, this Court should rule that the diminution in market value cannot be more than $2.8 billion.  It is incontrovertible that on July 16, 2001, after conducting a worldwide competitive auction involving bids from the most sophisticated commercial real estate developers, the Port Authority leased WTC 1, 2, 4, and 5 to WTCP in a transaction with a then net present value of $2.8 billion. Thus, by anyone's measure, the alleged replacement costs of $8.4 billion far exceed the fair market value of the destroyed buildings and cannot be recovered.

3

<u>Third</u>, as the courts have repeatedly recognized, a supplemental award of future rental payments on top of fair market value is not available because market value of income producing property, by definition, already includes anticipated future rental profits.

<u>Fourth</u>, the insurance proceeds received by WTCP as a result of the attacks on the WTC buildings (of at least $4.1 billion) exceed the highest possible loss in market value ($2.8 billion). Under New York's collateral source rule, embodied in New York Civil Practice Law & Rule 4545(c), any amount of recoverable damages must be offset by the insurance payments received by WTCP. As a matter of law, WTCP has no remaining recoverable damages for the destruction of WTC 1, 2, 4, and 5.

Black letter New York law applied to a core set of indisputable facts thus yields an inescapable conclusion: WTCP has already been more than fully compensated and indemnified for its alleged loss. The Court should dismiss WTCP's claims arising from the destruction of WTC 1, 2, 4, and 5.

## II.    Statement of Undisputed Facts.

### A.    The Auction Process.

In 1996, the Port Authority began a process to privatize the World Trade Center. SUF, at ¶ 1; Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 161 (Apr. 26, 2001). To obtain maximum financial value from the transaction, the Port Authority structured the transaction as a long-term net lease and invited bidding via a worldwide auction. SUF, at ¶ 3; Ex. A, Minutes of the Bd. of Comms'rs of the Port Auth. at 161.

After a lengthy bidding process, four finalists were selected as potential leaseholders: WTCP, Vornado Realty Trust,[4] Brookfield Properties,[5] and Boston Properties.[6] SUF, at ¶ 5. Before making final bids, the four finalists each conducted a thorough due diligence review of the World Trade Center's value. As J.P. Morgan, the Port Authority's consultant reported, those comprehensive reviews involved "four months of full-scale diligence, including financial review of property operations; physical inspection of the property; and legal/business reviews of data room materials." J.P. Morgan further noted that "[e]ach team spent at least one million dollars during this process." SUF, at ¶ 9; Ex. B to the Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation at 2 (Apr. 27, 2001).

---

[4]    According to its Web site, "Vornado is one of the largest owners and managers of real estate in the United States with a portfolio of over 100 million square feet in its major platforms, primarily located in the New York and Washington, DC metro areas. The company's four major platforms include: New York City Office; Washington, DC Office; Retail Properties and Merchandise Mart." SUF, at ¶ 6; Ex. E to the Barry Decl., Vornado Realty Trust, About Vornado Realty Trust, http://www.vno.com/about/ (last visited June 2, 2008).

[5]    According to its Web site, "Brookfield Properties is a commercial real estate corporation that owns, develops, and operates premier assets in the downtown cores of high-growth North American cities. Our signature properties define the skylines of many major metropolises including New York, Boston, Washington, D.C., Los Angeles, Houston, Toronto and Calgary. Brookfield Properties is a publicly traded company, and is listed under the ticker symbol BPO on both the New York and Toronto Stock Exchanges." SUF, at ¶ 7; Ex. F to the Barry Decl., Brookfield Properties, Company Overview, http://www.brookfieldproperties.com/corporate/ (last visited June 2, 2008).

[6]    Boston Properties, a self-administered and self-managed real estate investment trust, is one of the largest owners, managers, and developers of first-class office properties in the United States, with a significant presence in four core markets: Boston, Washington, D.C., Midtown Manhattan and San Francisco. SUF, at ¶ 8; Ex. G to the Barry Decl., Boston Properties, About, Overview, http://www.bostonproperties.com/site/about/index.aspx (last visited June 2, 2008).

The highest bid was $3.253 billion, submitted by Vornado for the entire complex including the Retail Mall.[7]  In February of 2001, the Port Authority entered into a 20-day exclusive negotiating period with Vornado.  However, negotiations broke down and Vornado declined to complete the transaction.  SUF, at ¶ 10; Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 161-62.

The Port Authority then entered into exclusive negotiations with the second-highest bidder, WTCP.  SUF, at ¶ 11; Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth. at 162.  On April 26, 2001, WTCP executed an "Agreement to Enter Net Lease" and the Port Authority Board authorized the Port Authority to enter a final agreement with WTCP at $3.2 billion.  That $3.2 billion value included $395 million for the Retail Mall, although WTCP's claim does not include any portion of the Retail Mall, which was controlled by Westfield, not WTCP.  SUF, at ¶ 12; Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth. (Apr. 26, 2001).  J.P. Morgan delivered a fairness opinion, concluding that, from a financial point of view, the consideration to be paid was fair to the Port Authority.  SUF, at ¶ 13; Ex. B to the Barry Decl., World Trade Ctr. Net Lease Transaction Fairness Opinion Presentation.

On July 16, 2001, WTCP and the Port Authority executed ninety-nine year net leases for the World Trade Center.  SUF, at ¶ 14; Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr. (July 16, 2001); Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr. (July 16, 2001); Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr. (July 16, 2001); Ex. O to the Barry Decl., Agreement of

---

[7]    The 2001 auction offered two segments of the World Trade Center complex for net leasing: an office portion (WTC 1, 2, 4, and 5, plus subgrade space) and a retail portion, sometimes known as the Retail Mall.

Lease – 5 World Trade Ctr. (July 16, 2001).  As set forth in the minutes of the Port
Authority's Board meeting on April 26, 2001, the $3.211 billion transaction was
structured as follows:

> (1)    An up-front payment of $616 million payable upon closing, which
> included a $491 million payment by WTCP for WTC 1, 2, 4, and 5 (and
> the subgrade space) and a $125 million payment by Westfield LLC for the
> Retail Mall.
>
> (2)    A ninety-nine year stream of fixed rental payments with a present value of
> $2.53 billion.
>
> (3)    A ninety-nine year stream of participating rental payments with a present
> value of approximately $65 million.

SUF, at ¶¶ 16, 17; Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port
Auth., at 164-65.

According to the information WTCP provided to its investors, WTCP
contemporaneously valued the transaction at $3.2 billion, with $2.84 billion allocated to
WTC 1, 2, 4, and 5, which were controlled by WTCP, and $395 million allocated to the
Retail Mall controlled by Westfield.  SUF, at ¶ 15; Ex. P to the Barry Decl., Silverstein
Properties, Inc., World Trade Center Office Complex Brochure, at 1.  WTCP's audited
financial statements contemporaneously valued the office component of the World Trade
Center (*i.e.*, WTC 1, 2, 4, and 5) as a capital asset worth $2.8 billion.  SUF, at ¶ 17; Ex.
W to the Barry Decl., World Trade Center Properties LLC and Subsidiaries Consolidated
Financial Statements as of December 31, 2001, at 2-3 (Apr. 22, 2002).

B.      **WTCP's Insurance Recoveries.**

The World Trade Center net leases required WTCP to insure the property against loss, including destruction by terrorists.   SUF, at ¶ 20; Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr., sec. 14.1.1; Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr., sec. 14.1.1; Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr., sec. 14.1.1; Ex. O to the Barry Decl., Agreement of Lease – 5 World Trade Ctr., sec. 14.1.1.  WTCP fulfilled that obligation by obtaining even more insurance than the $1.5 billion per occurrence required by the net leases and previously maintained by the Port Authority.  SUF, at ¶ 21; Ex. R to the Barry Decl., *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 158 (2d Cir. 2003).  Accordingly, as of September 11, 2001, WTCP had insured the World Trade Center for $3.5468 billion per occurrence.  That amount was set by WTCP's lender, GMAC, and was intended to cover the property value of the World Trade Center plus several years of rental income.  SUF, at ¶ 21; Ex. S to the Barry Decl., Trial Tr. at 1368-69, *SR Int'l Bus. Ins. v. World Trade Ctr. Props., LLC*, No. 01-CV-9291 (S.D.N.Y. Oct. 27, 2004).

After the buildings were destroyed, WTCP and its insurers disputed whether the attacks constituted one or two "occurrences" under the terms of the insurance policies.  A series of jury verdicts and appeals resulted in rulings that WTCP was insured for a total of $4.6 billion.  SUF, at ¶ 22; Ex. X to the Barry Decl., *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.*, 467 F.3d 107, 114-18, 140 (2d Cir. 2006).  Wachtell, Lipton, Rosen & Katz ("Wachtell") represented WTCP in the insurance litigation and prepared a chart recording the insurance payments received by WTCP.  According to Wachtell's

chart, WTCP has received, or will receive, payments totaling no less than $4,091,364,039 of the $4,581,794,675 in insurance payments made by its insurers.  SUF, at ¶ 23; Ex. T to the Barry Decl., Wachtell, Lipton, Rosen & Katz, WTCP Main Site Plaintiffs – Property Insurance Payments Received and to be Received, by Insurance Carrier.  The balance of $490,430,635 was allocated to Westfield for the retail portion of the complex.  SUF, at ¶ 23.

In sum, just fifty-five days before the September 11, 2001 terrorist attacks, WTCP entered into a transaction valued at $2.8 billion to lease WTC 1, 2, 4, and 5.  However, as of September 11, 2001, what WTCP actually had paid was only the $491 million up-front payment (which it had borrowed) and some two months' worth of the portion of the rental payments from subtenants that it paid over to the Port Authority.  Since September 11, 2001, WTCP has collected or will collect nearly $4.1 billion in insurance for the loss of WTC 1, 2, 4, and 5.

### C.    The Instant Motion.

The present Motion arose from the Court's direction at the March 18, 2008 conference that the parties "put this issue to a motion."  *See* Ex. U to the Barry Decl., March 18, 2008 Hearing Tr., at 41.  The Court instructed the parties to agree on "methods that you think you can put together to avoid a lot of expensive discovery and put an important legal issue to meet the rule."  *Id*. at 46.  Counsel for WTCP agreed that a resolution of the issue would be beneficial, stating "[w]e welcome such a motion so that Your Honor can guide all parties with your decision" as to whether WTCP has any recoverable damages.  *Id*. at 39.

Following the March 18, 2008 conference, WTCP confirmed its intention to seek $12.3 billion in damages for the loss of WTC 1, 2, 4, and 5. As WTCP's Damages Disclosure Form sets forth, that amount is comprised of (a) $8.4 billion for the alleged cost to replace the destroyed properties, and (b) $3.9 billion for the lost rental revenue and so called "mitigation costs" such as leasing expenses. SUF, at ¶¶ 24-26; Ex. V to the Barry Decl., WTCP Cross-Claim Plaintiffs' Updated Damage Disclosure: 1, 2, 4, and 5 World Trade Center (Apr. 23, 2007). Because the principles of New York law that preclude recovery of replacement costs and lost rental income are so firmly established, the Court can now apply that law to WTCP's damages contentions and determine that WTCP has no legally cognizable damages at all.

### III.    The Aviation Defendants are Entitled to Summary Judgment Dismissing All Claims for The Destruction of WTC 1, 2, 4, and 5

#### A.    Summary Judgment Standard.

The standard for summary judgment is well known. The Aviation Defendants must demonstrate that the available evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Of course, what facts are material is defined by applicable law. The burden then shifts to WTCP to present evidence that a material issue of sufficient magnitude to warrant a trial remains. *AT&T Corp. v. Cmty. Network Servs., Inc.*, No. 97 Civ. 316, 1999 U.S. Dist. LEXIS 19789, at *10 (S.D.N.Y. Dec. 31, 1999); *see also Borthwick v. First Georgetown Sec., Inc.*, 892 F.2d 178, 181 (2d Cir. 1989). Summary judgment is compelled where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not sufficiently probative. *Parker v. Chrysler Corp.*, 929 F. Supp. 162, 165 (S.D.N.Y. 1996). As this Court has recognized, "[m]ere speculation and

conjecture is insufficient to preclude the granting of the motion." *Baptiste v. Laquila-Pinnacle*, No. 02 Civ. 5540, 2003 U.S. Dist. LEXIS 13074, at *5-6 (S.D.N.Y. July 30, 2003).

Damages questions are not immune from summary judgment. Summary judgment is appropriate where, as here, the issue presented is not how to calculate the plaintiff's damages, but whether the plaintiff has any compensable damages at all. *See, e.g., Siradas v. Chase Lincoln First Bank, N.A.*, No. 98 Civ 4028, 1999 U.S. Dist. LEXIS 15593, at *9-10 (S.D.N.Y. Sept. 30, 1999) (holding that plaintiffs "cannot maintain a cause of action, because they have not been damaged" where the undisputed facts demonstrated that plaintiffs had not been charged excessive interest and granting defendants summary judgment because plaintiffs "have demonstrated no injury"); *see also Teplin v. Nat'l Bank of N. Am.*, No. 81 Civ. 2369, 1982 U.S. Dist. LEXIS 10925, at *7 (S.D.N.Y. Jan. 7, 1982) (granting summary judgment because plaintiff "has suffered no damages as a result of the [defendant's] negligence"); *Maier-Schule GMC, Inc. v. General Motors Corp.*, 154 F.R.D. 47, 52-57 (W.D.N.Y. 1994) (stating that "this Court's decision to award summary judgment on the issue of damages is hardly unprecedented" and discussing numerous cases in which summary judgment was awarded because a plaintiff had failed to substantiate its damages in response to a summary judgment motion).

**B.     WTCP Is Only Entitled to Recover the Diminution in Fair Market Value of WTC 1, 2, 4, and 5 and Is Not Entitled to Recover Replacement Costs.**

Under the Air Transportation Safety and System Stabilization Act § 408(b)(2), 49 U.S.C. § 40101 (2001) ("ATSSSA"), WTCP's damages claims are governed by New

York law.  Since at least 1892, and continuing in full and undiminished force today, it has
been the law that the measure of damages for property loss -- and the *only* measure -- is
the lesser of the diminution in fair market value or the cost of replacement.  *Hartshorn*,
135 N.Y. at 122; *see also Fisher*, 98 N.Y.2d at 539-40.

The "lesser of two" rule has been applied for more than 100 years in countless
property damage cases of all types, and remains fully intact in its original and
straightforward form.[8]  It applies to commercial real estate as well as residential property,
*see Hamilton Bldg. Co.*, 180 N.Y.S. at 71; *Fisher*, 98 N.Y.2d 534, and it applies to totally
destroyed buildings.  *See Sandoro v. Harlem-Genesse Market & Nursery, Inc.*, 482
N.Y.S.2d 165, 167 (4th Dep't 1984).  It applies, in short, to this property damage tort
case just as it has to every such case to precede it.

In *Hartshorn v. Chaddock*, a property owner sued his neighbor for wrongfully
obstructing a stream, which flooded the plaintiff's land, washed away his soil, and
destroyed his personal property.  The Court of Appeals there held that the "cost of
restoring the land" is the proper measure of damages *only* where it is "less than what is
shown to be the diminution of the market value of the whole property by reason of the
injury."  135 N.Y. at 122.  "[W]hen the cost of restoring is more than such diminution [of
market value], the latter is generally the true measure of damages, the rule of avoidable

---

[8]    *See, e.g., Scribner v. Summers*, 138 F.3d 471, 472 (2d Cir. 1998); *Kara Holding Corp. v.
Getty Petroleum Mktg., Inc.*, No. 99 Civ. 0275, 2004 WL 1811427, at *14 (S.D.N.Y. Aug.
12, 2004); *Fisher*, 98 N.Y.2d at 539-40; *Jenkins v. Ettinger*, 55 N.Y. 2d 35, 39 (1982);
*Hartshorn*, 135 N.Y. at 122; *Hamilton Bldg. Co. v. Rapid Transit Subway Constr. Co.*, 180
N.Y.S. 70, 71 (1st Dep't 1920); *E.H. Ogden Lumber Co. v. Busse*, 86 N.Y.S. 1098, 1100 (1st
Dep't 1904).

consequences requiring that in such cases the plaintiff shall diminish the loss as far as possible." *Id.*

This standard has been the law of New York ever since. It is rooted in this public policy: "Evidence of a lesser measure of damages, not unlike mitigation evidence, ensures that a plaintiff receives 'no more than is reasonably necessary to remedy fully the injury while avoiding uneconomical efforts.'" *Fisher*, 98 N.Y.2d at 539 (quoting *Jenkins*, 55 N.Y.2d at 39). The cost of replacement is not recoverable where it is greater than the value of the property prior to the injury because "[t]he plaintiff should not benefit by the loss." *Gass v. Agate Ice Cream*, 264 N.Y. 141, 143-44 (1934).

The Court of Appeals reaffirmed the "lesser of two" rule as recently as 2002. In *Fisher*, homeowners brought suit alleging that the defendant was responsible for a fire that completely destroyed their house. *See Fisher*, 98 N.Y.2d at 536. The replacement cost of the destroyed house ($1,330,000) was much more than the diminution in market value of the house ($480,000). *Id.* at 537. Although the plaintiffs had in fact rebuilt their house at the higher cost, the Court of Appeals confirmed -- citing *Hartshorn* from 1892 -- that the plaintiffs were only entitled to recover the lesser figure, the diminution in market value. *Id.* at 539-40.

Further, the Court of Appeals held that under New York's collateral source rule, the amount of damages (the loss of market value) had to be reduced by the insurance proceeds received by the plaintiffs. *Id.* at 540. The plaintiffs argued on appeal that there should be no such offset because their damages were based on the diminution in market value while their insurance was for replacement cost. The plaintiffs contended that those are two different categories of losses and damages. *Id.* at 539. The Court of Appeals

13

rejected that, reasoning that both are measures of the same thing -- lost property value. It

thus held:

> replacement cost and diminution in value are simply two sides of the same coin. Each is a proper way to measure lost property value, **the lower of the two figures affording full compensation to the owner**.

*Id.* at 540 (emphasis added).

This damages principle is so well entrenched in the law that there is a New York

Pattern Jury Instruction setting forth the rule:

> If plaintiff's (automobile, property) was damaged by the defendant's negligence, you will award the plaintiff as damages the difference between its market value immediately before and immediately after it was damaged, or the reasonable cost of repairs necessary to restore it to its former condition, **whichever is less**.

> Thus, if the reasonable cost of repairs exceeds the reduction in market value, you will award the amount by which the market value was reduced. If the reasonable cost of repairs is less than the reduction in market value, you will award to the plaintiff the reasonable cost of repairs required to restore the (automobile, property) to its condition immediately before it was damaged.

N.Y. PJI 2:311 for Damage for Property with Market Value (emphasis added).

This principle is the rule where, as in this case, the real property has been totally

destroyed. "There is no doubt that the diminution in the value of the land is the general

rule for measuring damages in an action for an injury to real property of a permanent

character." *Hartshorn*, 135 N.Y. at 121; *see also Victor A. Harder Realty & Constr. Co.

v. City of New York*, 64 N.Y.S.2d 310, 321 (N.Y. Sup. Ct. 1946); *Mennito v. Town of

Wayland*, 56 N.Y.S.2d 654, 671 (N.Y. Sup. Ct. 1945); *Cooper v. New York L & W Ry.

Co.*, 106 N.Y.S. 611, 613 (4th Dep't 1907). The wholesale destruction of buildings is

therefore governed by the "lesser of two" rule. *See Fisher*, 98 N.Y.2d at 539-40.[9] "[W]here a building is destroyed, the usual measure of damages is the difference between the market value of the building before and after the injury." *Sandoro*, 482 N.Y.S.2d at 167. Indeed, many cases involving the destruction of a building cite only the reduction in market value as the appropriate measure of damages. *See id.*; *see also Fagan v. Pathe Indus. Inc.*, 86 N.Y.S.2d 859 (1st Dep't 1949); *Stevens v. State*, 121 N.Y.S. 402, 412-13 (N.Y. Ct. Cl. 1909).[10]

This standard is also the rule where, as in this case, the property is commercial real estate. That commercial property is intended to generate income makes no legal difference. The rule applies to commercial and residential properties alike. *Compare Fisher*, 98 N.Y.2d 534 (residential house) *with Hamilton Bldg Co.*, 180 N.Y.S. 70 (commercial building used for manufacturing and printing).

---

[9]  This holding is consistent with cases that provide that the "lesser of two" rule applies when there is destruction to real property involving damage to land from contamination, flooding, trespass and the like (*i.e.*, when the property destroyed is something other than a building). *See Scribner*, 138 F.3d at 472 (barium contamination); *Kara Holding Corp.*, No. 99 Civ. 0275, 2004 WL 1811427, at *14 (petroleum spill); *McDermott* v. *Albany*, 765 N.Y.S.2d 903, 905 (3d Dep't 2003) (diversion of stormwater drainage onto property); *Jenkins*, 55 N.Y.2d at 39 (water damage); *Mennito*, 56 N.Y.S.2d at 671 (flooding).

[10]  Other courts have applied the same rule to property other than real estate. *See O'Brien Bros., Inc. v. The Helen B. Moran*, 160 F.2d 502, 505 (2d Cir. 1947) ("[W]here [property] is totally destroyed, the measure of damages is its reasonable market value immediately before destruction. There can be no recovery beyond such value for mere repairs."); *R.T. Jones Lumber Co. v. Roen S.S. Co.*, 270 F.2d 456, 459 (2d Cir. 1959) (proper measure of damages for lumber lost as a result of barge rolling over was market value of lumber lost); *Gass*, 264 N.Y. at 144 ("Where the automobile is totally destroyed, the measure of damages is its reasonable market value immediately before destruction. There can be no recovery beyond such value for mere repairs."); *Deutsch v. Nat'l Props., Inc.*, 19 A.D.2d 823 (1st Dep't 1963) ("If the personal property is totally destroyed the market value at the time and place of their destruction should be shown."); *see generally* N.Y. PJI 2:311, Comment ("In case of total destruction of the property, the measure of damages is its reasonable market value just prior to destruction.").

Neither *Fisher* nor any of the other cases setting forth the "lesser of two" rule contains a single reference limiting its application to residential property or distinguishing residential from income-producing property. To the contrary, *Fisher* cites as a primary rationale for its holding the need to "avoid[] uneconomical efforts." *Fisher*, 98 N.Y.2d at 539. Commercial actors and homeowners are equally susceptible to the temptation to undertake an expensive restoration effort that exceeds the value of the destroyed property if they can do so at the expense of the alleged tortfeasor. If the law does not afford homeowners like the Fishers the opportunity to rebuild a more valuable home at the tortfeasor's expense, there is no reason it should afford a sophisticated real estate investor like WTCP the opportunity to build, at the Aviation Defendants' expense, a new and improved complex substantially more valuable than the one the terrorists destroyed. Once WTCP has received the fair market value for the buildings as of September 11, 2001, it is free to invest that recovery any way it wishes: in the construction of a new office complex at Ground Zero, or in any other project that suits its needs. But at that point WTCP has been wholly compensated for its loss under New York law.

New York damages law is the same for the loss of other income-producing assets. "Where the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value at the time of the breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000); *see also Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (same).

16

Accordingly, the Court should rule that the only measure of damages applicable to WTCP's claims is the lesser of diminution in market value or replacement cost. As shown below, WTCP's arguments for excepting it from this clear-cut rule of law should be rejected.

### C.    Neither of WTCP's Arguments for a Special Exception to New York Damages Law Is Availing.

If WTCP were able to establish liability, an award of the lost market value of the WTC buildings would provide complete compensation for its alleged losses. As a measure of the future rental income from those commercial properties, the fair market value of the buildings as of September 11, 2001 would make WTCP whole. *See Sharma*, 916 F.2d at 826; *Bessemer Trust Co., N.A. v. Branin*, 544 F. Supp. 2d 385, 390 (S.D.N.Y. 2008). The "lesser of two" rule ensures that the plaintiff receives no more than is necessary to remedy the injury, "while avoiding uneconomical efforts" -- *e.g.*, replacing the damaged property at a cost that exceeds its market value. *Fisher*, 98 N.Y.2d at 539.

Nonetheless, WTCP makes two arguments for a special exception to the New York law of damages barring it from recovering replacement costs in excess of fair market value. The first is that the Port Authority somehow conferred the right to recover replacement costs under the net leases that WTCP executed in July 2001 by obligating WTCP to rebuild the towers in the event of their destruction. The second is that in adding a liability cap for WTCP to ATSSSA, Congress somehow conferred on WTCP a right to the additional recovery it seeks. Neither argument has any basis in law or logic.

WTCP alleges that it should be awarded $8.4 billion in replacement costs -- many times the $2.8 billion market value of the WTC buildings. As a matter of law, WTCP can recover no such damages. Spending money to build an income-generating real estate

17

development is not an injury.  It is the expense required to make money.  As demonstrated below, WTCP has no obligation to replace the destroyed property if it would be a money loser.  Its lease reflects the same economic principles behind *Fisher* and its legal lineage:  WTCP is not required to undertake "uneconomical efforts."  *See Fisher*, 98 N.Y.2d at 539.

Indeed, were WTCP's argument for a contractually-based exception accepted, the generally applicable rule that property owners are not entitled to recover replacement costs in excess of fair market value would be swallowed up by the exception, at least for sophisticated commercial parties.  Every real estate contract or lease would contain the magic provision, and the general rule would be left to apply only to those property owners not sophisticated enough to include it.

### 1.    WTCP's Argument For A Contractual Exception Fails

Recognizing that tort principles under New York law do not permit the recovery of replacement costs, WTCP attempts an end run around the tort rule by characterizing its replacement costs as consequential damages under its leases with the Port Authority. WTCP's argument fails for multiple reasons.

First, the *costs* to rebuild the World Trade Center are not the same as *damages*. The $8.4 billion WTCP claims as replacement costs are not damages, but an investment in a new revenue-producing real estate development.[11]  Awarding WTCP the cost of

---

[11]    Even if WTCP, contrary to New York law, were entitled to recover some form of consequential damages, those damages would not be assessed on the basis of the costs of construction of the new buildings, because that is only the expense side of the equation. Consequential damages are based on the *net* financial effect on the plaintiff. *See Deutsch v. Health Ins. Plan of Greater N.Y.*, 751 F.2d 59, 65 n.7 (2d Cir. 1984); *Cibro Petroleum Prods., Inc. v. Sohio Alaska Petroleum Co.*, 602 F. Supp. 1520, 1564 (N.D.N.Y. 1985).

constructing the new buildings would grant WTCP a windfall by making the Aviation Defendants pay for WTCP's new money-generating construction project. That windfall is forbidden. *See Fisher,* 98 N.Y.2d at 539 (holding that replacement costs in excess of fair market value are not recoverable because "[t]he plaintiff should not benefit by the loss" (quoting *Gass,* 264 N.Y. at 143-44)).

Next, WTCP's leases are inconsistent with its argument that the net leases create consequential damages. WTCP contends that it is obligated to rebuild by virtue of Section 15.1 of each lease. That provision, however, does not require WTCP to build anything at a financial loss. It requires only that the WTC buildings be replaced "to the extent feasible, prudent and commercially reasonable," and only according to the plans for the buildings as they existed on September 11, 2001. Section 15.1 thus provides that, in the event the premises are destroyed, WTCP shall:

> rebuild, restore, repair and replace the Premises (other than the Appurtenances) and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, **to the extent feasible, prudent and commercially reasonable, with the plans and specifications for the same as they existed prior to such damage or destruction** or, with the consent in writing of the Port Authority, which consent shall not be unreasonably withheld, conditioned or delayed, make such other repairs, replacements, changes or alterations as is mutually agreed to by the Port Authority and the Lessee.

Ex. L to the Barry Decl., Agreement of Lease — 1 World Trade Ctr. (July 16, 2001) (emphasis added).

WTCP's obligation is not to erect a new and more valuable complex but simply to restore the buildings to their pre-9/11 condition, if and only if the undertaking is "feasible, prudent and commercially reasonable." Notably, this language parallels

exactly the measure of damages (costs of restoration to the condition that immediately preceded the tort) that New York courts have found is not available if it exceeds the fair market value of the destroyed property. *See, e.g., Fisher*, 98 N.Y.2d at 539 ("Evidence of a lesser measure of damages, not unlike mitigation evidence, ensures that a plaintiff receives 'no more than is reasonably necessary to remedy fully the injury while avoiding uneconomical efforts.'" (quoting *Jenkins*, 55 N.Y.2d at 39)).

As the Court recognized, moreover, the exposure WTCP is claiming justifies a multibillion dollar award of excess replacement costs is further undermined by the absence of any recourse against WTCP itself.[12]   Section 16.1 of each Agreement of Lease, just as the Court anticipated, provides that all liability for repair or replacement of the buildings and for the payment of rent or other obligations under the net lease is limited to the respective Special Purpose Entity (*e.g.*, 1 World Trade Center LLC for WTC 1). But the sole asset of each Special Purpose Entity was the net lease, and the Port Authority's remedies are limited to: (a) the termination of the Special Purpose Entity's interest; or (b) the collection of a judgment or arbitral award but only out of the insurance proceeds or ongoing revenues that the Special Purpose Entity receives from operation of

---

[12]   *See* Ex. U to the Barry Decl., Transcript of March 18, 2008 Hearing, at 39-40:
THE COURT:  If you walked away from the obligation, what would be the consequence? The loss of the lease, or money damages as well?
MR. WILLIAMSON:  Well, I think the answer is both, but you can't do it because you are obligated to keep paying rent and you you're obligated, the next element I was going to come to, to replace the buildings that are there to the Port Authority's satisfaction.  So, you can't just walk away, you have to contractually under the leasehold's terms replace the buildings.
THE COURT:  There was no personal obligation, was there?
MR. WILLIAMSON:  I don't know off the top of my head, but there were certainly other obligations in the leases.  Whether there were cost guarantees or not, I don't know that off the top of my head.
THE COURT:  But I think what Mr. Barry will be coming up to say is that bottom line if you walked away the only damage would be the lost value of the leaseholds.

20

the buildings. *See* SUF at ¶ 19; Ex. L to the Barry Decl., Agreement of Lease – 1 World Trade Ctr., sec. 16.1; Ex. M to the Barry Decl., Agreement of Lease – 2 World Trade Ctr., sec. 16.1; Ex. N to the Barry Decl., Agreement of Lease – 4 World Trade Ctr., sec. 16.1; Ex. O to the Barry Decl., Agreement of Lease – 5 World Trade Ctr., sec. 16.1. Thus, WTCP could, to use the Court's term, "walk away" from any theoretical obligation to rebuild the destroyed buildings without any exposure to an out-of-pocket loss: all that could happen would be that the Port Authority would have a potential claim for a portion of rents (now non-existent) or insurance proceeds against a Special Purpose Entity whose only asset was the leasehold.

Further, the Port Authority could not confer under the net leases something the Port Authority itself did not have: the right to recover replacement costs in excess of fair market value. Had the WTC buildings been attacked before July 2001 -- before the Port Authority had leased the buildings to WTCP -- any property damage claims brought by the Port Authority would undeniably have been governed by the "lesser of two" rule. The Port Authority could never have sued the Aviation Defendants for $8.4 billion to fund a brand new real estate development. Any recovery would have been capped at the lost market value.

WTCP's status as a net lessee does not place it in any greater position than the Port Authority. To the contrary, under New York law, a net lease is *typically* presumed to impose the responsibility for all expenses arising from the property, including the costs of repairs of every nature, upon the tenant. *See 1833 Assoc. v. Frying Carpets Co., Inc.*, 594 N.Y.S.2d 121, 123 (N.Y. City Civ. Ct. 1992) ("It is *customary* for a [net lease] tenant to restore, replace, or reconstruct after damage.") (emphasis added).

Assigning responsibility for repairs to the lessee by contract does not grant the lessee any greater rights than those with which the lessor had to begin. It is of course axiomatic that a contracting party cannot convey any greater rights in real property than it enjoys itself. *See, e.g., Matter of International Ribbon Mills (Arjan Ribbons)*, 365 N.Y.S.2d 808, 811 (1975) ("It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor."); *Bruenn v. Cole*, 568 N.Y.S.2d 351, 354 (1st Dep't 1991) ("A sublease can convey no more than the rights afforded to the tenant.").

Permitting a leaseholder like WTCP to circumvent (and invert) the "lesser of two" rule would create an unprincipled loophole for the well-heeled and well-lawyered. Ordinary property owners, like the homeowners in *Fisher*, would be limited to recovery of lost market value. But sophisticated real estate players will be invited to contract around the rule by entering into net leases with special purpose vehicles. Nothing about this case warrants the creation of a new rule to provide a windfall for real estate developers.

In addition, there is not so much as a hint in New York case law that WTCP can by contract with a third party opt itself out of tort law measures of damages and impose different rules of law on alleged tortfeasors who are strangers to the contract. Contractual arrangements undertaken for its own benefit cannot alter the measure of damages available to WTCP under New York tort law. *See, e.g., Johnson v. Broomfield*, 580 N.Y.S.2d 122, 123 (N.Y. Ct. Cl. 1991) (holding that plaintiff could not recover for increased insurance premiums, even though defendant was 100% liable for the accident;

"a major factor making the plaintiff's claimed damages remote, indirect and unforeseeable is the fact that the defendant has no control over the plaintiff's contractual relationships entered into or sought to be entered with plaintiff's insurer, i.e. the purchase of automobile liability insurance."); *see also Jacobs v. Herrera*, No. 8749/01, 2004 WL 1900390, at *3 (N.Y. Dist. Ct. Aug. 20, 2004) (citing *Johnson*).

This instance is not the first time that WTCP has attempted to argue that its obligations under the net leases somehow entitle it to recoveries greater than the law otherwise allows. Unsurprisingly, its previous attempts to bootstrap the net leases were unsuccessful. In *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props. LLC*, WTCP argued that Section 6 of the net leases obligated WTCP to expend greater resources and build a replacement complex to a higher standard than necessary to restore the lost buildings to their condition as of September 11, 2001. *See SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2006 WL 3073220, at *9 (S.D.N.Y. Oct. 31, 2006). Therefore, WTCP was entitled to recover greater replacement costs from its insurers than other insureds had been allowed under New York law interpreting policy language defining replacement costs. *Id.* In rejecting the argument, the Court noted that "[i]t would be strange indeed if a policyholder were able to affect the amount of an insurer's obligation by entering into a third-party contract." *Id.* It would be just as strange – indeed, perhaps stranger – if WTCP were able to increase the damages recoverable from an alleged tortfeasor by entering into a third party contract. In addition, in an earlier decision in the same case, the Court rejected WTCP's claim that its alleged obligation to rebuild meant that it was entitled to coverage for the entire actual time required for reconstruction rather than the hypothetical period in which a replacement

could be constructed. *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props. LLC,* No. 01 Civ. 9291, 2005 WL 827074, at *5 (S.D.N.Y. Feb. 15, 2005).

Here, as in those cases, WTCP seeks to use its contractual obligations to recover greater amounts than it would otherwise be entitled to recover.  However, just as WTCP was not permitted to use its lease obligations to increase its contractual recoveries under its insurance policies, it should not be permitted to use those obligations to increase its tort measure of damages.  It is WTCP -- not the Aviation Defendants -- that is accountable for the obligations it voluntarily assumed.

### 2.    WTCP's Argument For A Statutory Exception Fails.

WTCP appears to claim that Section 408 (a)(2) of ATSSSA entitles it to a higher measure of damages in order to access the liability cap.  The argument makes no sense as a matter of statutory interpretation.  Congress enacted ATSSSA just days after the September 11 attacks with one of its primary objectives to protect the Aviation Defendants against crippling liability resulting from the attacks.  The Court is familiar with Section 408(a)(1) of ATSSSA, which in its initial incarnation protected the Aviation Defendants against liability in excess of the limits of their insurance coverage for claims arising out of the September 11 attacks.  As part of a "second wave" of September 11 legislation, Section 408 (a)(1) was amended to provide that the liability cap also applied to any "person with a property interest in the World Trade Center, on September 11, 2001, whether fee simple, leasehold, or easement."  At the same time, Congress added Section 408(a)(2), which provides:

> Paragraph (1) does not apply to any such person with a property interest in the World Trade Center if the Attorney General determines, after notice and an opportunity for a hearing on the record, that the person has defaulted willfully on a contractual

24

obligation to rebuild, or to assist in the rebuilding of, the World
Trade Center.

ATSSSA § 408(a)(2).

WTCP argues that this provision obligates it to rebuild and by some transitive
property entitles it to rebuild at the Aviation Defendants' expense.

Section 408(a)(2) does not obligate WTCP to rebuild. It merely places a
condition on the cap on liability that Congress granted to WTCP and the Port Authority.
Nothing in the language or legislative history suggests that this condition was intended to
make a radical modification of New York tort law on damages or to increase the liability
exposure of the Aviation Defendants for whose benefit Congress had initially enacted the
limitation on liability. To the contrary, the cap is a benefit to WTCP. It would be
incongruous to say the least if WTCP could leverage that benefit by claiming that to
access one benefit (the liability cap) it is entitled to claim another benefit (a higher
measure of damages than is permitted under New York law). That incongruity becomes
an absurdity when the statute that confers the liability cap on WTCP was intended
primarily to protect the very entities that WTCP is suing.[13]

---

[13]  Further, WTCP's liability cap argument makes no practical sense. WTCP was named as a
defendant in only a handful of wrongful death and personal injury suits in the former 21 MC
97. The Aviation Defendants have settled the vast majority of those cases and in all but one
of the settled cases have obtained a release that covers WTCP without WTCP contributing a
penny to the settlement costs. Moreover, this Court has granted WTCP summary judgment
in the respiratory cases so that WTCP also has no realistic exposure in that litigation. *In re
World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 571-75 (S.D.N.Y. 2006). WTCP
has not been and is not likely to be subjected to any liability arising out of the September 11
attacks. Accepting WTCP's argument that the cap requires it to rebuild in order to avoid a
theoretical liability that shows no signs of materializing would contravene the well-
established duty to mitigate damages. *See, e.g., Williams v. Bright*, 658 N.Y.S.2d 910, 911-
12 (1st Dep't 1997) ("[I]f an injured party allows the damages to be unnecessarily enhanced,
the incurred loss justly falls upon him"). There is simply no basis in ATSSSA to permit
WTCP a more generous measure of recovery, amounting to a windfall, than that available to
other property owners under well-established New York law. *See SR Int'l Bus. Ins. Co. Ltd.*

**D.    WTCP Cannot Recover Lost Profits in Addition to Fair Market Value.**

In addition to its claim for replacement costs, WTCP is claiming $3.9 billion in lost profits. The claimed lost profits consist of the rents from subtenants and/or return on its management activities that WTCP contends it would have received absent the buildings' collapse until the replacement buildings are completed (projected by WTCP to be 2014). New York law is clear, however, that the owner of destroyed property cannot collect lost profits in addition to fair market value. This Court should not permit WTCP to engage in this sort of double counting.

As one New York court put it:

> [G]enerally when a building is damaged the owner is entitled to damages for loss of rent during such time as may reasonably be required to make necessary repairs. **However, where a building is destroyed, the usual measure of damages is the difference between the market value of the building before and after the injury** (see *36 N.Y. Jur 2d, Damages,* § 76, p. 137; *22 Am. Jur 2d, Damages* § 155, p. 225). **Since damages measured by market value takes rental value into account, where a building is totally destroyed there is no separate allowance for damages for loss of rent.**

*Sandoro*, 482 N.Y.S.2d at 167 (emphasis added).

The holding in *Sandoro* reflects both long-standing New York law and economic reality. The Second Circuit (applying New York law) explained:

> **When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market**

---

*v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2008 U.S. Dist. LEXIS 44689, at *35 (S.D.N.Y. June 10, 2008) (rejecting WTCP's argument that it was entitled to priority over its insurers in any tort recovery in contravention of generally applicable rules of subrogation because of ATSSSA and holding that "[t]here is nothing to indicate such Congressional intent in passage of ATSSSA to alter the substantive rights existing among property owners and their insurers.").

> **value at the time of the breach – not the lost profits that the
> asset could have produced in the future** . . . Market value
> damages are "based on future profits as estimated by potential
> buyers who form the 'market'" and "reflect the buyer's discount
> for the fact that the profits would be postponed and . . . uncertain."

*Schonfeld*, 218 F.3d at 176 (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820,

825 (2d Cir. 1990) and 1 Dobbs Law of Remedies at § 3.3(7)) (internal citations omitted)

(emphasis added).

Because market value already takes into account the profits that the purchaser

expects to earn, it would be duplicative to award lost profits in addition to market value.

*See Champlain Stone & Sand Co. v. State of New York*, 123 N.Y.S. 546, 571-72 (N.Y. Ct.

Cl. 1910) (in the context of appropriation, awarding market value for the property makes

the plaintiff whole "for any rent which he could have received").

A recent decision by another court in this District confirms the continuing validity

of this proposition:

> According to the Second Circuit, "the most accurate and
> immediate measure of damages is the market value of the asset at
> the time of the breach – not the lost profits that the asset could
> have produced in the future" in part because this value "reflect[s]
> the buyer's discount for the fact that the profits [are] uncertain."
> Measuring damages in this fashion is "eminently sensible" and
> takes into account future lost profits. The "value of assets for
> which there is a market is the discounted value of the stream of
> future income that the assets are expected to produce."

*Bessemer Trust Co.,* 544 F. Supp. 2d at 390 (citing *Schonfeld*, 218 F.3d at 176 and

*Sharma*, 916 F.2d at 826).

The principle that lost profits cannot be recovered in addition to fair market value

is a black-letter legal proposition, and it is further supported by the indisputable facts

here. An examination of the materials underlying the 2001 auction reveals that WTCP,

as well as the other bidders, made precisely the calculations the courts expect. WTCP projected the future income stream that it expected to receive and paid a price for the net leases that reflected its anticipation of receiving that revenue. SUF, at ¶ 17; Ex. A to the Barry Decl., Minutes of the Bd. of Comm'rs of the Port Auth., at 164-65. Once WTCP is awarded the fair market value of the buildings as of September 11, 2001, it will have been returned to the position it was in before it made the investment in these buildings. To award WTCP the lost profits it expected to earn from the investment in addition to fair market value would result in a windfall to WTCP. In effect, WTCP would earn the return without ever making the investment and obtain an impermissible double recovery.

**E.    The Fair Market Value of WTC 1, 2, 4, and 5 Is No More Than $2.8 Billion.**

As a matter of New York law, the fair market value of WTC 1, 2, 4, and 5 on September 11, 2001 is capped by the $2.8 billion net lease deal that WTCP and the Port Authority negotiated in April 2001 and consummated on July 16, 2001, just fifty-five days before the September 11 attacks. The United States Supreme Court has defined fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). The price that WTCP paid as a result of the 2001 auction is just that: it was negotiated between sophisticated commercial actors (within the context of a competitive auction involving the most qualified purchasers of the interest at issue) dealing at arm's length following an extensive analysis of all the relevant facts.

Courts have universally recognized that "a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." *Schonfeld*, 218 F.3d at 178 (citing, *inter alia, Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 741-42 (1997); *Silverman v. Comm'r*, 538 F.2d 927, 932 n.7 (2d Cir. 1976); and *Grill v. United States*, 303 F.2d 922, 927 (Ct. Cl. 1962)). For that reason, the price agreed upon in an arm's length transaction should determine the value of the property, unless explained away as abnormal in some fashion. *Bessemer Trust Co.*, 544 F. Supp. 2d at 391 ("Since an arms-length transaction is the best evidence of fair market value, the Court finds that the actual purchase price is the most appropriate reflection of Brundage's value.") (internal citations omitted).

This rationale is easy to understand. Talk is cheap, and projections as to value may proliferate both before and -- even more so -- after a transaction takes place if litigation ensues. The value that commercial parties actually ascribe to a transaction is best represented in the price that they are willing to pay and accept for the asset or business in question. As one court noted, market value "requires no speculation on the part of the Court . . . [r]ather, the Court can look to the arms-length transaction through which the parties have already considered every relevant business factor in fixing a price." *Id.* at 390. For that reason, once a party has produced evidence of a recent sale price, the burden is on the opposing party to demonstrate special circumstances that would negate the relevance of the prior arm's length purchase price. *Schonfeld*, 218 F.3d at 179. That burden-shifting has particular resonance in the context of a motion for summary judgment.

29

Here, the Aviation Defendants have demonstrated that the maximum fair market value of WTC 1, 2, 4, and 5 on September 11, 2001 was definitively established by the net lease transaction that closed just fifty-five days before the attacks. WTCP cannot reasonably dispute that the price it paid to acquire its net leasehold interest provides the "best evidence" of the market value of the property on September 11, 2001. The purchase price was the result of a worldwide bidding process involving some of the most successful commercial real estate investors in the world. WTCP is itself a highly sophisticated real estate investor. For its part, the Port Authority retained multiple advisors, including J.P. Morgan, to review the terms of the transaction on its behalf. J.P. Morgan then confirmed that the financial terms of the transaction were fair to the Port Authority. There can be no doubt that the net lease transaction established the fair market value of the property, and mere speculation or conclusory assertions to the contrary will not defeat summary judgment.

To defeat summary judgment, WTCP bears the burden of presenting evidence sufficient to show that: (a) the market value of its interest in the WTC buildings is greater than the alleged replacement costs; and (b) the valuation of $2.8 billion arrived at after a competitive auction and sophisticated arm's length negotiation – that culminated in a deal that closed just 55 days before September 11, 2001 – is not the relevant measure of market value. Mere speculation or conclusory assertions will not suffice to defeat summary judgment. On this record, New York law dictates that WTCP's only cognizable damage for the destruction of WTC 1, 2, 4, and 5 is the diminution of market value – that being the "lower of the two figures affording full compensation to the

30

owner" – and that the amount of such damage can be no greater than $2.8 billion. *Fisher*, 98 N.Y.2d at 540.

**F.    WTCP's Insurance Recoveries Far Exceed the Damages Recoverable Under New York Law for WTC 1, 2, 4, and 5.**

When a party is pursuing a claim for property damage or other economic loss, New York Civil Practice Law and Rule 4545(c) provides that a court must reduce the damages award to the extent that an element of damages is indemnified by any collateral source, such as insurance. *See* N.Y. C.P.L.R. 4545 (McKinney, 2007); *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 64 (2d Cir. 2002).

Applying Rule 4545(c), the New York Court of Appeals in the *Fisher* case concluded that the homeowners had been more than fully compensated by insurance and no claim remained against the tortfeasor. There, the homeowner received a replacement cost payment of $862,770 from his property insurer. *See Fisher*, 98 N.Y.2d at 536. The Court of Appeals affirmed the lower court's holding that the recoverable damages were limited to the $480,000 diminution in market value. *Id.* at 539-40. The recoverable damages were entirely offset by the much larger insurance payment so the Court of Appeals held that the plaintiffs had no compensable claim against the defendant. *Id.*

WTCP's situation is identical to that of the plaintiff in *Fisher*, except that WTCP has received billions rather than thousands in insurance recoveries. The fair market value of WTC 1, 2, 4, and 5 as of September 11, 2001 can be no more than $2.8 billion, but WTCP received or will receive from its insurers payments totaling no less than $4,091,364,039 for those buildings. Although the Aviation Defendants are aware of no legal mandate to do so, WTCP may argue that the insurance payments should be discounted to their value as of September 11, 2001. A simple mathematical calculation

31

can apply the rate earned by risk-free short-term Treasury instruments[14] to yield a discounted value for the insurance payments of $3.5 billion. When the figures are compared, the conclusion is clear: WTCP has received or will receive insurance payments far exceeding the maximum diminution of market value of WTC 1, 2, 4, and 5 that can be recovered under New York law.[15]

At the March 18, 2008 conference before this Court, WTCP indicated that it would rely on pre-judgment interest to bring its claim above the threshold of its insurance payments. This argument ignores the fact that because WTCP's insurance recoveries properly valued as of September 11, 2001 exceed its loss as of that date, there is simply no base against which to accrue interest. WTCP has been overcompensated according to tort principles and has no compensable loss. Certainly WTCP cannot <u>both</u> add interest to the $2.8 billion figure to bring the loss up to the present date and then compare that loss to insurance payments that have been discounted back to September 11, 2001. *See, e.g.,* *State of Kansas v. State of Colorado*, No. 105, 2000 WL 34508307, at *18 (U.S. Aug. 31, 2001) ("Lower courts have observed that awarding prejudgment interest is just the flipside of discounting future losses to present value.") (internal quotation marks and citations omitted).

---

[14]  As will be discussed in more detail, this is the appropriate rate of interest (and therefore also the appropriate discount rate) to account for the time value of money in an action governed by federal law.

[15]  This conclusion does not change even if a different discount rate is applied. If a discount rate of 6% were applied, the insurance payments would be valued at $3.2 billion. Indeed, even if a discount rate of 9% were applied, the insurance payments would still be valued at over $3 billion, some $200 million more than the market value of the destroyed buildings. *See* SUF, at ¶ 27; Declaration of Rajiv Gokhale (the "Gokhale" Decl.), at ¶¶ 3 - 5 (attaching chart).

Moreover, WTCP pins its hopes on pre-judgment interest based on the mistaken premise that New York's mandatory statutory pre-judgment interest rate of 9 percent would apply to its claim. However, this is not a diversity case. ATSSSA is a federal statute creating an exclusive federal cause of action and applies state law only to the extent that it is not "inconsistent with" federal law. *See* 49 U.S.C. § 40101(b)(2). The federal interest rule applies to a claim brought under federal law. *See Strobl v. N.Y. Mercantile Exch.*, 590 F. Supp. 875, 881 (S.D.N.Y. 1984) (applying New York pre-judgment interest law to common law fraud claims and federal pre-judgment interest law to claims arising under the Commodity Exchange Act); *Atlantic Mut. Ins. Co. v. Napa Transp.*, 399 F. Supp. 2d 523, 525 (S.D.N.Y. 2005) (since the action was before court on a federal question, federal law governed the "issues of appropriateness, timing, and rate of pre-judgment interest.").

Under federal law, the court has discretion over whether and at what rate to award pre-judgment interest. *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998); *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 213 (S.D.N.Y. 2001) ("[i]n an action to enforce federal rights, the decision whether to award prejudgment interest and the rate to be applied if such interest is granted, are matters ordinarily left to the discretion of the district court."). Within the Second Circuit, there is a strong view that if pre-judgment interest is awarded on a federal claim pursuant to a statute that does not specify an alternative interest rate, it should be at the same rate that applies on a mandatory basis to post-judgment interest under 28 U.S.C. §1961. *See Atlantic Mut. Ins. Co.*, 399 F. Supp. 2d at 525 (awarding pre-judgment interest at the rate governing federal post-judgment interest); *N.Y. Marine Gen. Ins. Co. v. Tradeline LLC*, 266 F.3d 112, 130-31 (2d Cir.

33

2001); *Chandler v. Bombardier Capital*, 44 F.3d 80, 84 (2d Cir. 1994). That rate is keyed to the one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, and is typically significantly lower than 9 percent.

The Court need not resolve the issue of the proper pre-judgment interest rate, however, because no interest rate will revive WTCP's claim. At the Treasury rate of interest, with interest running to the date that each insurance payment has been or will be received, $2.8 billion with accrued interest amounts to $3.04 billion. At 6 percent interest, $2.8 billion with accrued interest amounts to $3.2 billion. Even at 9 percent interest, $2.8 billion with accrued interest amounts only to $3.4 billion. *See* SUF, at ¶ 25; Gokhale Decl., at ¶¶ 8-10. Because all three figures are well below the $4.1 billion in insurance payments that WTCP has received or will receive, it is clear that pre-judgment interest does not and cannot alter the outcome: WTCP has received or will receive insurance payments far in excess of any claim it might have for the destruction of WTC 1, 2, 4, and 5. Accordingly, its claims as to those buildings should be dismissed.

## IV.    Conclusion

This Motion turns on four black-letter propositions of New York law, as applied to four incontrovertible facts.

The four legal propositions are:

1.    An owner of damaged or destroyed property is restricted to recovering the lesser of fair market value as of the date of destruction or the costs of restoring the property to its prior condition.

34

2.    New York law does not permit a property damage plaintiff to recover lost profits in addition to fair market value, because fair market value already takes into account projected future profits.

3.    The best evidence of the fair market value of property is a recent sale between a willing and informed seller and buyer.  Proof of a recent sale shifts the burden to the opposing party to demonstrate by compelling, nonspeculative evidence that the fair market value is something other than the value established by the sale.

4.    Under New York law, claims for property damage must be reduced by the amount of the claimant's insurance recoveries.

The four incontrovertible facts are:

1.    As a result of the terrorist attacks of September 11, 2001, WTC 1, WTC 2, WTC 4, and WTC 5 were entirely destroyed.

2.    WTCP has claimed replacement costs that far exceed the fair market value of the buildings.

3.    Just fifty-five days before September 11, WTC 1, WTC 2, WTC 4, and WTC 5 were net leased to WTCP for $2.8 billion as the result of a worldwide competitive auction.

4.    WTCP has recovered or will receive insurance proceeds of at least $4.1 billion for the destruction of the buildings.

This Motion is therefore quite straightforward:  WTCP's insurance recoveries far exceed the fair market value of the destroyed buildings on September 11, 2001, which is the largest possible measure of recovery available to it under New York law.  As a matter

of law, no compensable claim for the destruction of WTC 1, WTC 2, WTC 4, and WTC 5

remains, and the Court should dismiss WTCP's claims as to those four buildings.

Dated: New York, New York
June 20, 2008

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
     Desmond T. Barry, Jr. (DB 8066)
     7 Times Square
     New York, NY 10036
     Telephone: (212) 490-9100
     Facsimile: (212) 370-4453
     dbarry@condonlaw.com

*Aviation Defendants' Liaison Counsel*

*Of Counsel*:

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Maura K. Monaghan
Tracy Burnett
Jacob Stahl

PERKINS COIE LLP
Thomas J. McLaughlin

RICHARDS KIBBE & ORBE LLP
Brian S. Fraser

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Robert A. Atkins