UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                         :

IN RE SEPTEMBER 11 PROPERTY DAMAGE  :
AND BUSINESS LOSS LITIGATION

                         :

------------------------------------------------------------X

21 MC 101 (AKH)

This document also relates to:

08 CIV 3719
08 CIV 3722

### DECLARATION OF MICHAEL L. LEVY
### IN OPPOSITION TO THE AVIATION DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT BASED ON CPLR 4545(c)

MICHAEL L. LEVY, pursuant to 28 U.S.C. §1746, declares under the penalties of perjury that the following is true and correct:

1.      I am Senior Vice President of plaintiffs World Trade Center Properties LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as 5 World Trade Center LLC), and 4 World Trade Center LLC.  Until 2006, I was the Senior Vice President of plaintiff 1 World Trade Center LLC.

2.      I submit this declaration to bring to the Court's attention relevant information and documents in opposition to the Aviation Defendants' motion for summary judgment based on CPLR 4545(c) seeking to dismiss the claims by plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC (collectively, "WTCP").  The information contained in this declaration is based upon my personal knowledge and which I have learned in my capacity as an officer, as described above, of the plaintiffs.

### The WTCP Plaintiffs

3.      WTCP is in the commercial real estate business.

### The Net Leases

4.      In July 2001, WTCP entered into four net leases (the "Net Leases") for WTC 1, 2, 4 and 5 (the "WTC Buildings") with the Port Authority of New York and New Jersey (the "Port Authority").

5.     The Net Leases leased to WTCP approximately 10 million square feet of office space within the WTC Buildings.

6.     As of September 11, 2001, the WTC Buildings had a very high occupancy rate; 1 World Trade Center and 2 World Trade Center were nearly fully tenanted and had more than 400 tenants on September 11, 2001.

7.     As of September 11, 2001, more than 50% of the tenants of the WTC Buildings had long-term leases not set to expire until 2006 or later.

8.     As of September 11, 2001, WTCP expected to receive from its tenants approximately $173 million in rental income from September 11, 2001 through the end of the calendar year 2001 and approximately $363 million in rental income in 2002.

9.     WTCP expected its annual rental income to increase substantially over the remainder of the term of the Net Leases.  For example, WTCP expected to receive over $500 million in rental income in 2010.

10.     On September 11, 2001, the two-month old leases, pursuant to which WTCP already had paid more than half a billion dollars in rental payments, had 99 years remaining.

11.     Upon information and belief, the $2.8 billion figure cited repeatedly by Defendants in their summary judgment motion papers is nothing more than the Port Authority's calculation of the net present value to the Port Authority of certain rental payments specified in the Net Leases based on its application of their chosen discount rate, selected by the Port Authority or its agents on or before April, 2001.

### Consequences for WTCP from Destruction of WTC Buildings

12.     Notwithstanding the destruction of the WTC Buildings, the Net Leases remained in effect and WTCP has complied with its contractual obligations to continue to pay rent to the Port Authority pursuant to terms of the Net Leases.  Over the last seven years, WTCP has paid the Port Authority nearly $1.2 billion in rental payments, and WTCP must continue to pay rent so as not to be in default on the Net Leases.

13. When the WTC Buildings were completely destroyed, the tenants' leases with WTCP terminated, leaving WTCP with no incoming revenue.

14. WTCP has lost billions of dollars in annual rental income it would have received from the former tenants of the WTC Buildings from September 11, 2001 to the present.

15. WTCP will continue to lose hundreds of millions of dollars annually that it would have received from the former tenants of the WTC Buildings from the present until such time as the replacement buildings are built, new tenant relationships are established, and the replacement buildings are leased at or near the occupancy levels of the WTC Buildings.

16. Preliminary April 2007 estimates of the cost of building the four replacement WTC Buildings were approximately $8.4 billion discounted to net present value as of September 11, 2001. Preliminary April 2007 estimates of the lost revenue and consequential damages, including but not limited to, leasing and other mitigation costs were approximately $3.9 billion discounted to net present value as of September 11, 2001. These April 2007 preliminary estimates reflect the facts that WTCP will be without any revenues at all for more than ten years and that there is more uncertainty and risk with respect to leasing of the replacement buildings.

### Insurance Recoveries

17. In July 2001, WTCP had procured insurance coverage in the amount of $3.56 billion, which was as much property insurance coverage as WTCP could procure in the insurance market with insurers that met the Port Authority's and lender's requirements for the biggest real estate transaction at the time, and the largest amount of insurance coverage ever procured for a real estate transaction in New York City.

18. After years of litigation to recover on its insurance policies, WTCP entered into settlement agreements with its property insurers pursuant to which the insurers agreed to pay certain amounts to WTCP in settlement of WTCP's insurance claims.

19. The Net Leases and settlement agreements between WTCP and its insurers restrict how WTCP can use the insurance monies.

3

20.    Some settlement agreements specify that WTCP may not use the insurance monies unless they are used to cover certain expenses, such as the cost of constructing replacement buildings, lost rent, or business interruption losses.

21.    Other settlement agreements provide that WTCP may not use the insurance monies unless certain conditions are met.

22.    With one exception, none of the settlement agreements allocate any specific dollar amount of the Settlement Payments or insurance proceeds to any specific category of loss.

23.    Attached as **Exhibit 5** is a true and correct copy of The Travelers Insurance Companies' policy form.

24.    Attached as **Exhibit 6** is a true and correct copy of the Stipulation of Settlement with Travelers Indemnity Company and Gulf Insurance Company, dated May 18, 2007.

25.    Attached as **Exhibit 7** is a true and correct copy of the Stipulation of Settlement with SR International Insurance Co. Ltd. and Industrial Risk Insurers, dated June 8, 2007.

26.    Attached as **Exhibit 8** is a true and correct copy of the Stipulation of Settlement with Royal Indemnity Company, dated July 12, 2007.

27.    Attached as **Exhibit 9** is a true and correct copy of the London Market Insurers Agreement with Certain Underwriters at Lloyd's, Great Lakes Reinsurance (UK) plc, Houston Casualty Company, QBE International Insurance Ltd., Wurttembergische Versicherung AG, dated September 25, 2002.

28.    Attached as **Exhibit 10** is a true and correct copy of the Letter Agreement with Federal Insurance Company, dated April 1, 2003.

29.    Attached as **Exhibit 11** is a true and correct copy of the Settlement Agreement and Release with ACE Bermuda Insurance Limited, dated February 13, 2002.

30.    Attached as **Exhibit 12** is a true and correct copy of the Settlement Agreement, Allianz Global Risks US Insurance Company regarding policy no. CLP 3001140, dated July 9, 2007.

31.    Attached as **Exhibit 13** is a true and correct copy of the Settlement Agreement, Allianz Global Risks US Insurance Company regarding policy no. CLP 3001091, dated July 9, 2007

32.    A copy of the settlement agreement involving the Employers Insurance of Wausau ("Wausau"), dated April 26, 2007, is not attached hereto because the document is subject to a confidentiality provision and Wausau refused to permit the production of the agreement in this litigation, even pursuant to a confidentiality protective order.

33.    Attached as **Exhibit 14** is a true and correct copy of the Hartford Fire Insurance Company, Letter Agreement, dated December 4, 2001.

34.    Attached as **Exhibit 15** is a true and correct copy of the Settlement Agreement and Release with Royal & Sun Alliance Insurance Group plc, RSA Overseas Holdings, dated July 9, 2007.

35.    Attached as **Exhibit 16** is a true and correct copy of the Pendente Lite Agreement with St. Paul Fire and Marine Insurance Company, dated December 12, 2002.

36.    Attached as **Exhibit 17** is a true and correct copy of the Settlement Agreement and Release with XL Insurance (Bermuda) Ltd., dated February 13, 2002.

37.    Attached as **Exhibit 18** is a true and correct copy of the Stipulation of Settlement with Zurich American Insurance Company, dated April 25, 2007.

Executed on August 11, 2008

_____
MICHAEL L. LEVY

# Exhibit 5 Intentionally Omitted.

Exhibit 5 is designated "Confidential" pursuant to the
Confidentiality Agreement and Protective Order filed herein
on February 5, 2004. WTCP has sought, but not yet
obtained, authorization from the designating person(s) to file
Exhibit 5 with the Court in connection with this Motion. If
authorization from the designating person(s) cannot be
obtained, WTCP will seek relief from the Court forthwith.

# EXHIBIT 6

EXECUTION COPY

## STIPULATION OF SETTLEMENT

This Stipulation of Settlement ("Stipulation") is made between Travelers Indemnity Company ("Travelers") and Gulf Insurance Company ("Gulf"), on the one hand, and World Trade Center Properties LLC, Silverstein Properties, Inc., Silverstein WTC Mgmt. Co., LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as "5 World Trade Center LLC"), 4 World Trade Center LLC (hereinafter collectively referred to as the "Silverstein Insureds"), WTC Retail LLC (formerly known as "Westfield WTC LLC"), Westfield, LLC (formerly known as "Westfield Corporation, Inc."), Westfield America, Inc., 1 World Trade Center LLC and The Port Authority of New York and New Jersey (the "Port Authority") (all parties other than Travelers and Gulf are collectively referred to as the "Insureds" and individually referred to as an "Insured") (WTC Retail LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Net Lessee Insureds," and 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Silverstein Net Lessee Insureds"), on the other hand.  Travelers, Gulf and the Insureds are referred to herein as the "Parties" (each, a "Party"), unless otherwise indicated.

WHEREAS, pursuant to net leases dated July 16, 2001, the Net Lessee Insureds leased from the Port Authority certain buildings and structures at the World Trade Center (hereinafter referred to as the "World Trade Center Property");

WHEREAS, on September 11, 2001, Travelers and Gulf participated in the layered first-party property and business interruption/lost rents insurance program issued to the Insureds on the World Trade Center Property (the "World Trade Center Property Insurance Program").

WTCP 0258046

Travelers provided coverage in the amount of:  $800,000 per-occurrence in the primary layer ($10 million excess of a $1 million deductible); $6,075,949.37 per-occurrence in layer 3 ($25 million excess of $50 million); $50,000,000 per-occurrence in layer 5 ($125 million excess of $125 million); $60,000,000 per-occurrence in layer 6 ($250 million excess of $250 million); and $93,745,041 per-occurrence in layer 10 ($767 million excess of $2.49 billion).  Gulf provided coverage in the amount of $65,000,000 per-occurrence in layer 10 ($767 million excess of $2.49 billion).  The coverage described in this paragraph is referred to hereinafter collectively as the "Travelers and Gulf Coverage";

WHEREAS, the World Trade Center Property was destroyed on September 11, 2001;

WHEREAS, the Parties disputed whether the destruction of the World Trade Center Property constituted one or more than one occurrence under the Travelers and Gulf Coverage and various other issues concerning Travelers' and Gulf's obligations under the Travelers and Gulf Coverage;

WHEREAS, the Parties have litigated this dispute in the civil actions numbered Case No. 01-CV-9291 in the United States District Court for the Southern District of New York (the "Federal Action"), and Index Numbers 602857/03, 602897/03, and 402523/06 in the Supreme Court of the State of New York, County of New York (collectively the "State Actions") (all collectively, the "Lawsuits");

WHEREAS, the Parties litigated the number-of-occurrences issue in the Federal Action;

WHEREAS, on December 6, 2004, a jury in the Federal Action found that, under the Travelers and Gulf Coverage, the Parties intended to treat what happened on September 11, 2001 at the World Trade Center as two occurrences;

{TRAVELERS/GULF SETTLEMENT -- 2}

WHEREAS, Travelers and Gulf appealed from the jury verdict in the Federal Action to the United States Court of Appeals for the Second Circuit;

WHEREAS, on October 18, 2006, the United States Court of Appeals for the Second Circuit affirmed the jury verdict in the Federal Action in favor of the Insureds and against Travelers and Gulf and, on February 27, 2007, the Court denied Travelers' and Gulf's petition for rehearing;

WHEREAS, the Insureds and, among other insurers, Travelers and Gulf have been in an ongoing appraisal (the "Appraisal") to resolve valuation issues with respect to the World Trade Center Property;

WHEREAS, Travelers has previously paid two hundred thirty-three million, seven hundred fifty-one thousand, eight hundred ninety-nine dollars ($233,751,899.00) under the Travelers and Gulf Coverage;

WHEREAS, on November 16, 2006, the Port Authority of New York and New Jersey, the Net Lessee Insureds, and The Port Authority Trans-Hudson Corporation entered into the Master Development Agreement for Towers 2/3/4 of the World Trade Center (the "Master Development Agreement");

WHEREAS, the Parties seek in this Stipulation to settle fully and finally and to resolve for all time any and all disputes between them regarding the Travelers and Gulf Coverage, including but not limited to the pending Lawsuits and appeal, on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of these premises, mutual promises and covenants, the Parties hereby agree as follows:

{TRAVELERS/GULF SETTLEMENT -- 3}

WTCP 0258048

1.    <u>Settlement Amount</u>:  Within five (5) business days of the Effective Date of this Stipulation, Travelers will pay to the Insureds the sum of three hundred four million, seven hundred fifty thousand dollars ($304,750,000), hereinafter referred to as the "Settlement Amount," by wire transfer of same-day funds to:

> Citibank, N.A.
> New York, NY
> ABA 021000089
> Credit:
> PBG Concentration Account #37432464
> Further Credit:
> Citibank, N.A. as Escrow Agent for
> 1 World Trade Center LLC et al.
> Account # 25D-036679-768
> Attention:  John P. Howard – 212-783-3755

2.    <u>Prior Payments</u>:  All prior payments made by Travelers under the Travelers and Gulf Coverage shall be considered final and without reservation, and not an advance.

3.    <u>Use of Settlement Amount</u>:

a.    The Parties agree that the Settlement Amount shall be deposited into the Escrow Accounts referenced in the Master Development Agreement (with 56.5% thereof deposited in a segregated Travelers sub-account within the Silverstein Lessees Sub-Account (the "Silverstein Lessees' Travelers Segregated Sub-Account"), 34.6% thereof deposited in a segregated Travelers sub-account within the 1/5 WTC Lessee Sub-Account (the "1/5 WTC Lessee's Travelers Segregated Sub-Account"), and 8.9% thereof deposited in a segregated Travelers sub-account within the Retail Lessee Sub-Account (the "WTC Retail Lessee's Travelers Segregated Sub-Account"), as such terms and other terms that are capitalized in this paragraph 3 but not defined herein are defined in the Master Development Agreement and

{TRAVELERS/GULF SETTLEMENT -- 4}

    WTCP 0258049

such segregated accounts shall in all instances be referred to as the "Travelers Segregated Accounts").

        b.      The Settlement Amount shall be withdrawn, disbursed and utilized to pay costs and expenses related to (i) the development, design, oversight and construction of the office towers and retail component (and related improvements and infrastructure) at the World Trade Center, as permitted and described by all terms of the Master Development Agreement and the related escrow agreements, as well as for lost rents/business interruption losses (including ground rent and other amounts payable from lost rents/business interruption recoveries) and/or (ii) the development, design, oversight and construction of the PATH concourses, access pathways, mechanical spaces and other similar PATH-related improvements located in or immediately adjacent to the footprints of the Net Lessee Insureds' leased premises but only if outside of the PATH Terminal Site (as defined below) ("PATH Swap Amounts"). Prior to any of the Settlements Amount being withdrawn, disbursed and utilized to pay for PATH Swap Amounts as provided for in paragraph 3.b(ii), agreements shall be in place ("Swap Agreements") that provide for the Port Authority or other stakeholders to reimburse such costs to the Silverstein Net Lessee Insureds, either directly in cash or through the Port Authority or such other stakeholders paying the cost of work that the Silverstein Net Lessee Insureds would otherwise have been responsible for under the Master Development Agreement. Notwithstanding anything in the foregoing to the contrary, the Settlement Amount may not be withdrawn, disbursed or utilized to pay costs and expenses relating to (x) the PATH Project in the area of the PATH terminal bounded by the rights-of-way of Fulton, Greenwich, Church and Dey Streets, as shown on the World Trade Center Site Diagram (the

CONFIDENTIAL

"PATH Terminal Site") or in any area outside of the East Bathtub, and (y) the Memorial to be located at the World Trade Center Site.

    c.    To the extent that any or all of the Silverstein Net Lessee Insureds, WTC Retail LLC, and/or 1 World Trade Center LLC fully expends (without regard to the availability of any other funding sources) its allocable amount of the Settlement Amount in accordance with this paragraph 3, that or those Net Lessee Insured(s) shall have satisfied its obligations under this paragraph 3 and Travelers/Gulf shall have no further rights against that or those Net Lessee Insured(s) hereunder, regardless of the level of its satisfaction of its restoration or development obligation as of the time of the complete expenditure of such allocated amount and regardless of whether any other Party shall have complied with its obligations hereunder or under the terms of the Master Development Agreement or shall have satisfied its restoration or development obligations.

    d.    The Parties hereto acknowledge that the Master Development Agreement contemplates the development of certain commercial space, retail space, infrastructure and other improvements. Nevertheless, either during the term of the Master Development Agreement, as it currently exists or as amended, or in the event of its termination, to the extent that the Settlement Amount is withdrawn, disbursed and utilized to pay costs and expenses related to (i) the development, design, oversight and construction of office towers and a retail component (and related improvements and infrastructure) at the World Trade Center, as well as for lost rents/business interruption losses (including ground rent and other amounts payable from lost rents/business interruption recoveries) or (ii) PATH Swap Amounts, irrespective of whether what is developed is the same as what is described in the terms of the Master Development Agreement, such expenditures shall be deemed to comply with this paragraph 3.

{TRAVELERS/GULF SETTLEMENT -- 6}

CONFIDENTIAL

Prior to any of the Settlements Amount being withdrawn, disbursed and utilized to pay for PATH Swap Amounts as provided for in paragraph 3.d(ii), Swap Agreements shall be in place. Notwithstanding anything in the foregoing to the contrary, the Settlement Amount may not be withdrawn, disbursed or utilized to pay costs and expenses relating to (x) the PATH Project in the PATH Terminal Site or in any area outside of the East Bathtub, and (y) the Memorial to be located at the World Trade Center Site.

      e.     The Silverstein Net Lessee Insureds will have no further obligations or liability under this paragraph 3 upon the earlier of the following: (i) the date on which the Silverstein Net Lessee Insureds shall have satisfied their restoration or development obligations described in the terms of the Master Development Agreement; or (ii) the date on which the Settlement Amount allocated to the Silverstein Lessees' Travelers Segregated Sub-Account shall have been expended as set forth in this paragraph 3. WTC Retail LLC will have no further obligations or liability under this paragraph 3 upon the earlier of the following: (i) the date on which WTC Retail LLC shall have satisfied its restoration or development obligations described in the terms of the Master Development Agreement; or (ii) the date on which the Settlement Amount allocated to the WTC Retail Lessee's Travelers Segregated Sub-Account shall have been expended as set forth in this paragraph 3. 1 World Trade Center LLC will have no further obligations or liability under this paragraph 3 upon the earlier of the following: (i) the date on which 1 World Trade Center LLC shall have satisfied its restoration or development obligations described in the terms of the Master Development Agreement; or (ii) the date on which the Settlement Amount allocated to the 1/5 WTC Lessee's Travelers Segregated Sub-Account shall have been expended as set forth in this paragraph 3. It is

{TRAVELERS/GULF SETTLEMENT -- 7}

CONFIDENTIAL

expressly understood and agreed that the obligations and/or any liabilities of each Net Lessee Insured hereunder shall be several and not joint and several.

      f.      Within 45 days after the close of each quarterly period, each of the Net Lessee Insureds shall provide to Travelers/Gulf a schedule of all expenditures of the Settlement Amount during that preceding quarter. Within 15 days of the receipt of such requisitions, Travelers/Gulf may request to review back-up material and/or inspect the construction site. Any information received or reviewed by Travelers/Gulf shall be kept strictly confidential by Travelers/Gulf.

      g.      The Insureds and/or their affiliates shall not spend or receive any funds contained in the Travelers Segregated Accounts in a manner that is inconsistent with the purposes set forth above.

      h.      In no event shall any Insured be responsible for the failure of any other Insured or other party to comply with terms of this paragraph 3.

      i.      In the event that Travelers/Gulf believes in good faith that one or more Net Lessee Insured(s) is or are in breach of this Stipulation, Travelers/Gulf shall notify the relevant Net Lessee Insured, with a copy to all other Insureds, of the alleged breach within 30 days of discovery of the alleged breach (which time period shall be extended by an additional 30 days upon a written request by Travelers/Gulf). Upon receipt of such a notice, the Net Lessee Insured shall have 30 days to cure any breach by returning to the relevant Travelers Segregated Account funds equivalent to any amounts improperly spent or disbursed. To the extent that the period to effect the cure in good faith will exceed 30 days, the Net Lessee Insured, on notice to all Parties herein, may request approval of a reasonable extension, and

{TRAVELERS/GULF SETTLEMENT -- 8}

such approval shall not be unreasonably denied. The cure period shall end immediately in the event of an express refusal to cure by the Net Lessee Insured.

   j. In the event that the Net Lessee Insured either fails properly to cure any breach within the relevant period set forth in paragraph 3.i or asserts that it has not breached, Travelers/Gulf may within 45 days thereafter submit the matter to Arbitration, the exclusive remedy in which shall be a requirement that funds equivalent to any amounts spent or disbursed in violation of paragraph 3 be restored to the relevant Travelers Segregated Account(s). To the extent that Travelers/Gulf believes in good faith that any of the following Insureds: World Trade Center Properties LLC, Silverstein Properties, Inc., Silverstein WTC Mgmt. Co., or the Port Authority, has spent or received funds from the relevant Travelers Segregated Account(s) in a manner that violated this paragraph 3, Travelers/Gulf may within 30 days (which time period shall be extended by an additional 30 days upon a written request by Travelers/Gulf to the Insured claimed to have breached) thereafter submit the matter to Arbitration, the exclusive remedy in which shall be a requirement that funds equivalent to any amounts spent or received by such Insured in a manner that violated paragraph 3 be restored to the relevant Travelers Segregated Account(s). Failure by Travelers/Gulf to either provide notice or pursue an Arbitration within the time periods set forth in paragraph 3.i or this paragraph 3.j, as applicable, shall constitute a waiver of any and all of Travelers/Gulf's rights in respect of any such alleged breach.

   k. In the event of an Abandonment (defined as all Net Lessee Insureds permanently ceasing and abandoning all rebuilding activities at their leased premises and having no intent to resume such building activities or, in the event that any Net Lessee Insured has satisfied its rebuilding obligations, the remaining Net Lessee Insureds have permanently

{TRAVELERS/GULF SETTLEMENT -- 9}

ceased and abandoned all rebuilding activities at their leased premises and have no intent to resume such building activities) and a final non-appealable judicial determination in the courts of the State of New York that a Completion Event of Default (as defined in the Master Development Agreement Article 8) has occurred, the Port Authority and/or the Silverstein Insureds shall have 90 days to elect to cause such redevelopment to continue; in the event that neither the Port Authority nor the Silverstein Insureds elect to cause such redevelopment to continue, any insurance proceeds then held in the abandoning Net Lessee Insured's Escrow Account, but only up to the amount of the Settlement Amount not utilized pursuant to paragraphs 3.b and 3.d herein or not otherwise owed by Travelers and Gulf for actual cash value or lost rents or business interruption losses under the original terms and placement of the Travelers and Gulf Coverage, shall, subject to paragraph 3.s herein, be returned to Travelers after the payment of any accrued and unpaid expenses payable pursuant to paragraphs 3.b and 3.d. In the event that there is a good faith dispute about whether an Abandonment has occurred, the determination that there has been an Abandonment must be made as a final non-appealable judicial determination in the courts of the State of New York, notwithstanding paragraphs 12 and 13 of this Stipulation.

l.    If the rights set forth in paragraph 3.k become operable, to determine the amount recoverable by Travelers/Gulf: (i) all those remaining amounts of the Settlement Amount as deposited into the Travelers Segregated Account(s) shall be treated as proceeds from Layer 10 of the original placement of the Travelers and Gulf Coverage within the overall World Trade Center Property Insurance Program; (ii) all those amounts spent by the Insureds prior to the Effective Date shall be assumed to have been properly spent pursuant to paragraphs 3.b and 3.d; (iii) all other amounts from other insurers in the World Trade Center

{TRAVELERS/GULF SETTLEMENT -- 10}

     WTCP 0258055

Insurance Program that have not been spent prior to the Effective Date shall be deemed to occupy the layer in which originally placed in the World Trade Center Insurance Program; and (iv) any other issues remaining at the time that the rights in paragraph 3.k become due shall be resolved in negotiations or shall be brought to Arbitration under paragraphs 12 and 13 herein.

m.      If Travelers/Gulf seeks recovery of funds under paragraphs 3.k and 3.l and other carriers in the World Trade Center Insurance Program take positions contrary to Travelers/Gulf's position, Travelers/Gulf agree that all issues shall be addressed in one consolidated proceeding.

n.      In no event shall the Silverstein Insureds, the Port Authority, or any Net Lessee Insured be responsible for any failure by any other Party or any third party to comply with the terms hereof or to expend its portion of the Settlement Amount.

o.      Travelers/Gulf is not intended to be, and shall not be, a third-party beneficiary of the Master Development Agreement or any other agreement or lease, and nothing herein shall give Travelers/Gulf any rights thereunder.

p.      The provisions of this paragraph 3 shall not be deemed to supplement, amend, modify or change any term or provision of any agreement between or among the Net Lessee Insureds and the Port Authority.

q.      If the Insureds enter into a settlement with any other insurer on the World Trade Center Property Insurance Program that provides for a "Use of Settlement Amounts"-type provision or concept similar to this paragraph 3, but with terms that, in the sole discretion of Travelers and Gulf, are more beneficial (not in terms of the procedure described in paragraph 3.f) to that insurer than this paragraph 3, the Parties to this Stipulation shall amend paragraph 3 to this Stipulation so that this paragraph 3 is parallel to the equivalent provision(s)

{TRAVELERS/GULF SETTLEMENT -- 11}

in the other settlement. This paragraph 3.q applies solely with respect to the use of settlement amounts (i.e., paragraph 3) and not the amount, nature of, or timing of the payment of settlement amounts.

       r.     This Stipulation shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, provided that any assignment to any party by any Net Lessee Insured shall contain a requirement that the assignee comply with the provisions of this paragraph 3. In the event of a default under any applicable loan or other financing agreement, any Lender shall have all of the rights of any Insured under this Stipulation, including without limitation any right to utilize the Settlement Amount as provided in paragraphs 3.b and 3.d, to elect to cause redevelopment to continue as provided in paragraph 3.k or to cure any default or breach hereunder, so long as such Lender complies with the provisions of this paragraph 3.

       s.     Travelers/Gulf shall cooperate in good faith with the Net Lessee Insureds in their efforts to obtain financing and develop and lease the new buildings by, among other things, providing potential Lenders and other third parties within 15 days of request such clarifications and estoppel letters as such Lenders and other third parties might reasonably request with regard to the terms and the intent of this Stipulation, including, without limitation, with regard to the expiration of the Net Lessee Insured's obligations under this paragraph 3. Travelers/Gulf hereby agrees (i) that any funds from the Settlement Amount Travelers/Gulf would be entitled to have reimbursed under paragraphs 3.k and 3.l above shall be reduced by the amount obtained by an Insured from any lender or other financing source (a "Lender") in lieu of use of the Settlement Amount so long as the funds from the Lender were obtained and utilized for a rebuilding purpose for which the Settlement Amount could have been used in

{TRAVELERS/GULF SETTLEMENT -- 12}

CONFIDENTIAL

accordance with paragraphs 3.b or 3.d above; (ii) that its rights under paragraphs 3.k and 3.l above are expressly subject and subordinate to, and shall not be used to interfere with, the rights of a Lender to repayment of such loan proceeds that are utilized for a rebuilding purpose for which the Settlement Amount could have been used in accordance with paragraphs 3.b or 3.d above.

4.    <u>No Further Obligations</u>:    Upon payment of the Settlement Amount, the Travelers and Gulf Coverage is deemed fully bought out, paid and satisfied in full.  Except as otherwise set forth herein, Travelers and Gulf shall have no further obligations of any sort to the Insureds with respect to the Travelers and Gulf Coverage.

5.    <u>Release by the Insureds</u>:  Effective upon receipt of the Settlement Amount, the Insureds, on behalf of themselves, their parents, subsidiaries, affiliates, partners, successors and assigns, and all of their officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, hereby fully and forever release, acquit and discharge Travelers and Gulf and each of their parents, subsidiaries, affiliates, partners, successors and assigns and all of their officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, from any and all claims, demands, debts, causes of action, obligations or liabilities of whatever kind and nature that directly or indirectly concern, arise out of, or relate to the Travelers and Gulf Coverage, including, without limitation, all claims and counterclaims that were brought or could have been brought by any of the Insureds against Travelers and Gulf in any of the Lawsuits.  This release does not cover: (a) any claims, demands, debts, causes of action, obligations or liabilities that were or could have been raised against any insurer other than Travelers or Gulf on the World Trade Center

{TRAVELERS/GULF SETTLEMENT -- 13}

CONFIDENTIAL

Property Insurance Program; (b) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance issued by Travelers or Gulf other than the Travelers and Gulf Coverage; and (c) any obligations created herein.

6.    Release by Travelers and Gulf:  Travelers and Gulf, on behalf of themselves and their parents, subsidiaries, affiliates, partners, successors and assigns, and all of their officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, hereby fully and forever release, acquit and discharge the Insureds and each of their parents, subsidiaries, affiliates, successors and assigns, and all of their officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, from any and all claims, demands, debts, causes of action, obligations or liabilities of whatever kind and nature that directly or indirectly concern, arise out of, or relate to the Travelers and Gulf Coverage, including, without limitation, all claims and counterclaims that were brought or could have been brought by Travelers or Gulf against any of the Insureds in any of the Lawsuits, subject to the obligations created herein.

7.    Dismissal:  Upon execution of this Stipulation, Travelers and Gulf shall withdraw from the Appraisal.  Within fifteen (15) days of the payment of the Settlement Amount by Travelers:  (a) the Insureds and Travelers and Gulf shall jointly file with the respective courts motions dismissing all claims and counterclaims as between the Insureds and Travelers and Gulf from the Lawsuits with prejudice and without costs as to any party, pursuant to the terms of agreed-upon forms of order; and (b) all Parties, to the extent that they have made any claims against any other Party to this Stipulation for costs and expenses with respect to the Lawsuits, shall withdraw any such claim for costs and expenses, and shall not

{TRAVELERS/GULF SETTLEMENT -- 14}

WTCP 0258059

seek to recover or collect any costs related to the appeal of the Federal Action to the United States Court of Appeals for the Second Circuit.

8.    No Admissions:  This Stipulation may not be used as an admission against Travelers, Gulf or the Insureds on this or any other past, present or future claim or matter.

9.    Authority:  The persons signing below on behalf of the respective Parties represent and warrant that they are duly authorized to enter into this Stipulation. Additionally, the respective Parties represent and warrant that they have not assigned or transferred in any way the right to pursue and settle the claims that are the subject of this Stipulation.

10.    No Third-Party Beneficiaries:  This Stipulation is solely for the benefit of the Parties except as provided in paragraph 3.  It is expressly understood that there are no third-party beneficiaries to the Stipulation, including, without limitation, any other insurers on the World Trade Center Property Insurance Program or any other insurers providing coverage of any kind to the Insureds, provided, however, that Lenders may rely upon and enforce the terms of paragraphs 3.r and 3.s herein.

11.    Governing Law:  This Stipulation is executed and delivered in the State of New York, and it is the desire and intention of the Parties that it be in all respects interpreted according to the laws of the State of New York. Each of the Parties hereto (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) specifically and irrevocably consents to the exclusive jurisdiction of the courts of the State of New York with respect to all matters concerning this Stipulation and its enforcement, subject to paragraphs 12 and 13 below. Each of the Parties agrees that the execution and performance of this Stipulation shall have a New York situs and, accordingly, they each consent (and solely with respect to the Port Authority, subject to the terms of the Port

{TRAVELERS/GULF SETTLEMENT -- 15}

CONFIDENTIAL

Authority Legislation (as defined below)) to personal jurisdiction in the State of New York for all purposes and proceedings arising from this Stipulation, subject to paragraphs 12 and 13 below. "Port Authority Legislation" shall mean the concurrent legislation of the State of New York and State of New Jersey set forth at Chapter 301 of the Laws of New York of 1950, as amended by Chapter 938 of the Laws of New York of 1974 (McKinney's Unconsolidated Laws §§7101-7112) and Chapter 204 of the Laws of New Jersey of 1951 (N.J.S.A. 32:1-157 to 32:1-168).

      12.   <u>Dispute Resolution</u>:  Matters subject to Arbitration under this Stipulation shall be resolved as follows:

      a.   Any Party may deliver to the other Parties a written notice seeking arbitration (an "Arbitration Notice") with respect to any matter subject to Arbitration under this Stipulation.

      b.   Any Arbitration under this Stipulation shall be conducted by three arbitrators (the "Arbitrators") who shall be mutually selected by the Parties hereto within seven days of the sending of an Arbitration Notice. If the Parties are unable mutually to agree upon three arbitrators, the Insureds shall choose one arbitrator, Travelers/Gulf shall choose one arbitrator, and the two arbitrators selected by the Parties shall select the third arbitrator.

      c.   Each Arbitration commenced pursuant to this paragraph shall be conducted in accordance with the then-prevailing commercial arbitration rules of the American Arbitration Association ("AAA"), except as modified above and as follows:

    i)  Each Arbitration shall be conducted on an expedited basis and shall be completed within thirty days of the selection of the Arbitrators.

{TRAVELERS/GULF SETTLEMENT -- 16}

WTCP 0258061

ii) The arbitration decision (the "Decision") shall be conclusive and binding on the

Parties, shall constitute an "award" by the Arbitrators within the meaning of the AAA

rules and applicable law and judgment may be entered thereon in any court of

competent jurisdiction.

iii) Each Party shall pay its own fees and expenses relating to the Arbitration.

13.    Remedies: The Parties agree that except as provided in paragraph 3.k above, the sole mechanism for the resolution of disputes under this Stipulation shall be through the pursuit of Arbitration. Subject to the specific terms and restrictions set forth in this paragraph 13 and paragraphs 3 and 12 above, any Party may pursue Arbitration seeking a Decision directing specific performance of, and/or compliance with, the terms of this Stipulation. If Travelers/Gulf commences an action or Arbitration against any of the Insureds, Travelers/Gulf shall not seek an injunction halting construction. The Parties agree that a breach of any term of this Stipulation shall not entitle any Party to claim that it is entitled to rescind this Stipulation.

14.    No Waiver: The failure of a Party to enforce, in any one or more instances, any term or condition of this Stipulation shall not be construed as a waiver of the future performance of any such term or condition.

15.    Entire Agreement: The Parties acknowledge and agree that this Stipulation embodies the entire and complete terms and conditions of their agreement described herein and that it supersedes any and all prior representations, understandings and agreements, whether written or oral.

16.    Publicity: The Parties to this Stipulation agree that any press release, public announcement, disclosure or other comment regarding this settlement and the claims being

{TRAVELERS/GULF SETTLEMENT -- 17}

CONFIDENTIAL

settled that is initiated, encouraged or facilitated by a Party or Parties shall not contain any negative or adverse characterization of any other Party or Parties.

17.    Amendment:  This Stipulation may not be amended, supplemented or modified except by a written instrument duly executed by the Parties.

18.    Construction:  Travelers, Gulf and the Insureds have all participated in the drafting and negotiation of this Stipulation after consulting with counsel. Therefore, if any question of intent or interpretation arises, this Stipulation shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party solely by virtue of the authorship of any of the provisions of this Stipulation.

19.    Severability:  If any provision of this Stipulation, or any portion of any provision of this Stipulation, shall be declared illegal, invalid, null and void or unenforceable by any court or tribunal having jurisdiction thereof, such provision or portion thereof shall be deemed separate or apart from the remainder of this Stipulation, which shall remain in full force and effect.

20.    Headings:    Section headings contained herein are for the purpose of organization only, and shall not constitute a part of this Stipulation.

21.    Execution in Counterparts:  This Stipulation may be signed in counterparts, and a facsimile or electronically scanned copy of an executed signature page shall be as effective as an original.  All fully executed copies shall be considered duplicate originals.

22.    Effective Date:  The "Effective Date" of this Stipulation shall be the date of the last signature set forth below.

{TRAVELERS/GULF SETTLEMENT -- 18}

CONFIDENTIAL

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By: _____
Name: _Michael Levy_
Its:  SVP
Dated: 5/18/07

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")

By: _____
Name:
Its:
Dated:

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By: _____
Name:
Its:
Dated:

TRAVELERS/GULF SETTLEMENT -- 195

CONFIDENTIAL

WTCP 0258064

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By:_____
    Name:
    Its:
    Dated:

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")

By:_____
    Name: Timothy J. Lynch
    Its: Deputy Director of Development for
    the Port Authority of N.Y. & NJ
    Dated: 5-18-07

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By:_____
    Name:
    Its:
    Dated:

TRAVELERS/GULF SETTLEMENT

CONFIDENTIAL

WTCP 0258065

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By: _R. M. Mulligan_
Name: Anne Marie Mulligan
Its: Treasurer
Dated: 5-18-07

1 WORLD TRADE CENTER LLC

By: _____
Name: Timothy Liqura
Its: Deputy Director of Development
JoF the Port Authority of NY NJ
Dated: 5-18-07

TRAVELERS INDEMNITY COMPANY

By: _____
Name:
Its:
Dated:

GULF INSURANCE COMPANY

By: _____
Name:
Its:
Dated:

TRAVELERS/GULF SETTLEMENT

CONFIDENTIAL

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By:_____
    Name:
    Its:
    Dated:

1 WORLD TRADE CENTER LLC

By:_____
    Name:
    Its:
    Dated:

TRAVELERS INDEMNITY COMPANY

By: _____
    Name: Michael E. Hotaling
    Its: VP & Group General Counsel
    Dated: May 18, 2007

GULF INSURANCE COMPANY

By: _____
    Name: Michael E. Hotaling
    Its: VP & Group General Counsel
    Dated: May 18, 2007

{TRAVELERS/GULF SETTLEMENT – 20}

CONFIDENTIAL

EXHIBIT 7

## STIPULATION OF SETTLEMENT

This Stipulation of Settlement ("Stipulation") is made between SR International Business Insurance Co. Ltd. ("Swiss Re"), Swiss Reinsurance Co. UK Ltd. ("Swiss Re UK") and Industrial Risk Insurers ("IRI"), on the one hand, and World Trade Center Properties LLC, Silverstein Properties, Inc., Silverstein WTC Mgmt. Co., LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as "5 World Trade Center LLC"), 4 World Trade Center LLC (hereinafter collectively referred to as the "Silverstein Insureds"), Westfield, LLC (formerly known as "Westfield Corporation, Inc."), Westfield America, Inc. (hereinafter, to-gether with Westfield, LLC, referred to as the "Westfield Insureds"), WTC Retail LLC (formerly known as "Westfield WTC LLC"), 1 World Trade Center LLC and The Port Authority of New York and New Jersey (the "Port Authority," together with WTC Retail LLC and 1 World Trade Center, the "Port Authority Insureds") (all parties other than Swiss Re, Swiss Re UK and IRI are collectively referred to as the "Insureds" and individually referred to as an "Insured") (WTC Re-tail LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Net Lessee Insureds," and 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are col-lectively referred to as the "Silverstein Net Lessee Insureds"), on the other hand.  Swiss Re, Swiss Re UK, IRI and the Insureds are referred to herein as the "Parties" (each, a "Party"), unless otherwise indicated.

WHEREAS, pursuant to net leases dated July 16, 2001, the Net Lessee Insureds leased from the Port Authority certain buildings and structures at the World Trade Center (here-inafter referred to as the "World Trade Center Property");

CONFIDENTIAL

WHEREAS, on September 11, 2001, Swiss Re and IRI participated in the layered first-party property and business interruption/lost rents insurance program issued to the Insureds on the World Trade Center Property (the "World Trade Center Property Insurance Program"). Swiss Re provided coverage on the World Trade Center Property Insurance Program in the amount of 22% of all layers excess of the $10 million primary layer and an additional $83,300,000 per occurrence in layer 9 ($993 million excess of $1.5 billion) and $16,107,000 per occurrence in layer 10 ($767 million excess of $2.49 billion) placed through its affiliate Swiss Re UK, for total per occurrence coverage of $877,503,000 (the "Swiss Re Coverage"). IRI provided coverage on the World Trade Center Property Insurance Program in the amount of $237,238,400 per occurrence in layer 9 ($993 million excess of $1.5 billion) (the "IRI Coverage"). The coverage described in this paragraph is referred to hereinafter collectively as the "Swiss Re and IRI Coverage";

WHEREAS, the World Trade Center Property was destroyed on September 11, 2001;

WHEREAS, Swiss Re and IRI, on the one hand, and the Insureds, on the other, disputed whether the destruction of the World Trade Center Property constituted one or more than one occurrence under the Swiss Re and IRI Coverage and various other issues concerning Swiss Re's and IRI's obligations under the Swiss Re and IRI Coverage;

WHEREAS, Swiss Re commenced a civil action numbered Case No. 01-CV-9291 in the United States District Court for the Southern District of New York (the "Federal Action") with respect to this dispute and various of the Insureds asserted counterclaims and third-party claims in the Federal Action against Swiss Re, Swiss Re UK and IRI, among other insurers. Various of the Insureds also commenced certain actions in the Supreme Court of the State of

SWISS RE/IRI SETTLEMENT -- 2

CONFIDENTIAL

WTCP 0258069

New York with Index Numbers 602857/03, 602897/03, and 402523/06 that variously named as defendants Swiss Re, Swiss Re UK and/or IRI (collectively the "State Actions") (all collectively, the "Lawsuits");

WHEREAS, the Parties litigated the number-of-occurrences issue in the Federal Action;

WHEREAS, on May 3, 2004, a jury in the Federal Action found that the Swiss Re Coverage was governed by the WilProp property insurance form under which the Court had determined the destruction of the World Trade Center on September 11, 2001 was a single occurrence;

WHEREAS, on December 6, 2004, a jury in the Federal Action found that, under the IRI Coverage, the Parties intended to treat what happened on September 11, 2001 at the World Trade Center as two occurrences;

WHEREAS, the Insureds appealed the judgment entered consistent with the May 3, 2004 verdict and IRI appealed the judgment entered consistent with the December 6, 2004 verdict in the Federal Action to the United States Court of Appeals for the Second Circuit;

WHEREAS, on October 18, 2006, the United States Court of Appeals for the Second Circuit affirmed all of the jury verdicts in the Federal Action;

WHEREAS, the Insureds petitioned the Second Circuit for rehearing and rehearing en banc, which petition remains pending;

WHEREAS, the Insureds and, among other insurers, IRI have been engaged in an ongoing appraisal (the "Appraisal") to resolve valuation issues with respect to the World Trade Center Property;

SWISS RE/IRI SETTLEMENT -- 3

CONFIDENTIAL

WTCP 0258070

WHEREAS, Swiss Re has paid the Insureds a total of two hundred nineteen million, four hundred seventy-six thousand, two hundred fifty-nine dollars ($219,476,259) under the Swiss Re Coverage;

WHEREAS, IRI has paid the Insureds a total of two hundred thirty-seven million, two hundred thirty-eight thousand, four hundred dollars ($237,238,400) under the IRI Coverage;

WHEREAS, Swiss Re and various other insurers participated on a separate property damage, extra expense and business interruption insurance program covering the properties owned by the Port Authority effective June 1, 2001 through June 1, 2002 (the "Port Authority Program");

WHEREAS, the Port Authority, as part of its claim, asserts that, as of September 11, 2001, the World Trade Center Property was insured property under the Port Authority Program and that the Port Authority can recover under the Port Authority Program for any "shortfall" in the Insureds' recovery under the World Trade Center Property Insurance Program ("Port Authority Shortfall Claim") and Swiss Re has denied such assertion;

WHEREAS, Swiss Re and other insurers participating on the Port Authority Program commenced certain civil actions concerning the Port Authority Program in the United States District Court for the Southern District of New York with respect to, among other things, the Port Authority Shortfall Claim (the "Port Authority Litigation");

WHEREAS, on November 16, 2006, the Port Authority of New York and New Jersey, the Net Lessee Insureds, and The Port Authority Trans-Hudson Corporation entered into the Master Development Agreement for Towers 2/3/4 of the World Trade Center (the "Master Development Agreement");

SWISS RE/IRI SETTLEMENT -- 4

CONFIDENTIAL

WTCP 0258071

WHEREAS, the Parties seek in this Stipulation to settle fully and finally and to resolve for all time any and all disputes between them regarding the Swiss Re and IRI Coverage, including but not limited to the pending Lawsuits and appeal, on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of these premises, mutual promises and covenants, the Parties hereby agree as follows:

1.    Settlement Amount:  Within seven (7) business days after the Effective Date, Swiss Re will pay to the Insureds the sum of five hundred ninety-six million, seven hundred sixty-one thousand, six hundred dollars ($596,761,600) and IRI will pay to the Insureds the sum of two hundred thirty-seven million, two hundred thirty-eight thousand, four hundred dollars ($237,238,400), the total amount of eight hundred thirty-four million dollars ($834,000,000) being referred to herein as the "Settlement Amount," by wire transfer of same-day funds to:

> Citibank, N.A.
> New York, NY
> ABA 021000089
> Credit:
> PBG Concentration Account # 37432464
> Further Credit:
> Citibank, N.A. as Escrow Agent for
> 1 World Trade Center LLC et al.
> Account # 25D-036679-768
> Attention:  John P. Howard – 212-783-3755

2.    Prior Payments:  All prior payments made by Swiss Re and IRI under the Swiss Re and IRI Coverage shall be considered final and without reservation, and not an advance.

3.    Use of Settlement Amount:

a.    The Parties agree that the Settlement Amount shall be deposited into the Escrow Accounts referenced in the Master Development Agreement (with 56.5% thereof

SWISS RE/IRI SETTLEMENT -- 5

deposited in a segregated Swiss Re/IRI sub-account within the Silverstein Lessees Sub-Account

(the "Silverstein Lessees' Swiss Re/IRI Segregated Sub-Account"), 34.6% thereof deposited in a

segregated Swiss Re/IRI sub-account within the 1/5 WTC Lessee Sub-Account (the "1/5 WTC

Lessee's Swiss Re/IRI Segregated Sub-Account"), and 8.9% thereof deposited in a segregated

Swiss Re/IRI sub-account within the Retail Lessee Sub-Account (the "WTC Retail Lessee's

Swiss Re/IRI Segregated Sub-Account"), as such terms and other terms that are capitalized in

this paragraph 3 but not defined herein are defined in the Master Development Agreement and

such segregated accounts shall in all instances be referred to as the "Swiss Re/IRI Segregated

Accounts").

      b.     The Net Lessee Insureds covenant that the Settlement Amount

shall be withdrawn, disbursed and utilized solely to pay costs and expenses related to (i) the de-

velopment, design, oversight and construction of the office towers and retail component (and re-

lated improvements and infrastructure) at the World Trade Center, as permitted and described by

all terms of the Master Development Agreement and the related escrow agreements, as well as

for lost rents/business interruption losses (including ground rent and other amounts payable from

lost rents/business interruption recoveries) and/or (ii) the development, design, oversight and

construction of the PATH concourses, access pathways, mechanical spaces and other similar

PATH-related improvements located in or immediately adjacent to the footprints of the Net Les-

see Insureds' leased premises but only if outside of the PATH Terminal Site (as defined below)

("PATH Swap Amounts"). Prior to any of the Settlement Amount being withdrawn, disbursed

and utilized to pay for PATH Swap Amounts, agreements shall be in place ("Swap Agreements")

that provide for the Port Authority or other stakeholders to reimburse such costs to the

Silverstein Net Lessee Insureds, either directly in cash or through the Port Authority or such

SWISS RE/IRI SETTLEMENT -- 6

CONFIDENTIAL

other stakeholders paying the cost of work that the Silverstein Net Lessee Insureds would other-wise have been responsible for under the Master Development Agreement. Notwithstanding anything in the foregoing to the contrary, the Settlement Amount may not be withdrawn, dis-bursed or utilized to pay costs and expenses relating to (x) the PATH Project in the area of the PATH terminal bounded by the rights-of-way of Fulton, Greenwich, Church and Dey Streets, as shown on the World Trade Center Site Diagram (the "PATH Terminal Site") or in any area out-side of the East Bathtub, and (y) the Memorial to be located at the World Trade Center Site.

      c.      To the extent that any or all of the Silverstein Net Lessee Insureds, WTC Retail LLC, and/or 1 World Trade Center LLC fully expends (without regard to the avail-ability of any other funding sources) its allocable amount of the Settlement Amount in accor-dance with this paragraph 3, that or those Net Lessee Insured(s) shall have satisfied its obliga-tions under this paragraph 3 and Swiss Re and IRI shall have no further rights against that or those Net Lessee Insured(s) hereunder, regardless of the level of its satisfaction of its restoration or development obligation as of the time of the complete expenditure of such allocated amount and regardless of whether any other Party shall have complied with its obligations hereunder or under the terms of the Master Development Agreement or shall have satisfied its restoration or development obligations.

      d.      The Parties hereto acknowledge that the Master Development Agreement contemplates the development of certain commercial space, retail space, infrastruc-ture and other improvements. Nevertheless, either during the term of the Master Development Agreement, as it currently exists or as amended, or in the event of its termination, to the extent that the Settlement Amount is withdrawn, disbursed and utilized to pay costs and expenses re-lated to (i) the development, design, oversight and construction of office towers and a retail

CONFIDENTIAL

component (and related improvements and infrastructure) at the World Trade Center, as well as for lost rents/business interruption losses (including ground rent and other amounts payable from lost rents/business interruption recoveries) or (ii) PATH Swap Amounts, irrespective of whether what is developed is the same as what is described in the terms of the Master Development Agreement, such expenditures shall be deemed to comply with this paragraph 3.

      e.    The Silverstein Net Lessee Insureds will have no further obligations or liability under this paragraph 3 upon the earlier of the following: (i) the date on which the Silverstein Net Lessee Insureds shall have satisfied their restoration or development obligations described in the terms of the Master Development Agreement; or (ii) the date on which the Settlement Amount allocated to the Silverstein Lessees' Swiss Re/IRI Segregated Sub-Account shall have been expended as set forth in this paragraph 3.  WTC Retail LLC will have no further obligations or liability under this paragraph 3 upon the earlier of the following: (i) the date on which WTC Retail LLC shall have satisfied its restoration or development obligations described in the terms of the Master Development Agreement; or (ii) the date on which the Settlement Amount allocated to the WTC Retail Lessee's Swiss Re/IRI Segregated Sub-Account shall have been expended as set forth in this paragraph 3.  1 World Trade Center LLC will have no further obligations or liability under this paragraph 3 upon the earlier of the following: (i) the date on which 1 World Trade Center LLC shall have satisfied its restoration or development obligations described in the terms of the Master Development Agreement; or (ii) the date on which the Settlement Amount allocated to the 1/5 WTC Lessee's Swiss Re/IRI Segregated Sub-Account shall have been expended as set forth in this paragraph 3.  It is expressly understood and agreed that the obligations and/or any liabilities of each Net Lessee Insured hereunder shall be several and not joint and several.

SWISS RE/IRI SETTLEMENT -- 8

CONFIDENTIAL

    f.    Within 45 days after the close of each quarterly period, each of the Net Lessee Insureds shall provide to Swiss Re and IRI: (i) a schedule of all expenditures of the Settlement Amount during that preceding quarter, with the understanding that the Net Lessee Insureds will endeavor in good faith to include on the schedule sufficient information to allow Swiss Re and IRI to determine whether such expenditures comply with this paragraph 3; and (ii) a narrative description of the status of the project, with the understanding that the Net Lessee Insureds will endeavor in good faith to identify any delay in the project attributable to a Force Majeure as defined in paragraph 3.m and to include in the narrative sufficient information to allow Swiss Re and IRI to determine whether there has been a delay in the project attributable to a Force Majeure as defined in paragraph 3.m. Within 15 days of the receipt of such information, Swiss Re and IRI may request to review back-up material and/or inspect the construction site. Any information received or reviewed by Swiss Re and IRI shall be kept strictly confidential by Swiss Re and IRI.

    g.    The Insureds and/or their affiliates shall not spend or receive any funds contained in the Swiss Re/IRI Segregated Accounts in a manner that is inconsistent with the purposes set forth above.

    h.    In no event shall any Insured be responsible for the failure of any other Insured or other party to comply with terms of this paragraph 3.

    i.    In no event shall any of the Westfield Insureds have any responsibility for any failure by any other Party or any third party to comply with the terms of this Stipulation of Settlement, including but not limited to any terms relating to how the Settlement Amount is expended.

SWISS RE/IRI SETTLEMENT -- 9

CONFIDENTIAL

WTCP 0258076

j.    In the event that Swiss Re/IRI believes in good faith that one or more Net Lessee Insured(s) is or are in breach of this Stipulation, Swiss Re/IRI shall notify the relevant Net Lessee Insured, with a copy to all other Insureds, of the alleged breach within 30 days of discovery of the alleged breach (which time period shall be extended by an additional 30 days upon a written request by Swiss Re/IRI). Upon receipt of such a notice, the Net Lessee Insured shall have 30 days to cure any breach by returning to the relevant Swiss Re/IRI Segregated Account funds equivalent to any amounts improperly spent or disbursed. To the extent that the period to effect the cure in good faith will exceed 30 days, the Net Lessee Insured, on notice to all Parties herein, may request approval of a reasonable extension, and such approval shall not be unreasonably denied. The cure period shall end immediately in the event of an express refusal to cure by the Net Lessee Insured.

k.    In the event that the Net Lessee Insured either fails properly to cure any breach within the relevant period set forth in paragraph 3.j or asserts that it has not breached, Swiss Re/IRI may within 45 days thereafter submit the matter to Arbitration, the exclusive remedy in which shall be a requirement that funds equivalent to any amounts spent or disbursed in violation of paragraph 3 be restored to the relevant Swiss Re/IRI Segregated Account(s). To the extent that Swiss Re/IRI believes in good faith that any of the following Insureds: World Trade Center Properties LLC, Silverstein Properties, Inc., Silverstein WTC Mgmt. Co., or the Port Authority, has spent or received funds from the relevant Swiss Re/IRI Segregated Account(s) in a manner that violated this paragraph 3, Swiss Re/IRI may within 30 days (which time period shall be extended by an additional 30 days upon a written request by Swiss Re/IRI to the Insured claimed to have breached) thereafter submit the matter to Arbitration, the exclusive remedy in which shall be a requirement that funds equivalent to any amounts spent or received by such In-

CONFIDENTIAL

WTCP 0258077

sured in a manner that violated paragraph 3 be restored to the relevant Swiss Re/IRI Segregated Account(s). Failure by Swiss Re/IRI to either provide notice or pursue an Arbitration within the time periods set forth in paragraph 3.j or this paragraph 3.k, as applicable, shall constitute a waiver of any and all of Swiss Re/IRI's rights in respect of any such alleged breach.

l.    In the event of an Abandonment (defined as all Net Lessee Insureds permanently ceasing and abandoning all rebuilding activities at their leased premises and having no intent to resume such building activities or, in the event that any Net Lessee Insured has satisfied its rebuilding obligations, the remaining Net Lessee Insureds have permanently ceased and abandoned all rebuilding activities at their leased premises and have no intent to resume such building activities) and a final non-appealable judicial determination in the courts of the State of New York that a Completion Event of Default (as defined in the Master Development Agreement Article 8) has occurred, the Port Authority and/or the Silverstein Insureds shall have 90 days to elect to cause such redevelopment to continue; in the event that neither the Port Authority nor the Silverstein Insureds elect to cause such redevelopment to continue, any insurance proceeds then held in the abandoning Net Lessee Insured's Escrow Account, but only up to the amount of the Settlement Amount not utilized pursuant to paragraphs 3.b and 3.d herein or not otherwise owed by Swiss Re and IRI for actual cash value or lost rents or business interruption losses under the original terms and placement of the Swiss Re and IRI Coverage, shall, subject to paragraph 3.t herein, be returned to Swiss Re and IRI within thirty (30) days after the payment of any accrued and unpaid expenses payable pursuant to paragraphs 3.b and 3.d. In the event that there is a good faith dispute about whether an Abandonment has occurred, the determination that there has been an Abandonment must be made as a final non-appealable judicial

CONFIDENTIAL

determination in the courts of the State of New York, notwithstanding paragraphs 15 and 16 of this Stipulation.

        m.      Subject to the other terms of this paragraph, any funds remaining in any of the Swiss Re/IRI Segregated Sub-Accounts as of December 31, 2017 (the "Termination Date") not then irrevocably committed to pay rebuilding costs and not otherwise owed to the Insureds by Swiss Re and IRI for actual cash value or lost rents or business interruption losses under the original terms and placement of the Swiss Re and IRI Coverage shall, subject to paragraph 3.t, be returned to Swiss Re/IRI. In the case of Force Majeure (as defined below), the Termination Date shall be moved forward in time by an amount of time equal to the delay caused by the Force Majeure. "Force Majeure" shall mean a delay in the withdrawal of funds from the Swiss Re/IRI Segregated Sub-Accounts caused directly or indirectly by (i) acts of God, war, sabotage, hostilities, invasion, insurrection, riot, mob violence, malicious mischief, embargo, enemy action, civil commotion, earthquake, flood, fire or other casualty, strikes, labor troubles, unusual weather conditions, or inability to procure labor, equipment, materials or supplies (exclusive of delays inherent in the ordering of long lead items, unless the need for any such long lead item could not reasonably be anticipated) to the extent beyond the reasonable control of the applicable party; (ii) any Additional Security Requirements (as defined in the Master Development Agreement); and (iii) any other matter beyond the reasonable control of the applicable Net Lessee Insured, including any delays caused by Swiss Re or IRI. In the event that there is a dispute about whether Force Majeure has occurred, the determination that there has been Force Majeure must be made as a final non-appealable judicial determination in the courts of the State of New York, notwithstanding paragraphs 15 and 16 of this Stipulation, and until such determination, no funds shall be returned to Swiss Re/IRI. In resolving any such dispute, neither the good faith

CONFIDENTIAL

WTCP 0258079

failure by any of the Net Lessee Insureds to identify any delay attributable to a Force Majeure or to provide information in accordance with paragraph 3.f nor the failure of Swiss Re/IRI to challenge or investigate information concerning a delay in the project shall prejudice the position of any Party. At least thirty days prior to seeking the return of any funds under this paragraph 3.m, Swiss Re/IRI shall provide written notice to each Party hereto and to each Lender (as defined below). Swiss Re/IRI shall not exercise any rights or remedies under this paragraph 3.m until all Lenders have been repaid in full all financing proceeds that were utilized for rebuilding purposes or related interest and other customary costs. This paragraph 3.m shall have no application with respect to the Swiss Re/IRI Segregated Sub-Account associated with any Net Lessee Insured that has completed its obligations under paragraph 3.e.

       n.     If the rights set forth in paragraph 3.l or 3.m become operable, to determine the amount recoverable by Swiss Re/IRI: (i) all those remaining amounts of the Settlement Amount as deposited into the Swiss Re/IRI Segregated Account(s) shall be deemed to occupy the layers in which the Swiss Re and IRI Coverage was originally placed within the overall World Trade Center Property Insurance Program; (ii) all those amounts spent by the Insureds prior to the Effective Date shall be assumed to have been properly spent pursuant to paragraphs 3.b and 3.d; (iii) all other amounts from other insurers in the World Trade Center Property Insurance Program that have not been spent prior to the Effective Date shall be deemed to occupy the layer in which originally placed in the World Trade Center Property Insurance Program; and (iv) any other issues remaining at the time that the rights in paragraph 3.l or 3.m become due shall be resolved in negotiations or shall be brought to Arbitration under paragraphs 15 and 16 herein.

SWISS RE/IRI SETTLEMENT -- 13

CONFIDENTIAL

WTCP 0258080

o.      If Swiss Re/IRI seeks recovery of funds under paragraphs 3.l or 3.m and other carriers in the World Trade Center Property Insurance Program take positions contrary to Swiss Re/IRI's position, Swiss Re/IRI agrees that all issues shall be addressed in one consolidated proceeding.

p.      In no event shall the Silverstein Insureds, the Port Authority, or any Net Lessee Insured be responsible for any failure by any other Party or any third party to comply with the terms hereof or to expend its portion of the Settlement Amount.

q.      Swiss Re/IRI is not intended to be, and shall not be, a third-party beneficiary of the Master Development Agreement or any other agreement or lease, and nothing herein shall give Swiss Re/IRI any rights thereunder.

r.      The provisions of this paragraph 3 shall not be deemed to supplement, amend, modify or change any term or provision of any agreement between or among the Insureds.

s.      This Stipulation shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.  In the event that any rights to the Settlement Amount are assigned or otherwise transferred, (i) notice shall be provided to Swiss Re and IRI in accordance with paragraph 23; and (ii) the assignment or transfer shall contain a requirement that the assignee or transferee comply with the provisions of this paragraph 3 and be subject to the obligations of such assigning or transferring Insured hereunder.  In the event of a default under any applicable loan or other financing agreement, any Lender shall have all of the rights of any Insured under this Stipulation, including without limitation any right to utilize the Settlement Amount as provided in paragraphs 3.b and 3.d, to elect to cause redevelopment to

SWISS RE/IRI SETTLEMENT -- 14

CONFIDENTIAL

WTCP 0258081

continue as provided in paragraph 3.l or to cure any default or breach hereunder, so long as such Lender complies with the provisions of this paragraph 3.

       t.     Swiss Re/IRI shall cooperate in good faith with the Net Lessee Insureds in their efforts to obtain financing and develop and lease the new buildings by, among other things, providing potential Lenders and other third parties within 15 days of request such clarifications and estoppel letters as such Lenders and other third parties might reasonably request with regard to the terms and the intent of this Stipulation, including, without limitation, with regard to the expiration of the Net Lessee Insured's obligations under this paragraph 3. Swiss Re/IRI hereby agrees (i) that any funds from the Settlement Amount Swiss Re/IRI would be entitled to have reimbursed under paragraphs 3.l, 3.m and 3.n above shall be reduced by the amount obtained by an Insured from any lender or other financing source (a "Lender") in lieu of use of the Settlement Amount so long as the funds from the Lender were obtained and utilized for a rebuilding purpose for which the Settlement Amount could have been used in accordance with paragraphs 3.b or 3.d above; (ii) that its rights under paragraphs 3.l, 3.m and 3.n above are expressly subject and subordinate to, and shall not be used to interfere with, the rights of a Lender to repayment of such loan proceeds that are utilized for a rebuilding purpose for which the Settlement Amount could have been used in accordance with paragraphs 3.b or 3.d above.

       u.     Nothing in the foregoing provisions shall be deemed to limit the rights of Swiss Re or IRI to assert a claim of fraud against any Insured with respect to the performance of that Insured's obligations under this paragraph 3. Any recovery in such an action shall be limited to restoration of the relevant portion of the Settlement Amount to the appropriate Swiss Re/IRI Segregated Account and the recovery shall not include any punitive, exemplary or multiplied damages award.

SWISS RE/IRI SETTLEMENT -- 15

CONFIDENTIAL

4.    <u>No Further Obligations</u>:  Upon payment of the Settlement Amount, the Swiss Re and IRI Coverage is deemed fully bought out, paid and satisfied in full.  Except as otherwise set forth herein, Swiss Re and IRI shall have no further obligations of any sort to the Insureds with respect to the Swiss Re and IRI Coverage.

5.    <u>Release by the Insureds</u>:  Effective upon receipt of the Settlement Amount, the Insureds, on behalf of themselves, their parents, subsidiaries, affiliates, partners, successors and assigns, and all of their officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, hereby fully and forever release, acquit and discharge Swiss Re, Swiss Re UK and IRI and each of their parents, subsidiaries, affiliates, partners, successors and assigns and all of their respective officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, from any and all claims, demands, debts, causes of action, obligations or liabilities of whatever kind and nature that directly or indirectly concern, arise out of, or relate to the Swiss Re and IRI Coverage, including, without limitation, all claims and counterclaims that were brought or could have been brought by any of the Insureds against Swiss Re, Swiss Re UK and IRI in any of the Lawsuits.  Notwithstanding any other provision in this Stipulation, this release does not cover:  (a) any claims, demands, debts, causes of action, obligations or liabilities that were or could have been raised against any insurer on the World Trade Center Property Insurance Program other than Swiss Re, Swiss Re UK or IRI; (b) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance issued by Swiss Re, Swiss Re UK or IRI other than the Swiss Re and IRI Coverage, including, but not limited to, claims by the Port Authority in the Port Authority Litigation or related in any way to the Port Authority Program; (c) subject to paragraph 10, any claims, demands, debts, causes of

SWISS RE/IRI SETTLEMENT -- 16

CONFIDENTIAL

WTCP 0258083

action, obligations or liabilities relating to issues of subrogation and priority of recovery as be-

tween IRI and any Insured in connection with the claims raised, whether now or in the future, in

In re September 11 Property Damage & Business Loss Litigation, 21-MC-101 (S.D.N.Y.), or In

re September 11, 2001 Litigation, 21-MC-97 (S.D.N.Y.); (d) the rights and obligations of any

party under the Settlement Agreement and Release, dated January 3, 2005, by and among

Silverstein Properties, Inc., 7 World Trade Company LP and IRI in the action 7 World Trade

Company, LP v. Industrial Risk Insurers and Westport Insurance Corp., 03 Civ. 4292 (S.D.N.Y.)

(MGC); and (e) any obligations created herein.

      6.    Release by Swiss Re, Swiss Re UK and IRI:  Swiss Re, Swiss Re UK and

IRI, on behalf of themselves and their parents, subsidiaries, affiliates, partners, successors and

assigns, and all of their officers, directors, shareholders, members, principals, employees, agents,

servants, attorneys, adjusters, accountants, trustees and legal representatives, hereby fully and

forever release, acquit and discharge the Insureds and each of their parents, subsidiaries, affili-

ates, successors and assigns, and all of their respective officers, directors, shareholders, mem-

bers, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal

representatives, from any and all claims, demands, debts, causes of action, obligations or liabili-

ties of whatever kind and nature that directly or indirectly concern, arise out of, or relate to the

Swiss Re and IRI Coverage, including, without limitation, all claims and counterclaims that were

brought or could have been brought by Swiss Re, Swiss Re UK or IRI against any of the Insur-

eds in any of the Lawsuits.  Notwithstanding any other provision in this Stipulation, this Release

does not cover (a) any claims, demands, debts, causes of action, obligations or liabilities con-

cerning any insurance issued by Swiss Re, Swiss Re UK or IRI other than the Swiss Re and IRI

Coverage, including, but not limited to, claims by Swiss Re in the Port Authority Litigation or

CONFIDENTIAL

related in any way to the Port Authority Program; (b) subject to paragraph 10, any claims, de-
mands, debts, causes of action, obligations or liabilities relating to issues of subrogation and pri-
ority of recovery as between IRI and any Insured in connection with the claims raised, whether
now or in the future, in In re September 11 Property Damage & Business Loss Litigation, 21-
MC-101 (S.D.N.Y.), or In re September 11, 2001 Litigation, 21-MC-97 (S.D.N.Y.); (c) the rights
and obligations of any party under the Settlement Agreement and Release, dated January 3,
2005, by and among Silverstein Properties, Inc., 7 World Trade Company LP and IRI in the ac-
tion 7 World Trade Company, LP v. Industrial Risk Insurers and Westport Insurance Corp., 03
Civ. 4292 (S.D.N.Y.) (MGC); and (d) any obligations created herein.

       7.    <u>Unknown Claims</u>:  Each Party acknowledges that it has been advised by
its attorneys concerning, and is familiar with, the California Civil Code Section 1542 and ex-
pressly waives any and all rights under California Civil Code Section 1542 only with respect to
the subject matter of this Stipulation as set forth above.  California Civil Code Section 1542 pro-
vides that "A general release does not extend to claims which the creditor does not know or sus-
pect to exist in his favor at the time of executing the release, which if known by him must have
materially affected his settlement with the debtor."  Each Party expressly waives any and all
rights under any other federal or state statute or law of similar effect with respect to the subject
matter of this Stipulation as set forth above.

       8.    <u>Dismissal</u>: Upon execution of this Stipulation, IRI shall withdraw from the
Appraisal.  Within ten (10) days after the payment of the Settlement Amount:  (a) the Insureds
and Swiss Re, Swiss Re UK and IRI shall jointly file with the relevant courts motions dismissing
all claims and counterclaims as between the Insureds and Swiss Re, Swiss Re UK and IRI from
the Lawsuits with prejudice and without costs as to any party, pursuant to the terms of agreed-

CONFIDENTIAL

upon forms of order; (b) the Insureds shall advise the Clerk of the Court for the United States

Court of Appeals for the Second Circuit that they are withdrawing their petition for rehearing

and rehearing en banc of the Second Circuit's October 18, 2006 decision with respect to Swiss

Re; and (c) all Parties, to the extent that they have made any claims against any other Party to

this Stipulation for costs and expenses with respect to the Lawsuits, shall withdraw any such

claim for costs and expenses, and shall not seek to recover or collect any costs related to the ap-

peal of the Federal Action to the United States Court of Appeals for the Second Circuit.

     9.    <u>No Admissions</u>:  This Stipulation and the negotiations related thereto may

not be used as an admission against Swiss Re, IRI or the Insureds on this or any other past, pre-

sent or future claim or matter.

     10.    <u>Other Lawsuits</u>:  Nothing in this Stipulation or the settlement set forth

herein shall release, affect or alter in any way the respective rights or obligations, including

without limitation any rights of subrogation or priority of recovery, of any of the Parties with re-

spect to any claims raised, whether now or in the future, in <u>In re September 11 Property Damage</u>

<u>& Business Loss Litigation</u>, 21-MC-101 (S.D.N.Y.), or <u>In re September 11, 2001 Litigation</u>, 21-

MC-97 (S.D.N.Y.), except that IRI and the Insureds hereby stipulate and agree that any issues

between IRI and any Insured concerning subrogation or the allocation of recoveries from third

parties relating to the World Trade Center Property, excluding any recoveries by an Insured from

an insurer with respect to liability insurance covering any Insured, that either IRI or the Insureds

obtain in <u>In re September 11 Property Damage & Business Loss Litigation</u>, 21-MC-101

(S.D.N.Y.), or <u>In re September 11, 2001 Litigation</u>, 21-MC-97 (S.D.N.Y.), shall be governed ex-

clusively by Section IV.C of the C-AR form governing IRI's coverage.

SWISS RE/IRI SETTLEMENT -- 19

CONFIDENTIAL

11.    <u>Stipulation Regarding the Port Authority Shortfall Claim:</u> As further consideration for this Stipulation, the Port Authority and Swiss Re hereby stipulate and agree that, with respect to the computation of amounts, if any, due under the Port Authority Shortfall Claim, Swiss Re will be deemed to have paid its full one occurrence limit hereunder. The Port Authority and Swiss Re further stipulate and agree that for purposes of computing the value, if any, of the Port Authority Shortfall Claim, eighty-five percent (85%) of the Settlement Amount or, $708,900,000, shall be deemed replacement costs regardless of how any portion of that $708,900,000 has been expended, used or characterized by the Insureds, and thus that $708,900,000 shall be included in the amounts deducted from the total replacement cost of the World Trade Center for purposes of calculating the Port Authority Shortfall Claim. Except as set forth herein, this paragraph 11 is without prejudice to any of the Port Authority's positions in the Port Authority Litigation, including, without limitation, its position that for purposes of calculating the Port Authority Shortfall Claim, a percentage smaller than 85% of all amounts recovered by the Insureds under the World Trade Center Property Insurance Program, other than the portion of the recovery represented by the Settlement Amount, has been recovered in connection with replacement costs. This paragraph 11 is without prejudice to any of Swiss Re's positions in the Port Authority Litigation, including but not limited to its position that, in the event the Port Authority Shortfall Claim is sustained, all amounts recovered by Insureds under the World Trade Center Property Insurance Program must be included in the amounts deducted from the total replacement costs for purposes of calculating the Port Authority Shortfall Claim.

12.    <u>Authority:</u> The persons signing below on behalf of the respective Parties represent and warrant that they are duly authorized to enter into this Stipulation. Additionally,

SWISS RE/IRI SETTLEMENT -- 20

CONFIDENTIAL

WTCP 0258087

the respective Parties represent and warrant that they have not assigned or transferred in any way the right to pursue and settle the claims that are the subject of this Stipulation.

13.    <u>No Third-Party Beneficiaries</u>:  This Stipulation is solely for the benefit of the Parties, except as provided in paragraph 3.  It is expressly understood that there are no third-party beneficiaries to the Stipulation, including, without limitation, any other insurers on the World Trade Center Property Insurance Program or any other insurers providing coverage of any kind to the Insureds, provided, however, that Lenders may rely upon and enforce the terms of paragraphs 3.s and 3.t herein.

14.    <u>Governing Law</u>:  This Stipulation is executed and delivered in the State of New York, and it is the desire and intention of the Parties that it be in all respects interpreted according to the laws of the State of New York.  Each of the Parties hereto (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) specifically and irrevocably consents to the exclusive jurisdiction of the courts of the State of New York with respect to all matters concerning this Stipulation and its enforcement, subject to paragraphs 15 and 16 below.  Each of the Parties agrees that the execution and performance of this Stipulation shall have a New York situs and, accordingly, they each consent (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) to personal jurisdiction in the State of New York for all purposes and proceedings arising from this Stipulation, subject to paragraphs 15 and 16 below.  "Port Authority Legislation" shall mean the concurrent legislation of the State of New York and State of New Jersey set forth at Chapter 301 of the Laws of New York of 1950, as amended by Chapter 938 of the Laws of New York of 1974 (McKinney's Unconsolidated Laws §§7101-7112) and Chapter 204 of the Laws of New Jersey of 1951 (N.J.S.A. 32:1-157 to 32:1-168).

SWISS RE/IRI SETTLEMENT -- 21

CONFIDENTIAL

15.     <u>Dispute Resolution</u>:  Matters subject to Arbitration under this Stipulation shall be resolved as follows:

a.     Any Party may deliver to the other Parties a written notice seeking arbitration (an "Arbitration Notice") with respect to any matter subject to Arbitration under this Stipulation.

b.     Any Arbitration under this Stipulation shall be conducted by three arbitrators (the "Arbitrators") who shall be mutually selected by the Parties hereto within seven days of the sending of an Arbitration Notice.  If the Parties are unable mutually to agree upon three arbitrators, the Insureds shall choose one arbitrator, Swiss Re/IRI shall choose one arbitrator, and the two arbitrators selected by the Parties shall select the third arbitrator.

c.     Each Arbitration commenced pursuant to this paragraph shall be conducted in accordance with the then-prevailing commercial arbitration rules of the American Arbitration Association ("AAA"), except as modified above and as follows:

(i)     Each Arbitration shall be conducted on an expedited basis and shall be completed within thirty days of the selection of the Arbitrators, except that the Arbitrators may in their discretion extend the date for completion an additional thirty days.

(ii)     The arbitration decision (the "Decision") shall be conclusive and binding on the Parties, shall constitute an "award" by the Arbitrators within the meaning of the AAA rules and applicable law and judgment may be entered thereon in any court of competent jurisdiction.

(iii)     Each Party shall pay its own fees and expenses relating to the Arbitration.

CONFIDENTIAL

16.    Remedies:  The Parties agree that, except as provided in paragraph 3.l and 3.m above, the sole mechanism for the resolution of disputes under this Stipulation shall be through the pursuit of Arbitration.  Subject to the specific terms and restrictions set forth in this paragraph 16 and paragraphs 3 and 15 above, any Party may pursue Arbitration seeking a Decision directing specific performance of, and/or compliance with, the terms of this Stipulation.  If Swiss Re/IRI commences an action or Arbitration against any of the Insureds, Swiss Re/IRI shall not seek an injunction halting construction.  The Parties agree that a breach of any term of this Stipulation shall not entitle any Party to claim that it is entitled to rescind this Stipulation.

17.    No Waiver:  The failure of a Party to enforce, in any one or more instances, any term or condition of this Stipulation shall not be construed as a waiver of the future performance of any such term or condition.

18.    Entire Agreement:  The Parties acknowledge and agree that this Stipulation embodies the entire and complete terms and conditions of their agreement described herein and that it supersedes any and all prior representations, understandings and agreements, whether written or oral.

19.    Publicity:  The Parties to this Stipulation agree that any press release, public announcement, disclosure or other comment regarding this settlement and the claims being settled that is initiated, encouraged or facilitated by a Party or Parties shall not contain any negative or adverse characterization of any other Party or Parties.

20.    Confidentiality:  This Stipulation, including its terms, shall be confidential and is not to be disclosed except by order of a court of competent jurisdiction or written agreement of the Parties, with such agreement not to be unreasonably withheld.  Notwithstanding the foregoing, the Stipulation itself or any of its terms may be disclosed:  (1) to other insurers on the

CONFIDENTIAL

World Trade Center Property Insurance Program; (2) to reinsurers directly or through intermediaries; (3) to actual or potential Lenders or other entities with whom any of the Insureds might be considering entering into any financial or business transaction; (4) to outside attorneys of any Party; (5) to external or internal auditors or accountants of any Party; (6) in any subsequent litigation, arbitration or other proceeding between the Parties, including but not limited to the Port Authority Litigation; (7) the New York State Department of Insurance; (8) as required, to the Internal Revenue Service, the Securities and Exchange Commission, or other governmental authority that properly requires disclosure by a Party hereto; and (9) as necessary, to comply with federal or state securities laws or public disclosure requirements.

   a.  In the event that a private litigant, by way of document request, interrogatory, subpoena, request under the Freedom of Information Act (5 U.S.C. Sec. 552) or similar state statute, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this paragraph 20, the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Stipulation prevents such disclosure. In the event that such private litigant seeks an Order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or government body requests or requires disclosure of anything protected by this paragraph 20, the Party from whom disclosure is sought shall give written notice to the other Parties in accordance with paragraph 23 as soon as reasonably practicable and in no event more than 5 days from receipt of the papers seeking the Order, and shall immediately provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate.

SWISS RE/IRI SETTLEMENT -- 24

CONFIDENTIAL

b.    Material protected by this paragraph 20 shall be deemed to fall within the protection afforded to compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

c.    Notwithstanding anything provided above in this paragraph 20, the Port Authority will be governed by the Port Authority's policy and procedures with respect to "Freedom of Information" to the extent that the above provisions are inconsistent with the Port Authority's policy and procedures with respect to "Freedom of Information."

21.    <u>Amendment</u>:  This Stipulation may not be amended, supplemented or modified except by a written instrument duly executed by the Parties.

22.    <u>Construction</u>:  Swiss Re, Swiss Re UK, and IRI and the Insureds have all participated in the drafting and negotiation of this Stipulation after consulting with counsel. Therefore, if any question of intent or interpretation arises, this Stipulation shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party solely by virtue of the authorship of any of the provisions of this Stipulation.

23.    <u>Notice</u>:  All notices or other communications that any Party desires or is required to give under this Stipulation shall be given in writing and shall be sent (i) by email and (ii) by first-class mail, hand-delivery or reputable express courier to the other Party or Parties and their counsel at the addresses noted below or such other addresses as a Party may designate for itself in writing from time to time:

**The Port Authority, 1 World Trade Center LLC and WTC Retail LLC:**

A. Paul Blanco
Chief Financial Officer
The Port Authority of New York and New Jersey
225 Park Avenue South
15th Floor
New York, New York 10003

SWISS RE/IRI SETTLEMENT -- 25

CONFIDENTIAL

Email: pblanco@panynj.gov

With a copy:

Darrell Buchbinder, Esq.
General Counsel
The Port Authority of New York and New Jersey
225 Park Avenue South
14th Floor
New York, New York 10003-1604

Email: dbuchbin@panynj.gov


**The Silverstein Insureds:**

Michael L. Levy
Chief Financial Officer
Silverstein Properties, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Email: mlevy@silvprop.com

With a copy to:

Marc Wolinsky, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

Email: mwolinsky@wlrk.com

**The Westfield Insureds:**

Peter Schwartz, Esq.
Westfield America, Inc.
11601 Wilshire Boulevard
12th Floor
Los Angeles, CA 90025

Email: PSchwartz@us.westfield.com

With a copy to:


SWISS RE/IRI SETTLEMENT -- 26

CONFIDENTIAL

WTCP 0258093

Peter K. Rosen, Esq.
Latham & Watkins, LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071

Email: Peter.Rosen@lw.com

**Swiss Re, Swiss Re UK and IRI:**

Markus U. Diethelm, Esq.
Member Executive Board, Group Chief
Legal Officer
Swiss Reinsurance Company
Mythenquai 50/60
Zurich, Switzerland 8022

Email: markusu_diethelm@swissre.com

With a copy to:

Barry R. Ostrager, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017

Email: bostrager@stblaw.com

24.    <u>Other Insurers:</u>

a.    If the Insureds enter into a settlement with any other insurer on the

World Trade Center Property Insurance Program that provides for a "Use of Settlement

Amount"-type provision or concept similar to paragraph 3, but with terms that, in the sole discre-

tion of Swiss Re and IRI, are more beneficial to that insurer than paragraph 3, the Parties to this

Stipulation shall amend paragraph 3 to this Stipulation so that this paragraph 3 is parallel to the

equivalent provision(s) in the other settlement. This provision applies solely with respect to pro-

visions in other settlements concerning the manner in which the settlement amount can be used

(<u>i.e.</u>, provisions parallel to those contained in paragraph 3 of this Stipulation) and has no applica-

CONFIDENTIAL

WTCP 0258094

tion, and provides no rights to Swiss Re and IRI, with respect to paragraph 3.s herein or with respect to provisions in other settlements concerning the amount or timing of the payment of the settlement amounts or concerning the manner in which settlement amounts are paid, including, for example, provisions concerning whether settlement amounts are paid pursuant to a letter-of-credit arrangement and whether any such letter-of-credit arrangement has provisions concerning the timing and manner in which such letter-of-credit may be drawn upon.

    b.    If the Insureds enter into a settlement with any other insurer on the World Trade Center Property Insurance Program that contains a "Stipulation Regarding the Port Authority Shortfall Claim"-type provision or concept similar to paragraph 11 but which allocates a percentage greater than 85% of that insurer's settlement amount to replacement costs for purposes of determining the Port Authority Shortfall Claim, the Parties to this Stipulation shall, in the sole discretion of Swiss Re and IRI, amend paragraph 11 to this Stipulation so that paragraph 11 is parallel to the equivalent provision in the other settlement.

    c.    If the Insureds, within five months after the Effective Date, enter into a settlement with Allianz with respect to Allianz's participation in the World Trade Center Property Insurance Program that contains an agreement as to the amount of uninsured or uncompensated loss suffered by the Insureds for purposes of subrogation and priority of recovery, then IRI will have the option, in its sole discretion, of having such agreed-upon amount of uninsured or uncompensated loss being deemed the amount of the Insureds' uninsured or uncompensated loss with respect to the World Trade Center Property for purposes of subrogation and priority of recovery as between IRI and the Insureds.

    d.    If the Insureds, within five months after the Effective Date, enter into a settlement with Allianz with respect to Allianz's participation in the World Trade Center

SWISS RE/IRI SETTLEMENT -- 28

CONFIDENTIAL

Property Insurance Program that contains an agreement as to a specific procedural mechanism for determining, as a factual matter, the amount of uninsured or uncompensated loss suffered by the Insureds for purposes of subrogation and priority of recovery, then IRI will have the option, in its sole discretion, of joining in that procedure. IRI's rights under this paragraph 24.d shall not be triggered by the Insureds entering into a settlement with Allianz that contains an agreement as to a specific procedural mechanism for resolving disputed policy interpretation issues and related legal issues with respect to issues of subrogation and priority of recovery under Allianz's coverage.

25. <u>Severability</u>: If any provision of this Stipulation, or any portion of any provision of this Stipulation, shall be declared illegal, invalid, null and void or unenforceable by any court or tribunal having jurisdiction thereof, such provision or portion thereof shall be deemed separate or apart from the remainder of this Stipulation, which shall remain in full force and effect.

26. <u>Headings</u>: Section headings contained herein are for the purpose of organization only, and shall not constitute a part of this Stipulation.

27. <u>Execution in Counterparts</u>: This Stipulation may be signed in counterparts, and a facsimile or electronically scanned copy of an executed signature page shall be as effective as an original. All fully executed copies shall be considered duplicate originals.

28. <u>Effective Date</u>: The "Effective Date" of this Stipulation shall be the date of the last signature set forth below.

CONFIDENTIAL

WTCP 0258096

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By: _____
    Name: Marboz Lary
    Its:   SVP
    Dated: 6/8/07

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By: _____
    Name:
    Its:
    Dated:

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")

By: _____
    Name:
    Its:
    Dated:

SWISS RE/IRI SETTLEMENT -- 30

CONFIDENTIAL

WTCP 0258097

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By:_____
  Name:
  Its:
  Dated:


WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By:_____
  Name: PETER SCHWARTZ
  Its: SR EX VP
  Dated: 6/8/07


WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")

By:_____
  Name:
  Its:
  Dated:


SWISS RE/IRI SETTLEMENT -- 30

CONFIDENTIAL

WTCP 0258098

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By:_____
   Name:
   Its:
   Dated:

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By:_____
   Name:
   Its:
   Dated:

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")
   By: The Port Authority of New York and
   New Jersey, its sole member

By:_____
   Name:  Michael B. François
   Its:    Director of Development
   Dated: June 8, 2007

SWISS RE/IRI SETTLEMENT -- 30

CONFIDENTIAL

WTCP 0258099

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By:_____
    Name:  Iran Engel
    Its:     Assistant Treasurer
    Dated:  June 8 , 2007


1 WORLD TRADE CENTER LLC
    By: The Port Authority of New York and
    New Jersey, its sole member

By:_____
    Name:  Michael B. Francois
    Its:     Director of Development
    Dated:  June   , 2007


SR INTERNATIONAL BUSINESS INSURANCE
CO. LTD., SWISS REINSURANCE CO. UK
LTD., AND INDUSTRIAL RISK INSURERS

By:_____
    Name:  Jacques Aigrain
    Its:     Chief Executive Officer,
             Swiss Reinsurance Company
    Dated:

SWISS RE/IRI SETTLEMENT -- 31

CONFIDENTIAL

WTCP 0258100

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY


By:_____
    Name:  Iran Engel
    Its:     Assistant Treasurer
    Dated:  June   , 2007


1 WORLD TRADE CENTER LLC
    By: The Port Authority of New York and
    New Jersey, its sole member

By:_____
    Name:  Michael B. Francois
    Its:     Director of Development
    Dated:  June 8, 2007


SR INTERNATIONAL BUSINESS INSURANCE
CO. LTD., SWISS REINSURANCE CO. UK
LTD., AND INDUSTRIAL RISK INSURERS


By:_____
    Name:  Jacques Aigrain
    Its:     Chief Executive Officer,
           Swiss Reinsurance Company
    Dated:


SWISS RE/IRI SETTLEMENT -- 31


CONFIDENTIAL

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By:_____
    Name:
    Its:
    Dated:


1 WORLD TRADE CENTER LLC

By:_____
    Name:
    Its:
    Dated:


SR INTERNATIONAL BUSINESS INSURANCE
CO. LTD., SWISS REINSURANCE CO. UK
LTD., AND INDUSTRIAL RISK INSURERS

By:_____
    Name:   Jacques Aigrain
    Its:     Chief Executive Officer,
          Swiss Reinsurance Company
    Dated:  June 8, 2007

CONFIDENTIAL

WTCP 0258102

# Exhibit 8 Intentionally Omitted.

Exhibit 8 is designated "Confidential" pursuant to the Confidentiality Agreement and Protective Order filed herein on February 5, 2004.  WTCP has sought, but not yet obtained, authorization from the designating person(s) to file Exhibit 8 with the Court in connection with this Motion.  If authorization from the designating person(s) cannot be obtained, WTCP will seek relief from the Court forthwith.

# EXHIBIT 9

## LONDON MARKET INSURERS AGREEMENT

This London Market Insurers Agreement (this "Agreement") is made and entered into between and among Silverstein Properties, Inc., Silverstein WTC Mgmt. Co. LLC, World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, Westfield WTC LLC, Westfield Corporation, Inc., Westfield America, Inc., The Port Authority of New York and New Jersey, UBS Warburg Real Estate Investments Inc., Wells Fargo Bank Minnesota, National Association, as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates Series 2001–WTC, under a Trust and Servicing Agreement dated August 21, 2001, and GMAC Commercial Mortgage Corporation, in its own right and in its capacity as Servicer under the Trust and Servicing Agreement dated as of August 21, 2001 (the foregoing insureds, mortgagees and/or loss payees referred to hereinafter as the "Insureds"), Certain Underwriters at Lloyd's, London syndicates numbered 2020, 33, 2027, 190, 1243, 1225, 376, 506, 79, 435, 1009, 1096, 2791, 2001, 1229, 2488, 2003, 623, 1212, 609 and 1003, Great Lakes Reinsurance (UK) plc, QBE International Insurance Ltd., Houston Casualty Company and Wurttembergische Versicherung AG (the foregoing insurers referred to hereinafter as the "London Market Insurers").

### WITNESSETH

WHEREAS, certain Insureds placed in the London Market during 2001 certain first-party insurance with respect to certain properties and appurtenances at the World Trade Center complex, which properties and appurtenances are described in net leases entered into between the

CONFIDENTIAL

Port Authority of New York and New Jersey and certain other Insureds (hereinafter the "Net Lease Properties");

WHEREAS, the London Market Insurers severally subscribed shares of one or more insurance placements (as set forth in Attachment A to this Agreement) (hereinafter the "London Placements") and, subject to and without waiving any individual London Market Insurer's position with respect to its several participation, are prepared to enter into this Agreement under all terms and conditions herein in order to respond to obligations under proofs of loss;

WHEREAS, the Net Lease Properties were physically damaged and lost on September 11, 2001, and the Insureds thereafter gave notice of loss to property insurers of the Net Lease Properties, including without limitation the London Market Insurers;

WHEREAS, certain Insureds submitted preliminary proofs of partial losses in connection with certain business income losses at the Net Lease Properties, and the London Market Insurers, among others, declined to accept those proofs as submitted but, under full reservations of rights, agreed to make cash advance payments subject to instruction letters from all Insureds (hereinafter the "Funding Payments");

WHEREAS, on November 7, 2001, certain Insureds submitted a preliminary proof of partial losses to the London Market Insurers and to other Net Lease Properties insurers seeking payment on an actual cash value basis (hereinafter "ACV") for the Net Lease Properties of at least a single occurrence limit of Three Billion Five Hundred Forty-Six Million, Eight Hundred Thousand Dollars (US$3,546,800,000.00), less the Funding Payments previously made to the Insureds as of that time (the "First ACV Proof");

-2-

WTCP 0257986

WHEREAS, the London Market Insurers responded to the First ACV Proof with a reservation of rights, neither accepting nor rejecting the proof, and sought production of supporting records, which certain Insureds undertook to provide;

WHEREAS, on January 15, 2002, certain Insureds filed suit against the London Market Insurers by way of counterclaims alleging rights to judicial declaration and recovery under the London Placements in an action styled SR International Business Insurance Co. Ltd. v. World Trade Center Properties, et al., C.A. No. 01 CV 9291 (JSM) (S.D.N.Y.) (hereinafter the "Coverage Action");

WHEREAS, the Coverage Action presents for judicial resolution a number of issues, including, without limitation, the issue of whether, as the London Market Insurers contend (and certain Insureds have disputed), they severally subscribed portions of the Net Lease Properties insurance on a WilProp 2000 policy, or whether, as certain Insureds contend (and the London Market Insurers have disputed), the London Market Insurers severally subscribed such insurance on a Travelers Indemnity Company policy (hereinafter the "Policy Dispute");

WHEREAS, on January 18, 2002, certain Insureds submitted a First Supplement to Preliminary Proof of Partial Losses No. 2, including materials supporting the First ACV Proof, also seeking ACV payment for the Net Lease Properties on a two-occurrence basis in the amount of Six Billion, Four Hundred Ninety-Seven Million Eight Hundred Eighty One Thousand Forty Five Dollars (US$6,497,881,045), less the Funding Payments previously made to the Insureds as of that time and, in addition, declaring the intention to seek replacement cost value when rebuilding took place, as well as business income losses during the period of rebuilding and after (hereinafter the "Second ACV Proof");

-3-

CONFIDENTIAL

WTCP 0257987

WHEREAS, on February 11, 2002, the London Market Insurers responded to the Second ACV Proof (i) by rejecting those parts of the Second ACV Proof that claimed two occurrences, that calculated ACV at the level submitted, and that purported to seek ACV and reserve replacement cost; and (ii) by reserving rights and seeking a reasonable opportunity to review and request additional details necessary to make an ACV calculation in accordance with the London Market Insurers' position with respect to the Policy Dispute;

WHEREAS, the London Market Insurers' ACV determination based on the WilProp 2000 wording is at this time sufficiently advanced that they have advised the Insureds of their intention to make a payment subject to the terms and conditions set forth herein, including, without limitation, the reservations of rights and limitations set forth herein;

WHEREAS, the Insureds are prepared to receive the London Market Insurers' payment subject to the terms and conditions set forth herein, including, without limitation, the reservations of rights and limitations set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and undertakings contained herein, and for good and valuable consideration and intending to be legally bound, the Parties to this Agreement hereby agree as follows:

1.    Defined Terms

In addition to those defined terms set forth elsewhere in this Agreement and incorporated herein by reference, the following terms hereinafter have the stated meaning whenever used in this Agreement:

-4-

CONFIDENTIAL

a.    "Silverstein" means:  Silverstein Properties, Inc., Silverstein WTC Mgmt. Co. LLC, World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC and 5 World Trade Center LLC.

b.    "Westfield" means:  Westfield Corporation, Inc., Westfield WTC LLC, and Westfield America, Inc.

c.    "Port Authority" means:  The Port Authority of New York and New Jersey.

d.    "Wells Fargo" means:  Wells Fargo Bank Minnesota, National Association (as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificate Series 2001-WTC).

e.    "GMACCM" means:  GMAC Commercial Mortgage Corporation (in its own right and in its capacity as Servicer under the Trust and Servicing Agreement between GMAC Commercial Mortgage Securities, Inc., GMACCM and Wells Fargo dated as of August 21, 2001).

f.    "UBS Warburg" means:  UBS Warburg Real Estate Investments Inc.

g.    "Great Lakes" means: Great Lakes Reinsurance (UK) plc.

h.    "QBE" means:  QBE International  Insurance Ltd. (Paris).

i.    "WURTT" means:  Wurttembergische Versicherung AG (London).

j.    "Lloyd's Syndicates" means:  underwriting syndicates at Lloyd's London numbered 2020, 33, 2027, 190, 1243, 1225, 376, 506, 79, 435, 1009, 1096, 2791, 2001, 1229, 2488, 2003, 623, 1212, 609 and 1003.

-5-

CONFIDENTIAL

k.    "Houston Casualty" means: Houston Casualty Company.

l.    "Parties" means collectively the Insureds and the London Market Insurers. The term "Party" refers to any of the foregoing individually.

m.    "Silverstein Property Insurance" means the first-party property insurance placed by the Insureds on the Net Lease Properties with an effective policy inception date of July 19, 2001, including but not limited to the participations of the London Market Insurers as shown on Attachment A.

n.    "London Market Insurers' Payment" means the amount, as set forth in Paragraph 4.a. hereof, that has been or will be paid by the London Market Insurers to the Insureds subject to and under this Agreement. Such amount is equal to the sum of the Prepayments (as hereinafter defined) and the amounts shown under the heading "London Market Insurers' Current Payment" in Attachment A to this Agreement.

o.    "Per Occurrence Limit" means Three Billion Five Hundred Forty Six Million Eight Hundred Thousand Dollars ($3,546,800,000).

2.    <u>ACV Calculations</u>

a.    By the calculation set forth in the First ACV Proof, the ACV for the Net Lease Properties is greater than the Per-Occurrence Limit of the Silverstein Property Insurance on a one-occurrence basis and, as set forth in the Second ACV Proof, when added to the Funding Payments, is above or near the Per-Occurrence Limit on a two-occurrence basis.

b.    By the London Market Insurers' calculation, the ACV for the Net Lease Properties is greater than the Per-Occurrence Limit of the Silverstein Property Insurance on the one-occurrence WilProp 2000 basis for which the London Market Insurers contend.

-6-

                                                      WTCP 0257990

3.    Reservations

a.    Except as expressly provided herein, the Parties reserve all of their respective positions, including, but not limited to, their positions with respect to the Policy Dispute and the Coverage Action. Neither this Agreement, nor the making or receipt of any portion of the London Market Insurers' Payment, is intended otherwise to admit, waive, prejudice or release any right, position, claim, defense, or other obligation.

b.    By way of illustration and not limitation, and without restricting the generality or application of Paragraph 3.a.:

(1)    The London Market Insurers expressly reserve the right to take the position that they underwrote on a WilProp 2000 policy, that the destruction of the Net Lease Properties constituted one occurrence, and that the unrejected part of certain Insureds' proofs to the London Market Insurers elects ACV; and

(2)    The Insureds expressly reserve the right to take the position that the London Placements were underwritten on a Travelers policy, that the destruction of the Net Lease Properties constituted multiple occurrences, and that the Insureds are entitled to ACV now and their replacement cost value at a later date.

4.    Payment Terms

a.    Subject to the foregoing, and net of the Prepayments (as hereinafter defined), the London Market Insurers will pay their several shares of the London Market Insurers' Payment to the Insureds. The shares of the London Market Insurers' Payment due hereafter from each London Market Insurer are shown under the heading "London Market Insurers' Current Payment" in Attachment A to this Agreement. The London Market Insurers' Current Payment

-7-

CONFIDENTIAL                                                                 WTCP 0257991

due hereafter from all London Market Insurers totals Seven Hundred Nineteen Million Six Hundred Sixty-One Thousand Eight Hundred Ninety-One Dollars and Twelve Cents (US $719,661,891.12). The London Market Insurers' Payment from all London Market Insurers totals Seven Hundred Thirty-One Million Seven Hundred Ninety-Three Thousand Eight Hundred Twenty-One Dollars and Thirty-Six Cents (US$731,793,821.36).

      b.     As determined and duly authorized by all Insureds (and any other mortgagees or loss payees known to them), the London Market Insurers' Payment shall be made by wire in same-day funds to the following account (or, if prior to the time at which payment is made, upon five days' actual notice delivered by facsimile from all of the Insureds to Ropes & Gray as provided in paragraph 9.d below, a subsequently designated account) (the "London Market Insurers' Payment Account"):

HSBC Bank USA
452 Fifth Avenue, New York
ABA No. 021-001-088
Acct Name: Issuer Services
Account No. 002-60016-1
Ref: WTC LLC et al. Escrow (10-877758)

      c.     Each London Market Insurer shall pay some or all of its several share of the London Market Insurers' Payment to the London Market Insurers' Payment Account after the Effective Date (as defined in Paragraph 9.b. below), but in no event more than thirty (30) days after delivery (by facsimile or mail) to Ropes & Gray of copies of signature pages of this Agreement executed by all Insureds (unless a longer period of time is specified in a writing provided by or on behalf of all Insureds).

      d.     The Insureds acknowledge that the following London Market Insurers have, prior to the date of this Agreement, previously made the following payments (the "Pre-

-8-

WTCP 0257992

payments") to the Insureds in response to the Insureds' request for funding under the Silverstein Property Insurance: Great Lakes ($9,706,605.24); Houston Casualty ($2,425,325.00). Except as set forth in the last sentence of this paragraph 4.d, the Prepayments shall be deemed for all purposes under this Agreement to be payments paid to the London Market Insurers' Payment Account pursuant to this Agreement during the time period specified in paragraph 4.c hereof. In no event shall the Prepayments be subject to the first sentence of paragraph 5.d hereof.

5.    Application

a.    Upon delivery of a payment to the London Market Insurers' Payment Account by a London Market Insurer, such London Market Insurer making such payment shall be fully, completely and forever released and discharged as to the amount of such payment received, except that this release and discharge shall no longer be effective as to a London Market Insurer up to the amount of any cash reimbursement or refund actually paid by or on behalf of the Insureds to, and actually received by, such London Market Insurer.

b.    Each of the Insureds hereby acknowledges and agrees that any London Market Insurer that, within the time period specified in paragraph 4.c hereof, pays 100% of its several share of the London Market Insurers' Payment to the London Market Insurers' Payment Account has, prior to the Effective Date, acted in good faith and, prior to the Effective Date, has not engaged in any unfair or improper action in connection with the investigation, adjustment, and handling of the First and Second ACV Proofs and cash advance requests from Insureds, and therefore is released as to liability for any interest, damages, fees, costs, expenses or recovery of any kind or description arising from or relating to such London Market Insurer's acts or failures to act prior to the Effective Date in connection with its payment of its several share of the Lon-

-9-

WTCP 0257993

don Market Insurers' Payment. This release is not affected by any reimbursement made pursuant to paragraph 5.e hereof.

c.      Except as expressly provided in paragraphs 5.a. and b. hereof, nothing in this Paragraph shall restrict or prejudice the rights of the Insureds to pursue any London Market Insurer with respect to any and all liability or other legal obligation, including, without limitation, recovery of additional occurrence limit(s) or amounts, payments, interest, consequential damages, fees, costs or expenses, recovery for any breach of this Agreement, or other recoveries of any kind or description.

d.      Upon receipt of funds into the London Market Insurers' Payment Account, the Insureds may make such agreements as they unanimously determine with respect to use of or withdrawal of such funds therefrom. The Insureds shall maintain a current written record (a "Record") of any withdrawal of funds from the London Market Insurers' Payment Account (a "Withdrawal"). Such Record shall specify the amount of each such Withdrawal, shall be signed by all of the Insureds and shall designate a "Responsible Payee" with respect to each such Withdrawal; provided, however, that in no event shall either UBS Warburg, GMACCM, Wells Fargo or the Port Authority be designated a Responsible Payee.

e.      If the trial court in the Coverage Action enters a final judgment determining amounts due and payable to the Insureds (the "Final Judgment"), and pursuant to such Final Judgment the highest combined ACV and business income loss then due and payable for one occurrence if found or, if more than one occurrence is found, for any single occurrence (the "Highest Occurrence") (excluding any interest on such amount) is less than US$3,546,800,000, then the Insureds shall reimburse (solely in the manner set forth in paragraph 5.f hereof) each London Market Insurer insuring above the US$1,500,000,000 level, as listed in the next sentence hereof,

-10-

to the extent that the amount, if any, that any such London Market Insurer has paid to the Insureds pursuant to this Agreement exceeds the amount that such London Market Insurer would otherwise have been obligated to pay the Insureds at that time pursuant to the Final Judgment with respect to the Highest Occurrence. The reimbursement described in the preceding sentence shall be made to the following London Market Insurers with respect to those placements and subscriptions shown in Attachment A as participating above US\$ 1,500,000,000: UF6235000 (Lloyd's Syndicates numbered 2791, 2001, 33, 376 and 1229); and UF6237500 (Lloyd's Syndicates numbered 2488, 623, 609, 1003/2003, 1212 and Württ.) Provided, however, that there shall in no event be any such reimbursement with respect to the following insurance placements and subscriptions shown on Attachment A as participating below US\$1,500,000,000: UF6234400 Houston Casualty); UF6234600 (Houston Casualty); UF6235100 (Great Lakes); UF6234700 (Lloyd's Syndicates numbered 2020, 33, 2027, 1243, 190, 1225, 79, 376, 506, Great Lakes and QBE); and UF6234800 (Lloyd's Syndicates numbered 435, 1009, 506 and 1096). Other than as expressly provided pursuant to this paragraph 5.e and paragraph 5.f hereof, there shall be no reimbursement of any amounts paid pursuant to this Agreement. Any reimbursement due to a London Market Insurer pursuant to this paragraph shall be due within 30 days after the date the Final Judgment is entered. In no event shall any reimbursement paid or due pursuant to this paragraph reduce or otherwise affect any amounts that may be due to any of the Insureds from any of the London Market Insurers with respect to any occurrence other than the Highest Occurrence.

        f.     In the event that any reimbursement of a London Market Insurer is required pursuant to paragraph 5.e hereof, such reimbursement (solely to the extent required by paragraph 5.e) shall be made in the following manner:

-11-

WTCP 0257995

(1)    First, if at the time such reimbursement is required there remains a balance of funds in the London Market Insurers' Payment Account, then such funds shall be used (solely to the extent necessary) to pay such reimbursement.

(2)    Second, if at the time such reimbursement is required the balance of funds in the London Market Insurers' Payment Account is not sufficient to pay fully such reimbursement, then such balance of funds shall be used in its entirety to pay such reimbursement, and the remainder of the reimbursement due shall be paid by the Responsible Payees severally and not jointly in proportion to the relative aggregate amounts of their designated Withdrawals.  In such instance, a copy of the Record described in paragraph 5.d hereof shall be provided to each London Market Insurer that is due reimbursement hereunder, no later than twenty days after entry of the Final Judgment.

g.    The Insureds agree to cooperate with the London Market Insurers in connection with reasonable requests for assistance in providing documentation for pursuing reinsurance recoveries.  The reasonable out-of-pocket costs of such assistance, including, without limitation, the cost of copying any documents, shall be paid by the London Market Insurers.

h.    Nothing in this Agreement shall be deemed to release or modify in any respect the obligations of any insurer not expressly identified herein.

6.    Subrogation

a.    The Insureds have been engaged in separate discussions with recovery counsel for certain of the London Market Insurers concerning terms on which subrogation may be pursued after any portion of the London Market Insurers' Payment has been made.  Nothing

-12-

    WTCP 0257996

in this Agreement affects or alters in any way the existence or substance of those discussions or any separate agreement the Parties may reach with respect to subrogation.

b.     The Parties expressly reserve and by entering into this Agreement do not waive any argument, claim, right, duty, or interest with respect to subrogation, including, without limitation, the right to pursue subrogation and the form and timing of any other recovery action.

7.     <u>Representations and Warranties</u>

a.     Silverstein, Westfield, the Port Authority, Wells Fargo, GMACCM, and UBS Warburg each severally and not jointly represents and warrants that:

(1)     To their knowledge, after diligent inquiry, they are collectively the only insureds under the London Placements and the only parties entitled to be named as payees or to receive any portion of the London Market Insurers' Payment;

(2)     The London Market Insurers' Payment Account is the correct account into which any payment of any portion of the London Market Insurers' Payment should be made; and

(3)     Any issue of allocation of any portion of the London Market Insurers' Payment among the Insureds is to be resolved by the Insureds alone, and the Insureds waive and release any claim that the London Market Insurers' Payment (or any part of it) should have been paid in whole or in part directly to one or more of them, individually or as a group, rather than to the London Market Insurers' Payment Account.

-13-

b.    Each respective Party executing this Agreement expressly represents and warrants that:

(1)    It is a corporation, limited liability company, or other business organization in good standing in its place of domicile, except as to the Port Authority, which represents that it is a body corporate and politic and a municipal corporate instrumentality of the State of New York and New Jersey created and existing by virtue of the Compact of April 30, 1921, made by and between those States and thereafter consented to by the Congress of the United States;

(2)    The execution of this Agreement is authorized by the Party on its own behalf and on behalf of all persons acting by, through or under its instruction;

(3)    The person executing this Agreement has the necessary and appropriate authority to do so.

8.    Effect of Agreement

a.    This Agreement is the free act and deed of parties of equal bargaining power.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law principles.  The Parties (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below), to the maximum extent permitted by applicable law) irrevocably and unconditionally submit to the jurisdiction of the United States District Court for the Southern District of New York (or, if such court shall not have jurisdiction of the relevant action, of New York State Supreme Court, County of New York), in connection with any proceedings commenced regarding this Agreement, and all Parties irrevocably submit to the jurisdiction of such courts for the de-

-14-

CONFIDENTIAL

termination of all issues in such proceedings, without regard to any principles of conflicts of laws, and irrevocably waive (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below), to the maximum extent permitted by applicable law) any objection to venue or inconvenient forum. "Port Authority Legislation" shall mean the concurrent legislation of the State of New York and the State of New Jersey set forth at Chapter 301 of the Laws of New York of 1950, as amended by Chapter 938 of the Laws of New York of 1974 (McKinney's Unconsolidated Laws §§7101-7112) and Chapter 204 of the Laws of New Jersey of 1951 (N.J.S.A. 32:1-157 to 32:1-168).

      b.     This Agreement is binding on and inures to the benefit of each Party hereto, and its respective successors, heirs and assigns. The Agreement may only be amended, changed, or discharged by a writing signed by a duly authorized representative of each of the Parties or their respective successors, heirs and assigns.

      c.     The rights and obligations under this Agreement may not be assigned by any Party without the prior written consent of all of the other Parties, which consent may not be unreasonably withheld; provided, however, that any Party may assign such rights and obligations in connection with a sale or other disposition of all or a material part of its assets, in which event the disposing Party shall require the purchaser, as a condition to any such sale or disposition, to assume in writing the obligations of the disposing Party under this Agreement. No such assignment or assumption shall relieve any of the other Parties of any obligation hereunder.

      d.     Except to the extent expressly provided herein, nothing in this Agreement shall be deemed or construed as an amendment, modification, or alteration of the London Placements.

-15-

CONFIDENTIAL

e.     Neither the Commissioners of the Port Authority, nor any director, officer, agent, manager, member, or employee of any of the Insureds, shall be held personally liable to any of the Parties hereto under any term or provision of this Agreement or because of its execution or because of any breach or alleged breach thereof.

9.     <u>Implementation</u>

a.     This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

b.     The effective date of this Agreement shall be the first date upon which this Agreement has been duly executed by all of the Parties hereto (as used herein, "Effective Date").

c.     The headings utilized in this Agreement are designed for the sole purpose of facilitating reference to the subject matters, and are to be disregarded when resolving any dispute concerning the meaning or interpretation of this Agreement.

d.     Notices directed to the respective Parties shall be sent by registered or certified mail, return receipt requested, to the following persons:

If to Silverstein Properties, Inc.,
    Silverstein WTC Mgmt. Co. LLC,
    World Trade Center Properties LLC,
    1 World Trade Center LLC,
    2 World Trade Center LLC,
    4 World Trade Center LLC, or
    5 World Trade Center LLC:

    Silverstein Properties, Inc.
    521 Fifth Avenue
    New York, New York  10175

    Attention:     Michael Levy

-16-

WTCP 0258000

With a copy to:

    Wachtell, Lipton, Rosen & Katz
    51 West 52nd Street
    New York, New York  10019

        Attention:    Meyer G. Koplow, Esq.
                    Adam O. Emmerich, Esq.

If to Westfield Corporation, Inc.,
    Westfield WTC LLC, or
    Westfield America, Inc.:

    Westfield America, Inc.
    11601 Wilshire Boulevard
    12th Floor
    Los Angeles, California  90025

        Attention:    Arthur E. Schramm, Jr.

With a copy to:

    Mayer, Brown, Rowe & Maw
    350 South Grand Avenue
    25th Floor
    Los Angeles, California  90071-1503

        Attention:    Peter K. Rosen, Esq.

           - and -

    Debevoise & Plimpton
    919 Third Avenue
    New York, New York 10022

        Attention:  Peter R. Schwartz, Esq.

If to the Port Authority of New York and New Jersey:

    The Port Authority of New York and New Jersey
    225 Park Avenue South
    New York, New York  10003

        Attention:    Charles F. McClafferty
                    Chief Financial Officer

CONFIDENTIAL                                            WTCP 0258001

With a copy to:

    The Port Authority of New York and New Jersey
    225 Park Avenue South
    New York, New York  10003
    Attention:    Jeffrey S. Green, Esq.
                General Counsel

If to Wells Fargo:

    Wells Fargo Bank Minnesota, National Association
    c/o GMAC Commercial Mortgage Corporation
    200 Witmer Road
    Horsham, Pennsylvania  19044

    Attention:    Maria Corpora-Buck, Esq.
                General Counsel

With a copy to:

    Heller Ehrman White & McAuliffe
    40th Floor
    601 South Figueroa
    Los Angeles, California  90017

    Attention:    Nancy Sher Cohen, Esq.
                Stephen N. Goldberg, Esq.

       - and -

    Cadwalader, Wickersham & Taft
    100 Maiden Lane
    New York, New York 10038

    Attention:    William P. McInerney, Esq.

If to GMAC Commercial Mortgage Corporation:

    GMAC Commercial Mortgage Corporation
    200 Witmer Road
    Horsham, Pennsylvania  19044

    Attention:    Maria Corpora-Buck, Esq.
                General Counsel

CONFIDENTIAL          WTCP 0258002

With a copy to:

    Heller Ehrman White & McAuliffe
    40th Floor
    601 South Figueroa
    Los Angeles, California  90017

    Attention:    Nancy Sher Cohen, Esq.
                 Stephen N. Goldberg, Esq.

       - and -

    Cadwalader, Wickersham & Taft
    100 Maiden Lane
    New York, New York 10038

    Attention:    William P. McInerney, Esq.

If to UBS Warburg:

    UBS Warburg Real Estate Investments Inc.
    1285 Avenue of the Americas
    New York, New York  10019

    Attention:    Robert W. Pettinato, Jr.

With a copy to:

    Covington & Burling
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C.  20004-2401

    Attention:    Mitchell F. Dolin, Esq.

       - and -

    Kaye Scholer LLP
    425 Park Avenue
    New York, New York  10022

    Attention:    Louis J. Hait, Esq.

-19-

CONFIDENTIAL           WTCP 0258003

If to London Market Insurers:

> Xchanging Claims Service
> One Lime Street
> London EC3M 7HA, U.K.
>
> Attention:    Robin V. Easton
>
>      - and -
>
> Great Lakes Reinsurance (UK) plc.
> 154 Fenchurch Street
> London EC3M 6JJ, U.K.
>
> Attention:  Edward Jaggers

With a copy to:

> Ropes & Gray
> One International Place
> Boston, Massachusetts  02110-2624
>
> Attention:    Kenneth W. Erickson, Esq.
>                     Robert A. Skinner, Esq.

Or to such other person or address as the listed person may specify in a written notice duly given

to all listed persons for notice in the manner specified in this paragraph 9.d.

-20-

CONFIDENTIAL                                                                      WTCP 0258004

IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Agreement on the date shown below:

SILVERSTEIN PROPERTIES, INC.

Date:_____  By:_____
                               Name:
                               Title:

SILVERSTEIN WTC MGMT. CO. LLC

Date:_____  By:_____
                               Name:
                               Title:

WORLD TRADE CENTER PROPERTIES LLC

Date:_____  By:_____
                               Name:
                               Title:

1 WORLD TRADE CENTER LLC

Date:_____  By:_____
                               Name:
                               Title:

2 WORLD TRADE CENTER LLC

Date:_____  By:_____
                               Name:
                               Title:

-21-

CONFIDENTIAL                                    WTCP 0258005

4 WORLD TRADE CENTER LLC

Date:_____    By:_____
                                     Name:
                                     Title:

5 WORLD TRADE CENTER LLC

Date:_____    By:_____
                                     Name:
                                     Title:

WESTFIELD CORPORATION, INC.

Date:_____    By:_____
                                     Name:
                                     Title:

WESTFIELD WTC LLC

Date:_____    By:_____
                                     Name:
                                     Title:

WESTFIELD AMERICA, INC.

Date:_____    By:_____
                                     Name:
                                     Title:

-22-

4 WORLD TRADE CENTER LLC

Date:_____          By:_____
                                      Name:
                                      Title:

5 WORLD TRADE CENTER LLC

Date:_____          By:_____
                                      Name:
                                      Title:

WESTFIELD CORPORATION, INC.

Date:_____          By: _____
                                      Name: Elizabeth P. Westman
                                      Title:        Secretary

WESTFIELD WTC LLC

Date:_____          By: _____
                                      Name: Elizabeth P. Westman
                                      Title:        Secretary

WESTFIELD AMERICA, INC.

Date:_____          By: _____
                                      Name: Elizabeth P. Westman
                                      Title:        Secretary

-22-

CONFIDENTIAL                                      WTCP 0258007

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____    By: _____
                                       Name:  Bruce D. Bohlen
                                       Title:   Treasurer

GMAC COMMERCIAL MORTGAGE CORPO-
RATION

Date:_____    _____

By GMAC Commercial Mortgage Corporation, in
its own right and as Servicer for Wells Fargo Bank
Minnesota, National Association, Trustee, under a
Trust and Servicing Agreement dated August 21,
2001

UBS WARBURG REAL ESTATE INVEST-
MENTS INC.

Date:_____    By:_____
                                       Name:
                                       Title:

                                  and

Date:_____    By:_____
                                       Name:
                                       Title:

-23-

CONFIDENTIAL                                    WTCP 0258008

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____  By:_____
                                   Name:
                                   Title:

GMAC COMMERCIAL MORTGAGE CORPO-
RATION

Date:_____

By: GMAC Commercial Mortgage Corporation, in
its own right and as Servicer for Wells Fargo Bank
Minnesota, National Association, Trustee, under a
Trust and Servicing Agreement dated August 21,
2001

Name:  Mark E. McCool
Title:  Senior Vice President

UBS  WARBURG  REAL  ESTATE  INVEST-
MENTS INC.

Date:_____  By:_____
                                   Name:
                                   Title:

                               and

Date:_____  By:_____
                                   Name:
                                   Title:

-23-

CONFIDENTIAL                                  WTCP 0258009

09/25/2002    10:24    COVINGTON & BURLING 10WEST → 912124032000              NO.170    P03
09/25/02  08:51 FAX 212 713 3106        PW                                    @002

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY


Date:_____    By:_____
                                      Name:
                                      Title:

GMAC COMMERCIAL MORTGAGE CORPO-
RATION


Date:_____    _____

                                  By GMAC Commercial Mortgage Corporation, in
                                  its own right and as Servicer for Wells Fargo Bank
                                  Minnesota, National Association, Trustee, under a
                                  Trust and Servicing Agreement dated August 21,
                                  2001

                                  UBS WARBURG REAL ESTATE INVEST-
                                  MENTS INC.


Date:  September 25, 2002         By:_____
                                      Name:   Robert Pettinato
                                      Title:

                                  and


Date:  September 25, 2002         By:_____
                                      Name:   Brad Cohen
                                      Title:


-23-

CONFIDENTIAL                                    WTCP 0258010

WELLS FARGO BANK MINNESOTA, NA-
TIONAL ASSOCIATION

Date:_____

By: GMAC Commercial Mortgage Corporation, as
Servicer for Wells Fargo Bank Minnesota, National
Association, Trustee, under a Trust and Servicing
Agreement dated August 21, 2001

Name: Mark E. McCool
Title:  Senior Vice President

LONDON MARKET INSURERS

Date:_____

By:_____
    Name:    Kenneth W. Erickson
    Title:    Partner, Ropes & Gray

As agent solely for the purpose of executing this
Agreement on behalf of the London Market Insurers
as defined herein

-24-

WTCP 0258011

WELLS FARGO BANK MINNESOTA, NA-
TIONAL ASSOCIATION

Date:_____

_____

By GMAC Commercial Mortgage Corporation, as
Servicer for Wells Fargo Bank Minnesota, National
Association, Trustee, under a Trust and Servicing
Agreement dated August 21, 2001

LONDON MARKET INSURERS

Date:_____

By:_____
    Name:    Kenneth W. Erickson
    Title:     Partner, Ropes & Gray

As agent solely for the purpose of executing this
Agreement on behalf of the London Market Insurers
as defined herein

-24-

CONFIDENTIAL

**ATTACHMENT A -- LONDON MARKET INSURERS AGREEMENT**

| Layer | Size of Layer in Dollars | London Market Insurers' Participation in Layer | Breakdown of London Market Insurers' Participation | London Market Insurers' Current Payment | Amounts Previously Paid |
|---|---|---|---|---|---|
| **10M xs Deduct. (UF6234400)** | 10,000,000 | | | | |
| Total London Participation | 400,000 | 4.00000% | | | |
| Houston Casualty | | | 100.0000% | $400,000.00 | $400,000.00 |
| | | | 100.0000% | $0.00 | |
| | | | | | |
| **25M xs 50M (UF6234600)** | 25,000,000 | | | | |
| Total London Participation | 2,025,325 | 8.10130% | | | |
| Houston Casualty | | | 100.0000% | $2,025,325.00 | $2,025,325.00 |
| | | | 100.0000% | $0.00 | |
| | | | | | |
| **450M xs 50M (UF6235100)** | 450,000,000 | | | | |
| Total London Participation | 18,000,000 | 4.00000% | | | |
| Great Lakes | | | 100.0000% | $18,000,000.00 | $9,706,605.24 |
| | | | 100.0000% | $8,293,394.76 | |
| | | | | | |
| **500M xs 500M (UF6234700)** | 500,000,000 | | | | |
| Total London Participation | 340,000,000 | 68.00000% | | | |
| 2020 | | | 18.3823% | $62,499,820.00 | |
| 33 | | | 24.2647% | $82,499,980.00 | |
| 2027 | | | 14.7059% | $50,000,060.00 | |
| 1243 | | | 6.6177% | $22,500,180.00 | |
| 190 | | | 14.7059% | $50,000,060.00 | |
| 1225 | | | 2.9412% | $10,000,080.00 | |
| 79 | | | 1.4706% | $5,000,040.00 | |
| 376 | | | 5.1470% | $17,499,800.00 | |
| 506 | | | 2.2059% | $7,500,060.00 | |
| Great Lakes | | | 5.8823% | $19,999,820.00 | |
| QBE | | | 3.6765% | $12,500,100.00 | |
| | | | 100.0000% | $340,000,000.00 | |
| | | | | | |
| **500M xs 1,000M (UF6234800)** | 500,000,000 | | | | |
| Total London Participation | 92,000,000 | 18.40000% | | | |
| 435 | | | 46.5116% | $42,790,672.00 | |
| 1009 | | | 23.2558% | $21,395,336.00 | |
| 506 | | | 6.9768% | $6,418,656.00 | |
| 1096 | | | 23.2558% | $21,395,336.00 | |
| | | | 100.0000% | $92,000,000.00 | |
| | | | | | |
| **767M xs 2,493M (UF6235000)** | 767,000,000 | 90.3696% of | | | |
| Total London Participation | 151,144,496.28 | 21.80593% | | | |
| 2791 | | | 29.3701% | $49,121,927.84 | |
| 2001 | | | 29.3701% | $49,121,927.84 | |
| 33 | | | 15.8147% | $26,450,320.30 | |
| 376 | | | 6.7777% | $11,335,803.77 | |
| 1229 | | | 9.0370% | $15,114,516.53 | |
| | | | 90.3696% | $151,144,496.28 | |
| | | | | | |
| **188,564,706 xs 3,358,235,294 (UF6237500)** | 188,564,706 | | | | |
| Total London Participation | 128,224,000 | 68.00000% | | | |
| 2488 | | | 33.0033% | $42,318,151.42 | |
| 623 | | | 19.8019% | $25,390,788.27 | |
| 609 | | | 5.6105% | $7,194,007.52 | |
| 1003/2003 | | | 23.1023% | $29,622,693.17 | |
| 1212 | | | 7.9208% | $10,156,366.60 | |
| Wurtt | | | 10.5612% | $13,541,993.10 | |
| | | | 100.0000% | $128,224,000.08 | |
| | | | | | |
| Totals | | | | $719,661,891.12 | $12,131,930.24 |
| | | | | | |
| Total London Market Insurers' Payment: | | | | $731,793,821.36 | |

CONFIDENTIAL

# EXHIBIT 10

April 1, 2003

**BY FACSIMILE**

Federal Insurance Company
c/o Cozen O'Connor
1900 Market Street
Philadelphia, Pennsylvania  19103-3508

Attention:  Jay M. Levin, Esq.

|  |  |  |
|---|---|---|
| Re: | Insured: | Silverstein Properties, Inc., et al. |
|  | Location: | World Trade Center Buildings 1, 2, 4, and 5 |
|  | Date of Loss: | September 11, 2001 |

Ladies and Gentlemen:

This letter agreement (this "Letter Agreement") will confirm the request of 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC (the "Silverstein Insureds") and Westfield WTC LLC (the "Westfield Insured" and together with the Silverstein Insureds, the "Silverstein/Westfield Insureds") to Federal Insurance Company ("Federal"), and the authorization by the other undersigneds (all of whom together with the Silverstein/Westfield Insureds, the "Insureds"), that funds in the amount of $254,307,300 (two hundred fifty four million three hundred seven thousand three hundred dollars) to be paid by Federal to the Insureds under insurance coverage provided by Federal to the Insureds (the "Federal Coverage") (without prejudice to the positions of any of the Insureds or of Federal as to the nature or characterization of such payment, which are not agreed or waived in any manner hereby), should be wired to the account noted below:

Citibank, N.A.
New York, NY
ABA 021000089
Credit:
PBG Concentration Account #37432464
Further Credit:
Citibank, N.A. as Escrow Agent for
1 World Trade Center LLC et al.
Account # 361325
Attention:  John P. Howard

This will also confirm the agreement of the Insureds, that the amounts to be paid in reliance on the instructions set forth herein (and not reimbursed or otherwise repaid to Federal) shall reduce the amount of Federal's liability under the Federal Coverage and they acknowledge that Federal is making the payment discussed above in reliance on this representation.

Upon receipt of funds into the escrow account identified above (the "Federal Payment Account"), the Insureds may make such agreements as they unanimously determine

W/724307v8

CONFIDENTIAL                                    WTCP 0258023

Page 2

with respect to use of or withdrawal of such funds therefrom. The Insureds shall maintain a current written record (a "<u>Record</u>") of any withdrawal of funds from the Federal Payment Account (a "<u>Withdrawal</u>"). It is understood and agreed that such Record shall specify the amount of each such Withdrawal, shall be signed by all of the Insureds and shall designate a "<u>Responsible Reimbursement Party</u>" with respect to each such Withdrawal (or portion of such Withdrawal), which in each such case shall be either the Silverstein Insureds or the Westfield Insured, as the case may be, but not any of the other Insureds. It is further understood and agreed that with respect to each such Withdrawal, one or more Responsible Reimbursement Parties shall be designated such that the aggregate amounts for which a Responsible Reimbursement Party is designated equals the entire amount of such Withdrawal, regardless of whether all or any portion of the Withdrawal is paid directly to any person other than a Responsible Reimbursement Party.

This will also confirm the agreement of the undersigned that:

1. in the event that a final judgment not subject to appeal (or other judgment by its terms requiring payment at the time (other than the posting of a bond), and not then subject to stay or other similar restraint) (a "final judgment") is entered determining that the total losses suffered by the Insureds and owing by Federal in respect of or arising out of the Federal Coverage do not exceed the amount paid hereunder, then the Silverstein Insureds and/or the Westfield Insured (as the case may be) (but not any of the other Insureds) shall be responsible to repay to Federal (in the manner set forth below) any amounts received hereunder but judicially determined by such final judgment to be in excess of the total amounts owing by Federal at that time (including, without limitation, any costs, interest or other amounts not otherwise expressly waived in this Letter Agreement) in respect of or arising out of the Federal Coverage; and

2. Federal shall be responsible to pay to the Insureds under the Federal Coverage any amounts (including, without limitation, any costs, interest or other amounts not otherwise expressly waived in this Letter Agreement) in excess of those paid hereunder that are judicially determined by a final judgment to be owing in respect of or arising out of the Federal Coverage (including, without limitation, should Federal be determined to be liable on a basis under which the losses sustained are determined to have arisen from more than one occurrence).

In the event that any reimbursement of Federal is required pursuant to paragraph 1 above, such reimbursement shall be made in the following manner:

First, if at the time such reimbursement is required there remains a balance of funds resulting from the Federal Coverage in the Federal Payment Account, then such funds shall be used (solely to the extent necessary) to pay such reimbursement.

Second, if at the time such reimbursement is required the balance of funds in the Federal Payment Account is not sufficient to pay fully such reimbursement, then such balance of funds shall be used in its entirety to pay such reimbursement, and the remainder of the reimbursement due shall be paid by the Responsible Reimbursement Parties, respectively, severally and not jointly in proportion to the relative aggregate amounts of their respective designations

Page 3

with respect to Withdrawals (it being agreed that each of the Silverstein Insureds shall be jointly and severally liable with respect to any reimbursement due to Federal pursuant to the terms of this paragraph for which any Silverstein Insured has been designated as the Responsible Reimbursement Party).

Each of the Insureds hereby acknowledges and agrees that if within 10 calendar days of the date of this letter, Federal pays the amount specified herein to the account specified herein, Federal shall be released as to liability for any interest arising from or relating to such payment that any Insured might otherwise claim was owed by Federal in respect of such payment. This will also confirm that the request, direction and authorization thereof reflected in this Letter Agreement, any payment contemplated hereby by Federal, and the corresponding receipt and acceptance of such payment by any or all of the Insureds shall all be without prejudice or admission of any kind to or by any party, except as expressly provided in the foregoing sentence, including, without limitation, any matter under or relating to the Federal Coverage or the insurance thereunder contracted for, and nothing contained in or contemplated by this Letter Agreement is intended to constitute, or should be construed as, a waiver or release by any party having an insurable interest under the Federal Coverage, or by Federal, of any of such party's rights or positions, or of any obligations, under the Federal Coverage, or otherwise, including, without limitation, in connection with any litigation, arbitration, proceeding or dispute, except that the Insureds hereby waive and release any claim that the payment to be made to the above-referenced account pursuant to this instruction should have been paid in whole or in part directly to one or more of the Insureds, individually or as a group, rather than to the above-referenced account, and they state that any issue of allocation of such payments to the above-referenced account among the Insureds will be resolved among themselves. Notwithstanding the foregoing, upon receipt of funds from Federal into the Federal Payment Account in accordance with the terms of this letter, the Insureds waive, release and agree not to plead in any court or other proceeding any claim that Federal has not made such payment. Except as expressly provided in the first sentence of this paragraph, this Letter Agreement is not intended to constitute, nor should it be construed as, a waiver or release of any rights of any party to this Letter Agreement to recover costs, interest or other amounts arising in connection with any litigation, arbitration, proceeding or dispute relating to any matter under or relating to the Federal Coverage or the insurance thereunder contracted for to which such party may otherwise be entitled under applicable law; provided, however, that only the Silverstein Insureds and/or the Westfield Insured (as the case may be) (but not any of the other Insureds) shall be responsible to repay to Federal (in the manner set forth above) any amounts received hereunder but judicially determined by a final judgment to be in excess of the total amounts owing by Federal at that time (including, without limitation, any costs, interest or other amounts not otherwise expressly waived in this Letter Agreement) in respect of or arising out of the Federal Coverage.

This will also confirm that the Insureds confirm that, to their knowledge, after diligent inquiry, they are the only parties entitled to be named under the Federal Coverage as payees of the requested payment hereunder.

No amendment or waiver of any provision of this Letter Agreement, nor any consent to any departure herefrom, shall in any event be effective unless the same shall be in writing and signed by the party to be charged therewith, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

CONFIDENTIAL

Page 4

        No failure on the part of any party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

        Any notice, demand or other communication hereunder to any of the undersigned shall be in writing and sent by facsimile or delivered in person or sent by courier service providing for verification of delivery, in each case in care of counsel for such party in the litigation presently pending with respect to the Federal Coverage.

        Each respective party executing this Letter Agreement expressly represents and warrants that the execution of this Letter Agreement is authorized by the party on its own behalf and on behalf of all persons acting by, through or under its instruction, and the person executing this Letter Agreement has the necessary and appropriate authority to do so. This Letter Agreement is the free act and deed of parties of equal bargaining power. This Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law principles. This Letter Agreement is binding on and inures to the benefit of each party hereto, and its respective successors, heirs and assigns. The rights and obligations under this Letter Agreement may not be assigned by any party without the prior written consent of all of the other parties, which consent may not be unreasonably withheld; provided, however, that any party may assign such rights and obligations in connection with a sale or other disposition of all or a material part of its assets, in which event the disposing party shall require the purchaser, as a condition to any such sale or disposition, to assume in writing the obligations of the disposing party under this Letter Agreement, including, without limitation, any reimbursement obligations under this Letter Agreement of such disposing party. No such assignment or assumption shall relieve any of the other parties of any obligation hereunder. This Letter Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

        The parties to this Letter Agreement (and solely with respect to The Port Authority of New York and New Jersey (the "Port Authority"), subject to the terms of the Port Authority Legislation (as defined below), to the maximum extent permitted by applicable law) irrevocably and unconditionally submit to the jurisdiction of the United States District Court for the Southern District of New York (or, if such court shall not have jurisdiction of the relevant action, of New York State Supreme Court, County of New York), in connection with any proceedings commenced regarding this Letter Agreement, and all such parties irrevocably submit to the jurisdiction of such courts for the determination of all issues in such proceedings, without regard to any principles of conflicts of laws, and irrevocably waive (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below), to the maximum extent permitted by applicable law) any objection to venue or inconvenient forum. The parties to this Letter Agreement hereby covenant to use their reasonable best efforts to have any dispute arising hereunder adjudicated in connection with the action styled SR International Business Insurance Co. Ltd. v. World Trade Center Properties, et al., C.A. No. 01 CV 9291 (JSM) (S.D.N.Y.). "Port Authority Legislation" shall mean the concurrent legislation of the State of New York and the State of New Jersey set forth at Chapter 301 of the Laws of New York of 1950, as amended by Chapter 938 of the Laws of New York of 1974 (McKinney's Unconsoli-

Page 5

dated Laws §§7101-7112) and Chapter 204 of the Laws of New Jersey of 1951 (N.J.S.A. 32:1-157 to 32:1-168).

As always, we appreciate your cooperation and assistance in this matter.

Sincerely,

**World Trade Center Properties LLC**

By: Silverstein WTC Properties LLC,
its manager

By: Silverstein WTC LLC, its manager

By: _____
Name:  Michael Levy
Title:   Vice President

**1 World Trade Center LLC**

By: _____
Name:  Michael Levy
Title:   Vice President

**4 World Trade Center LLC**

By: _____
Name:  Michael Levy
Title:   Vice President

**Silverstein Properties, Inc.**

By: _____
Name:  Michael Levy
Title:  Chief Financial Officer

**Silverstein WTC Mgmt. Co. LLC**

By: _____
Name:  Michael Levy
Title:   Vice President

**2 World Trade Center LLC**

By: _____
Name:  Michael Levy
Title:   Vice President

**5 World Trade Center LLC**

By: _____
Name:  Michael Levy
Title:   Vice President

CONFIDENTIAL

Page 6

**Westfield WTC LLC**

By:  Westfield WTC Holding LLC,
         sole member

By:  Westfield America Limited Partnership,
         its managing member

By:  Westfield America, Inc.,
         its general partner

By: _____
       Name:  PETER SCHWARTZ
       Title:  Senior Executive Vice President

**The Port Authority of New York and
     New Jersey**

By: _____
       Name:
       Title:

**Westfield Corporation, Inc.**

By: _____
       Name:  PETER SCHWARTZ
       Title:  Senior Executive Vice President

**Westfield America, Inc.**

By: _____
       Name:  PETER SCHWARTZ
       Title:  Senior Executive Vice President

**Wells Fargo Bank Minnesota, National As-
sociation, As Trustee for the registered cer-
tificateholders of GMAC Commercial
Mortgage Securities, Inc. Mortgage Pass-
Through Certificates, Series 2001-WTC,
under a Trust and Servicing Agreement
dated as of August 21, 2001 ("TSA")**

By:  GMAC Commercial Mortgage Corpo-
        ration, Servicer under the TSA

By: _____
       Name:
       Title:

**UBS Warburg Real Estate Investments Inc.**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

WTCP 0258028

Page 6

**Westfield WTC LLC**

By:  Westfield WTC Holding LLC,
       sole member

By:  Westfield America Limited Partnership,
       its managing member

By:  Westfield America, Inc.,
       its general partner

By:_____
    Name:
    Title:

**The Port Authority of New York and
   New Jersey**

By:_____
    Name:  Bruce D. Bohlen
    Title:    Treasurer

**Westfield Corporation, Inc.**

By:_____
    Name:
    Title:

**Westfield America, Inc.**

By:_____
    Name:
    Title:

**Wells Fargo Bank Minnesota, National As-
sociation, As Trustee for the registered cer-
tificateholders of GMAC Commercial
Mortgage Securities, Inc. Mortgage Pass-
Through Certificates, Series 2001-WTC,
under a Trust and Servicing Agreement
dated as of August 21, 2001 ("TSA")**

By:  GMAC Commercial Mortgage Corpo-
      ration, Servicer under the TSA

By:_____
    Name:
    Title:

**UBS Warburg Real Estate Investments Inc.**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Payment Direction Letter - Federal

CONFIDENTIAL

Page 6

**Westfield WTC LLC**

By: Westfield WTC Holding LLC,
      sole member

By: Westfield America Limited Partnership,
      its managing member

By: Westfield America, Inc.,
      its general partner

By:_____
    Name:
    Title:

**The Port Authority of New York and
    New Jersey**

By:_____
    Name:
    Title:

**Westfield Corporation, Inc.**

By:_____
    Name:
    Title:

**Westfield America, Inc.**

By:_____
    Name:
    Title:

**Wells Fargo Bank Minnesota, National Association, As Trustee for the registered certificateholders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001-WTC, under a Trust and Servicing Agreement dated as of August 21, 2001 ("TSA")**

By: GMAC Commercial Mortgage Corporation, Servicer under the TSA

By:_____
    Name: *John F. Weaver*
    Title: *Executive Vice President*

**UBS Warburg Real Estate Investments Inc.**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

CONFIDENTIAL

Page 6

**Westfield WTC LLC**

By: Westfield WTC Holding LLC,
      sole member

By: Westfield America Limited Partnership,
      its managing member

By: Westfield America, Inc.,
      its general partner

By:_____
      Name:
      Title:

**The Port Authority of New York and
New Jersey**

By:_____
      Name:
      Title:

Wells Fargo Bank Minnesota, National As-
sociation, As Trustee for the registered cer-
tificateholders of GMAC Commercial
Mortgage Securities, Inc. Mortgage Pass-
Through Certificates, Series 2001-WTC,
under a Trust and Servicing Agreement
dated as of August 21, 2001 ("TSA")

By: GMAC Commercial Mortgage Corpo-
      ration, Servicer under the TSA

By:_____
      Name:
      Title:

**Westfield Corporation, Inc.**

By:_____
      Name:
      Title:

**Westfield America, Inc.**

By:_____
      Name:
      Title:

UBS Warburg Real Estate Investments Inc.

By:_____
      Name:
      Title:

By:_____
      Name:
      Title:

CONFIDENTIAL

WTCP 0258031

Page 7

Confirmed and Agreed as of the date first above written:

Federal Insurance Company

By: _Eric TKrantz_____
Name: ERIC T. KRANTZ
Title: SR. VICE-PRESIDENT

CONFIDENTIAL

# EXHIBIT 11

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Settlement Agreement and Release") is made and entered into between Silverstein Properties, Inc., Silverstein WTC Mgmt. Co. LLC, World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, Westfield WTC LLC, Westfield Corporation, Inc., Westfield America, Inc., The Port Authority of New York and New Jersey, UBS Warburg Real Estate Investments Inc., Wells Fargo Bank Minnesota, National Association, as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001 - WTC, under a Trust and Servicing Agreement dated as of August 21, 2001, and GMAC Commercial Mortgage Corporation, in its own right and in its capacity as Servicer under the Trust and Servicing Agreement dated as of August 21, 2001 (collectively, the "Insureds"), on the one hand, and ACE Bermuda Insurance Limited ("ACE Bermuda"), on the other hand.

### WITNESSETH:

WHEREAS, on July 18, 2001, ACE Bermuda issued a binder bearing policy number SWTC 00274P (the "Binder") to the Insureds for excess property insurance coverage with respect to various properties located at the World Trade Center Complex, including without limitation One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center and all common areas and sub-grade levels including the mall and retail level, plaza, sidewalks, concrete structures and pots, plants and shrubs, parking areas, loading docks and ramps and pedestrian walkways and the transmission tower or antennae atop One World Trade Center (the "World Trade Center Complex"); and

CONFIDENTIAL

WHEREAS, the Binder provided that the policy form would follow in every way, with any exceptions noted therein, the WilProp manuscript policy form previously submitted by the broker for the Insureds to ACE Bermuda (the "WilProp Form"); and

WHEREAS, on July 20, 2001, ACE Bermuda issued a revised binder (the "Revised Binder"), also bearing policy number SWTC 00274P, to the Insureds with respect to the World Trade Center Complex; and

WHEREAS, the Revised Binder provided that the policy form would follow in every way, with any exceptions noted therein, the WilProp Form; and

WHEREAS, the WilProp Form defines "occurrence" to mean "all losses or damages that are attributable directly or indirectly to one cause or to one series of similar causes", and provides that "all such losses will be added together and the total amount of such losses will be treated as one occurrence irrespective of the period of time or area over which such losses occur;" and

WHEREAS, on September 11, 2001, two separate aircraft crashed into One World Trade Center and Two World Trade Center respectively, causing a fire and explosion in each of those buildings, and ultimately the collapse of each of those buildings and the destruction of the remainder of the World Trade Center Complex; and

WHEREAS, on September 24, 2001, the Insureds' broker transmitted to ACE Bermuda the policy issued by the primary insurer for the WTC Complex, the Travelers Indemnity Company (the "Travelers Policy"); and

-2-

CONFIDENTIAL

WHEREAS, on October 29, 2001, ACE Bermuda sent a letter rejecting the Travelers Policy and issued its own policy no. SWTC 00274P which, among other things, identified the WilProp Form as the "followed policy" and adopted the WilProp Form's definition of "occurrence"; and

WHEREAS, ACE Bermuda contends, among other things, that its insurance agreement is set forth in the WilProp Form and/or its policy no. SWTC 00274P, and pursuant thereto, (i) the events of September 11, 2001 at the World Trade Center Complex constitute a single "occurrence"; (ii) ACE Bermuda has no obligation to pay its "per occurrence" share of the actual cash value of the World Trade Center Complex unless the Insureds decide not to repair, rebuild or replace the damaged property; (iii) ACE Bermuda has no obligation to pay its "per occurrence" share of the replacement cost of the World Trade Center Complex to the Insureds unless and until the Insureds incur fees, costs, charges or expenses to rebuild; and (iv) any dispute must be submitted to binding arbitration in London, England; and

WHEREAS, certain of the Insureds intend to replace the damaged property but such replacement will reasonably require a number of years to be accomplished such that if ACE Bermuda's contention is correct, replacement cost payments would not be due until years in the future; and

WHEREAS, certain of the Insureds contend, among other things, that notwithstanding the terms of the Binder, the Revised Binder and policy no. SWTC 00274P, ACE Bermuda's insurance agreement should be deemed to follow the Travelers Form and, pursuant thereto, (i) the events of September 11, 2001 at the World Trade Center Complex constitute more than one "occurrence"; and (ii) ACE Bermuda has an obligation to pay its "per occurrence" share of the ac-

-3-

CONFIDENTIAL

tual cash value of the World Trade Center Complex upon presentation of a proof of loss with respect thereto notwithstanding the Insureds' intent to repair, rebuild or replace the damaged property; and

WHEREAS, on November 7, 2001, certain of the Insureds submitted a preliminary proof of partial loss to ACE Bermuda and other insurers of the World Trade Center Complex, seeking to recover payment based on the "actual cash value" of the World Trade Center Complex; and

WHEREAS, ACE Bermuda contests the adequacy and sufficiency of the preliminary proof of partial loss; and

WHEREAS, the Parties, as hereinafter defined, now desire to compromise, settle and adjust fully and finally, any and all claims for coverage under the Policy, as hereinafter defined, with respect to any and all losses of any kind occurring at the World Trade Center Complex; and

WHEREAS, each of the Parties has taken all steps necessary to enter into a valid and binding settlement agreement and release;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and undertakings contained herein, and for other good and valuable consideration, and intending to be legally bound, the Parties to this Settlement Agreement and Release hereby agree as follows:

<u>Definitions</u>

As used in this Settlement Agreement and Release, and for the purpose of this Settlement Agreement and Release only, the following terms have the following meanings:

1.    "ACE" means:  ACE Bermuda, and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, divisions, and assigns of any and all of them, exclud-

-4-

    WTCP 0257929

ing, however, ACE Global Markets to the extent of any liability of ACE Global Markets under slip or policy numbers 711137001 or UF62375, to the extent that ACE Bermuda has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, divisions, and/or assigns of any and all of the foregoing.

    2.    "Silverstein" means: Silverstein Properties, Inc., in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, including, but not limited to, Silverstein WTC Mgmt. Co. LLC, and/or assigns of any and all of the foregoing, to the extent that Silverstein has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

    3.    "WTC Properties" means: World Trade Center Properties LLC, in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, including, but not limited to, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, and/or assigns of any and all of the foregoing, to the extent that WTC Properties has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

    4.    "Westfield" means: Westfield Corporation, Inc., in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, including, but not limited to, Westfield WTC LLC, Westfield

-5-

America, Inc., and assigns of any and all of the foregoing, to the extent that Westfield has legal

authority to bind said predecessors, successors, past, present and future parents, subsidiaries, af-

filiates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the fore-

going.

5.    "Port Authority" means:  The Port Authority of New York and New Jersey, in its

own right and/or any predecessors, successors, trustees, commissioners, directors, and/or assigns

of any and all of the foregoing, to the extent that Port Authority has legal authority to bind said

predecessors, successors, trustees, commissioners, directors, and/or assigns of any and all of the

foregoing.

6.    "Wells Fargo" means:  Wells Fargo Bank Minnesota, National Association, as

Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc.

Mortgage Pass-through Certificate Series 2001-WTC and/or any predecessors, successors, past,

present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees,

and/or assigns of any and all of the foregoing, to the extent that Wells Fargo has legal authority

to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates,

partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

7.    GMACCM means:  GMAC Commercial Mortgage Corporation, in its own right

and in its capacity as Servicer under the Trust and Servicing Agreement between GMAC Com-

mercial Mortgage Securities, Inc., GMACCM and Wells Fargo dated as of August 21, 2001,

and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates,

partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing,

including, but not limited to, Wells Fargo Bank Minnesota, N.A., to the extent that GMACCM

-6-

CONFIDENTIAL

has legal authority to bind said predecessors, successors, past, present and future parents, sub-sidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

      8.     "UBS Warburg" means:  UBS Warburg Real Estate Investments Inc., in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, divisions, and/or assigns of any and all of the foregoing, to the extent that UBS Warburg has le-gal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

      9.     "The Settled Claims" means and includes:

      (a)     Any and all actual, potential or threatened claims, demands, actions, rights, suits, proceedings, liabilities, or obligations, of every kind and nature and/or notices of any responsibility for any insurance coverage by any Person of any kind under the Policy made, demanded, asserted or filed by any or all Insureds whether in the past, present or future, whether at law or in equity, and whether by statute or in tort, contract, equity, or otherwise with respect to any and all losses of any kind occurring at the World Trade Center Complex; and

      (b)     Any and all property, risks, perils, and interests insured under the Policy, including without limitation all compensatory damages, business interruption, property loss or damage, debris removal, cleanup costs, contamination cleanup, valuable papers and records, de-struction of property, protection devices, removal, expediting expenses, consequential loss, de-fense expenses, fine arts, improvements and betterments, electronic data processing equipment

CONFIDENTIAL                        WTCP 0257932

and media, loss of rental income, loss of profits, or any other losses or liabilities of any kind under or relating to the Policy and occurring at the World Trade Center Complex.

10.    "Parties" means collectively Silverstein Properties, Inc., Silverstein WTC Mgmt. Co. LLC, World Trade Center Properties LLC, Westfield WTC LLC, Westfield Corporation, Inc., Westfield America, Inc., The Port Authority of New York and New Jersey, GMAC Commercial Mortgage Corporation, in its own right and in its capacity as Servicer under the Trust and Servicing Agreement dated as of August 21, 2001, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, UBS Warburg Real Estate Investments Inc., Wells Fargo Bank Minnesota, National Association, as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001 - WTC, under a Trust and Servicing Agreement dated as of August 21, 2001, and ACE Bermuda Insurance Ltd.  Each of the Parties is referred to herein in its individual capacity as a "Party".

11.    "London Arbitration" means the arbitration commenced by ACE Bermuda by letter dated October 31, 2001 addressed to Robert F. Strachan of Silverstein Properties, Inc.

12.    "New York Litigation" means the litigation commenced by certain of the Insureds that is pending in the Southern District of New York, styled <u>World Trade Center Properties LLC,</u> <u>et al. v. ACE Bermuda Ins. Co. Ltd. and XL Insurance Ltd.</u>, docket number 01-CV-9731.

13.    "Person" means an individual, a corporation, a partnership, an association, a trust or any other entity or organization (or estate, guardian or beneficiary thereof) including without limitation any federal, state or local governmental or quasi-governmental body or political subdivision or any agency or instrumentality thereof.

-8-

14.     "Policy" means ACE Bermuda policy No. SWTC 00274P and/or any other policy that was to be issued pursuant to the terms of the Binder or the Revised Binder issued by ACE Bermuda to the Insureds, including any policy that would follow the form of the Travelers Policy.  The term "Policy" shall not include slip or policy numbers 711137001 or UF62375 or any other policy to be issued by ACE Global Markets to the Insureds.

Settlement Amount and Payment

15.     In consideration of the agreements in this Settlement Agreement and Release, ACE Bermuda shall irrevocably pay to the Insureds the total sum of TWO HUNDRED NINETY-EIGHT MILLION DOLLARS ($298,000,000) (the "Settlement Amount").  ACE Bermuda shall make payment to the Insureds of the Settlement Amount within thirty (30) calendar days from the Effective Date (as defined herein).

16.     The Settlement Amount shall be paid by wire transfer into an agreed-upon account, the particulars of which (including wire instructions) shall be in a written instruction signed by or on behalf of all Insureds and sent to ACE Bermuda and its counsel.

17.     The Parties agree that payment of the Settlement Amount in the manner set forth in Paragraphs 15 and 16 is satisfactory to each and every one of them and constitutes complete and satisfactory compliance with the terms of the Policy.

18.     The Parties agree that receipt of the Settlement Amount shall constitute full satisfaction and discharge of any and all of ACE Bermuda's obligations under the Policy.

-9-

                                                    WTCP 0257934

The Releases

19.    (a)    Each and every Insured and its directors, officers, employees, assigns and/or agents hereby fully, completely and forever release and discharge, with prejudice, ACE and the directors, officers, employees, assigns and/or agents of ACE, with respect to the Policy, including without limitation any claims, whether now known or unknown, however caused and wherever located, for property losses, business interruption, debris removal, cleanup, indemnity or any other alleged obligations, costs, fees, penalties, or interest payments with respect to the Policy, however caused and wherever located, whether now known or unknown, which currently exist or subsequently accrue, which the Insureds and their directors, officers, employers, assigns and/or agents ever had, now have or hereinafter can, shall or may have, for, upon or by reason of, any matter, cause or thing whatsoever, whether known, unknown, fixed or unliquidated, conditioned or contingent, and whether obtained by subrogation, assignment or otherwise.

(b)    The release in subparagraph (a) above includes but is not limited to: any and all claims for insurance coverage under the Policy that have been raised or could have been raised in the London Arbitration or in the New York Litigation, including compensatory, punitive, statutory, extra contractual or other damages or relief based on alleged bad faith, breach of the duty of good faith and fair dealing, unfair claim practice, unfair trade practice, and/or any improper act or failure to act in connection with the investigation, handling, adjustment, litigation or settlement of the Settled Claims; and any alleged obligation on the part of ACE under the Policy, to investigate, adjust, indemnify or otherwise satisfy any Settled Claim released pursuant to this Settlement Agreement and Release.

(c)    Nothing in this agreement shall be deemed to release or modify in any respect the obligations of any insurer other than ACE Bermuda with respect to insurance coverage

-10-

WTCP 0257935

issued by such other insurer to any Insured, including without limitation any insurance coverage applicable to any loss arising directly or indirectly out of the events of September 11, 2001.

(d)    ACE and its directors, officers, employees, assigns and/or agents hereby fully, completely and forever release and discharge, with prejudice, the Insureds and the directors, officers, employees, assigns and/or agents of each of the Insureds, with respect to the Policy, including without limitation any claims, whether now known or unknown, however caused and wherever located, for property losses, business interruption, debris removal, cleanup, indemnity, or any other alleged obligations, costs, fees, penalties, or interest payments with respect to the Policy, however caused and wherever located, whether now known or unknown, which currently exist or subsequently accrue, which ACE and its directors, officers, employees, assigns and/or agents ever had, now have or hereinafter can, shall or may have, for, upon or by reason of, any matter, cause or thing whatsoever, whether know, unknown, fixed or unliquidated, conditioned or contingent, whether obtained by subrogation, assignment or otherwise.

(e)    The release in subparagraph (d) above includes but is not limited to: any and all claims arising out of or relating to the Policy that have been raised or could have been raised in the London Arbitration or in the New York Litigation, including compensatory, punitive, statutory, extra contractual or other damages or relief based on alleged bad faith, breach of the duty of good faith and fair dealing, unfair claim practice, unfair trade practice, and/or any improper act or failure to act in connection with the Insureds' application for the Policy or the adjustment, litigation or settlement of the Settled Claims.

(f)    The Parties agree that it is the intent and material term of this Settlement Agreement and Release that ACE is released from any and all types of claims arising out of or

-11-

WTCP 0257936

related to the Policy, including, but not limited to, claims for coverage that were or could be

made under the Policy against ACE and that the Insureds are released from any and all types of

claims arising out of or related to the Policy.

(g)     Each and every Insured and its directors, officers, employees, assigns,

and/or agents covenant not to present to ACE Bermuda for coverage any claims for coverage un-

der the Policy and agree not to cooperate with any other entity which might, in the future, at-

tempt to make such claims for coverage under the Policy.

(h)     The Parties hereby expressly waive any rights they or any of them may

otherwise have under the statutory provisions or common law of any jurisdiction limiting the

scope or effect of the Settlement Agreement and Release.

(i)     The releases in subparagraphs (a), (b), (d), (e), (f), and (g) above shall be-

come effective immediately upon the Insureds' receipt of the Settlement Amount.

Subrogation

20.     The Parties agree that ACE Bermuda preserves and does not waive any rights of

subrogation arising from or relating to ACE Bermuda's payment of the Settlement Amount to the

extent that any such rights arise; provided, however, that (i) ACE Bermuda shall not assert any

claim of subrogation against any of the Parties or any other insurer that has issued any policy or

contract of insurance covering one or more of the Insureds' interests in the World Trade Center

Complex, and (ii) except as provided in paragraph 20 hereof, ACE Bermuda shall not assert any

claim against any such other insurer for contribution, indemnity or other relief with respect to the

payment of the Settlement Amount pursuant hereto. ACE Bermuda further agrees that it will not

assert any claim of subrogation until the Insureds have been made whole for any losses they have

-12-

CONFIDENTIAL                                                    WTCP 0257937

incurred arising out of the events of September 11, 2001.  ACE Bermuda agrees not to pursue

any claim of subrogation without first consulting with and obtaining the prior consent of the In-

sureds, which consent will not be unreasonably withheld, except that the Port Authority may ref-

use its consent, in its absolute discretion, with respect to any claim of subrogation against any

governmental officer or instrumentality.  ACE Bermuda further acknowledges that its assertion

of any claim of subrogation against any governmental officer or instrumentality would pose par-

ticular difficulties to the Insureds other than the Port Authority, which difficulties such Insureds

may take into account in withholding consent.  ACE Bermuda shall use its best efforts to assert

any claim of subrogation solely in the name of ACE Bermuda and not in the name of any of the

Insureds, but shall not be obligated to do so if it must assert a subrogation claim in the name of

the Insureds.

21.    In the event that the Insureds settle with any other insurer that has issued any

policy or contract of insurance covering one or more of the Insureds' interests in the World

Trade Center Complex, the Insureds will use their reasonable efforts to obtain from each such

insurer with which they settle or will settle a waiver, release, or covenant not to sue with respect

to the right to assert a claim or demand against ACE Bermuda seeking contribution, indemnity,

damages, attorneys' fees, costs, or other reimbursement, subrogation, allocation, and/or appor-

tionment relating to or arising out of the Policy or the Settled Claims.  The Insureds further agree

that they will not voluntarily assist or cooperate with any Person in making any claims for con-

tribution, indemnity, damages, attorneys' fees, costs, or other reimbursement, apportionment

and/or allocation against ACE Bermuda relating to or arising out of the Policy or the Settled

Claims; provided, however, that nothing in this paragraph shall preclude or prevent any Person

from complying with appropriate subpoenas and discovery requests.

-13-

WTCP 0257938

No Effect

22.    Nothing in this Settlement Agreement and Release shall limit or affect any rights ACE Bermuda has with respect to any reinsurance coverage for any portion of the Settlement Amount from any of its reinsurers.

23.    Nothing in this Settlement Agreement and Release shall limit or affect in any way the Insureds' rights against any other Person (except ACE Bermuda), whether pursuant to this Settlement Agreement and Release or otherwise.

Reinsurance Cooperation

24.    The Insureds agree to cooperate with ACE Bermuda in connection with ACE Bermuda's seeking any reinsurance for this settlement, including reasonable requests to provide copies of documents that may be needed in pursuit of such reinsurance. The reasonable cost of copying any such documents shall be paid by ACE Bermuda.

No Admissions

25.    This Settlement Agreement and Release is the result of confidential settlement negotiations and compromise by the Parties. This Settlement Agreement and Release, communications, documents and/or correspondence exchanged during the negotiation/settlement process shall neither be considered an admission by any of the Parties as to the validity of any contention of any other Party nor a denial of coverage, liability, or responsibility. The negotiations leading to this Settlement Agreement and Release shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence or any analogous state or common law rules or practice.

-14-

WTCP 0257939

26.    This Settlement Agreement and Release is not a policy of insurance, and the Parties do not intend that this Settlement Agreement and Release be interpreted as such.

27.    This Settlement Agreement and Release does not adopt any specific coverage theory and is the product of informed negotiations between Parties of equal bargaining power.

28.    Nothing in this Settlement Agreement and Release shall be deemed or construed as an amendment, modification, or alteration of the Policy.

Dismissal of New York Litigation, And
Withdrawal Of London Arbitration Demand

29.    Within five (5) business days after the Insureds' timely receipt of the Settlement Amount, counsel for the Insureds that are plaintiffs in the New York Litigation shall execute and file a Notice of Voluntary Dismissal of Claims With Prejudice, dismissing with prejudice and without costs the claims and causes of action that such Insureds have asserted against ACE Bermuda in the New York Litigation.

30.    Within five (5) business days after the Effective Date of this Settlement Agreement and Release, counsel for ACE Bermuda shall forward to counsel for each of the Insureds written notification of the withdrawal with prejudice of ACE Bermuda's demand for arbitration. ACE Bermuda hereby covenants not to initiate any demand for arbitration or any litigation with respect to the Policy.

31.    Nothing in this Settlement Agreement and Release shall obligate either the Insureds or ACE Bermuda to pay the other any of its attorneys' fees or costs related to the London Arbitration or the New York Litigation or any of its attorneys' fees or costs related to the presentation of claim with regard to the damage and destruction of the World Trade Center Complex.

-15-

CONFIDENTIAL

The Insureds and ACE Bermuda expressly agree that they will not seek to recover from the other any fees, costs or expenses (including costs of experts whether related to the presentation of the claim or otherwise) of any kind incurred in connection with the London Arbitration or New York Litigation.

<u>Amendments and Changes</u>

32.    This Settlement Agreement and Release may not be amended, changed, modified, released or discharged except by a writing signed by duly authorized officers of each of the Parties hereto or their successors or permitted assigns, and this provision cannot be orally waived. No express or implied representations, warranties or promises, including any representation by the Insureds as to the amount of their losses resulting from the events of September 11, 2001, have been made or relied upon by the Parties other than those set forth herein.

<u>No Assignment</u>

33.    The Parties represent and warrant that they have not sold, assigned, transferred or otherwise disposed of any of the rights or obligations granted or imposed pursuant to the Policy.

34.    The rights or obligations granted or imposed pursuant to this Settlement Agreement and Release with respect to the Policy may not be assigned without the prior written consent of the other Parties, which consent shall not be unreasonably withheld; provided, however, that any Party may assign the rights or obligations granted or imposed pursuant to this Settlement Agreement and Release with respect to the Policy in connection with a sale or other disposition of a material part of its assets, in which event the selling Party shall require the purchaser, as a condition to any such sale or disposition, to assume in writing the obligations of the seller under

-16-

WTCP 0257941

this Settlement Agreement and Release. No such assignment or assumption shall relieve any of the Parties to this Settlement Agreement and Release of any obligations hereunder.

Binding Effect of Agreement

35.    Each of the terms of this Settlement Agreement and Release is binding upon and inures to the benefit of each Party hereto, and its respective successors, heirs and assigns.

Execution in Counterparts

36.    This Settlement Agreement and Release may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

Headings

37.    The headings utilized in this Settlement Agreement and Release are designed for the sole purpose of facilitating ready reference to the subject matter of this Settlement Agreement and Release. Said headings shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Settlement Agreement and Release.

Representations

38.    The respective Party executing this Settlement Agreement and Release expressly warrants and represents that:

(a)    It is a corporation or limited liability company in good standing in its respective place of domicile except as to the Port Authority, which represents that it is a body corporate and politic and a municipal corporate instrumentality of the States of New York and New Jersey created and existing by virtue of the Compact of April 30, 1921, made by and between said States and thereafter consented to by the Congress of the United States;

-17-

CONFIDENTIAL

(b)    The execution of this Settlement Agreement and Release is fully author-

ized by the respective Party on its own behalf and on behalf of all persons acting by, through or

under any of them;

(c)    The Person executing this Settlement Agreement and Release has the nec-

essary and appropriate authority to do so;

(d)    There is no pending lawsuit, agreement, transaction or negotiation that

would render this Settlement Agreement and Release or any part thereof void, voidable, or unen-

forceable; and

(e)    The only Insureds under the Policy are Parties hereto, and other than the

Parties to this Settlement Agreement and Release there are no other Persons which are insured

under the Policy.

39.    The representations, warranties, agreements, and promises made by each party to

this Settlement Agreement and Release and contained herein shall survive the execution of this

Settlement Agreement and Release.

Governing Law

40.    This Settlement Agreement and Release and all transactions under it shall be con-

strued in accordance with the laws of the State of New York, without regard to conflict of laws

principles.

-18-

Effective Date

    41.    The Effective Date of this Settlement Agreement and Release shall be the date

upon which the last Party has signed the Settlement Agreement and Release.

Notices

    42.    Notices directed to the respective Parties shall be sent by registered or certified

mail, return receipt requested, to the following Persons:

> If to Silverstein Properties, Inc.,
> Silverstein WTC Mgmt. Co. LLC,
> World Trade Center Properties LLC,
> 1 World Trade Center LLC,
> 2 World Trade Center LLC,
> 4 World Trade Center LLC, or
> 5 World Trade Center LLC:
>
>> Silverstein Properties, Inc.
>> 521 Fifth Avenue
>> New York, New York  10175
>>
>> Attention:   Michael Levy
>
> With a copy to:
>
>> Wachtell, Lipton, Rosen & Katz
>> 51 West 52nd Street
>> New York, New York 10019
>>
>> Attention:   Herbert M. Wachtell, Esq.,
>>                         Eric M. Roth, Esq.

-19-

CONFIDENTIAL

WTCP 0257944

If to Westfield Corporation, Inc.,
Westfield WTC LLC, or
Westfield America, Inc.:

    Westfield America, Inc.
    11601 Wilshire Boulevard
    12th Floor
    Los Angeles, California  90025

    Attention:   Arthur E. Schramm, Jr.

With a copy to:

    Mayer, Brown, Rowe & Maw
    350 South Grand Avenue
    25th Floor
    Los Angeles, California  90071-1503

    Attention:   Peter K. Rosen, Esq.

    Debevoise & Plimpton
    919 Third Avenue
    New York, New York 10022

    Attention:   Peter R. Schwartz, Esq.

If to The Port Authority of New York and New Jersey:

    The Port Authority of New York and New Jersey
    225 Park Avenue South
    New York, New York 10003

    Attention:   Charles F. McClafferty
              Chief Financial Officer

With a copy to:

    The Port Authority of New York and New Jersey
    225 Park Avenue South
    New York, New York 10003

    Attention:   Jeffrey S. Green, Esq.
              General Counsel

-20-

CONFIDENTIAL

WTCP 0257945

If to Wells Fargo:

    Wells Fargo Bank Minnesota, National Association
    c/o GMAC Commercial Mortgage Corporation
    200 Witmer Road
    Horsham, Pennsylvania  19044

    Attention:   Maria Corpora-Buck, Esq.
               General Counsel

With a copy to:

    Heller Ehrman White & McAuliffe
    40th Floor
    601 S. Figueroa
    Los Angeles, California 90017

    Attention:   Nancy Sher Cohen, Esq.
               Stephen N. Goldberg, Esq.

        - and -

    Cadwalader, Wickersham & Taft
    100 Maiden Lane
    New York, New York 10038

    Attention:   William P. McInerney, Esq.

If to GMAC Commercial Mortgage Corporation:

    GMAC Commercial Mortgage Corporation
    200 Witmer Road
    Horsham, Penslyvania 19044

    Attention:   Maria Corpora-Buck, Esq.
               General Counsel

CONFIDENTIAL

WTCP 0257946

With a copy to:

    Heller Ehrman White & McAuliffe
    40th Floor
    601 S. Figueroa
    Los Angeles, California 90017

    Attention:  Nancy Sher Cohen, Esq.
              Stephen N. Goldberg, Esq.

        - and -

    Cadwalader, Wickersham & Taft
    100 Maiden Lane
    New York, New York 10038

    Attention:  William P. McInerney, Esq.


If to UBS Warburg:

    UBS Warburg Real Estate Investments Inc.
    1285 Avenue of the Americas
    New York, New York  10019

    Attention:  Robert W. Pettinato, Jr.


With a copy to:

    Covington & Burling
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C.  20004-2401

    Attention:  Mitchell F. Dolin, Esq.


If to ACE Bermuda:

    ACE Bermuda Insurance Ltd.
    17 Woodbourne Avenue
    Hamilton, HM08
    BERMUDA

    Attention:  Frank A. Lattal, Esq.,
              Executive Vice-President, General Counsel, and Secretary

CONFIDENTIAL                                                                 WTCP 0257947

With a copy to:

    O'Melveny & Myers LLP
    Citicorp Center
    153 East 53rd Street
    New York, New York 10022

    Attention:  Paul R. Koepff, Esq.
               Rosemary B. Boller, Esq.

or to such other Person or address as the addressee may have specified in a notice duly given to the sender as provided herein.

    IN WITNESS WHEREOF, each Party by its duly authorized representative has executed this Settlement Agreement and Release on the date shown below:

SILVERSTEIN PROPERTIES, INC.

Date: 2/13/02

By: _____
Name: Michael Levy
Title: Chief Financial Officer

SILVERSTEIN WTC MGMT. CO. LLC

Date: 2/13/02

By: _____
Name: Michael Levy
Title: Vice President

WORLD TRADE CENTER PROPERTIES LLC
By Silverstein WTC Properties LLC, its Manager
By Silverstein WTC LLC, its Manager

Date: 2/13/02

By: _____
Name: Michael Levy
Title: Vice President

-23-

1 WORLD TRADE CENTER LLC

Date : _2/13/02_  By: _____
     Name: Michael Levy
     Title: Vice President

2 WORLD TRADE CENTER LLC

Date : _2/13/02_  By: _____
     Name: Michael Levy
     Title: Vice President

4 WORLD TRADE CENTER LLC

Date : _2/13/02_  By: _____
     Name: Michael Levy
     Title: Vice President

5 WORLD TRADE CENTER LLC

Date : _2/13/02_  By: _____
     Name: Michael Levy
     Title: Vice President

WESTFIELD CORPORATION, INC.

Date: _____  By: _____
     Name:
     Title:

WESTFIELD WTC LLC

Date: _____  By: _____
     Name:
     Title:

-24-

CONFIDENTIAL    WTCP 0257949

1 WORLD TRADE CENTER LLC

Date :_____          By:_____
                                            Name:
                                            Title:

2 WORLD TRADE CENTER LLC

Date :_____          By:_____
                                            Name:
                                            Title:

4 WORLD TRADE CENTER LLC

Date :_____          By:_____
                                            Name:
                                            Title:

5 WORLD TRADE CENTER LLC

Date :_____          By:_____
                                            Name:
                                            Title:

WESTFIELD CORPORATION, INC.

Date:_____           By: _____
                                            Name:   Elizabeth P. Westman
                                            Title:       Secretary

WESTFIELD WTC LLC
                                         By: _____
Date:_____           By: _____
                                            Name:   Elizabeth P. Westman
                                            Title:       Secretary

-24-

CONFIDENTIAL                                              WTCP 0257950

02-15-02   01:09pm   From-ARTHUR E SCHRAMM JR                    +3104784518           T-832   P.03/03   F-250

WESTFIELD AMERICA, INC.

Date:_____        By: _____
                                       Name:
                                       Title:    Elizabeth P. Westman
                                                  Secretary

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____        By:_____
                                       Name:
                                       Title:

GMAC COMMERCIAL MORTGAGE
CORPORATION

Date:_____        _____

By GMAC Commercial Mortgage Corporation, in its own
right and as servicer for Wells Fargo Bank Minnesota,
National Association, Trustee, under a Trust and Servicing
Agreement dated August 21, 2001

UBS WARBURG REAL ESTATE
INVESTMENTS INC.

Date:_____        By:_____
                                       Name:
                                       Title:

                                    - and -

Date:_____        By:_____
                                       Name:
                                       Title:

WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

Date:_____        _____

By GMAC Commercial Mortgage Corporation, as servicer
for Wells Fargo Bank Minnesota, National Association,
Trustee, under a Trust and Servicing Agreement dated
August 21, 2001

CONFIDENTIAL

FEB-13-2002  18:38      OPERATIONS SUCES MME                1 201 216 2908

THE PORT AUTHORITY
OF NEW YORK AND NEW JERSEY

Date: February 13, 2002                By:  _____
                                       Name:  Bruce D. Bohlen
                                       Title:   Treasurer


THE PORT AUTHORITY OF NEW YORK OF NEW JERSEY

SIGNATURE PAGE TO

THE SETTLEMENT AGREEMENT AND RELEASE MADE AND ENTERED INTO BETWEEN
SILVERSTEIN PROPERTIES, INC., SILVERSTEIN WTC MGMT. CO. LLC, WORLD TRADE
CENTER PROPERTIES LLC, 1 WORLD TRADE CENTER LLC, 2 WORLD TRADE CENTER
LLC, 4 WORLD TRADE CENTER LLC, 5 WORLD TRADE CENTER LLC, WESTFIELD WTC
LLC, WESTFIELD CORPORATION, INC., WESTFIELD AMERICA, INC., THE PORT AUTHORITY
OF NEW YORK AND NEW JERSEY, UBS WARBURG REAL ESTATE INVESTMENTS INC.,
WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE
REGISTERED CERTIFICATE HOLDERS OF GMAC COMMERCIAL MORTGAGE SECURITIES, INC.
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2001 - WTC, UNDER A TRUST AND
SERVICING AGREEMENT DATED AS OF AUGUST 21, 2001, AND GMAC COMMERCIAL
MORTGAGE CORPORATION, IN ITS OWN RIGHT AND IN ITS CAPACITY AS SERVICER UNDER
THE TRUST AND SERVICING AGREEMENT DATED AS OF AUGUST 21, 2001 (COLLECTIVELY,
THE "INSUREDS"), ON THE ONE HAND, AND ACE BERMUDA INSURANCE LIMITED ("ACE
BERMUDA"), ON THE OTHER HAND.

CONFIDENTIAL                                    WTCP 0257952

02/13/2002 16:57 FAX 2153283620          LEGAL                                    ☑003
02/13/2002 12:24 FAX                         HELLER EHRMAN LLP #3                      ☑002/002

WESTFIELD AMERICA, INC.

Date:_____          By:_____
                                            Name:
                                            Title:

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____          By:_____
                                            Name:
                                            Title:

GMAC COMMERCIAL MORTGAGE
CORPORATION

Date:_____          By: GMAC Commercial Mortgage Corporation, in its own
                                        right and as servicer for Wells Fargo Bank Minnesota,
                                        National Association, Trustee, under a Trust and Servicing
                                        Agreement dated August 21, 2001

UBS WARBURG REAL ESTATE
INVESTMENTS INC.

Date:_____          By:_____
                                            Name:
                                            Title:

                                        - and -

Date:_____          By:_____
                                            Name:
                                            Title:

WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

Date:_____          By: GMAC Commercial Mortgage Corporation, as servicer
                                        for Wells Fargo Bank Minnesota, National Association,
                                        Trustee, under a Trust and Servicing Agreement dated
                                        August 21, 2001

CONFIDENTIAL

02/13/2002    17:30    COVINGTON & BURLING 10WEST → 912124032257          NO.247    003
02/13/2002    15:40    COVINGTON & BURLING 10WEST → 912127134391          NO.241    002

WESTFIELD AMERICA, INC.

Date:_____          By:_____
                                             Name:
                                             Title:

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____          By:_____
                                             Name:
                                             Title:

GMAC COMMERCIAL MORTGAGE
CORPORATION

Date:_____          By GMAC Commercial Mortgage Corporation, in its own
                                         right and as servicer for Wells Fargo Bank Minnesota,
                                         National Association, Trustee, under a Trust and Servicing
                                         Agreement dated August 21, 2001

                                         UBS WARBURG REAL ESTATE
                                         INVESTMENTS INC.

Date: FEBRUARY 13, 2002                  By:_____
                                             Name: ROBERT PETTINATO
                                             Title: DIRECTOR

                                         - and -

Date: 2/13/02                            By:_____
                                             Name: Brad Cohen
                                             Title: Director

                                         WELLS FARGO BANK MINNESOTA,
                                         NATIONAL ASSOCIATION

Date:_____          By GMAC Commercial Mortgage Corporation, as servicer
                                         for Wells Fargo Bank Minnesota, National Association,
                                         Trustee, under a Trust and Servicing Agreement dated
                                         August 21, 2001

CONFIDENTIAL                                                    WTCP 0257954

ACE BERMUDA INSURANCE LTD.

Date: __2/12/02__

By: _____
Name: MARK HERMAN
Title: PRESIDENT and CEO

NY1:839344.11

-26-

CONFIDENTIAL

WTCP 0257955

# EXHIBIT 12

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made between:

- Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("Allianz")

on the one hand; and, on the other hand:

- World Trade Center Properties LLC ("WTC Properties LLC"), Silverstein Properties, Inc., Silverstein WTC Mgmt. Co., LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as "5 World Trade Center LLC"), and 4 World Trade Center LLC (hereinafter collectively referred to as the "Silverstein Insureds");

- Westfield, LLC (formerly known as "Westfield Corporation, Inc.") and Westfield America, Inc. (hereinafter collectively referred to as the "Westfield Insureds"); and

- WTC Retail LLC (formerly known as "Westfield WTC LLC"), 1 World Trade Center LLC; and

- The Port Authority of New York and New Jersey ("Port Authority").

Throughout this Agreement, all parties other than Allianz are collectively referred to as the "Insureds" and individually referred to as an "Insured"; WTC Retail LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Net Lessee Insureds"; 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Silverstein Net Lessee Insureds"; WTC Retail LLC and 1 World Trade Center LLC are collectively referred

W/1152252v11

WTCP 0015982

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

to as the "Port Authority Net Lessee Insureds"; and Allianz and the Insureds are referred to herein as the "Parties" (each, a "Party"), unless otherwise indicated.

WHEREAS, pursuant to net leases dated on or about July 16, 2001, the Net Lessee Insureds leased from the Port Authority certain buildings and structures at the World Trade Center (hereinafter referred to as the "World Trade Center Property");

WHEREAS, in August 2001, Allianz issued insurance policy No. CLP 3001140 (the "Allianz Fronting Policy") for the World Trade Center Property in the total amount of $354,680,000, part of $3,546,800,000 per occurrence, including, subject to the policy terms and conditions, insurance for the World Trade Center Property and business interruption/lost rents;

WHEREAS, Allianz also issued insurance policy No. CLP 3001091 which is the subject of a separate Settlement Agreement of even date;

WHEREAS, Allianz agreed to deem each of the Insureds to be insureds and/or loss payees and/or mortgagees, as their interests may be, under the Allianz Fronting Policy;

WHEREAS, the World Trade Center Property was destroyed on September 11, 2001;

WHEREAS, on November 16, 2006, the Port Authority of New York and New Jersey, the Net Lessee Insureds, and The Port Authority Trans-Hudson Corporation entered into the Master Development Agreement for Towers 2/3/4 of the World Trade Center (the "Master Development Agreement");

WHEREAS, Allianz has previously advanced the Insureds $264,709,587 under the Allianz Fronting Policy;

WHEREAS, the Parties disputed whether the destruction of the World Trade Center Property constituted one or more than one occurrence under the Allianz Fronting Policy and

-2-

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

various other issues concerning the Parties' rights and obligations under the Allianz Fronting
Policy arising out of the destruction of the World Trade Center Property;

WHEREAS, the Parties have litigated this dispute in the civil actions numbered Case
Numbers 01-CV-9291 and 02-CV-0017 in the United States District Court for the Southern
District of New York and have taken related appeals (collectively, the "Federal Action"), and
also in Index Numbers 602857/03, 602897/03, and 402523/06 in the Supreme Court of the State
of New York, County of New York (collectively, the "State Actions") (all collectively, the
"Lawsuits");

WHEREAS, the Parties litigated the number-of-occurrences issue in the Federal Action;

WHEREAS, on December 6, 2004, a jury in the Federal Action found that, under the
Allianz Fronting Policy, the Parties intended to treat what happened on September 11, 2001 at
the World Trade Center as two occurrences;

WHEREAS, Allianz appealed from the jury verdict in the Federal Action to the United
States Court of Appeals for the Second Circuit;

WHEREAS, on October 18, 2006, the United States Court of Appeals for the Second
Circuit affirmed the jury verdict in the Federal Action in favor of the Insureds and against
Allianz and, on December 29, 2006, the Second Circuit denied Allianz's petition for rehearing;

WHEREAS, Allianz demanded appraisal on February 25, 2002 and the Insureds and,
among other insurers, Allianz, have been engaged in an ongoing appraisal to resolve valuation
issues with respect to the World Trade Center Property (the "Appraisal");

WHEREAS, the Appraisal is ongoing and has resulted in settlements and awards on
certain disputed issues of fact relating to "core and shell" Replacement Cost, but other valuation

-3-

WTCP 0015984

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

issues, including Actual Cash Value, Lost Rents, Allocation and certain aspects of Replacement

Cost remain to be resolved;

WHEREAS, the Lawsuits have resulted in numerous rulings as a matter of law on

disputed issues, many of which have not yet been appealed but could be appealed at a later time,

and other legal issues remain in dispute but have not yet been presented to the court for

resolution;

WHEREAS, the Parties have incurred and in the absence of this Agreement would

continue to incur substantial attorneys fees and expenses in connection with the Lawsuits and the

Appraisal;

WHEREAS, the Parties wish to preclude the necessity of incurring such additional fees

and expenses;

WHEREAS, the Parties seek in this Agreement to settle fully and finally and to resolve

for all time any and all disputes between them regarding the Allianz Fronting Policy, including

but not limited to the pending Lawsuits, on the terms and conditions set forth herein (but without

waiving their positions, arguments and defenses in connection with the Lawsuits);

NOW, THEREFORE, in consideration of these premises, mutual promises and

covenants, the Parties hereby agree as follows:

1.    Settlement Payments:

a.    Cash Payment: On or before August 1, 2007, Allianz will pay to the

Insureds the sum of $115,000,000 (One Hundred Fifteen Million Dollars), hereinafter referred to

as the "Cash Payment," by wire transfer of same-day funds to:

-4-

WTCP 0015985

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Citibank, N.A.
New York, NY
ABA 021000089
Credit:
PBG Concentration Account #37432464
Further Credit:
Citibank, N.A. as Escrow Agent for
1 World Trade Center LLC et al.
Account # 25D-036679-768
Attention: John P. Howard – 212-783-3755

Upon its receipt, the Insureds covenant with one another, and Allianz does not object, that the Cash Payment shall be deposited into the Escrow Accounts referenced in the Master Development Agreement (with 56.5% thereof deposited into the Silverstein Lessees Sub-Account, 34.6% thereof deposited into the 1/5 WTC Lessee Sub-Account, and 8.9% thereof deposited into the Retail Lessee Sub-Account, as such terms are defined in the Master Development Agreement).

The Cash Payment shall be considered final and without reservation, and not an advance.

b.    Establishment of Letters of Credit:  Within sixty (60) calendar days of the Effective Date of this Agreement, Allianz will post two letters of credit (the "Letters of Credit"), substantially similar to, and containing no modifications adverse to the beneficiaries of such Letters of Credit from, the form attached hereto as Exhibit A, in favor of the Net Lessee Insureds in the aggregate amount of $329,650,413 (Three Hundred Twenty-Nine Million Six Hundred Fifty Thousand Four Hundred and Thirteen Dollars) (the "LOC Amount"); provided, however, that the Letters of Credit shall provide for the cancellation thereof in accordance with subparagraph 1.b.ii and paragraphs 2 and 6.  In the event that Allianz fails to provide Letters of Credit within sixty (60) calendar days of the Effective Date that comply, in form and substance, with the provisions of this Agreement, then Allianz shall place the entire LOC Amount in escrow

-5-

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

with an Issuing Bank (defined below) for the benefit of the Net Lessee Insureds (but with interest

on such account accruing to Allianz). The Net Lessee Insureds shall be permitted to draw upon

such escrow upon the terms and conditions set forth in this Agreement with respect to the Letters

of Credit.  In the event of a dispute between the Parties as to the sufficiency of the Letters of

Credit, such dispute shall be resolved by Arbitration in accordance with paragraphs 18 and 19.

One letter of credit shall be posted in favor of the Port Authority Net Lessee Insureds (the "Port

Authority LOC") in the amount of $143,397,930 (the "Port Authority LOC Amount"), and the

second letter of credit shall be posted in favor of the Silverstein Net Lessee Insureds (the

"Silverstein LOC") in the amount of $186,252,483 (the "Silverstein LOC Amount").

i.    The Letters of Credit shall be irrevocable, except as set forth in

subparagraph 1.b.ii and paragraphs 2 and 6 below.

ii.    The Letters of Credit shall have a term of not less than one year,

which shall automatically be renewed for successive one-year terms until *either* it is reduced to

zero *or* the "Termination Date" established by the operation of Section 3(m) of that certain

Stipulation of Settlement, dated June 8, 2007 (the "SR International Stipulation"), between,

among others, the Net Lessee Insureds, SR International Business Insurance Co. Ltd., Swiss

Reinsurance Co. UK Ltd. and Industrial Risk Insurers (including as such Termination Date may

be extended in accordance with the terms of Section 3(m) of the SR International Stipulation)

(such date hereafter, the "LOC Termination Date"), whichever is earlier, unless the Issuing Bank

(as defined below) shall have delivered written notice of non-renewal to all Parties as specified

in paragraph 20 below not less than sixty (60) days nor more than ninety (90) days prior to the

expiration date of the then-effective term, and shall provide that the remaining balance of the

Letters of Credit may be drawn down in full by the applicable Net Lessee Insureds if not

-6-

WTCP 0015987

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

replaced by replacement Letters of Credit satisfying the terms of this Agreement by the date

twenty-one (21) days prior to the expiration of the then-effective term. In the alternative and

before the date twenty-one (21) days prior to the expiration of the then-effective term of the

Letters of Credit, Allianz may place the remaining balance of such Letter(s) of Credit in escrow

with an Issuing Bank for the benefit of the Net Lessee Insureds (but with interest accruing to

Allianz) to be drawn upon pursuant to the terms and conditions set forth in this Agreement with

respect to the Letters of Credit. At least thirty (30) days prior to seeking the termination of one

or both of the Letters of Credit under this paragraph 1, Allianz shall provide written notice to

each Party hereto. Allianz shall not exercise any rights or remedies under this paragraph 1 until

all Lenders (as defined below) have been repaid in full all financing proceeds that were utilized

for rebuilding purposes or related interest and other customary costs; *provided*, however, that

such Lenders shall reimburse Allianz for any additional costs actually expended and disbursed

by Allianz to maintain the Letters of Credit for so long as its rights or remedies shall be so

restricted. In the event that there is a dispute about whether the LOC Termination Date shall

have occurred, the determination of such matter must be made as a final non-appealable judicial

determination in the courts of the State of New York, notwithstanding paragraphs 18 and 19 of

this Agreement, and until such determination Allianz shall not be permitted to take any action to

cancel the Letters of Credit. In order to cancel the applicable Letter of Credit, Allianz shall

present the Issuing Bank and all of the Net Lessee Insureds with a sworn certification in the form

specified in Annex F to Exhibit A hereof indicating that Allianz intends to cancel the applicable

Letter of Credit. If the Net Lessee Insureds do not dispute the validity of Allianz's submission to

the Issuing Bank within fifteen (15) business days after their receipt of Allianz's certificate by

delivery of written notice of dispute to the Issuing Bank and Allianz, the Issuing Bank shall

-7-

WTCP 0015988

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

cancel the applicable Letter of Credit as permitted hereunder and requested in Allianz's sworn

certification. If the Insureds do dispute the validity of Allianz's submission to the Issuing Bank,

the dispute shall be subject to the provisions of paragraph 18; *provided* that, if such dispute is

resolved in Allianz's favor, the disputing Net Lessee Insured(s) shall be liable to Allianz for any

additional costs actually expended and disbursed by Allianz to maintain the Letters of Credit

beginning on the sixteenth (16th) business day after the date of Allianz's submission.

Notwithstanding the foregoing, if it is so determined that the LOC Termination Date has

occurred and if draws were made by a Net Lessee Insured against the Letters of Credit to

reimburse LOC Draw-Rate Costs (as defined below) that were expended or disbursed after the

LOC Termination Date, then such Net Lessee Insured shall be liable to Allianz for the full

amount of such draws plus 5% interest from the date of each such draw.

        iii.     The Letters of Credit shall be issued by a bank with a credit rating

of AA or better and undivided capital and surplus of at least five billion dollars ($5,000,000,000)

(the "Issuing Bank") and shall permit all draws to be made in New York. In the event the

Issuing Bank is merged with another bank, any replacement letter of credit shall be issued by

which ever of either the original Issuing Bank or the merged bank has a higher credit rating.

The Net Lessee Insureds covenant with Allianz that they will provide each Lender (as defined

below) or other potential source of financing or equity with a copy of this Agreement prior

entering into any financial arrangement with any such person.

        c.     <u>Letters of Credit Draws</u>:

The Net Lessee Insureds may draw on the Letters of Credit as follows:

        i.     <u>First Lump Sum Draw</u>. On or after February 29, 2008, the Net

Lessee Insureds may draw (a) in the case of the Port Authority Net Lessee Insureds, $13,050,000

-8-

WTCP 0015989

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

from the Port Authority LOC and (b) in the case of the Silverstein Net Lessee Insureds,

$16,950,000 from the Silverstein LOC. The Net Lessee Insureds covenant with one another, and

Allianz does not object, that all money drawn pursuant to this subparagraph shall be deposited

into the Escrow Accounts referenced in the Master Development Agreement (with 56.5% thereof

deposited into the Silverstein Lessees Sub-Account, 34.6% thereof deposited into the 1/5 WTC

Lessee Sub-Account, and 8.9% thereof deposited into the Retail Lessee Sub-Account, as such

terms are defined in the Master Development Agreement).

        ii.     <u>Second Lump Sum Draw</u>. On or after August 31, 2008, the Net

Lessee Insureds may draw (a) in the case of the Port Authority Net Lessee Insureds, $13,050,000

from the Port Authority LOC and (b) in the case of the Silverstein Net Lessee Insureds,

$16,950,000 from the Silverstein LOC. The Net Lessee Insureds covenant with one another, and

Allianz does not object, that all money drawn pursuant to this subparagraph shall be deposited

into the Escrow Accounts referenced in the Master Development Agreement (with 56.5% thereof

deposited into the Silverstein Lessees Sub-Account, 34.6% thereof deposited into the 1/5 WTC

Lessee Sub-Account, and 8.9% thereof deposited into the Retail Lessee Sub-Account, as such

terms are defined in the Master Development Agreement).

        iii.     <u>Pro Rata Cash Flow Draws</u>. In addition to the Lump Sum Draws

described above, the Net Lessee Insureds may draw upon their respective Letters of Credit based

on LOC Draw-Rate Costs actually expended and disbursed (the "Pro Rata Cash Flow Draws"),

subject to the following requirements:

        a)     Pro Rata Cash Flow Draws may not be made before January 31,

2008. Beginning on January 31, 2008, and on the last business day of each calendar

month thereafter, Pro Rata Cash Flow Draws may be made monthly to reimburse the

WTCP 0015990

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

drawing Party for LOC Draw-Rate Costs actually expended and disbursed; *provided*, that

Pro Rata Cash Flow Draws may not be made to reimburse a Party for LOC Draw-Rate

Costs actually expended and disbursed prior to December 31, 2007. Pro Rata Cash Flow

Draws shall be made in the amounts and on the dates set forth on Exhibit B; *provided* that

the Port Authority Net Lessee Insureds, in the case of the Port Authority LOC, and the

Silverstein Net Lessee Insureds, in the case of the Silverstein LOC, (i) shall be permitted

to make Pro Rata Cash Flow Draws on January 31, 2008, February 29, 2008, March 31,

2008 and April 30, 2008, without regard to LOC Draw-Rate Costs actually expended and

disbursed; (ii) must actually expend and disburse a minimum of $12,500,000 in LOC

Draw-Rate Costs in each of the first three calendar quarters of 2008 in order to make their

respective Draws in the remainder of 2008; and (iii) thereafter, must actually expend and

disburse a minimum of $25,000,000 in LOC Draw-Rate Costs (such respective minimum

amounts in clauses (ii) and (iii) hereof, the "LOC Threshold") in the preceding calendar

quarter in order to make their respective monthly Pro Rata Cash Flow Draws; *provided*

further that, if the Port Authority Net Lessee Insureds, in the case of the Port Authority

LOC, or the Silverstein Net Lessee Insureds, in the case of the Silverstein LOC, do not

actually expend and disburse the LOC Threshold and are prohibited from making their

respective Pro Rata Cash Flow Draws during a calendar quarter, then the amounts of such

previously prohibited Pro Rata Cash Flow Draws (as set forth on Exhibit B) shall become

available for draw (a "Make Up Draw") simultaneously with the first monthly Pro Rata

Cash Flow Draw following the calendar quarter during which such Net Lessee Insured

actually expended and disbursed the LOC Threshold, and the only condition on drawing

the Make Up Draw amount in addition to the monthly Pro Rata Cash Flow Draw amount

WTCP 0015991

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

for the month when the draw takes place shall be that the aggregate amount drawn does not exceed the sum of LOC Draw-Rate Costs actually expended and disbursed during the calendar quarter during which such Net Lessee Insured is making the draw and any calendar quarters after January 31, 2008 for which such Net Lessee Insureds have not yet made draws. Solely for the purpose of compliance with this paragraph 1, only the following costs and expenses (collectively, the "LOC Draw-Rate Costs") may be included: Hard and soft costs relating to the development, design, oversight and construction of the office towers and retail component (and related improvements and infrastructure) at the World Trade Center, including construction costs, construction manager or general contractor fees, general conditions, bonding, insurance, contingencies, architect fees, engineering fees, consulting fees, testing and inspection, developer's fees, legal fees relating to construction or financing of construction, Port Authority review fees or oversight fees, interest on amounts borrowed to pay for the aforementioned hard and soft costs, and all other usual and customary construction-related costs or expenses. Notwithstanding anything in the foregoing to the contrary, LOC Draw-Rate Costs shall not include legal fees unrelated to construction or financing of construction, ground rents, payments for lost rents/business interruption, and/or costs and expenses relating to (x) the PATH Project in the area of the PATH terminal bounded by the rights-of-way of Fulton, Greenwich, Church and Dey Streets, as shown on the World Trade Center Site Diagram (the "PATH Terminal Site") or in any area outside of the East Bathtub, (y) any Memorial to be located at the World Trade Center Site; and (z) residential construction.

WTCP 0015992

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

b)      Pro Rata Cash Flow Draws may continue until the earlier of (x) the date that the Letters of Credit have been reduced to zero, whether by draws or as a result of circumstances or transactions described in paragraphs 2 and 6 below; or (z) the LOC Termination Date.

c)      The Parties hereto acknowledge that the Master Development Agreement contemplates the development of particular commercial space, retail space, infrastructure and other improvements. Nevertheless, either during the term of the Master Development Agreement, as it currently exists or as amended, or in the event of its termination, the definition of LOC Draw-Rate Costs shall remain consistent and shall apply to any redevelopment of office towers and a retail component (and related improvements and infrastructure) at the World Trade Center site irrespective of whether what is developed is the same as what is described in the Master Development Agreement.

d)      The only condition to the Issuing Bank honoring a draw by a Net Lessee Insured on the Letters of Credit shall be that such Net Lessee Insured must first provide to the Issuing Bank a sight draft in the amount of such draw, accompanied by a certificate (the "LOC Certificate") to the effect that the LOC Draw-Rate Costs actually expended and disbursed during the immediately preceding calendar quarter exceeded the LOC Threshold and, in the case of a Make Up Draw, that the aggregate amount drawn does not exceed the sum of LOC Draw-Rate Costs actually expended and disbursed during the calendar quarter during which such Net Lessee Insured is making the draw and any calendar quarters after January 31, 2008 for which such Net Lessee Insureds did not meet the LOC Threshold. A copy of the sight draft and LOC Certificate shall be

-12-

WTCP 0015993

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

presented to Allianz at the same time that it is presented to the Issuing Bank. Once such LOC Certificate and sight draft are presented, the Issuing Bank shall immediately pay the requested amount to:

> Citibank, N.A.
> New York, NY
> ABA 021000089
> Credit:
> PBG Concentration Account #37432464
> Further Credit:
> Citibank, N.A. as Escrow Agent for
> 1 World Trade Center LLC et al.
> Account # 25D-036679-768
> Attention: John P. Howard – 212-783-3755

Following the receipt of such payments from the Issuing Bank, the Insureds covenant with one another, and Allianz does not object, that all amounts received shall be deposited into the Escrow Accounts referenced in the Master Development Agreement (with 56.5% thereof deposited into the Silverstein Lessees Sub-Account, 34.6% thereof deposited into the 1/5 WTC Lessee Sub-Account, and 8.9% thereof deposited into the Retail Lessee Sub-Account, as such terms are defined in the Master Development Agreement).

e)    During the continuance of an event of default under any applicable loan or other financing agreement (after giving effect to any applicable cure or grace period) or as may otherwise be permitted in any such loan agreement, any Lender shall have all of the rights of any Net Lessee Insured under this Agreement, including without limitation any right to draw upon the Letters of Credit, and the Letters of Credit shall so provide. In this paragraph, and wherever the term "Lender" appears in this Agreement, it shall have the same meaning as the term "Mortgagee" in the Silverstein Leases (as such term is defined in the Master Development Agreement).

-13-

WTCP 0015994

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

f)    Once the requested amount is paid to the Net Lessee Insureds from the Letters of Credit pursuant to paragraph 1.c.iii.d, the use of such proceeds shall be governed by paragraph 4 below.

d.    Effect of Exhaustion of Letters of Credit.

Upon the exhaustion of the Port Authority LOC Amount or the Silverstein LOC Amount, as applicable, by draws permitted under the terms and conditions of paragraph 1.c, above, the respective Net Lessee Insureds and Allianz shall have satisfied their obligations with respect to the applicable Letter of Credit, and Allianz shall have no rights against such Net Lessee Insureds and such Net Lessee Insureds shall have no rights against Allianz, regardless of the level of their satisfaction of their respective restoration or development obligations under the terms of the Master Development Agreement or otherwise and regardless of whether any other Party shall have complied with its obligations hereunder.

2.    Abandonment. In the event of an Abandonment (defined as, for the Silverstein LOC, all Silverstein Net Lessee Insureds, and for the Port Authority LOC, the Port Authority Net Lessee Insureds, permanently ceasing and abandoning all rebuilding activities at their respective premises and having no intent to resume such building activities or, in the event that any Net Lessee Insured has satisfied its rebuilding obligations, the remaining Silverstein or Port Authority Net Lessee Insureds have permanently ceased and abandoned all rebuilding activities at their leased premises and have no intent to resume such building activities) and a final non-appealable judicial determination in the courts of the State of New York that a Completion Event of Default (as defined in the Master Development Agreement Article 8) has occurred, the Port Authority and/or the Silverstein Insureds, or any Lender shall have 90 days (or such longer period as is reasonable under the circumstances) to elect to cause the redevelopment to continue,

-14-

WTCP 0015995

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

in which case an Abandonment shall be deemed not to have occurred; in the event that neither

the Port Authority (in the case of the Port Authority LOC), the Silverstein Insureds (in the case

of the Silverstein LOC) or any Lender (in the case of the Letters of Credit) elects to cause the

redevelopment to continue during such 90 days (or longer period as is reasonable under the

circumstances), Allianz may, subject to paragraph 9, seek to cancel the Silverstein LOC, for

Abandonment by the Silverstein Net Lessees, and/or of the Port Authority LOC, for

Abandonment by the Port Authority Net Lessees, as applicable. In the event that there is a good

faith dispute about whether an Abandonment has occurred, the determination that there has been

an Abandonment must be made as a final non-appealable judicial determination in the courts of

the State of New York, notwithstanding paragraphs 18 and 19 of this Agreement, and until such

determination (x) Allianz shall not be permitted to take any action to cancel the applicable Letter

of Credit pertaining to the abandoning Net Lessee Insureds and (y) the abandoning Net Lessee

Insureds or any Lender may elect to cause the redevelopment to continue, in which event an

Abandonment shall be deemed not to have occurred. In order to cancel the applicable Letter of

Credit, Allianz shall present the Issuing Bank and all of the Net Lessee Insureds with a sworn

certification in the form specified in Annex F to Exhibit A hereof indicating that Allianz intends

to cancel the applicable Letter of Credit. If the Net Lessee Insureds do not dispute the validity of

Allianz's submission to the Issuing Bank within fifteen (15) business days after their receipt of

Allianz's certificate by delivery of written notice of dispute to the Issuing Bank and Allianz, the

Issuing Bank shall cancel the applicable Letter of Credit as permitted hereunder and requested in

Allianz's sworn certification. If the Insureds do dispute the validity of Allianz's submission to

the Issuing Bank, the dispute shall be subject to the provisions of paragraph 18; *provided* that, if

such dispute is resolved in Allianz's favor, the disputing Net Lessee Insured(s) shall be liable to

-15-

WTCP 0015996

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Allianz for any additional costs actually expended and disbursed by Allianz to maintain the

Letters of Credit beginning on the sixteenth (16th) business day after the date of Allianz's

submission. Notwithstanding the foregoing, if it is so determined that an Abandonment has

occurred and if draws were made by a Net Lessee Insured against the Letter of Credit for Lump

Sum Payments scheduled to take place after the date of such Abandonment or to reimburse LOC

Draw-Rate Costs that were expended or disbursed after the date of such Abandonment, then such

Net Lessee Insured shall be liable to Allianz for the full amount of such draws plus 5% interest

from the date of each such draw.

     3.    <u>Prior Payments</u>:  As part of the consideration for this Agreement, all prior

payments made by Allianz under the Allianz Fronting Policy shall be considered final and

without reservation, and not an advance.

     4.    <u>Use of Settlement Proceeds</u>:

     a.    The Net Lessee Insureds covenant with one another, and Allianz

does not object, that the Cash Payment Amount and the funds from the Letters of Credit

deposited into the Net Lessee Insureds' escrow accounts in accordance with paragraph 1.c,

above, (collectively, the "Settlement Amount") shall be used as set forth in paragraphs 4.b and

4.c, below.

     b.    The Net Lessee Insureds covenant with one another, and Allianz

does not object, that the Settlement Amount shall be withdrawn, disbursed and utilized to pay

costs and expenses related to (i) the development, design, oversight and construction of the office

towers and retail component (and related improvements and infrastructure) at the World Trade

Center, as permitted and described by all terms of the Master Development Agreement and the

related escrow agreements, as well for lost rents/business interruption losses (including

-16-

WTCP 0015997

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

ground rent and other amounts payable from lost rents/business interruption recoveries) and/or

(ii) PATH Swap Amounts, which are defined as any costs of the type described in paragraph

1.c.iii.a incurred in connection with the development, design, oversight or construction of the

PATH concourses, access pathways, mechanical spaces and other similar PATH-related

improvements located in or immediately adjacent to the footprints of the Net Lessee Insureds'

leased premises but only if outside of the PATH Terminal Site (as defined below).  Prior to the

Settlement Amount being withdrawn, disbursed and utilized to pay for PATH Swap Amounts,

agreements ("Swap Agreements") that provide for the Port Authority or other stakeholders to

reimburse such costs to the Silverstein Net Lessee Insureds, either directly in cash or through the

Port Authority or such other stakeholders paying the cost of work that the Silverstein Net Lessee

Insureds would otherwise have been responsible for under the Master Development Agreement,

shall be in place.  Notwithstanding anything in the foregoing to the contrary, the Settlement

Amount may not be withdrawn, disbursed or utilized to pay costs and expenses relating to (x) the

PATH Project in the area of the PATH terminal bounded by the rights-of-way of Fulton,

Greenwich, Church and Dey Streets, as shown on the World Trade Center Site Diagram (the

"PATH Terminal Site") or in any area outside of the East Bathtub, and (y) the Memorial to be

located at the World Trade Center Site.

      c.     The Net Lessee Insureds acknowledge that the Master

Development Agreement contemplates the development of certain commercial space, retail

space, infrastructure and other improvements.  Nevertheless, either during the term of the Master

Development Agreement, as it currently exists or as amended, or in the event of its termination,

to the extent that the Settlement Amount is withdrawn, disbursed and utilized to pay costs and

expenses related to (i) the development, design, oversight and construction of office towers and a

-17-

WTCP 0015998

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

retail component (and related improvements and infrastructure) at the World Trade Center, as well as for lost rents/business interruption losses (including ground rent and other amounts payable from lost rents/business interruption recoveries) or (ii) PATH Swap Amounts, irrespective of whether what is developed is the same as what is described in the terms of the Master Development Agreement, such expenditures shall be deemed to comply with this paragraph 4, and Allianz does not object. Notwithstanding anything in the foregoing to the contrary, the Settlement Amount may not be withdrawn, disbursed or utilized to pay costs and expenses relating to (x) the PATH Project in the PATH Terminal Site or in any area outside of the East Bathtub, and (y) the Memorial to be located at the World Trade Center Site.

5.      Information: Within 45 days after the close of any quarterly period during which the Letters of Credit were drawn upon, the drawing Parties (or their permitted assigns) shall provide to Allianz (a) a schedule of all LOC Draw-Rate Costs during that preceding quarter; (b) *either*: a certified statement that there have been no events of the type described in subparagraphs 6.c. and 6.d, below, by any of the Silverstein Insureds; *or*: a certified statement describing any such events and attaching documents effecting such events; and (c) a narrative description of the status of the project, with the understanding that the Net Lessee Insureds will endeavor in good faith to identify any delay in the project which may have the effect of extending the LOC Termination Date and to include in the narrative sufficient information to allow Allianz to determine whether there has been a delay in the project pursuant to the terms of Section 3(m) of the SR International Stipulation. Within fifteen (15) days of the receipt of such information, Allianz may request to review back-up material necessary to permit enforcement of this Agreement and/or inspect the construction site. Any information received or reviewed by Allianz shall be kept strictly confidential by Allianz.

-18-

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

6.    Assignments:

a.    Allianz hereby consents under the Allianz Fronting Policy to (1) the transactions pursuant to which the Port Authority acquired the membership interest assets in 1 World Trade Center LLC under the Master Development Agreement and related agreements consummated on or about November 16, 2006; and (2) the transactions pursuant to which the Port Authority acquired the membership interest assets in WTC Retail under the Agreement for Purchase and Sale of Membership Interest Assets and related agreements consummated on or about December 23, 2003. With respect to Allianz's separate insurance coverage issued to the Port Authority, neither consent given in this subparagraph 6.a shall be deemed a waiver by Allianz or the Port Authority or shall in any way estop Allianz or the Port Authority from relying on any terms and conditions of such insurance coverage.

b.    Allianz hereby further consents under the Allianz Fronting Policy to any and all future assignments by the Port Authority of any or all of its rights or interests in 1 World Trade Center LLC and/or WTC Retail LLC and/or to any and all future assignments of the leasehold interests of either or both such entities, and Allianz expressly agrees that any such Port Authority assignee(s) shall have the same rights to draw upon the Letter of Credit that the Port Authority would have had in the absence of such an assignment and Allianz shall have the same rights with respect to any such assignee(s) that it would have had against the Port Authority in the absence of such an assignment. With respect to Allianz's separate insurance coverage issued to the Port Authority, the consent given in this subparagraph 6.b shall not be deemed a waiver by Allianz or the Port Authority and shall not in any way estop Allianz or the Port Authority from relying on any terms and conditions of such insurance coverage.

-19-

WTCP 0016000

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

c.      Except as otherwise expressly agreed in this paragraph 6, the Silverstein

Insureds are not permitted, directly or indirectly, to sell, assign, transfer or convey their rights or

interest under the Silverstein LOC (an "Assignment"), including by direct or indirect sale,

assignment, transfer or conveyance of a majority (greater than 50%) of the membership interests

in WTC Properties LLC or all three of the Silverstein Net Lessee Insureds, or all of their

leasehold interests in the World Trade Center Property. In the event of an Assignment, Allianz

shall have the right, subject to the other provisions of this paragraph 6 and to the terms of

paragraph 9, to cancel the Silverstein LOC. This Agreement (expressly including, without

limitation, this paragraph 6; Allianz's right to cancel the Silverstein LOC in the event of an

Assignment; and the right of the Net Lessee Insureds to draw upon the Letters of Credit) shall be

binding upon the Parties hereto and their respective successors and assigns, _provided_ that Allianz

shall remain obligated hereunder notwithstanding any assignment of its rights hereunder.

d.      Notwithstanding the foregoing and any other provision of this Agreement

to the contrary, each of the following events shall not be deemed an Assignment for the purposes

of subparagraph 6.c hereof, even if such event would have otherwise constituted an Assignment

for the purposes of subparagraph 6.c, and the effectuation of any such transaction shall not in any

way affect the right to draw amounts under the Silverstein LOC: _(i)_ the sale, assignment,

transfer, conveyance, or other disposition, pledge, hypothecation, or encumbrance of any interest

in a Silverstein Net Lessee Insured's parent, or in any person or entity which directly or

indirectly owns a beneficial interest in such Silverstein Net Lessee Insured's parent, to (x) a

Person or Persons (as such terms are defined in the Silverstein Leases) in each of which such

Silverstein Net Lessee Insured and/or one or more Related Entities (as such term is defined in the

Silverstein Leases) of such Silverstein Net Lessee Insured have in the aggregate at least a ninety

-20-

WTCP 0016001

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

percent (90%) interest and in which the remaining interests are owned by the officers, directors and/or employees of the Net Lessee Insured or of any such affiliates of the Net Lessee Insured (a "Beneficial Transfer"), or (y) a joint venture (which term shall include a partnership, limited liability company or tenancy-in-common) in which a Silverstein Net Lessee Insured and/or one or more Related Entities have in the aggregate more than a fifty percent (50%) interest and are the managing joint venturers, *(ii)* any sale, assignment, transfer, conveyance, or other disposition, pledge, hypothecation, or encumbrance of any interest in the general partner or managing member of a Silverstein Net Lessee Insured to an immediate family member of a member, partner or shareholder of such general partner or managing member, to a trust (inter-*vivos* or testamentary) for the benefit of an immediate family member of a member, partner or shareholder of the general partner(s) or managing member(s), or to the estate of a member, partner or shareholder of a Silverstein Net Lessee Insured, or its direct or indirect equity owners, or to an entity established by the general partner(s) or managing member(s), or its direct or indirect equity owners (as used herein, the term "immediate family member" shall mean: spouse; parents and grandparents; children and grandchildren (including adopted children or grandchildren)), or to an employee of a member, partner or shareholder of a Silverstein Net Lessee Insured, provided such transfer to an employee does not exceed twenty percent (20%) of the interest in such general partner or managing member of such Silverstein Net Lessee Insured, *(iii)* any sale, assignment, transfer, conveyance, issuance or other disposition, pledge, hypothecation, or encumbrance of any direct or indirect interest in a Silverstein Insured which does not result in a Change of Control; *(iv)* the transfer of a Silverstein Net Lessee Insured's direct or indirect leasehold interest in the Premises to a Lender by foreclosure, assignment-in-lieu of foreclosure, deed-in-lieu of foreclosure or otherwise and the subsequent sale by such Lender

-21-

WTCP 0016002

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

of such interest in the Premises (as such term is defined in the Silverstein Leases); *(v)* the sale, assignment, transfer or conveyance of any interest in an entity (or an entity which has an interest in such entity) which has a direct or indirect interest in a Silverstein Net Lessee Insured, *provided* that the value of such entity's direct or indirect interest in the Premises (as such term is defined in the Silverstein Leases) constitutes less than fifty percent (50)% of the value of all assets owned, directly or indirectly, by such entity and *provided* that the same does not result in a Change of Control; *(vi)* a lease or sublease, including an equity lease or similar arrangement, of any Silverstein Net Lessee Insured's portion of the World Trade Center Property, *provided* such lease or sublease does not result in a Change of Control; *(vii)* a disposition or dilution of a direct interest in a Silverstein Net Lessee Insured, *provided* such disposition or dilution results from the exercise of remedies pursuant to the organizational documents as of the date hereof of the holders of such direct interest in the Lessee following a default by the holder of such direct interest in the Lessee under such applicable organizational documents, and *provided* such disposition or dilution was not effectuated to circumvent the prohibition on Assignment set forth in this paragraph 6; *(viii)* a Change of Control of any or all of the Silverstein Net Lessee Insureds upon the death, disability of incapacity of Larry A. Silverstein; *provided* that WTC Investors LLC continues to own at least a fifty percent (50%) interest in World Trade Center Properties LLC; and *(ix)* a Direct Assignment with a Related Entity, as an Assignee, *provided*, however, that such Direct Assignment is permitted pursuant to the Silverstein Leases; and *(x)* the sale, assignment, transfer, conveyance, or other disposition, pledge, hypothecation, or encumbrance of any limited partnership or non-managing member interest if it does not result in a Change of Control.

-22-

WTCP 0016003

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

e.     For purposes of this paragraph 6, "Change of Control" shall require both

(x) a disposition of legal or beneficial ownership of an amount of the capital stock and voting

rights (with power to exercise such voting rights), membership interests, partnership interests or

other direct or indirect interests, resulting in a change in the power to direct or cause the direction

of the business decisions of a Person, whether through ownership of voting securities or by

contract or otherwise (it being understood that the right of an owner of equity in a Person to

make or veto major decisions or the like, grant or withhold certain consents, serve on a board of

directors, or act in an advisory capacity shall not constitute such power to direct or cause the

direction of the business decisions of such Person as contemplated by this definition) and (y) the

granting of a right to a Person, other than a Related Entity, to exert day-to-day control of

management or operations over a Silverstein Net Lessee Insured (it being understood that the

right of a Person to make or veto major decisions or the like, grant or withhold certain consents,

serve on a board of directors, or act in an advisory capacity shall not constitute day-to-day

control over management or operations of a Silverstein Net Lessee Insured as contemplated by

this definition); *provided,* however, that, if all proceeds of any disposition, sale, assignment,

issuance, transfer or conveyance (net of expenses and repayment of debt) received by the

Silverstein Insureds are not devoted solely to paying costs and expenses in accordance with

paragraph 4 (re: Use of Proceeds), then such disposition, sale, assignment, issuance, transfer or

conveyance shall be deemed to be a Change of Control.

f.     In the event of an Assignment of or by one or two, but not all three, of the

Silverstein Net Lessee Insureds, Allianz shall not have the right to cancel the Silverstein LOC

and the provisions of subparagraph 6.c above shall not apply; *provided,* however, that in the

event of an Assignment of or by one or two, but not all three, of the Silverstein Net Lessee

-23-

WTCP 0016004

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Insureds, Allianz shall have the right as a result thereof to cause the remaining balance of the Silverstein LOC Amount to be drawn upon solely by the Silverstein Net Lessee Insured(s) that are unaffected by such Assignment and the remaining balance of the Silverstein LOC Amount shall be available solely to reimburse the remaining Silverstein Net Lessee Insured(s) for LOC Draw-Rate Costs paid by and on behalf of such remaining Silverstein Net Lessee Insured(s).

g.    The Silverstein Insureds (*i*) shall, within fifteen (15) days of receipt, submit to Allianz a copy of all notices received by any Silverstein Insured from the Port Authority claiming, alleging or otherwise with respect to an Assignment or other sale, assignment, transfer or conveyance prohibited by Article 7 of the Silverstein Leases and (*ii*) simultaneously with delivery of any request or notice to the Port Authority required pursuant to Section 7.1.4 of the Silverstein Leases, deliver to Allianz copies of the same and all other requests submitted to the Port Authority in connection with any Silverstein Insured's request or notice of a sale, assignment, transfer or conveyance in accordance with Article 7 of its Silverstein Lease with the Port Authority. Further, the Silverstein Insureds shall simultaneously submit to Allianz documentation reasonably necessary to allow Allianz to determine whether any proposed transaction is an Assignment or a transaction contemplated by subparagraphs 6.c and 6.d, above.

h.    In the event that there is a dispute about whether an Assignment or transaction contemplated by this paragraph 6 shall have occurred, the determination of such matter must be made as a final non-appealable judicial determination in the courts of the State of New York, notwithstanding paragraphs 18 and 19 of this Agreement, and until such determination Allianz shall not be permitted to take any action to cancel the Silverstein LOC. Until such final non-appealable determination is obtained, the Insureds shall have the right to

-24-

WTCP 0016005

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

reverse or otherwise cure any Assignment, whereupon Allianz's rights in connection therewith shall cease to apply. In order to cancel the applicable Letter of Credit, Allianz shall present the Issuing Bank and all of the Net Lessee Insureds with a sworn certification in the form specified in Annex F to Exhibit A hereof indicating that Allianz intends to cancel the applicable Letter of Credit. If the Net Lessee Insureds do not dispute the validity of Allianz's submission to the Issuing Bank within fifteen (15) business days after their receipt of Allianz's certificate by delivery of written notice of dispute to the Issuing Bank and Allianz, the Issuing Bank shall cancel the applicable Letter of Credit as permitted hereunder and requested in Allianz's sworn certification. If the Insureds do dispute the validity of Allianz's submission to the Issuing Bank, the dispute shall be subject to the provisions of paragraph 18; _provided_ that, if such dispute is resolved in Allianz's favor, the disputing Net Lessee Insured(s) shall be liable to Allianz for any additional costs actually expended and disbursed by Allianz to maintain the Letters of Credit beginning on the sixteenth (16th) business day after the date of Allianz's submission. Notwithstanding the foregoing, if it is so determined that an Assignment has occurred and if draws were made by a Silverstein Net Lessee Insured against the Silverstein LOC for Lump Sum Payments scheduled to take place after the date of such Assignment or to reimburse LOC Draw-Rate Costs that were expended or disbursed after the date of such Assignment, then such Silverstein Net Lessee Insured shall be liable to Allianz for the full amount of such draws plus 5% interest from the date of each such draw.

      i.    The Silverstein Net Lessees may request confirmation from Allianz that any transaction or proposed transaction does not and will not constitute an Assignment, and in the event of any such request Allianz shall not unreasonably withhold or delay such confirmation and in any event shall respond within fifteen (15) days of request. In the event Allianz believes

WTCP 0016006

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

an inquired about transaction does constitute an Assignment, it shall provide an explanation of the reasons therefor.

    7.    Subrogation/Priority of Recovery:

The Parties to this Agreement are pursuing claims against third-parties alleged to be responsible for property and other damages occurring on September 11, 2001. These claims are pending in the United States District Court for the Southern District of New York in consolidated litigation entitled *In Re September 11 Litigation* (21 MC 97) and *In Re September 11 Property Damage and Business Loss Litigation* (21 MC 101) (collectively the "Recovery Litigation"). The Parties have a disagreement with respect to issues of subrogation and priority of recovery in the Recovery Litigation. The Parties hereby agree that they shall request that either Judge Alvin K. Hellerstein or Judge Harold Baer, Jr. of the United States District Court for the Southern District of New York (with a request that the matter of which judge is to hear the motion to be determined by the two judges) resolve this disagreement by means of one or more motions.

    8.    Obligations/Procedure:

    a.    In no event shall any Insured be responsible for the failure of any other Insured or any third party to comply with the terms of this Agreement. It is expressly understood and agreed that the obligations and/or any liabilities of each Insured hereunder shall be several and not joint and several. In no event shall any of the Westfield Insureds have any responsibility with respect to the manner in which funds are drawn from the Letters of Credit or the manner in which funds obtained from the Letters of Credit are expended.

    b.    In the event that Allianz believes in good faith that any Net Lessee Insured has drawn money from the Letters of Credit on the basis of an LOC Certificate that is inaccurate

-26-

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

or incorrect in any material respect, or after the Termination Date or an Assignment or

Abandonment that would have the effect of terminating such Net Lessee Insured's rights under

the Letters of Credit pursuant to paragraphs 1.b.ii, 2 and 6, above, or in any other manner that

violates the terms of subparagraph 1.c, Allianz shall have the right, but not the duty, in Allianz's

sole discretion, to challenge such draw or draws and, if applicable, to seek reinstatement of the

amounts so drawn ("Challenge"). If Allianz chooses to exercise this right, then it shall notify the

relevant Net Lessee Insured, with a copy to all other Insureds, of the alleged breach within thirty

(30) days of discovery of the alleged breach (which time period shall be extended by an

additional thirty (30) days upon a written request by Allianz). Upon receipt of such a notice, the

Net Lessee Insured shall have thirty (30) days to cure any breach by committing not to draw on

the Letters of Credit until such Net Lessee Insured has actually expended and disbursed LOC

Draw-Rate Costs, in addition to the LOC Threshold, equivalent to any amounts improperly

drawn from the Letters of Credit (or, in the event of a post-Termination Date, post-Assignment

or post-Abandonment draw, by restoring any amounts improperly drawn from the Letters of

Credit to the Issuing Bank within thirty (30) days with instructions for such Bank to issue a new

Letter of Credit in accordance with the terms of paragraph 1 herein reflecting the increase in

amount available thereunder as the result of such restored funds). Except with respect to post-

Termination Date, post-Assignment or post-Abandonment draws, to the extent that the period to

effect the cure in good faith will exceed thirty (30) days, the Net Lessee Insured, on notice to all

Parties herein, may request approval of a reasonable extension, not to exceed an additional sixty

(60) days, and such approval shall not be unreasonably conditioned, withheld or delayed. The

cure period shall end immediately in the event of an express refusal to cure by the Net Lessee

Insured.

WTCP 0016008

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

c.    In the event of a Challenge, if the Net Lessee Insured either fails properly to cure any breach within the relevant period set forth in paragraph 8.b, above, or asserts that it has not breached, Allianz may submit the matter to Arbitration. If Allianz elects to submit the matter to Arbitration, then it shall do so no later than forty-five (45) days after the expiration of the cure period described in paragraph 8.b, above. The exclusive remedies in such Arbitration shall be (i) a requirement that the breaching Net Lessee Insured not draw on the Letters of Credit until such Net Lessee Insured has expended amounts that otherwise could have been drawn on the Letters of Credit equivalent to any amounts improperly drawn from the Letters of Credit; or (ii) if the applicable Letter of Credit has been fully exhausted, a requirement that the breaching Net Lessee Insured restore any amounts improperly drawn from the Letters of Credit to the Issuing Bank, with instructions for such Bank to issue a new Letter of Credit in accordance with the terms of paragraph 1 herein reflecting the increase in amount available thereunder as the result of such restored funds, and (iii) in the case of a Challenge based on draws made after the Termination Date or after an Assignment or Abandonment, the remedies set forth in paragraphs 1.b.ii, 2 and 6, above. For the avoidance of doubt, the Parties agree that nothing in this paragraph 8 shall supercede, limit or otherwise affect the requirements of paragraphs 1.b.ii, 2 and 6 that, in the event of a dispute, there be a final, non-appealable judicial determination in the courts of the State of New York with respect to the occurrence of the Termination Date, an Assignment or an Abandonment.

d.    Failure by Allianz to either provide notice or pursue an Arbitration or judicial determination, as applicable, within the time periods set forth in this Agreement shall constitute a waiver of Allianz's rights in respect of the particular alleged breach of paragraphs 1.b, 1.c, 2 and 6, but not of any of Allianz's other rights under this Agreement. Notwithstanding

-28-

WTCP 0016009

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

the foregoing, Allianz may request an extension of thirty (30) days upon notice to the Net Lessee Insureds within the applicable time period set forth in this Agreement, and the Net Lessee Insureds' consent to such request shall not be unreasonably withheld, conditioned or delayed.

   e.  It is expressly understood that the rights and remedies granted to Allianz (but not to the Insureds or Lenders) contained in paragraphs 1, 2, 5, 6, 8.b and 8.c are solely and exclusively for the protection of Allianz; that they do not create any rights in any Party or third party against Allianz; that Allianz has the right but not the duty to act under these paragraphs in Allianz's sole discretion; and that in no event shall Allianz be liable to any person or entity (including, without limitation, any Party) for any improper draw by any other Party upon the Letters of Credit and/or for any breach and/or failure to cure by any other Party.

   f.  Allianz is not intended to be, and shall not be, a third-party beneficiary of the Master Development Agreement or any other agreement or lease, and nothing herein shall give Allianz any rights thereunder.

   g.  The provisions of this Agreement shall not be deemed to supplement, amend, modify or change any term or provision of any agreement between or among the Net Lessee Insureds and the Port Authority.

   9.  <u>Cooperation with Lenders</u>:  Allianz shall cooperate in good faith with the Net Lessee Insureds in their efforts to obtain financing and develop and lease the new buildings by, among other things, providing potential Lenders and other third parties within fifteen (15) days of request such clarifications and estoppel letters as such Lenders and other third parties might reasonably request with regard to the terms and the intent of this Agreement.  Allianz hereby agrees (i) that in the event that it is permitted to cancel the Letters of Credit pursuant to paragraphs 1.b.ii, 2 or 6 above, the Letters of Credit shall not be terminated or reduced below the

WTCP 0016010

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Substitute Borrowed Amount (as defined below) if any Lender shall have advanced and not been repaid any funds in respect of which a draw could have been made under the Letters of Credit if the applicable Net Lessee Insured had so chosen (the amount of such funds, the "Substitute Borrowed Amount"), and, instead, the LOC Amount shall be reduced to the Substitute Borrowed Amount and the Lender shall be permitted to draw upon the Letters of Credit for the Substitute Borrowed Amount to repay itself; and (ii) that its rights under paragraphs 1.b.ii, 2 and 6 are expressly subject and subordinate to, and shall not be used to interfere with, the rights of a Lender to repayment of any Substitute Borrowed Amount, including through such Lender drawing against the Letters of Credit, and in any event shall not be exercised until all Lenders shall have been repaid in full.

10.    No Further Obligations:  Upon the issuance of the Letters of Credit, the Allianz Fronting Policy is deemed fully bought out, paid and satisfied in full.  Except as otherwise set forth herein, Allianz shall have no further obligations of any sort to the Insureds with respect to the Allianz Fronting Policy.

11.    Release by the Insureds:  Effective upon the issuance of the Letters of Credit, the Insureds, on behalf of themselves, their parents, subsidiaries, affiliates, partners, successors and assigns, and all of their officers, directors, shareholders, investors, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, hereby fully and forever release, acquit, discharge and covenant not to sue Allianz and each of its parents, subsidiaries, affiliates, partners, successors and assigns and all of their respective officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, from any and all claims, demands, debts, causes of action, obligations or liabilities of whatever kind and nature, past, present or

WTCP 0016011

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

future, known or unknown, asserted or unasserted, in law or in equity that directly or indirectly

concern, arise out of, or relate to the Allianz Fronting Policy, the Insureds' claims for insurance

coverage thereunder, and/or the Lawsuits, including, without limitation, all claims and

counterclaims that were brought or could have been brought by any of the Insureds against

Allianz in any of the Lawsuits.  This release and covenant not to sue includes without limitation

any and all claims for compensatory, consequential, multiple or punitive damages, interest, costs

or attorneys fees including those arising out of any allegation of breach of contract, bad faith,

improper or fraudulent claims, unfair claims practices, malpractice, slander, libel, tortious

interference with contract or any other theory or cause of action whatsoever in connection with

the investigation and/or making of or resolution of claims under the Allianz Fronting Policy and

the handling, adjustment, litigation or settlement of this matter.  This release and covenant not to

sue does not cover:  (a) any claims, demands, debts, causes of action, obligations or liabilities

that were or could have been raised against any insurer other than Allianz that participated in the

first-party property and business interruption/lost rents insurance issued to WTC Properties LLC

and other entities on the World Trade Center Property (the "World Trade Center Property

Insurance Program"); (b) any claims, demands, debts, causes of action, obligations or liabilities

concerning any insurance for any Westfield entity anywhere in the world at any time, other than

the Allianz Fronting Policy; (c) any claims, demands, debts, causes of action, obligations or

liabilities concerning any insurance issued by Allianz other than the Allianz Fronting Policy,

including, but not limited to, the Port Authority's separate program of property damage, extra

expense, and business interruption insurance; (d) except as set forth in paragraph 7, any claims,

demands, debts, causes of action, obligations or liabilities relating to matters of subrogation,

priority of recovery and claims against third parties; and (e) any obligations created herein.

WTCP 0016012

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

12.    Release by Allianz:

Effective upon the issuance of the Letters of Credit, Allianz, on behalf of itself and its

parents, subsidiaries, affiliates, partners, successors and assigns, and all of their officers,

directors, shareholders, investors, members, principals, employees, agents, servants, attorneys,

adjusters, accountants, trustees and legal representatives, hereby fully and forever release, acquit,

discharge and covenant not to sue the Insureds and each of their parents, subsidiaries, affiliates,

successors and assigns, and all of their respective officers, directors, shareholders, members,

principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal

representatives, from any and all claims, demands, debts, causes of action, obligations or

liabilities of whatever kind and nature, past, present or future, known or unknown, asserted or

unasserted, in law or in equity that directly or indirectly concern, arise out of, or relate to the

Allianz Fronting Policy, the Insureds' claims for insurance coverage thereunder, and/or the

Lawsuits, including, without limitation, all claims and counterclaims that were brought or could

have been brought by Allianz against any of the Insureds in any of the Lawsuits. This release

and covenant not to sue includes without limitation any and all claims for compensatory,

consequential, multiple or punitive damages, interest, costs or attorneys fees including those

arising out of any allegation of breach of contract, bad faith, improper or fraudulent claims,

unfair claims practices, malpractice, slander, libel, tortious interference with contract or any

other theory or cause of action whatsoever in connection with the investigation and/or making of

or resolution of claims under the Allianz Fronting Policy and the handling, adjustment, litigation

or settlement of this matter. This release and covenant not to sue does not cover: (a) any claims,

demands, debts, causes of action, obligations or liabilities that were or could have been raised

against any insurer other than Allianz that participated in the World Trade Center Property

-32-

WTCP 0016013

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Insurance Program; (b) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance for any Westfield entity anywhere in the world at any time, other than the Allianz Fronting Policy; (c) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance issued by Allianz other than the Allianz Fronting Policy, including, but not limited to, the Port Authority's separate program of property damage, extra expense, and business interruption insurance; (d) except as set forth in paragraph 7, any claims, demands, debts, causes of action, obligations or liabilities relating to matters of subrogation, priority of recovery and claims against third parties; and (e) any obligations created herein.

13.    Dismissal:

Within fifteen (15) days of the issuance of the Letters of Credit according to the terms of paragraph 1.b, or, in the event either or both of the Letters of Credit are not properly issued, within fifteen (15) days of the date the escrows provided for in paragraph 1.b are established: (a) the Insureds and Allianz shall jointly file with the respective courts motions dismissing all claims and counterclaims as between the Insureds and Allianz from the Lawsuits with prejudice and without costs as to any party, pursuant to the terms of agreed-upon forms of order, which order shall have a provision consistent with the terms of this Agreement reserving the Parties' respective rights with respect to claims of subrogation and priority of recovery as provided in paragraph 7; and (b) all Parties, to the extent that they have made any claims against any other Party to this Agreement for costs and expenses with respect to the Lawsuits, shall withdraw any such claim for costs and expenses, and shall not seek to recover or collect any costs related to the appeal of the Federal Action to the United States Court of Appeals for the Second Circuit.

WTCP 0016014

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

14.    <u>No Admissions</u>:

The consideration for this Agreement is the result of negotiation between the Parties for the compromise of disputed claims. Neither this Agreement nor the Parties' compliance with its terms shall be used as an admission against Allianz or the Insureds on this or any other past, present or future claim or matter.

15.    <u>Authority</u>:

The persons signing below on behalf of the respective Parties represent and warrant that they are duly authorized to enter into this Agreement. Additionally, the respective Parties represent and warrant that they have not assigned or transferred in any way the right to pursue and settle the claims that are the subject of this Agreement.

16.    <u>No Third-Party Beneficiaries</u>:

This Agreement is solely for the benefit of the Parties. It is expressly understood that there are no third-party beneficiaries to the Agreement, including, without limitation, any other insurers on the World Trade Center Property Insurance Program or any other insurers providing coverage of any kind to the Insureds; *provided*, however, that Lenders may rely upon and enforce the terms of paragraphs 1, 2, 6, 8 and 9 herein according to their terms.

17.    <u>Governing Law</u>:

This Agreement is executed and delivered in the State of New York, and it is the desire and intention of the Parties that it be in all respects interpreted according to the laws of the State of New York. Each of the Parties hereto (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) specifically and irrevocably consents to the exclusive jurisdiction of the courts of the State of New York with respect to all

-34-

WTCP 0016015

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

matters concerning this Agreement and its enforcement, subject to paragraphs 18 and 19 below. Each of the Parties agrees that the execution and performance of this Agreement shall have a New York situs and, accordingly, they each consent (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) to personal jurisdiction in the State of New York for all purposes and proceedings arising from this Agreement, subject to paragraphs 18 and 19 below. "Port Authority Legislation" shall mean the concurrent legislation of the State of New York and State of New Jersey set forth at Chapter 301 of the Laws of New York of 1950, as amended by Chapter 938 of the Laws of New York of 1974 (McKinney's Unconsolidated Laws §§7101-7112) and Chapter 204 of the Laws of New Jersey of 1951 (N.J.S.A. 32:1-157 to 32:1-168).

18.    Dispute Resolution:

Matters subject to Arbitration under this Agreement shall be resolved as follows:

a.    Any Party may deliver to the other Parties a written notice seeking arbitration (an "Arbitration Notice") with respect to any matter subject to Arbitration under this Agreement.

b.    Any Arbitration under this Agreement shall be conducted by three arbitrators (the "Arbitrators") who shall be mutually selected by the Parties hereto within seven (7) days of the sending of an Arbitration Notice. If the Parties are unable mutually to agree upon three arbitrators, the Insureds shall choose one arbitrator, Allianz shall choose one arbitrator, and the two arbitrators selected by the Parties shall select the third arbitrator within seven (7) days.

WTCP 0016016

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

c.    Each Arbitration commenced pursuant to this paragraph shall be conducted in accordance with the then-prevailing commercial arbitration rules of the American Arbitration Association ("AAA"), except as modified above and as follows:

i.    Each Arbitration shall be conducted on an expedited basis and, unless otherwise agreed by the parties to the Arbitration, shall be completed within thirty (30) days of the selection of the Arbitrators, except that the Arbitrators may in their discretion extend the date if for completion an additional thirty (30) days.

ii.    The Arbitrators shall render their decision in writing, signed by each Arbitrator ("Decision"). The decision by any two Arbitrators shall be conclusive and binding on the Parties; shall constitute an "award" by the Arbitrators within the meaning of the AAA rules and applicable law; and judgment may be entered thereon in any court of competent jurisdiction.

iii.    Each Party shall pay its own fees and expenses relating to the Arbitration.

19.    Remedies:

The Parties agree that, except as provided in paragraphs 1.b.ii, 2 and 6 above, the sole mechanism for the resolution of disputes under this Agreement shall be through the pursuit of Arbitration. Subject to the specific terms and restrictions set forth in this paragraph 19 and paragraphs 1.b.ii, 2, 6 and 18, above, any Party may pursue Arbitration seeking a Decision directing specific performance of, and/or compliance with, the terms of this Agreement. If Allianz commences an action or Arbitration against any of the Insureds, Allianz shall not seek an injunction halting construction at the World Trade Center site. The Parties agree that a breach of

-36-

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

any term of this Agreement shall not entitle any Party to claim that it is entitled to rescind this

Agreement.

    20.   Notifications:

Notifications hereunder shall be sent by overnight mail and email as follows:

> To Allianz:
>
> Stephen L. Kovach
> Vice President
> Allianz Global Risks US Insurance Company
> Claims Department
> P.O. Box 7782
> Burbank, CA  91510-7782
>
> Email: skovach@aic-allianz.com
>
> With a copy to:
>
> Catherine M. Colinvaux
> Zelle, Hofmann, Voelbel, Mason & Gette, LLP
> 950 Winter Street, Suite 1300
> Waltham, Massachusetts 02451
>
> Email: ccolinvaux@zelle.com
>
> To the Silverstein Insureds:
>
> Larry A. Silverstein
> President
> and
> Michael L. Levy
> Chief Financial Officer
> Silverstein Properties, Inc.
> 7 World Trade Center
> 250 Greenwich Street
> New York, New York 10007
>
> Email:  lsilverstein@silvprop.com
>         mlevy@silvprop.com
>
> With a copy to:

-37-

WTCP 0016018

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Marc Wolinsky, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

Email: mwolinsky@wlrk.com

With a copy to the Lenders, as such may be designated in writing to the
Parties from time to time.


The Port Authority, 1 World Trade Center LLC and WTC Retail LLC:

A. Paul Blanco
Chief Financial Officer
The Port Authority of New York and New Jersey
225 Park Avenue South
15th Floor
New York, New York 10003

Email: pblanco@panynj.gov

With a copy:

Darrell Buchbinder, Esq.
General Counsel
The Port Authority of New York and New Jersey
225 Park Avenue South
15th Floor
New York, New York 10003-1604

Email: dbuchbin@panynj.gov

With a copy to Lenders, as such may be designated in writing to the
Parties from time to time.

The Westfield Insureds:

Peter Schwartz, Esq.
Westfield America, Inc.
11601 Wilshire Boulevard
12th Floor
Los Angeles, California 90025

Email: PScwartz@us.westfield.com


-38-

WTCP 0016019

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

With a copy:

Peter K. Rosen, Esq.
Latham & Watkins, LLP
633 West Fifth Street, Suite 4000
Los Angeles, California 90071

Email: Peter.Rosen@lw.com

Any Party may change the individual to whom or address to which notifications are to be sent by written notice to the others. Notwithstanding any provision of this Agreement to the contrary, notices shall not be deemed sent to any Silverstein Insured or Port Authority Insured unless copies have been provided to the Lenders designated above (and to such other Lenders as the Silverstein Insureds or Port Authority Insureds may designate in writing to each of the Parties from time to time).

21.    No Waiver:

The failure of a Party to enforce, in any one or more instances, any term or condition of this Agreement shall not be construed as a waiver of the future performance of any such term or condition.

22.    Entire Agreement:

The Parties acknowledge and agree that this Agreement embodies the entire and complete terms and conditions of their agreement described herein and that it supersedes any and all prior representations, understandings and agreements, whether written or oral.

23.    Publicity:

The Parties to this Agreement agree that any press release, public announcement, disclosure or other public comment (including comments to elected officials and government officers, but excepting statements (i) under compulsion of law, (ii) under oath in response to a

-39-

WTCP 0016020

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

formal government inquiry or (iii) made in the course of litigation or other legal process or proceedings), regarding this settlement and the claims being settled, that is initiated, encouraged or facilitated by a Party or Parties shall not contain any negative or adverse characterization of any other Party or Parties. A breach of this paragraph 23 shall entitle the non-breaching Party to obtain actual money damages, if any, under paragraphs 18 and 19 of this Agreement.

24.    Amendment:

This Agreement may not be amended, supplemented or modified except by a written instrument duly executed by the Parties.

25.    Construction:

Allianz and the Insureds have all participated in the drafting and negotiation of this Agreement after consulting with counsel. Therefore, if any question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party solely by virtue of the authorship of any of the provisions of this Agreement.

26.    Severability:

If any provision of this Agreement, or any portion of any provision of this Agreement, shall be declared illegal, invalid, null and void or unenforceable by any court or tribunal having jurisdiction thereof, such provision or portion thereof shall be deemed separate or apart from the remainder of this Agreement, which shall remain in full force and effect.

27.    Headings:

Section headings contained herein are for the purpose of organization only, and shall not constitute a part of this Agreement.

-40-

WTCP 0016021

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

28.     <u>Execution in Counterparts</u>:

This Agreement may be signed in counterparts, and a facsimile or electronically scanned copy of an executed signature page shall be as effective as an original. All fully executed copies shall be considered duplicate originals.

29.     <u>Effective Date</u>:

The "Effective Date" of this Agreement shall be the date of the last signature set forth below.

-41-

WTCP 0016022

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By:_____
Name: Micdroe Levy
Its:  SVP
Dated:  7/6/07


WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By:_____
Name:
Its:
Dated:


THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By:_____
Name:
Its:
Dated:


-42-

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By:_____
    Name:
    Its:
    Dated:

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By:_____
    Name: PETER SCHWARTZ
    Its: SR. EX V.P.
    Dated: 7/9/07

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By:_____
    Name:
    Its:
    Dated:

-42-

WTCP 0016024

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly
known as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By:_____
    Name:
    Its:
    Dated:

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By:_____
    Name:
    Its:
    Dated:

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By:_____
    Name:  Anne Marie Mulligan
    Its:    Treasurer
    Dated:  July 9, 2007

-42-

WTCP 0016025

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")
 By: The Port Authority of New York and
   New Jersey, its sole member

By:_____
 Name: Timothy Lizura
 Its:  Deputy Director of Development
 Dated: July 9, 2007


1 WORLD TRADE CENTER LLC
 By: The Port Authority of New York and
   New Jersey, its sole member

 By:_____
  Name: Timothy Lizura
  Its:  Deputy Director of Development
  Dated: July 9, 2007


ALLIANZ GLOBAL RISKS US INSURANCE
COMPANY


 By:_____
  Name:
  Its:
  Dated:

-43-

WTCP 0016026

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")

By:_____
    Name:
    Its:
    Dated:

1 WORLD TRADE CENTER LLC

    By:_____
        Name:
        Its:
        Dated:

ALLIANZ GLOBAL RISKS US INSURANCE
COMPANY

    By: Brent A Sorenson
        Name: BRENT A. SORENSON
        Its: SENIOR VICE PRESIDENT
        Dated: July 6, 2007

-46-

WTCP 0016027

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

**Exhibit A**

[Form of Letter of Credit]

[Letterhead of Money Center Bank]

## LETTER OF CREDIT

2 World Trade Center LLC
3 World Trade Center LLC
4 World Trade Center LLC
[ADDRESS]

[or, depending on beneficiary]

WTC Retail LLC
1 World Trade Center LLC
[ADDRESS]

Ladies and Gentlemen:

1.    At the request and for the account of Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("Allianz"), we engage with and hereby establish in favor of [first letter of credit: 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC] [second letter of credit: WTC Retail LLC and 1 World Trade Center LLC] (each, a "Beneficiary" , and collectively, "you") this Letter of Credit ("this Credit") in an amount not exceeding U.S. $[•] (the "Credit Amount").

2.    On or after [•], any of you may demand payment of U.S. $[•] (the "First Lump Sum Payment Amount") of the Credit Amount by presentation of a draft and request for payment, in the form of Annex A, signed by the requesting person.[1]

3.    On or after [•], any of you may demand payment of U.S. $[•] (the "Second Lump Sum Payment Amount") of the Credit Amount by presentation of a draft and request for payment, in the form of Annex B, signed by the requesting person.[2]

4.    On or after the dates set forth in Annex D, any of you may demand payment of all or a portion of the Payment Amount reflected on Annex D with respect to each such date (or, if draws prior to such dates have not been made, in whole or in part, then in the Payment

---

[1] Source: Para. 1.c.i. of the Settlement Agreement.
[2] Source: Para. 1.c.ii. of Settlement Agreement.

W/1152820v7

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Amount reflected on Annex D plus additional amounts not to exceed the amount of prior missed draws) by presentation of a sight draft and certificate, in the form of Annex C.[3]

5.    This Credit shall have an initial term of one year, which shall automatically be renewed for successive one-year terms until the earlier of the date that the Credit Amount is reduced to zero or this Credit is terminated after Certification by Allianz as set forth in paragraph 6, below, unless we have provided a written notice of non-renewal, in the form of Annex E, to each party (each such party, a "Notice Party") listed on Appendix A (which is part of this Credit) in the manner provided therein, not less than sixty (60) days nor more than ninety (90) days prior to the expiration date of the then-effective term, and the Credit Amount may be drawn down in full by you if not replaced by a letter of credit issued by a bank with a credit rating of AA or better and undivided capital and surplus of at least five billion dollars (U.S. $5,000,000,000) containing identical terms, or with such immaterial variations as may be acceptable to the Beneficiaries, acting reasonably, to this Credit by the date that is twenty-one (21) days prior to the expiration of the then-effective term.

6.    You understand and agree that this Letter of Credit may be terminated by Allianz acting pursuant to the terms of the Settlement Agreement, dated as of [•], 2007, among Allianz, each of you and certain other parties thereto (the "Settlement Agreement"). In order to terminate the Letter of Credit, Allianz (or its legal successor) must present to us a Certificate in the form of Annex F hereto. We hereby undertake not to terminate this Letter of Credit if you object to such Certificate by notice to us within fifteen (15) business days.

7.    We hereby undertake that any draft drawn under and in compliance with this Credit prior to its expiration as set forth herein will be duly honored after presentation and delivery of the documents hereinabove set forth. Payment upon the draft shall be made by us immediately, but in no event later than the following business day, to such person as is designated in the draft, in immediately available funds by wire transfer by us to such account in the United States as is specified for payment in the draft presented to us. Except to the extent expressly set forth in the preceding sentence, any rights to defer honor of your demands for payment hereunder are hereby waived.

8.    [For second letter of credit: Each reference to 1 World Trade Center LLC or WTC Retail LLC shall include its successors or any assignee of all or substantially all of its assets.] [For first letter of credit: This Credit and your rights to draw hereunder are not assignable, except to permitted successors and assigns.]

9.    This Credit and all rights hereunder may be pledged, hypothecated or otherwise encumbered.

10.    Any provisions of Section 5-106 of the Uniform Commercial Code (the "UCC") to the contrary notwithstanding, we hereby undertake that, except as stated herein, we will not modify, revoke or, except as set forth above, terminate this Credit without your written

---

[3] Source: Para. 1.c.iii. of Settlement Agreement.

WTCP 0016029

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

consent. Except as stated herein, payment of drafts drawn under this Credit is not subject to any condition or qualification. This Credit sets forth in full the terms of our undertaking, and such undertaking shall not be modified, annulled or amplified by reference to any other document, instrument or agreement referred to herein or in which this Credit is referred to or to which this Credit relates, and any such reference shall not be deemed to incorporate herein by reference any document, instrument or agreement. Our obligations hereunder are primary obligations and shall not be affected by the performance or nonperformance by you or Allianz of any obligations under any agreement between Allianz and you or between Allianz and us.

11.   All documents presented to us in connection with any demand for payment hereunder, as well as all notices and other communications to us in respect of this Credit, shall be in writing (including without limitation by telecopy), addressed to us at the following address:

       [INSERT ADDRESS]

12.   This Credit is subject to the Uniform Customs and Practice for Documentary Credits, 1993 Revision, ICC Publication No. 500.

13.   This Credit is issued under and governed by Article 5 of the UCC as in effect from time to time in the State of New York. This Credit shall be deemed to be a contract made under the laws of the State of New York.

Dated:

                          Very truly yours,

                          [NAME OF BANK]

                          By: _____
                              Authorized Signer

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Appendix A

Notifications hereunder shall be sent by overnight mail and email as follows:

<u>To Allianz</u>:

Stephen L. Kovach
Vice President
Allianz Global Risks US Insurance Company
Claims Department
P.O. Box 7782
Burbank, CA  91510-7782

Email: skovach@aic-allianz.com

With a copy to:

Catherine M. Colinvaux
Zelle, Hofmann, Voelbel, Mason & Gette, LLP
950 Winter Street, Suite 1300
Waltham, Massachusetts 02451

Email: ccolinvaux@zelle.com

<u>To 2 World Trade Center LLC, 3 World Trade Center LLC and 4 World Trade Center LLC</u>
("Silverstein Beneficiaries"):

Larry Silverstein, President
Michael L. Levy,        Chief Financial Officer
Silverstein Properties, Inc.
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Email:  lsilverstein@silvprop.com
          mlevy@silvprop.com

With a copy to:

Marc Wolinsky, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

Email:  mwolinsky@wlrk.com

With a copy to such Lenders as may be designated in writing by the Silverstein Beneficiaries from time to time.

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

To The Port Authority of New York and New Jersey, 1 World Trade Center LLC and WTC Retail LLC:

A. Paul Blanco
Chief Financial Officer
The Port Authority of New York and New Jersey
225 Park Avenue South
15th Floor
New York, New York 10003

Email: pblanco@panynj.gov


With a copy:

Darrell Buchbinder, Esq.
General Counsel
The Port Authority of New York and New Jersey
225 Park Avenue South
14th Floor
New York, New York 10003-1604

Email: dbuchbin@panynj.gov

You may change the individual to whom or address to which notifications are to be sent by written notice to us with a copy sent to all notice recipients on this Appendix A. Notwithstanding any provision of this Credit to the contrary, notices shall not be deemed sent to any Silverstein Beneficiary unless copies have been provided to the Lenders designated above (and to such other Lenders as the Silverstein Beneficiaries may designate in writing to us with a copy to each of the other Notice Parties from time to time).

WTCP 0016032

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Annex A

## DRAFT AND REQUEST FOR PAYMENT

Date:

[NAME AND ADDRESS OF ISSUING BANK]

Attention:

Ladies and Gentlemen:

The undersigned hereby draws the First Lump Sum Payment Amount on the Letter of Credit (the "Letter of Credit") dated [•], 2007, issued by [NAME OF BANK] in favor of [2 World Trade Center LLC, 3 World Trade Center LLC, 4 World Trade Center LLC/WTC Retail LLC and 1 World Trade Center LLC] (the "Beneficiaries"). Capitalized terms used herein and not otherwise defined are used as defined in the Letter of Credit.

Please make payment to the following account:

| Account | Amount |
|---------|--------|
| [Insert Account Information] | [Silverstein LOC: $16,950,000]<br>[WTC 1/Retail LOC: $13,050,000] |

IN WITNESS WHEREOF, the Beneficiary named below has executed and delivered this instrument this _____ day of _____, _____.

[INSERT NAME OF BENEFICIARY MAKING DRAW]

By: _____
        Authorized Officer

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Annex B

## DRAFT AND REQUEST FOR PAYMENT

Date:

[NAME AND ADDRESS OF ISSUING BANK]

Attention:

Ladies and Gentlemen:

The undersigned hereby draws the Second Lump Sum Payment Amount on the Letter of Credit (the "Letter of Credit") dated [•], 2007, issued by [NAME OF BANK] in favor of [2 World Trade Center LLC, 3 World Trade Center LLC, 4 World Trade Center LLC/WTC Retail LLC and 1 World Trade Center LLC] (the "Beneficiaries"). Capitalized terms used herein and not otherwise defined are used as defined in the Letter of Credit.

Please make payment to the following account:

| Account | Amount |
|---|---|
| [Insert Account Information] | [Silverstein LOC:  $16,950,000]<br>[WTC 1/Retail LOC:  $13,050,000] |

IN WITNESS WHEREOF, the Beneficiary named below has executed and delivered this instrument this _____ day of _____, ____.

[INSERT NAME OF BENEFICIARY
MAKING DRAW]

By: _____
    Authorized Officer

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Annex C

## DRAFT AND REQUEST FOR PAYMENT

Date:

[NAME AND ADDRESS OF ISSUING BANK]

Attention:

Ladies and Gentlemen:

The undersigned hereby draws U.S. $[•] on the Letter of Credit (the "Letter of Credit") dated [•], 2007, issued by [NAME OF BANK] (the "Issuer") in favor of [2 World Trade Center LLC, 3 World Trade Center LLC, 4 World Trade Center LLC/WTC Retail LLC and 1 World Trade Center LLC] (the "Beneficiaries"). Capitalized terms used herein and not otherwise defined are used as defined in the Letter of Credit.

In connection therewith, the undersigned hereby certifies to the Issuer that it has met all of the requirements under paragraphs 1.b, 1.c, 2 and 6.h. of the Settlement Agreement to be permitted to make this draw and further, that the amount of this draw is no more than the Beneficiary is allowed to draw under paragraphs 1.b, 1.c, 2 and 6.h of the Settlement Agreement.

Please make payment to the following accounts in the following amounts:

Account                                    Amount

[Insert Account Information]               [Insert Amounts]

IN WITNESS WHEREOF, the Beneficiary named below has executed and delivered this instrument this _____ day of _____, _____.

[INSERT NAME OF BENEFICIARY MAKING DRAW]

By: _____
      Authorized Officer

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Annex D

## LETTER OF CREDIT DRAW SCHEDULE
### (Thousands)

|              | Port Draws | Silverstein Draws |
|--------------|------------|-------------------|
|              |            |                   |
| 31-Jan-08    | 3,001      | 1,946             |
| 29-Feb-08    | 3,001      | 1,946             |
| 31-Mar-08    | 3,001      | 1,946             |
| 30-Apr-08    | 3,001      | 1,946             |
| 30-May-08    | 3,001      | 1,946             |
| 30-Jun-08    | 3,001      | 1,946             |
| 31-Jul-08    | 3,001      | 1,946             |
| 29-Aug-08    | 3,001      | 1,946             |
| 30-Sep-08    | 3,001      | 1,946             |
| 31-Oct-08    | 3,001      | 1,946             |
| 28-Nov-08    | 3,001      | 1,946             |
| 31-Dec-08    | 3,001      | 1,946             |
| 30-Jan-09    | 4,891      | 5,723             |
| 27-Feb-09    | 4,891      | 5,723             |
| 31-Mar-09    | 4,891      | 5,723             |
| 30-Apr-09    | 4,891      | 5,723             |
| 29-May-09    | 4,891      | 5,723             |
| 30-Jun-09    | 4,891      | 5,723             |
| 31-Jul-09    | 4,891      | 5,723             |
| 31-Aug-09    | 4,891      | 5,723             |
| 30-Sep-09    | 4,891      | 5,723             |
| 30-Oct-09    | 4,891      | 5,723             |
| 30-Nov-09    | 4,891      | 5,723             |
| 31-Dec-09    | 4,891      | 5,723             |
| 29-Jan-10    | 5,785      | 8,032             |
| 26-Feb-10    | 5,785      | 8,032             |
| 31-Mar-10    | 5,785      | 8,032             |
| 30-Apr-10    | 5,238.93   | 8,032             |
| 31-May-10    |            | 8,032             |
| 30-Jun-10    |            | 8,032             |
| 30-Jul-10    |            | 8,032             |
| 31-Aug-10    |            | 4,100.483         |
|              |            |                   |
| Sub-totals:  | 117,297.93 | 152,352.483       |

WTCP 0016036

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Annex E

## NOTICE OF NON-RENEWAL OF LETTER OF CREDIT

Date:

[NAME AND ADDRESS OF EACH NOTICE PARTY]

Ladies and Gentlemen:

[NAME OF BANK] (the "Issuer") hereby provides notice pursuant to paragraph [5] of the Letter of Credit (the "Letter of Credit") dated [•], 2007, issued by the Issuer in favor of [2 World Trade Center LLC, 3 World Trade Center LLC, 4 World Trade Center LLC/WTC Retail LLC and 1 World Trade Center LLC] (the "Beneficiaries") that the Letter of Credit will not be renewed after the expiration of its current term on [•].


IN WITNESS WHEREOF, the Issuer has executed and delivered this instrument this _____ day of _____, _____.

[NAME OF BANK]


By: _____
        Authorized Officer

WTCP 0016037

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WTCP 0016038

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Annex F

## REQUEST FOR TERMINATION OF LETTER OF CREDIT

Date:

[NAME AND ADDRESS OF ISSUING BANK]

Attention:

Ladies and Gentlemen:

      The undersigned hereby requests cancellation of this Letter of Credit (the "Letter of Credit") dated [•], 2007, issued by the Issuer in favor of [2 World Trade Center LLC, 3 World Trade Center LLC, 4 World Trade Center LLC/WTC Retail LLC and 1 World Trade Center LLC] effective immediately, pursuant to paragraph 6 of the Letter of Credit. Capitalized terms used herein and not otherwise defined are used as defined in the Letter of Credit.

      In connection therewith, the undersigned hereby certifies to the Issuer that it is permitted to terminate this Letter of Credit pursuant to [paragraph 1.b.ii /paragraph 2/ paragraph6] of the Settlement Agreement.

      Please cancel the Letter of Credit forthwith.

      IN WITNESS WHEREOF, Allianz (or its legal successor) has executed and delivered this instrument this _____ day of _____, _____.

By: _____
        Authorized Officer

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER IN RE
SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y.)
21 MC 101 (AKH) (S.D.N.Y.)
CONFIDENTIAL - DO NOT COPY OR DISCLOSE

## EXHIBIT B
## LETTER OF CREDIT DRAW SCHEDULE
### (Thousands)

| | Port Draws | Silverstein Draws |
|---|---|---|
| 31-Jan-08 | 3,001 | 1,946 |
| 29-Feb-08 | 3,001 | 1,946 |
| 31-Mar-08 | 3,001 | 1,946 |
| 30-Apr-08 | 3,001 | 1,946 |
| 30-May-08 | 3,001 | 1,946 |
| 30-Jun-08 | 3,001 | 1,946 |
| 31-Jul-08 | 3,001 | 1,946 |
| 29-Aug-08 | 3,001 | 1,946 |
| 30-Sep-08 | 3,001 | 1,946 |
| 31-Oct-08 | 3,001 | 1,946 |
| 28-Nov-08 | 3,001 | 1,946 |
| 31-Dec-08 | 3,001 | 1,946 |
| 30-Jan-09 | 4,891 | 5,723 |
| 27-Feb-09 | 4,891 | 5,723 |
| 31-Mar-09 | 4,891 | 5,723 |
| 30-Apr-09 | 4,891 | 5,723 |
| 29-May-09 | 4,891 | 5,723 |
| 30-Jun-09 | 4,891 | 5,723 |
| 31-Jul-09 | 4,891 | 5,723 |
| 31-Aug-09 | 4,891 | 5,723 |
| 30-Sep-09 | 4,891 | 5,723 |
| 30-Oct-09 | 4,891 | 5,723 |
| 30-Nov-09 | 4,891 | 5,723 |
| 31-Dec-09 | 4,891 | 5,723 |
| 29-Jan-10 | 5,785 | 8,032 |
| 26-Feb-10 | 5,785 | 8,032 |
| 31-Mar-10 | 5,785 | 8,032 |
| 30-Apr-10 | 5,238.93 | 8,032 |
| 31-May-10 | | 8,032 |
| 30-Jun-10 | | 8,032 |
| 30-Jul-10 | | 8,032 |
| 31-Aug-10 | | 4,100.483 |
| **Sub-totals:** | 117,297.93 | 152,352.483 |

-45-

WTCP 0016040

# EXHIBIT 13

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made between:

- Allianz Global Risks US Insurance Company f/k/a Allianz Insurance Company ("Allianz")

on the one hand; and, on the other hand:

- World Trade Center Properties LLC ("WTC Properties LLC"), Silverstein Properties, Inc., Silverstein WTC Mgmt. Co., LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as "5 World Trade Center LLC"), and 4 World Trade Center LLC (hereinafter collectively referred to as the "Silverstein Insureds");

- Westfield, LLC (formerly known as "Westfield Corporation, Inc.") and Westfield America, Inc. (hereinafter collectively referred to as the "Westfield Insureds"); and

- WTC Retail LLC (formerly known as "Westfield WTC LLC"), 1 World Trade Center LLC; and

- The Port Authority of New York and New Jersey ("Port Authority").

Throughout this Agreement, all parties other than Allianz are collectively referred to as the "Insureds" and individually referred to as an "Insured"; WTC Retail LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Net Lessee Insureds"; 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC are collectively referred to as the "Silverstein Net Lessee Insureds"; WTC Retail LLC and 1 World Trade Center LLC are collectively referred to as

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

the "Port Authority Net Lessee Insureds"; and Allianz and the Insureds are referred to herein as the "Parties" (each, a "Party"), unless otherwise indicated.

WHEREAS, pursuant to net leases dated on or about July 16, 2001, the Net Lessee Insureds leased from the Port Authority certain buildings and structures at the World Trade Center (hereinafter referred to as the "World Trade Center Property");

WHEREAS, in August 2001, Allianz issued insurance policy No. CLP 3001091 (the "Allianz Direct Policy") in the amount of $7,898,734 per occurrence in Layer 3 ($25 million xs $50 million) and in the amount of $70,000,000 per occurrence in Layer 6 ($250 million xs $250 million), including, subject to the policy terms and conditions, insurance for the World Trade Center Property and business interruption/lost rents;

WHEREAS, Allianz also issued insurance policy No. CLP 3001140, which is the subject of a separate Settlement Agreement of even date (the "Fronting Policy Settlement Agreement");

WHEREAS, Allianz agreed to deem each of the Insureds to be insureds and/or loss payees and/or mortgagees, as their interests may be, under the Allianz Direct Policy;

WHEREAS, the World Trade Center Property was destroyed on September 11, 2001;

WHEREAS, Allianz has previously advanced the Insureds $155,797,468 under the Allianz Direct Policy;

WHEREAS, the Parties disputed whether the destruction of the World Trade Center Property constituted one or more than one occurrence under the Allianz Direct Policy and various other issues concerning the Parties' rights and obligations under the Allianz Direct Policy arising out of the destruction of the World Trade Center Property;

ALLIANZ DIRECT SETTLEMENT -- 2

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WHEREAS, the Parties have litigated this dispute in the civil actions numbered Case Numbers 01-CV-9291 and 02-CV-0017 in the United States District Court for the Southern District of New York and have taken related appeals (collectively, the "Federal Action"), and also in Index Numbers 602857/03, 602897/03, and 402523/06 in the Supreme Court of the State of New York, County of New York (collectively, the "State Actions") (all collectively, the "Lawsuits");

WHEREAS, the Parties litigated the number-of-occurrences issue in the Federal Action;

WHEREAS, on December 6, 2004, a jury in the Federal Action found that, under the Allianz Direct Policy, the Parties intended to treat what happened on September 11, 2001 at the World Trade Center as two occurrences;

WHEREAS, Allianz appealed from the jury verdict in the Federal Action to the United States Court of Appeals for the Second Circuit;

WHEREAS, on October 18, 2006, the United States Court of Appeals for the Second Circuit affirmed the jury verdict in the Federal Action in favor of the Insureds and against Allianz and, on December 29, 2006, the Second Circuit denied Allianz's petition for rehearing;

WHEREAS, Allianz demanded appraisal on February 25, 2002 and the Insureds and, among other insurers, Allianz, have been engaged in an ongoing appraisal to resolve valuation issues with respect to the World Trade Center Property (the "Appraisal");

WHEREAS, the Appraisal is ongoing and has resulted in settlements and awards on certain disputed issues of fact relating to "core and shell" Replacement Cost, but other valuation issues, including Actual Cash Value, Lost Rents, Allocation and certain aspects of Replacement Cost remain to be resolved;

ALLIANZ DIRECT SETTLEMENT -- 3

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WHEREAS, the Lawsuits have resulted in numerous rulings as a matter of law on disputed issues, many of which have not yet been appealed but could be appealed at a later time, and other legal issues remain in dispute but have not yet been presented to the court for resolution;

WHEREAS, the Parties have incurred and in the absence of this Agreement would continue to incur substantial attorneys fees and expenses in connection with the Lawsuits and the Appraisal;

WHEREAS, the Parties wish to preclude the necessity of incurring such additional fees and expenses;

WHEREAS, the Parties seek in this Agreement to settle fully and finally and to resolve for all time any and all disputes between them regarding the Allianz Direct Policy, including but not limited to the pending Lawsuits, on the terms and conditions set forth herein (but without waiving their positions, arguments and defenses in connection with the Lawsuits);

NOW, THEREFORE, in consideration of these premises, mutual promises and covenants, the Parties hereby agree as follows:

1.    Settlement Amount:  On or before August 1, 2007, Allianz will pay to the Insureds the sum of five million dollars ($5,000,000) (the "Settlement Amount") by wire transfer of same-day funds to:

> Citibank, N.A.
> New York, NY
> ABA 021000089
> Credit:
> PBG Concentration Account #37432464
> Further Credit:
> Citibank, N.A. as Escrow Agent for
> 1 World Trade Center LLC et al.
> Account # 25D-036679-768
> Attention:  John P. Howard – 212-783-3755

ALLIANZ DIRECT SETTLEMENT -- 4

WTCP 0015968

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

The payment of the Settlement Amount shall be considered final and without reservation, and not an advance.

2. _Prior Payments:_ As part of the consideration for this Agreement, all prior payments made by Allianz under the Allianz Direct Policy shall be considered final and without reservation, and not an advance.

3. _No Further Obligations:_

a. Effective upon the Insureds' receipt of the Settlement Amount in accordance with paragraph 1 above, the Allianz Direct Policy is deemed fully bought out, paid and satisfied in full. Except as otherwise set forth herein, Allianz shall have no further obligations of any sort to the Insureds with respect to the Allianz Direct Policy.

b. In no event shall any of the Westfield Insureds have any responsibility for any failure by any other Party or any third party to comply with the terms of this Agreement, including, but not limited to, any terms relating to how the Settlement Amount is expended.

4. _Release by the Insureds:_ Effective upon the Insureds' receipt of the Settlement Amount in accordance with paragraph 1 above, the Insureds, on behalf of themselves, their parents, subsidiaries, affiliates, partners, successors and assigns, and all of their officers, directors, shareholders, investors, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, hereby fully and forever release, acquit, discharge and covenant not to sue Allianz and each of its parents, subsidiaries, affiliates, partners, successors and assigns and all of their respective officers, directors, shareholders, members, principals, employees, agents, servants, attorneys, adjusters, accountants, trustees and legal representatives, from any and all claims, demands, debts, causes of action, obligations or liabilities of whatever kind and nature, past, present or future, known or unknown, asserted or unasserted, in law or in

ALLIANZ DIRECT SETTLEMENT -- 5

WTCP 0015969

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

equity that directly or indirectly concern, arise out of, or relate to the Allianz Direct Policy, the Insureds' claims for insurance coverage thereunder, and/or the Lawsuits, including, without limitation, all claims and counterclaims that were brought or could have been brought by any of the Insureds against Allianz with respect to the Allianz Direct Policy in any of the Lawsuits. This release and covenant not to sue includes without limitation any and all claims for compensatory, consequential, multiple or punitive damages, interest, costs or attorneys fees including those arising out of any allegation of breach of contract, bad faith, improper or fraudulent claims, unfair claims practices, malpractice, slander, libel, tortious interference with contract or any other theory or cause of action whatsoever in connection with the investigation and/or making of or resolution of claims under the Allianz Direct Policy and the handling, adjustment, litigation or settlement of this matter. This release and covenant not to sue does not cover: (a) any claims, demands, debts, causes of action, obligations or liabilities that were or could have been raised against any insurer other than Allianz that participated in the first-party property and business interruption/lost rents insurance issued to WTC Properties LLC and other entities on the World Trade Center Property (the "World Trade Center Property Insurance Program"); (b) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance for any Westfield entity anywhere in the world at any time, other than the Allianz Direct Policy; (c) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance issued by Allianz other than the Allianz Direct Policy, including, but not limited to, the Port Authority's separate program of property damage, extra expense, and business interruption insurance; (d) except as set forth in paragraph 6, any claims, demands, debts, causes of action, obligations or liabilities relating to matters of subrogation, priority of recovery and claims against third parties; and (e) any obligations created herein.

ALLIANZ DIRECT SETTLEMENT -- 6

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

5.   <u>Release by Allianz</u>:   Effective upon the Insureds' receipt of the Settlement Amount

in accordance with paragraph 1 above, Allianz, on behalf of itself and its parents, subsidiaries,

affiliates, partners, successors and assigns, and all of their officers, directors, shareholders,

investors, members, principals, employees, agents, servants, attorneys, adjusters, accountants,

trustees and legal representatives, hereby fully and forever release, acquit, discharge and covenant

not to sue the Insureds and each of their parents, subsidiaries, affiliates, successors and assigns,

and all of their respective officers, directors, shareholders, members, principals, employees, agents,

servants, attorneys, adjusters, accountants, trustees and legal representatives, from  any and all

claims, demands, debts, causes of action, obligations or liabilities of whatever kind and nature,

past, present or future, known or unknown, asserted or unasserted, in law or in equity that directly

or indirectly concern, arise out of, or relate to the Allianz Direct Policy, the Insureds' claims for

insurance coverage thereunder, and/or the Lawsuits, including, without limitation, all claims and

counterclaims that were brought or could have been brought by Allianz against any of the Insureds

with respect to the Allianz Direct Policy in any of the Lawsuits.  This release and covenant not to

sue includes without limitation any and all claims for compensatory, consequential, multiple or

punitive damages, interest, costs or attorneys fees including those arising out of any allegation of

breach of contract, bad faith, improper or fraudulent claims, unfair claims practices, malpractice,

slander, libel, tortious interference with contract or any other theory or cause of action whatsoever

in connection with the investigation and/or making of or resolution of claims under the Allianz

Direct Policy and the handling, adjustment, litigation or settlement of this matter.  This release and

covenant not to sue does not cover:  (a) any claims, demands, debts, causes of action, obligations

or liabilities that were or could have been raised against any insurer other than Allianz that

participated in the World Trade Center Property Insurance Program; (b) any claims, demands,

debts, causes of action, obligations or liabilities concerning any insurance for any Westfield entity

ALLIANZ DIRECT SETTLEMENT -- 7

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

anywhere in the world at any time, other than the Allianz Direct Policy; (c) any claims, demands, debts, causes of action, obligations or liabilities concerning any insurance issued by Allianz other than the Allianz Direct Policy, including, but not limited to, the Port Authority's separate program of property damage, extra expense, and business interruption insurance; (d) except as set forth in paragraph 6, any claims, demands, debts, causes of action, obligations or liabilities relating to matters of subrogation, priority of recovery and claims against third parties; and (e) any obligations created herein.

6.        Subrogation/Priority of Recovery:

The Parties to this Agreement are pursuing claims against third-parties alleged to be responsible for property and other damages occurring on September 11, 2001. These claims are pending in the United States District Court for the Southern District of New York in consolidated litigation entitled *In Re September 11 Litigation* (21 MC 97) and *In Re September 11 Property Damage and Business Loss Litigation* (21 MC 101) (collectively the "Recovery Litigation"). The Parties have a disagreement with respect to issues of subrogation and priority of recovery in the Recovery Litigation. The Parties hereby agree that they shall request that either Judge Alvin K. Hellerstein or Judge Harold Baer, Jr. of the United States District Court for the Southern District of New York (with a request that the matter of which judge is to hear the motion to be determined by the two judges) resolve this disagreement by means of one or more motions.

7.        Dismissal:

Upon the Effective Date, Allianz shall withdraw from the Appraisal. At the time specified by paragraph 13 of the Fronting Policy Settlement Agreement: (a) the Insureds and Allianz shall jointly file with the respective courts motions dismissing all claims and counterclaims as between the Insureds and Allianz with respect to the Allianz Direct Policy from the Lawsuits with prejudice

WTCP 0015972

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
(21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

and without costs as to any party, pursuant to the terms of agreed-upon forms of order, which order shall have a provision consistent with the terms of this Agreement reserving the Parties' respective rights with respect to claims of subrogation and priority of recovery as provided in paragraph 6; and (b) all Parties, to the extent that they have made any claims against any other Party to this Agreement for costs and expenses with respect to the Lawsuits, shall withdraw any such claim for costs and expenses, and shall not seek to recover or collect any costs related to the appeal of the Federal Action to the United States Court of Appeals for the Second Circuit.

8.    No Admissions:

The consideration for this Agreement is the result of negotiation between the Parties for the compromise of disputed claims. Neither this Agreement nor the Parties' compliance with its terms shall be used as an admission against Allianz or the Insureds on this or any other past, present or future claim or matter.

9.    Authority:

The persons signing below on behalf of the respective Parties represent and warrant that they are duly authorized to enter into this Agreement. Additionally, the respective Parties represent and warrant that they have not assigned or transferred in any way the right to pursue and settle the claims that are the subject of this Agreement.

10.    No Third-Party Beneficiaries:

This Agreement is solely for the benefit of the Parties. It is expressly understood that there are no third-party beneficiaries to the Agreement, including, without limitation, any other insurers on the World Trade Center Property Insurance Program or any other insurers providing coverage of any kind to the Insureds.

ALLIANZ DIRECT SETTLEMENT -- 9

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

11.    Governing Law:

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

This Agreement is executed and delivered in the State of New York, and it is the desire and intention of the Parties that it be in all respects interpreted according to the laws of the State of New York. Each of the Parties hereto (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) specifically and irrevocably consents to the exclusive jurisdiction of the courts of the State of New York with respect to all matters concerning this Agreement and its enforcement. Each of the Parties agrees that the execution and performance of this Agreement shall have a New York situs and, accordingly, they each consent (and solely with respect to the Port Authority, subject to the terms of the Port Authority Legislation (as defined below)) to personal jurisdiction in the State of New York for all purposes and proceedings arising from this Agreement. "Port Authority Legislation" shall mean the concurrent legislation of the State of New York and State of New Jersey set forth at Chapter 301 of the Laws of New York of 1950, as amended by Chapter 938 of the Laws of New York of 1974 (McKinney's Unconsolidated Laws §§7101-7112) and Chapter 204 of the Laws of New Jersey of 1951 (N.J.S.A. 32:1-157 to 32:1-168).

12.    No Waiver:

The failure of a Party to enforce, in any one or more instances, any term or condition of this Agreement shall not be construed as a waiver of the future performance of any such term or condition.

13.    Remedies: The Parties (and solely with respect to the Port Authority, subject to the Port Authority Legislation) agree that, in addition to any other remedy for breach of this Agreement, including damages, any Party may seek an order from a court of competent jurisdiction directing specific performance of and/or compliance with the terms of this Agreement.

ALLIANZ DIRECT SETTLEMENT -- 10

WTCP 0015974

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

Notwithstanding the foregoing, the Parties agree that a breach of any term of this agreement shall not entitle any Party to claim that it is entitled to rescind this Agreement.

14.    Entire Agreement:

The Parties acknowledge and agree that this Agreement embodies the entire and complete terms and conditions of their agreement described herein and that it supersedes any and all prior representations, understandings and agreements, whether written or oral.

15.    Publicity:

The Parties to this Agreement agree that any press release, public announcement, disclosure or other public comment (including comments to elected officials and government officers, but excepting statements (i) under compulsion of law, (ii) under oath in response to a formal government inquiry or (iii) made in the course of litigation or other legal process or proceedings), regarding this settlement and the claims being settled, that is initiated, encouraged or facilitated by a Party or Parties shall not contain any negative or adverse characterization of any other Party or Parties. The Parties agree that a breach of this paragraph 15 shall be governed by the provisions of paragraph 23 of the Fronting Policy Settlement Agreement.

16.    Amendment:

This Agreement may not be amended, supplemented or modified except by a written instrument duly executed by the Parties.

17.    Construction:

Allianz and the Insureds have all participated in the drafting and negotiation of this Agreement after consulting with counsel. Therefore, if any question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or

WTCP 0015975

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

burden of proof shall arise favoring or disfavoring any Party solely by virtue of the authorship of any of the provisions of this Agreement.

18.    Severability:

If any provision of this Agreement, or any portion of any provision of this Agreement, shall be declared illegal, invalid, null and void or unenforceable by any court or tribunal having jurisdiction thereof, such provision or portion thereof shall be deemed separate or apart from the remainder of this Agreement, which shall remain in full force and effect.

19.    Headings:

Section headings contained herein are for the purpose of organization only, and shall not constitute a part of this Agreement.

20.    Execution in Counterparts:

This Agreement may be signed in counterparts, and a facsimile or electronically scanned copy of an executed signature page shall be as effective as an original. All fully executed copies shall be considered duplicate originals.

21.    Effective Date:  The "Effective Date" of this Agreement shall be the date of the last signature set forth below.

ALLIANZ DIRECT SETTLEMENT -- 12

WTCP 0015976

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly known
as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By: _____
Name: Michter Levy
Its: SVP
Dated: 7/6/07

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By: _____
Name:
Its:
Dated:

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By: _____
Name:
Its:
Dated:

ALLIANZ DIRECT SETTLEMENT -- 13

WTCP 0015977

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly known
as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By: _____
    Name:
    Its:
    Dated:

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By: _____
    Name: PETER SCHWARZ
    Its: SR. EG U.P.
    Dated: 7/6/07

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By: _____
    Name:
    Its:
    Dated:

ALLIANZ DIRECT SETTLEMENT -- 13

WTCP 0015978

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

IN WITNESS WHEREOF,

WORLD TRADE CENTER PROPERTIES LLC,
SILVERSTEIN PROPERTIES, INC.,
SILVERSTEIN WTC MGMT. CO. LLC,
2 WORLD TRADE CENTER LLC,
3 WORLD TRADE CENTER LLC (formerly known
as "5 WORLD TRADE CENTER LLC"),
4 WORLD TRADE CENTER LLC

By: _____
Name:
Its:
Dated:

WESTFIELD, LLC (formerly known as
"WESTFIELD CORPORATION, INC."),
WESTFIELD AMERICA, INC.

By: _____
Name:
Its:
Dated:

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

By: _____
Name: Anne Marie Mulligan
Its:   Treasurer
Dated: July 9, 2007

ALLIANZ DIRECT SETTLEMENT -- 14

WTCP 0015979

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")
    By: The Port Authority of New York and New
        Jersey, its sole member

By:
    Name:  Timothy Lizura
    Its:     Deputy Director of Development
    Dated:  July 9, 2007

1 WORLD TRADE CENTER LLC
    By: The Port Authority of New York and New
        Jersey, its sole member

By:
    Name:  Timothy Lizura
    Its:     Deputy Director of Development
    Dated:  July 9, 2007

ALLIANZ GLOBAL RISKS US INSURANCE
COMPANY

By:
    Name:
    Its:
    Dated:

ALLIANZ DIRECT SETTLEMENT -- 15

WTCP 0015980

SUBJECT TO CONFIDENTIALITY PROTECTIVE ORDER
IN RE SEPTEMBER 11 LITIGATION
21 MC 97 (AKH) (S.D.N.Y)
21 MC 101 (AKH) (S.D.N.Y)

CONFIDENTIAL - DO NOT COPY OR DISCLOSE

WTC RETAIL LLC (formerly known as
"WESTFIELD WTC LLC")

By: _____
    Name:
    Its:
    Dated:

1 WORLD TRADE CENTER LLC

    By: _____
        Name:
        Its:
        Dated:

ALLIANZ GLOBAL RISKS US INSURANCE
COMPANY

    By: _Brent A Sorenson_
        Name: BRENT A. SORENSON
        Its: SENIOR VICE PRESIDENT
        Dated: July 6, 2007

ALLIANZ DIRECT SETTLEMENT -- 15

# EXHIBIT 14

# HOGAN & HARTSON
### L.L.P.

PATRICK F. HOFER
PARTNER
(202) 637-5765
PFHOFER@HHLAW.COM

December 4, 2001

COLUMBIA SQUARE
555 THIRTEENTH STREET, NW
WASHINGTON, DC 20004-1109
TEL: (202) 637-5600
FAX: (202) 637-5910
WWW.HHLAW.COM

*BY FEDERAL EXPRESS*

GMACCM/UBS Warburg WTC Insurance Proceeds
  Clearing Account
c/o GMAC Commercial Mortgage Corporation
200 Witmer Road
Horsham, PA 19044

Attn:     Mr. Mark C. McCool, Senior Vice President, Servicing Accounting

        Re:    Insured:     Silverstein Properties, et al.
                 Policy No.:  Hartford Fire Policy No. GX 0000546
                 Location:   World Trade Center
                 Date of Loss: September 11, 2001
                 Hartford
                 Claim No.:  3047708

Dear Mr. McCool:

       On behalf of our client, Hartford Fire Insurance Company ("Hartford"), and pursuant to the request of the insureds under the above-referenced Hartford policy and/or binder, we hereby enclose Hartford's check in the amount of $32,000,000.00, payable to "GMACCM/UBS Warburg WTC Insurance Proceeds Clearing Account," per the letter of payment instructions dated November 15, 2001, signed by all insureds and mortgagees/loss payees, as modified by the letter of November 29, 2001, from Adam Emmerich of Wachtell, Lipton, Rosen & Katz.

       This payment is made in respect of the request of the insureds for an advance insurance payment prior to final adjustment of the claim of the insureds arising out of the destruction of the insured premises by the terrorist attack of September 11, 2001.  Hartford is pleased to accommodate the insureds' request in

BRUSSELS  BUDAPEST*  LONDON  MOSCOW  PARIS*  PRAGUE*  WARSAW
BALTIMORE, MD  BOULDER, CO  COLORADO SPRINGS, CO  DENVER, CO  LOS ANGELES, CA  McLEAN, VA  NEW YORK, NY
*Affiliated Offices

HOGAN & HARTSON L.L.P.

Mr. Mark C. McCool
December 4, 2001
Page 2

this way. This payment is not made with respect to any particular element of loss incurred by the insureds.

Hartford bound coverage for a $32 million part of a $50 million layer excess of $75 million in underlying insurance, each such limit applying per occurrence. Accordingly, this payment exhausts Hartford's obligation with respect to this loss.

Please let me know if you have any questions.

Sincerely yours,

Patrick F. Hofer

Enclosure

ccs:    Mr. Steve Puleio
        Herbert M. Wachtell, Esq.
        Eric M. Roth, Esq.
        Peter K. Rosen, Esq.
        Timothy G. Reynolds, Esq.
        H. Peter Haveles, Jr., Esq.
        Mitchell F. Dolin, Esq.

        Mr. Edward R. Reilly
        Mr. Jerry Hourihan

CONFIDENTIAL    SILV 117    001397

# Exhibit 15 Intentionally Omitted.

Exhibit 15 is designated "Confidential" pursuant to the Confidentiality Agreement and Protective Order filed herein on February 5, 2004. WTCP has sought, but not yet obtained, authorization from the designating person(s) to file Exhibit 15 with the Court in connection with this Motion. If authorization from the designating person(s) cannot be obtained, WTCP will seek relief from the Court forthwith.

# EXHIBIT 16

**Pendente Lite Agreement**

December 12, 2002

       In connection with that certain litigation among the undersigned relating to insurance with respect to the World Trade Center (SR International Business Co. Ltd. v. World Trade Center Properties LLC, et al., 01 Civ. 9291., including any appeals or other proceedings in connection therewith, the "St. Paul Coverage Litigation", and the insurance coverage found by the District Court in the St. Paul Coverage Litigation to have been provided by St. Paul, the "St. Paul Coverage"), this will confirm the agreement of each of the undersigned 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC (the "Silverstein Claimants") and Westfield WTC LLC (the "Westfield Claimant" and together with the Silverstein Claimants, the "Silverstein/Westfield Claimants"), and St. Paul Fire and Marine Insurance Company ("St. Paul"), and the authorization and agreement by the other insureds and mortgagees/loss payees under the St. Paul Coverage, that funds in the amount of $30,000,000.00 (thirty million dollars) will be advanced by St. Paul to the undersigned insureds and mortgagees/loss payees (by wire to the account noted below (the "St. Paul Payment Account")), without prejudice to any of the positions of any of the insureds and mortgagees/loss payees or of St. Paul as to any issue or matter in dispute (including, without limitation, the nature or characterization of such advance, or the form or terms of the St. Paul Coverage, or the existence of the St. Paul coverage, which St. Paul has disclaimed, or any obligation of St. Paul or any of the insureds or mortgagees/loss payees for any interest or costs in connection with the St. Paul Coverage Litigation, the St. Paul Coverage or any payment thereunder or related thereto, or any other issue or matter in dispute in the St. Paul Coverage Litigation, none of which are agreed or waived in any manner hereby, all of which are subject to final adjudication in the St. Paul Coverage Litigation).  The St. Paul Payment Account is:

       Citibank, N.A.
       New York, NY
       ABA 021000089
       Credit:
       PBG Concentration Account #37432464
       Further Credit:
       Citibank, N.A. as Escrow Agent for
       1 World Trade Center LLC et al.
       Account # 361198
       Attention:  John P. Howard – 212.804.5468

       This will also confirm the agreement of the undersigned that:

1.  the Silverstein/Westfield Claimants (but not any of the other insureds and mortgagees/loss payees) shall be responsible to repay to St. Paul any amounts paid hereunder but judicially determined by a final judgment not subject to appeal (or other judgment by its terms requiring payment at the time (other than the posting of a bond), and not then subject to stay or other similar restraint) (a "final judgment") to be in excess of the total amounts owing by St. Paul (including, without limitation, any

W/667758v14

WTCP 0258014

St. Paul Pendente Lite Agreement
Page 2

costs, interest or other amounts) in respect of or arising out of the St. Paul Coverage or the St. Paul Coverage Litigation (including, without limitation, should St. Paul be judicially determined by a final judgment to be without liability in the St. Paul Coverage Litigation); and

2. St. Paul shall be responsible to pay to the insureds and mortgagees/loss payees under the St. Paul Coverage any amounts (including, without limitation, any costs, interest or other amounts) in excess of those paid hereunder that are judicially determined by a final judgment to be owing by St. Paul in respect of or arising out of the St. Paul Coverage or the St. Paul Coverage Litigation (including, without limitation, should St. Paul be determined to be liable on a basis under which the losses sustained are determined to have arisen from more than one occurrence). In no event shall St. Paul be responsible for the payment of any interest accruing after November 4, 2002 on any amount (or portion of any amount) that St. Paul should be found to owe that is less than or equal to $30,000,000.

In the event that any reimbursement of St. Paul is required pursuant to paragraph 1 above, such reimbursement (solely to the extent required by paragraph 1 above) shall be made in the following manner:

First, if at the time such reimbursement is required there remains a balance of funds resulting from the St. Paul Coverage in the St. Paul Payment Account, then such funds shall be used (solely to the extent necessary) to pay such reimbursement.

Second, if at the time such reimbursement is required the balance of funds in the St. Paul Payment Account is not sufficient to pay fully such reimbursement, then such balance of funds shall be used in its entirety to pay such reimbursement, and the remainder of the reimbursement due shall be paid by the Silverstein Claimants and the Westfield Claimant severally and not jointly in proportion to the relative aggregate amounts of their respective withdrawals of funds from the St. Paul Payment Account.

This will also confirm that the request, direction and authorization reflected herein, any payment contemplated hereby by St. Paul, and the corresponding receipt and acceptance of such payment by any or all of the insureds and mortgagees/loss payees shall all be without prejudice or admission of any kind to or by any party, including, without limitation, any matter under or relating to the St. Paul Coverage or the insurance thereunder contracted for, and nothing contained in or contemplated hereby is intended to constitute, or should be construed as, a waiver or release by any party having an insurable interest under the St. Paul Coverage, or by St. Paul, of any of such party's rights or positions, or of any obligations, under the St. Paul Coverage, or otherwise, including, without limitation, in connection with any litigation, arbitration, proceeding or dispute, except that the Silverstein/Westfield Claimants, the other insureds and the mortgagees/loss payees under the St. Paul Coverage hereby waive and release any claim that the payments to be made to the above-referenced account pursuant to this instruction should have been paid in whole or in part directly to one or more of the insureds or mortgagees/loss payees, individually or as a group, rather than to the above-referenced account, and they state that any issue of allocation of such payments to the above-referenced account among the insureds and mortgagees/loss payees will be resolved among themselves.

CONFIDENTIAL

St. Paul Pendente Lite Agreement
Page 3

This will also confirm that the insureds, mortgagees and loss payees which are signatories hereto confirm that, to their knowledge, after diligent inquiry, they are the only parties entitled to be named under the St. Paul Coverage as payees of the requested advance.

No amendment or waiver of any provision of this letter agreement, nor any consent to any departure herefrom, shall in any event be effective unless the same shall be in writing and signed by the party to be charged therewith, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

No failure on the part of any party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Any notice, demand or other communication hereunder to any of the undersigned shall be in writing and sent by facsimile or delivered in person or sent by courier service providing for verification of delivery, in each case in care of counsel for such party in the St. Paul Coverage Litigation.

CONFIDENTIAL

NOV. 8.2002   9:59AM    SILVERSTEIN PROPERTIES              NO.428   P.3/3

St. Paul Pendente Lite Agreement
Page 4

**World Trade Center Properties LLC, Insured**

By: Silverstein WTC Properties LLC,
    its manager

By: Silverstein WTC LLC, its manager

By:
    Name: Michael Levy
    Title:  Vice President

**1 World Trade Center LLC, Insured**

By:
    Name:  Michael Levy
    Title:  Vice President

**4 World Trade Center LLC, Insured**

By:
    Name:  Michael Levy
    Title:  Vice President

**Silverstein Properties, Inc., Insured**

By:
    Name:  Michael Levy
    Title:  Chief Financial Officer

**Silverstein WTC Mgmt. Co. LLC, Insured**

By:
    Name:  Michael Levy
    Title:  Vice President

**2 World Trade Center LLC, Insured**

By:
    Name:  Michael Levy
    Title:  Vice President

**5 World Trade Center LLC, Insured**

By:
    Name:  Michael Levy
    Title:  Vice President

CONFIDENTIAL

St. Paul Pendente Lite Agreement
Page 5

Westfield WTC LLC, Insured

By: Westfield WTC Holding LLC,
    sole member

By: Westfield America Limited Partnership,
    its managing member

By: Westfield America, Inc.,
    its general partner

By: _____
    Name:
    Title:

The Port Authority of New York and
    New Jersey, Insured

By: _____
    Name:
    Title:

Westfield Corporation, Inc., Insured

By: _____
    Name:
    Title:

Westfield America, Inc., Insured

By: _____
    Name:
    Title:

Wells Fargo Bank Minnesota, National As-
sociation, As Trustee for the registered cer-
tificateholders of GMAC Commercial
Mortgage Securities, Inc. Mortgage Pass-
Through Certificates, Series 2001-WTC,
under a Trust and Servicing Agreement
dated as of August 21, 2001 ("TSA")

By: GMAC Commercial Mortgage Corpo-
    ration, Servicer under the TSA

By: _____
    Name:
    Title:

UBS Warburg Real Estate Investments Inc.,
    Mortgagee/Loss Payee

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

CONFIDENTIAL

WTCP 0258018

St. Paul Pendente Lite Agreement
Page 5

| | |
|---|---|
| **Westfield WTC LLC, Insured** | **Westfield Corporation, Inc., Insured** |

By: Westfield WTC Holding LLC,
      sole member

By:_____
      Name:
      Title:

By: Westfield America Limited Partnership,
      its managing member

By: Westfield America, Inc.,
      its general partner

**Westfield America, Inc., Insured**

By:_____
      Name:
      Title:

By:_____
      Name:
      Title:

**The Port Authority of New York and
    New Jersey, Insured**

By: *B. D. Bohlen*
      Name: Bruce D. Bohlen
      Title: Treasurer

**Wells Fargo Bank Minnesota, National Association, As Trustee for the registered certificateholders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001-WTC, under a Trust and Servicing Agreement dated as of August 21, 2001 ("TSA")**

**UBS Warburg Real Estate Investments Inc.,
    Mortgagee/Loss Payee**

By:_____
      Name:
      Title:

By: GMAC Commercial Mortgage Corporation, Servicer under the TSA

By:_____
      Name:
      Title:

By:_____
      Name:
      Title:

CONFIDENTIAL

WTCP 0258019

St. Paul Pendente Lite Agreement
Page 5

Westfield WTC LLC, Insured

By: Westfield WTC Holding LLC,
      sole member

By: Westfield America Limited Partnership,
      its managing member

By: Westfield America, Inc.,
      its general partner

By:_____
      Name:
      Title:

The Port Authority of New York and
      New Jersey, Insured

By:_____
      Name:
      Title:

Westfield Corporation, Inc., Insured

By:_____
      Name:
      Title:

Westfield America, Inc., Insured

By:_____
      Name:
      Title:

Wells Fargo Bank Minnesota, National As-
sociation, As Trustee for the registered cer-
tificateholders of GMAC Commercial
Mortgage Securities, Inc. Mortgage Pass-
Through Certificates, Series 2001-WTC,
under a Trust and Servicing Agreement
dated as of August 21, 2001 ("TSA")

By:   GMAC Commercial Mortgage Corpo-
       ration, Servicer under the TSA

By: _John F. Weaver_____
      Name: John F. Weaver
      Title: Executive Vice President

UBS Warburg Real Estate Investments Inc.,
      Mortgagee/Loss Payee

By:_____
      Name:
      Title:

By:_____
      Name:
      Title:

WTCP 0258020

St. Paul Pendente Lite Agreement
Page 5

**Westfield WTC LLC, Insured**

By:  Westfield WTC Holding LLC,
sole member

By:  Westfield America Limited Partnership,
its managing member

By:  Westfield America, Inc.,
its general partner

By:_____
Name:
Title:

**The Port Authority of New York and
New Jersey, Insured**

By:_____
Name:
Title:

**Wells Fargo Bank Minnesota, National Association, As Trustee for the registered certificateholders of GMAC Commercial
Mortgage Securities, Inc. Mortgage Pass-
Through Certificates, Series 2001-WTC,
under a Trust and Servicing Agreement
dated as of August 21, 2001 ("TSA")**

By:  GMAC Commercial Mortgage Corporation, Servicer under the TSA

By:_____
Name:
Title:

**Westfield Corporation, Inc., Insured**

By:_____
Name:
Title:

**Westfield America, Inc., Insured**

By:_____
Name:
Title:

**UBS Warburg Real Estate Investments Inc
Mortgagee/Loan Payee**

By:_____
Name:
Title:

By:_____
Name:
Title:

CONFIDENTIAL

St. Paul Pendente Lite Agreement
Page 4

**Wells Fargo Bank Minnesota, National Association, As Trustee for the registered certificateholders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001-WTC, under a Trust and Servicing Agreement dated as of August 21, 2001 ("TSA")**

**By: GMAC Commercial Mortgage Corporation, Servicer under the TSA**

By:_____
    Name:
    Title:

**UBS Warburg Real Estate Investments Inc., Mortgagee/Loss Payee**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**St. Paul Fire and Marine Insurance Company**

By: _Charles H. Loud_
    Name: CHARLES H. LOUD
    Title: A. U. P.

# EXHIBIT 17

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Settlement Agreement and Release") is made and entered into between Silverstein Properties, Inc., Silverstein WTC Mgmt. Co. LLC, World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, Westfield WTC LLC, Westfield Corporation, Inc., Westfield America, Inc., The Port Authority of New York and New Jersey, UBS Warburg Real Estate Investments Inc., Wells Fargo Bank Minnesota, National Association, as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001 - WTC, under a Trust and Servicing Agreement dated as of August 21, 2001, and GMAC Commercial Mortgage Corporation, in its own right and in its capacity as Servicer under the Trust and Servicing Agreement dated as of August 21, 2001 (collectively, the "Insureds"), on the one hand, and XL Insurance (Bermuda) Ltd, formerly known as XL Insurance Ltd ("XL"), on the other hand.

### WITNESSETH:

WHEREAS, on July 31, 2001, XL issued a binder bearing policy number XLPRP-11129-01 ("Binder") to the Insureds for excess property insurance coverage with respect to various properties located at the World Trade Center Complex, including without limitation One World Trade Center, Two World Trade Center, Four World Trade Center, Five World Trade Center and all common areas and sub-grade levels including the mall and retail level, plaza, sidewalks, concrete structures and pots, plants and shrubs, parking areas, loading docks and ramps and pedestrian walkways and the transmission tower or antennae atop One World Trade Center (the "World Trade Center Complex"); and

CONFIDENTIAL

WHEREAS, the Binder provided that the policy form would follow in every way, with any exceptions noted therein, the WilProp manuscript policy form previously submitted by the broker for the Insureds to XL (the "WilProp Form"); and

WHEREAS, on August 14, 2001, XL issued a revised binder (the "Revised Binder"), also bearing policy number XLPRP-11129-01, to the Insureds with respect to the World Trade Center Complex; and

WHEREAS, the Revised Binder provided that the policy form would follow in every way, with any exceptions noted therein, the WilProp Form; and

WHEREAS, the WilProp Form defines "occurrence" to mean "all losses or damages that are attributable directly or indirectly to one cause or to one series of similar causes", and provides that "all such losses will be added together and the total amount of such losses will be treated as one occurrence irrespective of the period of time or area over which such losses occur;" and

WHEREAS, on September 11, 2001, two separate aircraft crashed into One World Trade Center and Two World Trade Center respectively, causing a fire and explosion in each of those buildings, and ultimately the collapse of each of those buildings and the destruction of the remainder of the World Trade Center Complex; and

WHEREAS, on September 24, 2001, the Insureds' broker transmitted to XL the policy issued by the primary insurer for the WTC Complex, the Travelers Indemnity Company (the "Travelers Policy"); and

-2-

WTCP 0257957

WHEREAS, XL contends, among other things, that its insurance agreement is set forth in the WilProp Form and, pursuant thereto, (i) the events of September 11, 2001 at the World Trade Center Complex constitute a single "occurrence"; (ii) XL has no obligation to pay its "per occurrence" share of the actual cash value of the World Trade Center Complex unless the Insureds decide not to repair, rebuild or replace the damaged property; (iii) XL has no obligation to pay its "per occurrence" share of the replacement cost of the World Trade Center Complex to the Insureds unless and until the Insureds incur fees, costs, charges or expenses to rebuild; and (iv) any dispute must be submitted to binding arbitration in London, England; and

WHEREAS, on October 31, 2001, XL gave notice to the Insureds of its desire to arbitrate in London, England, any and all disputes that may arise pursuant to its insurance of the World Trade Center Complex; and

WHEREAS, certain of the Insureds intend to replace the damaged property but such replacement will reasonably require a number of years to be accomplished such that if XL's contention is correct, replacement cost payments would not be due until years in the future;

WHEREAS, certain of the Insureds contend, among other things, that notwithstanding the terms of the Binder and the Revised Binder, XL's insurance agreement should be deemed to follow the Travelers Policy and, pursuant thereto, (i) the events of September 11, 2001 at the World Trade Center Complex constitute more than one "occurrence"; and (ii) XL has an obligation to pay its "per occurrence" share of the actual cash value of the World Trade Center Complex upon presentation of a proof of loss with respect thereto notwithstanding the Insureds' intent to repair, rebuild or replace the damaged property; and

-3-

CONFIDENTIAL

WHEREAS, on November 7, 2001, certain of the Insureds submitted a preliminary proof of partial loss to XL and other insurers of the World Trade Center Complex, seeking to recover payment based on the "actual cash value" of the World Trade Center Complex; and

WHEREAS, XL contests the adequacy and sufficiency of the preliminary proof of partial loss; and

WHEREAS, the Parties, as hereinafter defined, now desire to compromise, settle and adjust fully and finally, any and all claims for coverage under the Policy, as hereinafter defined, with respect to any and all losses of any kind occurring at the World Trade Center Complex; and

WHEREAS, each of the Parties has taken all steps necessary to enter into a valid and binding settlement agreement and release;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and undertakings contained herein, and for other good and valuable consideration, and intending to be legally bound, the Parties to this Settlement Agreement and Release hereby agree as follows:

Definitions

As used in this Settlement Agreement and Release, and for the purpose of this Settlement Agreement and Release only, the following terms have the following meanings:

1.    "XL" means:  XL, and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, divisions, and assigns of any and all of them, to the extent that XL has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, divisions, and/or assigns of any and all of the foregoing.

-4-

CONFIDENTIAL

2.    "Silverstein" means: Silverstein Properties, Inc., in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, including, but not limited to, Silverstein WTC Mgmt. Co. LLC, and/or assigns of any and all of the foregoing, to the extent that Silverstein has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

3.    "WTC Properties" means: World Trade Center Properties LLC, in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, including, but not limited to, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, and/or assigns of any and all of the foregoing, to the extent that WTC Properties has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

4.    "Westfield" means: Westfield Corporation, Inc., in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, including, but not limited to, Westfield WTC LLC, Westfield America, Inc., and assigns of any and all of the foregoing, to the extent that Westfield has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

CONFIDENTIAL                                                    WTCP 0257960

5.     "Port Authority" means:  The Port Authority of New York and New Jersey, in its own right and/or any predecessors, successors, trustees, commissioners, directors, and/or assigns of any and all of the foregoing, to the extent that Port Authority has legal authority to bind said predecessors, successors, trustees, commissioners, directors, and/or assigns of any and all of the foregoing.

6.     "Wells Fargo" means:  Wells Fargo Bank Minnesota, National Association, as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-through Certificate Series 2001-WTC and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing, to the extent that Wells Fargo has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

7.     GMACCM means:  GMAC Commercial Mortgage Corporation, in its own right and in its capacity as Servicer under the Trust and Servicing Agreement between GMAC Commercial Mortgage Securities, Inc., GMACCM and Wells Fargo dated as of August 21, 2001, and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing, including, but not limited to, Wells Fargo Bank Minnesota, N.A., to the extent that GMACCM has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

CONFIDENTIAL                                                  WTCP 0257961

8.    "UBS Warburg" means:  UBS Warburg Real Estate Investments Inc., in its own right and/or any predecessors, successors, past, present and future parents, subsidiaries, affiliates, divisions, and/or assigns of any and all of the foregoing, to the extent that UBS Warburg has legal authority to bind said predecessors, successors, past, present and future parents, subsidiaries, affiliates, partnerships, joint ventures, divisions, trustees, and/or assigns of any and all of the foregoing.

9.    "The Settled Claims" means and includes:

(a)    Any and all actual, potential or threatened claims, demands, actions, rights, suits, proceedings, liabilities, or obligations, of every kind and nature and/or notices of any responsibility for any insurance coverage by any Person of any kind under the Policy made, demanded, asserted or filed by any or all Insureds whether in the past, present or future, whether at law or in equity, and whether by statute or in tort, contract, equity, or otherwise with respect to any and all losses of any kind occurring at the World Trade Center Complex; and

(b)    Any and all property, risks, perils, and interests insured under the Policy, including without limitation all compensatory damages, business interruption, property loss or damage, debris removal, cleanup costs, contamination cleanup, valuable papers and records, destruction of property, protection devices, removal, expediting expenses, consequential loss, defense expenses, fine arts, improvements and betterments, electronic data processing equipment and media, loss of rental income, loss of profits, or any other losses or liabilities of any kind under or relating to the Policy and occurring at the World Trade Center Complex.

10.    "Parties" means collectively Silverstein Properties, Inc., Silverstein WTC Mgmt. Co. LLC, World Trade Center Properties LLC, Westfield WTC LLC, Westfield Corporation,

-7-

WTCP 0257962

Inc., Westfield America, Inc., The Port Authority of New York and New Jersey, GMAC Commercial Mortgage Corporation, in its own right and in its capacity as Servicer under the Trust and Servicing Agreement dated as of August 21, 2001, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, UBS Warburg Real Estate Investments Inc., Wells Fargo Bank Minnesota, National Association, as Trustee for the registered certificate holders of GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2001- WTC, under a Trust and Servicing Agreement dated as of August 21, 2001, and XL Insurance Ltd. Each of the Parties is referred to herein in its individual capacity as a "Party".

11.    "London Arbitration" means the arbitration commenced by XL by letter dated October 31, 2001 addressed to Robert F. Strachan of Silverstein Properties, Inc, and Herbert Wachtell of Wachtell, Lipton, Rosen & Katz .

12.    "New York Litigation" means the litigation commenced by certain of the Insureds that is pending in the Southern District of New York, styled World Trade Center Properties LLC, et al. v. ACE Bermuda Ins. Co. Ltd. and XL Insurance Ltd., docket number 01-CV-9731.

13.    "Person" means an individual, a corporation, a partnership, an association, a trust or any other entity or organization (or estate, guardian or beneficiary thereof) including without limitation any federal, state or local governmental or quasi-governmental body or political subdivision or any agency or instrumentality thereof.

14.    "Policy" means XL policy No. XLPRP-11129-01 and/or any other policy that was to be issued pursuant to the terms of the Binder or the Revised Binder issued by XL to the Insureds, including any policy that would follow the form of the Travelers Policy.

-8-

    WTCP 0257963

Settlement Amount and Payment

15.    In consideration of the agreements in this Settlement Agreement and Release, XL shall irrevocably pay to the Insureds the total sum of SIXTY-SIX MILLION EIGHT HUNDRED THOUSAND DOLLARS ($66,800,000) (the "Settlement Amount"). XL shall make payment to the Insureds of the Settlement Amount within thirty (30) calendar days from the Effective Date (as defined herein).

16.    The Settlement Amount shall be paid by wire transfer into an agreed-upon account, the particulars of which (including wire instructions) shall be in a written instruction signed by or on behalf of all Insureds and sent to XL and its counsel.

17.    The Parties agree that payment of the Settlement Amount in the manner set forth in Paragraphs 15 and 16 is satisfactory to each and every one of them and constitutes complete and satisfactory compliance with the terms of the Policy.

18.    The Parties agree that receipt of the Settlement Amount shall constitute full satisfaction and discharge of any and all of XL's obligations under the Policy.

The Releases

19.    (a)    Each and every Insured and its directors, officers, employees, assigns and/or agents hereby fully, completely and forever release and discharge, with prejudice, XL and the directors, officers, employees, assigns, and/or agents of XL, with respect to the Policy, including without limitation any claims, whether now known or unknown, however caused and wherever located, for property losses, business interruption, debris removal, cleanup, indemnity or any other alleged obligations, costs, fees, penalties, or interest payments with respect to the Policy, however caused and wherever located, whether now known or unknown, which currently

-9-

WTCP 0257964

exist or subsequently accrue, which the Insureds and their directors, officers, employers, assigns and/or agents ever had, now have or hereinafter can, shall or may have, for, upon or by reason of, any matter, cause or thing whatsoever, whether known, unknown, fixed or unliquidated, conditioned or contingent, and whether obtained by subrogation, assignment or otherwise.

(b)    The release in subparagraph (a) above includes but is not limited to:  any and all claims for insurance coverage under the Policy that have been raised or could have been raised in the London Arbitration or in the New York Litigation, including compensatory, punitive, statutory, extra contractual or other damages or relief based on alleged bad faith, breach of the duty of good faith and fair dealing, unfair claim practice, unfair trade practice, and/or any improper act or failure to act in connection with the investigation, handling, adjustment, litigation or settlement of the Settled Claims; and any alleged obligation on the part of XL under the Policy, to investigate, adjust, indemnify or otherwise satisfy any Settled Claim released pursuant to this Settlement Agreement and Release.

(c)    Nothing in this agreement shall be deemed to release or modify in any respect the obligations of any insurer other than XL with respect to insurance coverage issued by such other insurer to any Insured, including without limitation any insurance coverage applicable to any loss arising directly or indirectly out of the events of September 11, 2001.

(d)    XL and its directors, officers, employees, assigns, and/or agents hereby fully, completely and forever release and discharge, with prejudice, the Insureds and the directors, officers, employees, assigns, and/or agents of each of the Insureds, with respect to the Policy, including without limitation any claims, whether now known or unknown, however caused and wherever located, for property losses, business interruption, debris removal, cleanup, indem-

-10-

CONFIDENTIAL

WTCP 0257965

nity, or any other alleged obligations, costs, fees, penalties, or interest payments with respect to the Policy, however caused and wherever located, whether now known or unknown, which currently exist or subsequently accrue, which XL and its directors, officers, employees, assigns and/or agents ever had, now have or hereinafter can, shall or may have, for, upon or by reason of, any matter, cause or thing whatsoever, whether know, unknown, fixed or unliquidated, conditioned or contingent, whether obtained by subrogation, assignment or otherwise.

(e)     The release in subparagraph (d) above includes but is not limited to: any and all claims arising out of or relating to the Policy that have been raised or could have been raised in the London Arbitration or in the New York Litigation, including compensatory, punitive, statutory, extra contractual or other damages or relief based on alleged bad faith, breach of the duty of good faith and fair dealing, unfair claim practice, unfair trade practice, and/or any improper act or failure to act in connection with the Insureds' application for the Policy or the adjustment, litigation or settlement of the Settled Claims.

(f)     The Parties agree that it is the intent and material term of this Settlement Agreement and Release that XL is released from any and all types of claims arising out of or related to the Policy, including, but not limited to, claims for coverage that were or could be made under the Policy against XL and that the Insureds are released from any and all types of claims arising out of or related to the Policy.

(g)     Each and every Insured and its directors, officers, employees, assigns, and/or agents covenant not to present to XL for coverage any claims for coverage under the Policy and agree not to cooperate with any other entity which might, in the future, attempt to make such claims for coverage under the Policy.

-11-

CONFIDENTIAL

(h)      The Parties hereby expressly waive any rights they or any of them may

otherwise have under the statutory provisions or common law of any jurisdiction limiting the

scope or effect of the Settlement Agreement and Release.

(i)      The releases in subparagraphs (a), (b), (d), (e), (f), and (g) above shall be-

come effective immediately upon the Insureds' receipt of the Settlement Amount.

Subrogation

20.      The Parties agree that XL preserves and does not waive any rights of subrogation

arising from or relating to XL's payment of the Settlement Amount to the extent that any such

rights arise; provided, however, that (i) XL shall not assert any claim of subrogation against any

of the Parties or any other insurer that has issued any policy or contract of insurance covering

one or more of the Insureds' interests in the World Trade Center Complex, and (ii) except as

provided in paragraph 20 hereof, XL shall not assert any claim against any such other insurer for

contribution, indemnity or other relief with respect to the payment of the Settlement Amount

pursuant hereto.  XL further agrees that it will not assert any claim of subrogation until the In-

sureds have been made whole for any losses they have incurred arising out of the events of Sep-

tember 11, 2001.  XL agrees not to pursue any claim of subrogation without first consulting with

and obtaining the prior consent of the Insureds, which consent will not be unreasonably withheld,

except that the Port Authority may refuse its consent, in its absolute discretion, with respect to

any claim of subrogation against any governmental officer or instrumentality.  XL further ac-

knowledges that its assertion of any claim of subrogation against any governmental officer or

instrumentality would pose particular difficulties to the Insureds other than the Port Authority,

which difficulties such Insureds may take into account in withholding consent.  XL shall use its

best efforts to assert any claim of subrogation solely in the name of XL and not in the name of

-12-

CONFIDENTIAL                                                  WTCP 0257967

any of the Insureds, but shall not be obligated to do so if it must assert a subrogation claim in the name of the Insureds.

21.    In the event that the Insureds settle with any other insurer that has issued any policy or contract of insurance covering one or more of the Insureds' interests in the World Trade Center Complex, the Insureds will use their reasonable efforts to obtain from each such insurer with which they settle or will settle a waiver, release, or covenant not to sue with respect to the right to assert a claim or demand against XL seeking contribution, indemnity, damages, attorneys' fees, costs, or other reimbursement, subrogation, allocation, and/or apportionment relating to or arising out of the Policy or the Settled Claims.  The Insureds further agree that they will not voluntarily assist or cooperate with any Person in making any claims for contribution, indemnity, damages, attorneys' fees, costs, or other reimbursement, apportionment and/or allocation against XL relating to or arising out of the Policy or the Settled Claims; provided, however, that nothing in this paragraph shall preclude or prevent any Person from complying with appropriate subpoenas and discovery requests.

No Effect

22.    Nothing in this Settlement Agreement and Release shall limit or affect any rights XL has with respect to any reinsurance coverage for any portion of the Settlement Amount from any of its reinsurers.

23.    Nothing in this Settlement Agreement and Release shall limit or affect in any way the Insureds' rights against any other Person (except XL), whether pursuant to this Settlement Agreement and Release or otherwise.

-13-

Reinsurance Cooperation

24.    The Insureds agree to cooperate with XL in connection with XL's seeking any reinsurance for this settlement, including reasonable requests to provide copies of documents that may be needed in pursuit of such reinsurance. The reasonable cost of copying any such documents shall be paid by XL.

No Admissions

25.    This Settlement Agreement and Release is the result of confidential settlement negotiations and compromise by the Parties. This Settlement Agreement and Release, communications, documents and/or correspondence exchanged during the negotiation/settlement process shall neither be considered an admission by any of the Parties as to the validity of any contention of any other Party nor a denial of coverage, liability, or responsibility. The negotiations leading to this Settlement Agreement and Release shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence or any analogous state or common law rules or practice.

26.    This Settlement Agreement and Release is not a policy of insurance, and the Parties do not intend that this Settlement Agreement and Release be interpreted as such.

27.    This Settlement Agreement and Release does not adopt any specific coverage theory and is the product of informed negotiations between Parties of equal bargaining power.

28.    Nothing in this Settlement Agreement and Release shall be deemed or construed as an amendment, modification, or alteration of the Policy.

CONFIDENTIAL                                                  WTCP 0257969

Dismissal of New York Litigation, And
Withdrawal Of London Arbitration Demand

29.     Within five (5) business days after the Insureds' timely receipt of the Settlement

Amount, counsel for the Insureds that are plaintiffs in the New York Litigation shall execute and

file a Notice of Voluntary Dismissal of Claims With Prejudice, dismissing with prejudice and

without costs the claims and causes of action that such Insureds have asserted against XL in the

New York Litigation.

30.     Within five (5) business days after the Effective Date of this Settlement Agree-

ment and Release, counsel for XL shall forward to counsel for each of the Insureds written noti-

fication of the withdrawal with prejudice of XL's demand for arbitration.  XL hereby covenants

not to initiate any demand for arbitration or any litigation with respect to the Policy.

31.     Nothing in this Settlement Agreement and Release shall obligate either the In-

sureds or XL to pay the other any of its attorneys' fees or costs related to the London Arbitration

or the New York Litigation or any of its attorneys' fees or costs related to the presentation of

claim with regard to the damage and destruction of the World Trade Center Complex.  The In-

sureds and XL expressly agree that they will not seek to recover from the other any fees, costs or

expenses (including costs of experts whether related to the presentation of the claim or other-

wise) of any kind incurred in connection with the London Arbitration or New York Litigation.

Amendments and Changes

32.     This Settlement Agreement and Release may not be amended, changed, modified,

released or discharged except by a writing signed by duly authorized officers of each of the Par-

ties hereto or their successors or permitted assigns, and this provision cannot be orally waived.

No express or implied representations, warranties or promises, including any representation by

-15-

CONFIDENTIAL

WTCP 0257970

the Insureds as to the amount of their losses resulting from the events of September 11, 2001, have been made or relied upon by the Parties other than those set forth herein.

## No Assignment

33.    The Parties represent and warrant that they have not sold, assigned, transferred or otherwise disposed of any of the rights or obligations granted or imposed pursuant to the Policy.

34.    The rights or obligations granted or imposed pursuant to this Settlement Agreement and Release with respect to the Policy may not be assigned without the prior written consent of the other Parties, which consent shall not be unreasonably withheld; provided, however, that any Party may assign the rights or obligations granted or imposed pursuant to this Settlement Agreement and Release with respect to the Policy in connection with a sale or other disposition of a material part of its assets, in which event the selling Party shall require the purchaser, as a condition to any such sale or disposition, to assume in writing the obligations of the seller under this Settlement Agreement and Release.  No such assignment or assumption shall relieve any of the Parties to this Settlement Agreement and Release of any obligations hereunder.

## Binding Effect of Agreement

35.    Each of the terms of this Settlement Agreement and Release is binding upon and inures to the benefit of each Party hereto, and its respective successors, heirs and assigns.

## Execution in Counterparts

36.    This Settlement Agreement and Release may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

-16-

CONFIDENTIAL

Headings

37.    The headings utilized in this Settlement Agreement and Release are designed for the sole purpose of facilitating ready reference to the subject matter of this Settlement Agreement and Release.  Said headings shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Settlement Agreement and Release.

Representations

38.    The respective Party executing this Settlement Agreement and Release expressly warrants and represents that:

(a)    It is a corporation or limited liability company in good standing in its respective place of domicile except as to the Port Authority, which represents that it is a body corporate and politic and a municipal corporate instrumentality of the States of New York and New Jersey created and existing by virtue of the Compact of April 30, 1921, made by and between said States and thereafter consented to by the Congress of the United States;

(b)    The execution of this Settlement Agreement and Release is fully authorized by the respective Party on its own behalf and on behalf of all persons acting by, through or under any of them;

(c)    The Person executing this Settlement Agreement and Release has the necessary and appropriate authority to do so;

(d)    There is no pending lawsuit, agreement, transaction or negotiation that would render this Settlement Agreement and Release or any part thereof void, voidable, or unenforceable; and

-17-

CONFIDENTIAL

(e)    The only Insureds under the Policy are Parties hereto, and other than the Parties to this Settlement Agreement and Release there are no other Persons which are insured under the Policy.

39.    The representations, warranties, agreements, and promises made by each party to this Settlement Agreement and Release and contained herein shall survive the execution of this Settlement Agreement and Release.

## Governing Law

40.    This Settlement Agreement and Release and all transactions under it shall be construed in accordance with the laws of the State of New York, without regard to conflict of laws principles.

## Effective Date

41.    The Effective Date of this Settlement Agreement and Release shall be the date upon which the last Party has signed the Settlement Agreement and Release.

## Notices

42.    Notices directed to the respective Parties shall be sent by registered or certified mail, return receipt requested, to the following Persons:

-18-

CONFIDENTIAL

If to Silverstein Properties, Inc.,
    Silverstein WTC Mgmt. Co. LLC,
    World Trade Center Properties LLC,
    1 World Trade Center LLC,
    2 World Trade Center LLC,
    4 World Trade Center LLC, or
    5 World Trade Center LLC:

    Silverstein Properties, Inc.
    521 Fifth Avenue
    New York, New York  10175

    Attention:  Michael Levy

With a copy to:

    Wachtell, Lipton, Rosen & Katz
    51 West 52nd Street
    New York, New York 10019

    Attention:  Herbert M. Wachtell, Esq.,
             Eric M. Roth, Esq.

If to Westfield Corporation, Inc.,
    Westfield WTC LLC, or
    Westfield America, Inc.:

    Westfield America, Inc.
    11601 Wilshire Boulevard
    12th Floor
    Los Angeles, California  90025

    Attention:  Arthur E. Schramm, Jr.

With a copy to:

    Mayer, Brown, Rowe & Maw
    350 South Grand Avenue
    25th Floor
    Los Angeles, California  90071-1503

    Attention:  Peter K. Rosen, Esq.

-19-

WTCP 0257974

Debevoise & Plimpton
919 Third Avenue
New York, New York 10022

Attention:  Peter R. Schwartz, Esq.

If to the Port Authority of New York and New Jersey:

The Port Authority of New York and New Jersey
225 Park Avenue South
New York, New York 10003

Attention:  Charles F. McClafferty
Chief Financial Officer

With a copy to:

The Port Authority of New York and New Jersey
225 Park Avenue South
New York, New York 10003

Attention:  Jeffrey S. Green, Esq.
General Counsel

If to Wells Fargo:

Wells Fargo Bank Minnesota, National Association
c/o GMAC Commercial Mortgage Corporation
200 Witmer Road
Horsham, Pennsylvania  19044

Attention:  Maria Corpora-Buck, Esq.
General Counsel

-20-

CONFIDENTIAL

WTCP 0257975

With a copy to:

    Heller Ehrman White & McAuliffe
    40th Floor
    601 S. Figueroa
    Los Angeles, California 90017

    Attention:  Nancy Sher Cohen, Esq.
                Stephen N. Goldberg, Esq.

      - and -

    Cadwalader, Wickersham & Taft
    100 Maiden Lane
    New York, New York 10038

    Attention:  William P. McInerney, Esq.


If to GMAC Commercial Mortgage Corporation:

    GMAC Commercial Mortgage Corporation
    200 Witmer Road
    Horsham, Pennslyvania 19044

    Attention:  Maria Corpora-Buck, Esq.
                General Counsel


With a copy to:

    Heller Ehrman White & McAuliffe
    40th Floor
    601 S. Figueroa
    Los Angeles, California 90017

    Attention:  Nancy Sher Cohen, Esq.
                Stephen N. Goldberg, Esq.

      - and -

    Cadwalader, Wickersham & Taft
    100 Maiden Lane
    New York, New York 10038

    Attention:  William P. McInerney, Esq.

CONFIDENTIAL          WTCP 0257976

If to UBS Warburg:

    UBS Warburg Real Estate Investments Inc.
    1285 Avenue of the Americas
    New York, New York 10019

    Attention:   Robert W. Pettinato, Jr.

With a copy to:

    Covington & Burling
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C. 20004-2401

    Attention:   Mitchell F. Dolin, Esq.

If to XL:

    XL Insurance (Bermuda) Ltd
    XL House
    One Bermudiana Road
    P.O. Box 2245
    Hamilton, HM JX
    BERMUDA
    Tel: +1 (441) 292-8515
    Fax: +1 (441) 292-4352

    Attention:      Henry French, Esq.
               General Counsel

With a copy to:

    Ropes & Gray
    One International Place
    Boston, MA 02110-2624

    Attention:      Kenneth W. Erickson, Esq.

or to such other Person or address as the addressee may have specified in a notice duly given to

the sender as provided herein.

    IN WITNESS WHEREOF, each Party by its duly authorized representative has executed

-22-

WTCP 0257977

this Settlement Agreement and Release on the date shown below:

SILVERSTEIN PROPERTIES, INC.

Date : _____2/13/02_____

By: _____
Name: Michael Levy
Title: Chief Financial Officer

SILVERSTEIN WTC MGMT. CO. LLC

Date : _____2/13/02_____

By: _____
Name: Michael Levy
Title: Vice President

WORLD TRADE CENTER PROPERTIES LLC
By Silverstein WTC Properties LLC, its Manager
By Silverstein WTC LLC, its Manager

Date : _____2/13/02_____

By: _____
Name: Michael Levy
Title: Vice President

1 WORLD TRADE CENTER LLC

Date : _____2/13/02_____

By: _____
Name: Michael Levy
Title: Vice President

2 WORLD TRADE CENTER LLC

Date : _____2/13/02_____

By: _____
Name: Michael Levy
Title: Vice President

4 WORLD TRADE CENTER LLC

Date : _____2/13/02_____

By: _____
Name: Michael Levy
Title: Vice President

-23-

CONFIDENTIAL                                    WTCP 0257978

5 WORLD TRADE CENTER LLC

Date : _2/13/02_

By: _____
    Name: Michael Levy
    Title: Vice President

WESTFIELD CORPORATION, INC.

Date:_____

By:_____
    Name:
    Title:

WESTFIELD WTC LLC

Date:_____

By:_____
    Name:
    Title:

WESTFIELD AMERICA, INC.

Date:_____

By:_____
    Name:
    Title:

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____

By:_____
    Name:
    Title:

-24-

CONFIDENTIAL

5 WORLD TRADE CENTER LLC

Date :_____        By:_____
                                         Name:
                                         Title:

WESTFIELD CORPORATION, INC.

Date:_____         By: _____
                                         Name:    Elizabeth P. Westman
                                         Title:   Associate General Counsel

WESTFIELD WTC LLC
By: Westfield WTC Holding LLC, its sole member
By: Westfield America Limited Partnership, its sole member
By: Westfield America, Inc., its general partner
Date:_____         By:_____
                                         Name:    Elizabeth P. Westman
                                         Title:   Associate General Counsel

WESTFIELD AMERICA, INC.

Date:_____         By:_____
                                         Name:    Elizabeth P. Westman
                                         Title:   Associate General Counsel

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

Date:_____         By:_____
                                         Name:
                                         Title:

-24-

CONFIDENTIAL                                          WTCP 0257980

FEB-13-2002  18:38    OPERATIONS SVCES MME    1 201 216 2908

THE PORT AUTHORITY
OF NEW YORK AND NEW JERSEY

Date: February 13, 2002          By: _*B.D. Bohlen*_____

Name:  Bruce D. Bohlen
Title:   Treasurer

THE PORT AUTHORITY OF NEW YORK OF NEW JERSEY

SIGNATURE PAGE TO

THE SETTLEMENT AGREEMENT AND RELEASE MADE AND ENTERED INTO BETWEEN
SILVERSTEIN PROPERTIES, INC., SILVERSTEIN WTC MGMT. CO. LLC, WORLD TRADE
CENTER PROPERTIES LLC, 1 WORLD TRADE CENTER LLC, 2 WORLD TRADE CENTER
LLC, 4 WORLD TRADE CENTER LLC, 5 WORLD TRADE CENTER LLC, WESTFIELD WTC
LLC, WESTFIELD CORPORATION, INC., WESTFIELD AMERICA, INC., THE PORT AUTHORITY
OF NEW YORK AND NEW JERSEY, UBS WARBURG REAL ESTATE INVESTMENTS INC.,
WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE
REGISTERED CERTIFICATE HOLDERS OF GMAC COMMERCIAL MORTGAGE SECURITIES, INC.
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2001 – WTC, UNDER A TRUST AND
SERVICING AGREEMENT DATED AS OF AUGUST 21, 2001, AND GMAC COMMERCIAL
MORTGAGE CORPORATION, IN ITS OWN RIGHT AND IN ITS CAPACITY AS SERVICER UNDER
THE TRUST AND SERVICING AGREEMENT DATED AS OF AUGUST 21, 2001 (COLLECTIVELY,
THE "INSUREDS"), ON THE ONE HAND, AND XL INSURANCE (BERMUDA) LTD, FORMERLY
KNOWN AS XL INSURANCE LTD ("XL"), ON THE OTHER HAND.

CONFIDENTIAL

WTCP 0257981

GMAC COMMERCIAL MORTGAGE CORPORATION

Date:_____

By GMAC Commercial Mortgage Corporation, in its own
right and as servicer for Wells Fargo Bank Minnesota,
National Association, Trustee, under a Trust and Servicing
Agreement dated August 21, 2001

UBS WARBURG REAL ESTATE INVESTMENTS INC.

Date:_____

By:_____
    Name:
    Title:

– and –

Date:_____

By:_____
    Name:
    Title:

WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

By GMAC Commercial Mortgage Corporation, as servicer
for Wells Fargo Bank Minnesota, National Association,
Trustee, under a Trust and Servicing Agreement dated
August 21, 2001

Date:_____

XL INSURANCE (BERMUDA) LTD,
formerly known as XL Insurance Ltd

Date:_____

By:_____
    Name:
    Title:

-19-

CONFIDENTIAL

GMAC COMMERCIAL MORTGAGE CORPORATION

Date:_____

By GMAC Commercial Mortgage Corporation, in its own
right and as services for Wells Fargo Bank Minnesota,
National Association, Trustee, under a Trust and Servicing
Agreement dated August 21, 2001

UBS WARBURG REAL ESTATE INVESTMENTS INC.

Date: FEBRUARY 13, 2002

By:_____
Name: ROBERT PETTINATO
Title: DIRECTOR

– and –

Date: 2/13/2002

By:_____
Name: Bird Cohen
Title: Director

WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION

Date:_____

By GMAC Commercial Mortgage Corporation, as servicer
for Wells Fargo Bank Minnesota, National Association,
Trustee, under a Trust and Servicing Agreement dated
August 21, 2001

XL INSURANCE (BERMUDA) LTD,
formerly known as XL Insurance Ltd

Date:_____

By:_____
Name:
Title:

-19-

CONFIDENTIAL                                                        WTCP 0257983

FEB-15-2002  09:21        ROPES & GRAY                                    P.03

XL INSURANCE (BERMUDA) LTD,
formerly known as XL Insurance Ltd

Date: ___13 February 2002___

By: _____
Name: HENRY T. FRENCH JR.
Title: GENERAL COUNSEL

-26-

TOTAL P.03

CONFIDENTIAL                                            WTCP 0257984

# Exhibit 18 Intentionally Omitted.

Exhibit 18 is designated "Confidential" pursuant to the Confidentiality Agreement and Protective Order filed herein on February 5, 2004. WTCP has sought, but not yet obtained, authorization from the designating person(s) to file Exhibit 18 with the Court in connection with this Motion. If authorization from the designating person(s) cannot be obtained, WTCP will seek relief from the Court forthwith.