Richard A. Williamson, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
rwilliamson@fzwz.com

Attorneys for Plaintiffs
World Trade Center Properties LLC
1 World Trade Center LLC
2 World Trade Center LLC
3 World Trade Center LLC
4 World Trade Center LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                   :

IN RE SEPTEMBER 11 PROPERTY DAMAGE   :
AND BUSINESS LOSS LITIGATION

                                   :
------------------------------------------------------------X

21 MC 101 (AKH)

This document also relates to:

08 CIV 3719
08 CIV 3722

## DECLARATION OF RICHARD A. WILLIAMSON
## IN OPPOSITION TO THE AVIATION DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT BASED ON CPLR 4545(c)

RICHARD A. WILLIAMSON, an attorney admitted to practice law in the State of New York and before this Court, declares under the penalties of perjury that the following is true and correct, pursuant to 28 U.S.C. § 1746:

1.       I am a member of the law firm Flemming Zulack Williamson Zauderer LLP, counsel for plaintiffs World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, and 4 World Trade Center LLC (collectively "WTCP").

2.       I submit this declaration to bring to the Court's attention relevant information and documents in opposition to the Aviation Defendants' motion for summary judgment based on CPLR 4545(c) seeking to dismiss WTCP's claims. The information contained in this declaration is based upon my personal knowledge and from review of documents.

## September 11 Actions Against WTCP For Which
## It Had Limited Liability Protection Under ATSSSA

3.    WTCP and their affiliates were sued in over 1,200 wrongful death and personal injury non-respiratory and property damage actions arising out of, resulting from and relating to the terrorist-related aircraft crashes of September 11, 2001. WTCP and their affiliates were also sued in thousands of state and federal lawsuits arising out of the events of 9/11 alleging respiratory and other injuries at and near the WTC site. This included a pending class action on behalf of more than 10,000 persons. WTCP spent almost seven years defending those actions. The potential liability was enormous.

4.    Most of the wrongful death and personal injury plaintiffs received multi-million dollar awards from the Victim Compensation Fund (totaling over $6 billion). Certain of the Aviation Defendants have settled a number of the wrongful death and personal injury actions for similar amounts per plaintiff or higher.

5.    There are several remaining wrongful death and personal injury plaintiffs with unresolved claims. No party has objected to any settlements of such claims. Certain plaintiffs' attorneys continue to name WTCP in new actions alleging respiratory injuries despite WTCP's October 2006 dismissal from the 21 MC 100 docket by Order of this Court.

## The Dual Role of WTCP's Insurers

6.    Discovery has revealed that some of WTCP's property insurers or their subsidiaries or affiliates also insure defendants in this litigation.

7.    Discovery has revealed that, upon information and belief, Allianz and Munich Re or their subsidiaries or affiliates provided liability insurance to certain Aviation Defendants, including Boeing, Huntleigh, Colgan, US Airways, American Airlines/AMR Corp. and United/UAL.

8.    Discovery has revealed that, upon information and belief, Swiss Re provided excess insurance to American Airlines/AMR Corp. and an affiliate insured Boeing. Although Swiss Re, another of WTCP's insurers, is not itself one of the Clifford Group of

Plaintiffs, upon information and belief, Swiss Re has purchased IRI which is one of the Clifford Group of Plaintiffs.

9.    The Clifford Group of Plaintiffs in this action, dominated by insurance companies seeking to be reimbursed for 9/11 claims paid to WTCP and other insureds, have joined Defendants in this motion to dismiss the claims of their WTCP insureds. By doing so, the Clifford Group insurers seeks to reduce their own potential liability and that of their subsidiaries and their affiliates as insurers of the Aviation Defendants and to increase the limited fund available for them to recover from other insurers.

### Exhibits

10.    Attached as **Exhibit 1** is a true and correct copy of a March 14, 2008 Letter from Desmond T. Barry, Jr. to Hon. Alvin K. Hellerstein in the September 11 Litigation.

11.    Attached as **Exhibit 2** is a true and correct copy of the transcript of the March 18, 2008 status conference in the September 11 Litigation.

12.    Attached as **Exhibit 3** is a true and correct copy of excerpts from Aviation Defendants' Memorandum of Law in Support of Their Motion for a Determination of the Law Applicable to Flight 11, 77 and 175 Punitive Damages Claims, filed April 30, 2007.

13.    Attached as **Exhibit 4** is a true and correct copy of Matthew D. Barrett, *Recovering Damages for Tortious Injury to Historic Buildings and Other 'Special Purpose' Property in Indiana: Drawing the Line Between 'Fair Market Value' and 'Cost of Repair' in Cases of Permanent Damage*, 50-DEC RES GESTAE 21 (Dec. 2006).

Dated: August 15, 2008
        New York, New York

Richard A. Williamson

# EXHIBIT 1

# CONDON & FORSYTH LLP

NEW YORK
LOS ANGELES

Direct Dial: (212) 894-6770
Direct Fax: (212) 894-6771
dbarry@condonlaw.com

March 14, 2008

**VIA FACSIMILE AND EMAIL**

Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1050
New York, New York 10007

Re:    In re September 11 Litigation, 21 MC 101
        Property Damage and Business Loss Litigation;
        Unsettled Wrongful Death and Personal Injury Cases
        C & F Ref: DTB/CRC/28507

Dear Judge Hellerstein:

I write in my capacity as Aviation Defendants' Liaison Counsel to provide the Court with the position of the Aviation Defendants concerning the items set forth in the Court's Agenda for the March 18, 2008 status conference in 21 MC 101.

In addition to commenting on each of the Court's Agenda items, the Aviation Defendants have drafted a Case Management Plan and Proposed Order for the remainder of the litigation, a copy of which is attached hereto as Exhibit "A". We attempted to agree on a joint Case Management Plan and Proposed Order with counsel representing the various plaintiffs' interests but were unable to do so. Given the multiplicity of claims and essential discovery, the Aviation Defendants' Case Management Plan and Proposed Order calls for the completion of all fact and expert discovery early in 2010 and a bifurcated liability trial in July of that year.

It should be noted at the outset that the Aviation Defendants intend to file dispositive and evidentiary motions at the appropriate time that could dispose of this litigation or at least help focus discovery productively. *See* Section IX, *infra*. These motions include dismissal of the property cases for lack of duty and proximate cause, and a motion seeking a ruling that the 9/11

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 2


Report, Aviation Monograph and Staff Statements are not hearsay under Federal Rule of
Evidence 803.

Set forth below are responses to each of the Court's Agenda items organized according to the
section numbers and headings used in that Agenda.

## I.    DISCOVERY TO DATE

> **a. Interrogatories and Requests to Produce, as filtered by TSA**
> **b. Quantify discovery that has been completed**
> **c. Any open discovery**
> **d. Anything pending before TSA**


For the convenience of the Court, attached hereto as Exhibit "B" is a chart setting forth the status
of the document discovery served by Plaintiffs and the Aviation Defendants to date.  A brief
synopsis of the status of each category of discovery, including responses to the questions raised
by the Court, is set forth below.

### Plaintiffs' Liability Discovery

Plaintiffs have served two sets of master document requests upon the Aviation Defendants.
Plaintiffs also have served additional document requests and interrogatories directed towards
certain Defendants regarding specific issues such as insurance and screening equipment.  With
the exception of those requests about which the parties continue to meet and confer, it is the
Aviation Defendants' position that their responses to all discovery requests served by Plaintiffs
either are complete or will be completed shortly, based on the agreements reached between
Defense and Plaintiffs' counsel.  Although thousands of pages of documents produced by the
Aviation Defendants are pending review by the TSA, the Aviation Defendants understand that
the TSA is reviewing these documents as quickly as possible and that the agency will provide a
separate report on the status of specific categories of documents.

### Aviation Defendants' Liability Discovery

The Aviation Defendants continue to pursue liability document discovery directed towards
narrowing and defining Plaintiffs' claims and supporting Defendants' potential defenses.
Specifically, the Aviation Defendants have served Plaintiffs with document requests and
interrogatories concerning each flight.   In addition, the Aviation Defendants have served

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 3

Plaintiffs with contention interrogatories and requests for the identification of potential fact witnesses. The Aviation Defendants also have requested that Plaintiffs supplement their responses to the requests for the names of witnesses so that a list of witnesses to be deposed can be formulated. The Aviation Defendants' Case Management Plan and Proposed Order contains deadlines for Plaintiffs to provide this information prior to the close of fact discovery, Ex. "A" at 2. The parties continue to meet and confer concerning these requests. If these discussions remain unsuccessful in resolving the parties' disputes, we will bring these issues to the Court's attention for resolution.

The Aviation Defendants also have served document subpoenas upon the TSA and FAA. In addition, the Aviation Defendants have served document requests pursuant to the Freedom of Information Act upon these agencies as well as the FBI and NTSB. The agencies continue to produce documents in response to these requests.

**Aviation Defendants' Damages Discovery**

Each of the multiple property Plaintiffs has a separate and distinct claim for property damage, business interruption, or other losses relating to one of at least ten buildings destroyed or damaged on 9/11. The Aviation Defendants served document requests and interrogatories on each Plaintiff asking fundamental information relating to the nature and amount of damages. The Plaintiffs are in different stages of responding to these discovery requests but few, if any, have fully completed their responses. This discovery is necessary not merely to determine the appropriate calculation of these parties' damages claims, but whether a legal and factual foundation exists for many of those claims. As discussed below, the Aviation Defendants' preliminary analysis of the available information indicates that several Plaintiffs have no legally recoverable damages claims or that those claims are vastly inflated. Many more documents remain to be produced, and the Aviation Defendants continue to meet and confer with Plaintiffs' counsel regarding their responses to these requests. Additionally, the Aviation Defendants have served more than 20 third-party subpoenas relating to WTCP's damages claims.

II.    **DEPOSITIONS**

   a. **How many depositions have been completed, and of whom**
   b. **What is pending**
   c. **Anything pending before TSA**
   d. **What disputes about discovery are extant? Have the discovery issues described in the Condon & Forsyth letter of February 6, 2008 been vetted by the parties, and when will non-agreed issues be tendered for rulings?**

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 4

For the convenience of the Court, attached hereto as Exhibit "C" is a chart listing the 101 liability and property damage depositions conducted to date by Plaintiffs and the Aviation Defendants. A brief synopsis of the status of each category of depositions, including responses to the questions raised by the Court, is set forth below. With respect to Item II (d) of the Court's agenda, as described below and in Section I, *supra*, the Aviation Defendants continue to meet and confer with Plaintiffs and the Government regarding extant discovery disputes including those described in the Aviation Defendants' February 6, 2008 letter to the Court. In the event the parties are unable to resolve these disputes, the parties will submit a joint letter pursuant to Rule 2(E) of the Court's Individual Rules regarding these disputes as soon as possible

**Plaintiffs' Liability Depositions**

Since liability depositions began in September 2006, the Aviation Defendants have produced 91 witnesses in response to Plaintiffs' requests. These witnesses include numerous checkpoint screeners, security managers, airline ticket and gate agents, airport managers, corporate security personnel, and aircraft security witnesses. In addition, Plaintiffs recently noticed 19 additional depositions of defense witnesses, and efforts are being made to schedule those depositions. Plaintiffs also have advised that further depositions of defense witnesses will be noticed shortly.

**Aviation Defendants' Liability Depositions**

The Aviation Defendants continue to seek testimony from Government witnesses to refute Plaintiffs' anticipated claims. Specifically, the Aviation Defendants have served Rule 30(b)(6) deposition notices upon the TSA and FAA. In response, the agencies produced Robert Cammaroto, Branch Chief for Commercial Airports Policy at the TSA, in February 2008 to testify on certain limited FAA Rule 30(b)(6) deposition topics. Government counsel has advised that the agencies likely will be producing two individual witnesses to testify on certain Rule 30(b)(6) topics, and will produce documents in lieu of testimony on the other remaining topics.

In addition, Government counsel asked the Aviation Defendants to defer discussions of Rule 30(b)(6) topics relating to aircraft design, including the systems and components newly put at issue in Plaintiffs' recently Amended Master Complaints. The Aviation Defendants have complied with that request but are ready to provide their list of such topics at the Government's convenience. Accordingly, depositions on topics related to aircraft design, certification and regulatory issues remain to be discussed and scheduled.

The Aviation Defendants also have served several notices requesting testimony of individual government witnesses. In response, the FAA and TSA produced former FAA Special Agent

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 5


David Peterson in January 2008 to testify about the testing he performed on Logan Airport security equipment on September 11, 2001. The Aviation Defendants' other deposition requests either are pending or have been denied. The denied requests include those for the testimony of five former and current FBI employees and two CIA witnesses and are the subject of Complaints filed by the Aviation Defendants pursuant to the Administrative Procedure Act, as discussed in more detail in Section VII, *infra*.

In addition, in November 2006 the Aviation Defendants and Plaintiffs deposed James Helliwell, the author of the Checkpoint Operations Guide ("COG").

**Aviation Defendants' Damages Depositions**

In conjunction with their pursuit of damages document discovery from the WTCP and PANYNJ Cross-Claim Plaintiffs and the subrogated insurers and business Plaintiffs, the Aviation Defendants also continue to seek deposition testimony regarding these parties' damages claims. The Aviation Defendants have deposed three witnesses on document custodian issues pertaining to PANYNJ and WTCP, and have noticed substantive depositions of five other PANYNJ witnesses. Additionally, the Aviation Defendants have noticed more than 20 depositions of third parties related to WTCP's damages claims.


| III. | **STATUS OF UNSETTLED WRONGFUL DEATH AND PERSONAL INJURY CASES** |

a.   The Aviation Defendants agree with the Court's statement that "the differences between plaintiffs and defendants in the unsettled death and injury cases are not likely to be bridged commensurate with the values that informed the previously settled cases." The Aviation Defendants will continue to pursue reasonable settlements in the remaining death and injury cases. The Defendants also intend to move to dismiss the property damage claims contemporaneously with these offers.

b.   **The cases requiring further proceedings should be brought on quickly for rulings.**

(i)   On March 13, 2008, the parties agreed to settle the *Cahill* case. Accordingly, no dismissal motion will be filed in this case.

(ii)   A Joint Case Management Plan and Proposed Order in the *Bruno* case is attached hereto as Exhibit "D".

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 6

     (iii)    The *Hayden* non-binding arbitration/mediation before Judge Parker has been completed and settlement negotiations are continuing. A settlement offer has been made reflective of the recommendations of Judge Parker.

     (iv)    No other motions are contemplated by the parties at this time in the death and injury cases.

  **c.**    **Further mediations, if pursued, should not be allowed to interfere with the progress of discovery in all other cases.**

     The *Merrill* personal injury case will be mediated before Ms. Birnbaum on March 19, 2008 at 2:00 p.m. The parties in the *Tansey* personal injury case are conducting settlement negotiations that also could lead to mediation. Any further mediations will not interfere with the progress of discovery in all other cases

  **d.**    The Aviation Defendants' list of active cases in 21 MC 97 is attached hereto as Exhibit "E". The parties will submit a joint proposed Order on Monday, March 17, 2008 transferring the cases identified in Exhibit "E" and the cross-claims filed by WTCP and PANYNJ.

**IV-V.**  <u>STATUS OF PROTECTIVE ORDERS AND STATUS OF MOTION TO SET ASIDE AVIATION DEFENDANTS' CONFIDENTIALITY DESIGNATIONS</u>

Plaintiffs' motion to set aside the Aviation Defendants' confidentiality designations has been fully briefed by the parties and putative *amicus curiae*, the Reporters Committee for Freedom of the Press. The parties continue to discuss a possible resolution that would involve the post-litigation creation of a document repository for evidence discovered during the litigaton and will inform the Court if such an agreement is reached.

**VI.**  <u>DISCOVERY NOT YET HAD AND DESIRED BY THE PARTIES</u>

  **a.**    **What issues are not fairly disputable and have not yet been reduced to stipulations or admissions?**

<u>The Structure and Responsibility for the Aviation Security System</u>

The federal Aviation Security Improvement Act of 1990 established an aviation security system that specifically mandated that the federal government assess threats to commercial aviation and design appropriate countermeasures to be implemented by the Aviation Defendants. It is beyond

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 7


dispute that the federal threat assessment system did not foresee the September 11th attacks, and did not design a security system appropriate to counter such attacks. The Aviation Defendants believe these facts should not be reasonably disputable, and can be established either by stipulation or a ruling by this Court. Should such a stipulation not be possible, the Aviation Defendants will seek additional discovery from the federal government and other parties in order to establish these essential facts.

Likewise, the Aviation Defendants will seek a stipulation that certain security methods employed in other jurisdictions were not allowed under U.S. law, including racial profiling of individuals of Middle Eastern descent, and that the federal aviation security system and equipment approved for use in that system was not intended to, nor capable of, preventing all prohibited items from entering the sterile area – particularly small knives and containers of mace or pepper spray. Absent such a stipulation, additional discovery and expert testimony will be required on these issues.

In addition, the Aviation Defendants will seek a stipulation that the federal government was responsible for ensuring that aircraft included all features necessary and appropriate for aviation safety, including any necessary to address aviation security; that the federal government's judgments regarding appropriate aircraft design were reflected in the Federal Aviation Regulations pertaining to commercial aircraft design; that the FAA certified the design of the hijacked aircraft as meeting the applicable regulations; and that the hijacked aircraft in fact satisfied those regulations. Absent such a stipulation, additional fact and expert discovery will be required on these and related issues.

      **b.**       **What discovery remains?**

**Liability Discovery**

*The Responsibility of the Aviation Defendants to Have "Done More."*  To the extent that Plaintiffs claim that the Aviation Defendants should have "done more" than was required by the federal aviation security regime, additional discovery will be necessary to establish whether such measures would have required governmental approval, the factors and process for approval, and whether such measures would have prevented the September 11th attacks.

It is impossible for the Aviation Defendants to define the parameters of such discovery until Plaintiffs provide more specific claim and contention information. However, the need for this type of discovery could be obviated if the Court were to reconsider and favorably decide Defendants' motion for a determination of applicable law that was argued in June of 2007.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 8


*The Terrorists' Planning for the Attack.* The Aviation Defendants plan to conduct discovery to establish the terrorists' meticulous planning for the September 11th attacks. Such discovery will establish how the terrorists spent their time before and after entering the United States, their efforts to develop familiarity with the federal aviation security system, their reconnaissance flights, the degree to which they experimented with varying means of attack, their physical training for the attacks, and their flight school training.

*The Execution of the Attack.* Depending upon Plaintiffs' contentions and the admissibility of the 9/11 Commission Report, Aviation Monograph and various other government documents, it may be necessary for the Aviation Defendants to conduct discovery to confirm the facts set forth in the 9/11 Commission Report, Aviation Monograph and various other government documents regarding the actions of the terrorists and other persons on board the hijacked aircraft during the September 11th attacks, including the terrorists' activities during and after their takeover of the aircraft.

*Aircraft Design Issues.* Certain Aviation Defendants plan to conduct discovery relating to the Federal Aviation Regulations governing commercial aircraft design; the objectives of those regulations; the regulatory issues and policy issues implicated by Plaintiffs' alternative design theories; the conflict between Plaintiffs' alternative design theories and the regulations in existence on and before September 11, 2001; the federal certification process for commercial aircraft; the certification of the design of the hijacked aircraft by the FAA as meeting all applicable regulations; and the design of other comparable commercial aircraft with respect to the aircraft systems and components placed at issue by Plaintiffs in their recently Amended Master Complaints.

Finally, because Plaintiffs' liability contentions remain undefined, the Aviation Defendants may need to take additional discovery to refute Plaintiffs' claims once those claims are clarified.

**Damages Discovery**

The Aviation Defendants continue to seek necessary discovery from WTCP, PANYNJ, and the subrogated insurers and uninsured business Plaintiffs to determine the amount of their legally recoverable damages. Although many documents have been produced, few, if any, of the Plaintiffs have completed their document productions.

The Aviation Defendants anticipate further document requests and at least 50 depositions on damages alone. The remaining damages discovery is necessary because each claim is factually and legally different. Several potential factual and legal defenses exist which, if successful, could eliminate, or at least reduce significantly, the amount of these parties' legally recoverable

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 9


damages.

For example, the Aviation Defendants continue to pursue discovery from WTCP and third parties to determine how WTCP calculated its $12.3 billion damage claim because the Aviation Defendants believe that WTCP has been fully indemnified by its insurers for all its legally recoverable damages. The Aviation Defendants also seek discovery from PANYNJ regarding its insurance claims files to show that it similarly has been fully compensated for its legally recoverable damages. In addition, the Aviation Defendants continue to pursue discovery from the subrogated insurer Plaintiffs to show that their legally recoverable damages may be less than claimed because they may have paid more to their insureds than required by the terms of their insurance policies. The Aviation Defendants also need further discovery from other uninsured loss business Plaintiffs, such as ConEd which alleges more than $1 billion in uninsured losses, to demonstrate that their claims may be either duplicative of claims asserted by their insurers or otherwise not legally supportable.

The Aviation Defendants' property damage discovery is still in the preliminary stages. Initially, this discovery was delayed because the parties were focused on the death and injury cases. More recently, it has proceeded slowly because the Aviation Defendants have not received complete responses to their initial discovery requests on issues relating to damages. For instance, PANYNJ has taken the position that it will not produce certain "substantive" discovery until the conclusion of its first-party insurance claims adjustment process. Thus, it has not produced any claims-related documents created or received after May 2006, nor has it permitted "substantive" depositions of its witnesses with respect to its first-party insurance claims. Similarly, WTCP has not provided complete responses to the Aviation Defendants' interrogatories and document requests. WTCP has also refused to provide its schedule of insurance payments.

The Aviation Defendants are attempting to resolve these outstanding issues with the various Plaintiffs and Cross-Claim Plaintiffs but anticipate seeking the Court's assistance on several issues in the near future.

Given the complexity of the liability and damages issues in this consolidated litigation, the Aviation Defendants anticipate that substantial expert discovery also will be required before trial. The Aviation Defendants believe that the time periods set forth in the Aviation Defendants' Case Management Plan and Proposed Order (Exhibit "A") are necessary to address the expected scope of expert discovery.

      c.        **Should discovery proceed on multiple tracks?**

As set forth in the Aviation Defendants' Case Management Plan and Proposed Order, it is the

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 10


Aviation Defendants' suggestion that liability and damages discovery proceed on simultaneous tracks. *See* Aviation Defendants' Case Management Plan and Proposed Order, Ex. "A" at 2-3. Under the Aviation Defendants' proposal, fact discovery regarding liability and damages in all cases would be completed by July 1, 2009; expert discovery and motion practice regarding liability and damages experts in all cases would be completed by January 22, 2010.

VII.    DISCOVERY FROM SOURCES WITHIN THE GOVERNMENT

      a.      **How does discovery of information in government files generally proceed?**

      b.      **Is *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the governing authority, and does it require a plenary action under the Administrative Procedure Act and FOIA? Or can a court, in the context of ongoing litigation between private parties, decide the issue posed by *Touhy*: whether, notwithstanding the control of papers by the Departmental Secretary, productions should nevertheless be ordered by a court because of the papers "materiality to the case" and "the best public interests." In other words, is the APA/FOIA case brought by the Airline Defendants against U.S., to gain access to FBI and CIA witnesses and documents, an unnecessary and time-wasting procedure?**

**Procedures for Seeking Information from the Government**

Counsel for the Government is in the best position to advise the Court as to how civil litigants' discovery of information in government files generally proceeds.

With respect to requests for the deposition testimony of current or former FBI and CIA employees, the precedent and agency regulations established by *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) require that such requests be referred to the relevant agency. *See* 28 C.F.R. § 16.21 *et seq.* (regulations applicable to FBI employees); 32 C.F.R. Part 1905 (CIA regulations). The agency then makes a determination as to whether or not to authorize the testimony. *See* 28 C.F.R. § 16.24; 32 C.F.R. §§ 1905.3-1905.4. Even if the Court orders an agency witness to appear in response to a motion to compel, the witness must refuse to appear if the agency declines to authorize his testimony. *See* 28 C.F.R. § 16.28; 32 C.F.R. Part 1905.4(g).

While it is clear that the Aviation Defendants and the seven FBI and CIA witnesses they seek to depose were bound to follow the agencies' *Touhy* process, the law is ambiguous as to the standard that should be used to review the agencies' subsequent refusals to allow the testimony. The Second Circuit Court of Appeals has suggested that the Administrative Procedures Act, 5

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 11

U.S.C. §§ 701-706 ("APA"), which provides the necessary waiver of sovereign immunity, also establishes the standard of review. *See Envtl. Prot. Agency v. Gen. Elec. Co.,* 197 F.3d 592 (2d Cir. 1999). However, the Court of Appeals has yet to resolve this question definitively. *See, e.g., Envtl. Prot. Agency v. Gen. Elec. Co.,* 212 F.3d 689, 690 (2d Cir. 2000) (clarifying on rehearing that the issue remains undecided by the Second Circuit). Given this ambiguity, the Aviation Defendants chose to follow the more conservative course and commence proceedings under the APA, rather than seek redress by motions to compel made pursuant to Rule 45 of the Federal Rules of Civil Procedure. If the Court would prefer that in the future agency refusals to allow testimony be raised by motion, the Aviation Defendants would certainly follow that procedure.

      **c.**       **Why, and to what extent, does "the nature and scope of defendants' duty, foreseeability, causation and intervening or superseding cause" depend on information not known to defendants but known to government personnel? (See letter, Condon & Forsyth, March 20, 2007, p. 3)**

**The Relevance of Information Known to Government Personnel**

On September 11, 2001, the federal Government had a statutory duty to protect the nation from terrorist attacks and various agencies of the Government were charged by statute with specific responsibility to assess terrorist threats to civil aviation, to develop appropriate countermeasures, and to oversee the security procedures that the Aviation Defendants were required to follow on September 11, 2001. The federal Government also had the responsibility for determining what if any aircraft design features were required to address threats to aviation safety, including terrorist threats. Given the Government's direct responsibility for preventing these attacks and for dictating aviation security procedures, there can be no question that Government knowledge and action regarding terrorist threats prior to September 11th is relevant to determining whether the Aviation Defendants bear any legal responsibility for the attacks.

Fundamental principles of tort law make the Government's knowledge and action relevant regardless of whether the Government communicated its knowledge to the Aviation Defendants. With respect to duty, Government agencies (including the FBI, CIA and FAA) were "society's experts" in protecting the nation against terrorist attacks, as established by statutory charge and their real-world responsibilities. As such, the agencies' knowledge and actions, whether or not known to the Aviation Defendants, provide relevant benchmarks in determining the scope of the Aviation Defendants' duties. *See Eisenman v. State,* 511 N.E.2d 1128, 1137 (N.Y. 1987).

With respect to causation, it is a basic principle of tort law that defendants are permitted to show

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 12

that events and circumstances beyond their acts or omissions were the substantial cause of a plaintiff's injury. *See, e.g., Baptiste v. New York City Transit Auth.*, 814 N.Y.S.2d 136, 138 (1st Dep't 2006). This Court acknowledged this principle in its September 2003 decision, which recognized that actions of others may "so attenuate[] defendants' negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." *In re Sept. 11 Litig.*, 280 F. Supp. 2d 279, 302 (S.D.N.Y. 2003) (citations omitted). Clearly, the Aviation Defendants are entitled to present evidence of circumstances other than the Aviation Defendants' own actions for a jury to consider. Government intelligence regarding terrorist threats, and the Government's actions in response to those threats, is directly relevant to issues of causation, as illustrated by the following examples:

- The Aviation Defendants intend to argue that the best way to prevent sophisticated attacks by terrorist organizations such as al Qaeda is to identify plots in advance and take action to eliminate the threat. Congress charged the FAA and the FBI with the statutory responsibility to assess terrorist threats relating to domestic aviation. 49 U.S.C. § 44904(a) (2000). Generally, the Aviation Defendants should be permitted to show what the Government knew about the terrorist threat prior to 9/11 and that despite having substantial information about an impending attack by terrorists against the United States – information to which the Aviation Defendants did not have access – the Government was unable to identify the specific threat and could not stop the attacks.[1]

- More specifically, the Aviation Defendants should be permitted to show whether the Government failed to act on specific information concerning the 9/11 hijackers (not known to the Aviation Defendants), including evidence obtained as a result of the August 2001 arrest of al Qaeda operative Zacarias Moussaoui, and whether any such failure was a significant contributing factor in the success of the 9/11 plot.

- In addition, information known to the Government, but not shared with the Aviation Defendants, will show that the 9/11 attacks were carried out by sophisticated, dedicated, and ideologically driven terrorist groups and were carefully planned and rehearsed to take

---

[1] This portion of the Aviation Defendants' submission offers the Court a general discussion of the reasons why the Aviation Defendants seek discovery of information known to the Government but not known by the Aviation Defendants prior to 9/11. An example of the more specific discovery the Aviation Defendants seek that is relevant to issues of causation is discovery relating to the Government's missed opportunities to locate and apprehend two of the Flight 77 terrorists, or place those two terrorists on a no-fly list.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 13

advantage of existing vulnerabilities in the federally designed security system, rather than relying upon any negligence by the Aviation Defendants. This information is critical to the defense that the 9/11 terrorists' actions were a supervening cause of the Plaintiffs' injuries. *See, e.g., Port Auth. of N.Y. and N.J. v. Arcadian Corp.*, 991 F. Supp. 390, 408 (D. N.J. 1997), *aff'd*, 189 F.3d 305 (3d Cir. 1999). Discovery about how the 9/11 attacks were carried out includes information learned by the Government after 9/11 about the attacks.

- Finally, information known to the Government regarding threats to aircraft and utilized by the FAA in their decision-making regarding aircraft design features (including the cockpit door) is relevant to decisions made by the Aviation Defendants regarding the configuration of the hijacked aircraft.

With respect to forseeability, the Government's knowledge and assessment of likely threats to civilian aviation prior to September 11th is directly relevant. The 9/11 Commission noted that the Government's aviation security strategy assumed that hijackers would not undertake suicide attacks and the most serious threat would be from non-suicidal sabotage. *See* 9/11 Commission Report at 84. This view had to have been based upon Government intelligence. The Aviation Defendants would be severely prejudiced if they were not able to demonstrate that the Government had additional threat information, not known to the Aviation Defendants, and still concluded that a suicide terrorist attack was not a likely scenario. *See, e.g.*, 9/11 Commission Report at 84-85.

Information known to the Government but not known to the Aviation Defendants is also highly relevant to the reasonableness of the Aviation Defendants' conduct on and before September 11th. Plaintiffs allege that the Aviation Defendants' compliance with aviation security procedures required by the FAA was not enough and that the Aviation Defendants acted unreasonably by not implementing additional security procedures.[2] It is a matter of hornbook law that the reasonableness of a defendant's conduct may be judged by reference to the conduct of others. *See, e.g.*, 2 Wigmore *Evidence* § 461 (Chadbourne rev. 1970) (relevant evidence of a defendant's reasonable conduct includes evidence of the "conduct of others . . . under circumstances substantially similar"). The Government's counterterrorism efforts provide

---

[2]    As this Court is aware, the Aviation Defendants have a different view of the controlling law, but include in this discussion the reasons why the Government discovery sought is relevant to the common law negligence claims that Plaintiffs may be asserting.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 14

critical context for evaluating the reasonableness of the Aviation Defendants' conduct on and before 9/11. For example, discovery from the Government will show that the relevant Government entities (the FBI, CIA and FAA) all had far greater information about terrorist threats than did the Aviation Defendants. Armed with this greater knowledge, the relevant Government entities did not deem it necessary to inform the Aviation Defendants of this information nor did they deem it necessary to change any of the aviation security procedures in place on and before 9/11.

   d.  **What is the status of the APA lawsuit, and what is the briefing schedule?**

   e.  **Since the Airlines' APA lawsuit is an independent suit, the losing party has the right to appeal. What is the possible impact on pre-trial and trial schedules?**

   f.  **Will the APA lawsuit cause delay in other pending discovery?**

**The Status and Effect of the APA Proceedings**

The filing of the pending APA proceedings has not and will not cause any delay in the September 11 Litigation. The APA proceedings, which have been assigned to this Court as related cases to the September 11 Litigation, raise discreet issues that may be decided on motions for summary judgment. No additional discovery is needed before such dispositive motions can be filed or decided. Indeed, the Aviation Defendants are ready to file a summary judgment motion in the proceedings against the FBI and will confer with the Government to submit a joint proposed briefing schedule to the Court.

Even if the Government or the Aviation Defendants choose to appeal the Court's decision in the APA proceedings, that appeal could be concluded within the time the Aviation Defendants' Case Management Plan and Proposed Order provides for completion of fact and expert discovery.

**VIII. FIXING DISCOVERY COMPLETION DATES**

The Aviation Defendants' suggested dates for completion of fact and expert discovery are set forth in the Aviation Defendants' Case Management Plan and Proposed Order, Ex. "A" at 2-3. Under the Aviation Defendants' proposal, fact discovery regarding liability and damages in all cases would be completed by July 1, 2009; expert discovery and motion practice regarding liability and damages experts in all cases would be completed by January 22, 2010.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 15


### IX.    MOTIONS NOT MADE DURING DISCOVERY THAT SHOULD BE MADE BEFORE TRIALS

#### a.    Dispositive Motions

(i – iii) *Wrongful Death, Personal Injury, and Property Damage Cases.* Airlines named in Plaintiffs' Complaints that did not own or operate any of the aircraft involved in the terrorist attacks of September 11th will seek dismissal, as will other Defendants for whom security responsibilities (e.g., Massport), causation (e.g., Boeing), or third-party contractual relationships (e.g., the security companies), may not exist as a matter of law.

With respect to the property damage cases, the Aviation Defendants intend, at the appropriate time, to file a renewed motion seeking dismissal of the property damage cases for lack of duty and the absence of proximate cause. In addition, the Aviation Defendants believe that WTCP and PANYNJ have been fully indemnified by their insurers for all their legally allowable damages, and anticipate that a motion seeking to dismiss their cross-claims for property damage will be filed in the near future.

WTCP has now settled its insurance claims with its various insurers for approximately $4.55 billion – more than $1.3 billion dollars *more* than the stated net present value of what WTCP agreed to pay only weeks before the September 11th attacks for its interest in the World Trade Center complex. In the wake of WTCP's settlement with its insurers, the Aviation Defendants believe WTCP's continued presence in this litigation is inappropriate because it has been more-than-fully indemnified for its losses by collateral source payments. *See Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534 (2002); CPLR § 4545(c). The Aviation Defendants also seek discovery from PANYNJ regarding its insurance claims files to show that it similarly has been fully compensated for its legally recoverably damages.

(iv)   *Fixing Damages for Subrogated and Other Business Plaintiffs.*   The Aviation Defendants believe it is too early to assess whether a protocol to fix the subrogated insurer and other business Plaintiffs' damages is possible, let alone whether it is practical given the particulars of Plaintiffs' wide-ranging damages claims. As this Court recognizes, the criteria of "loss" relevant to the amounts paid by insurers under the relevant insurance contracts differ from the measure of "loss" available to the subrogated Plaintiffs under tort law. Not only is this measure of recoverable tort damages unrelated to the measures applicable under these insurance contracts, but the required showings are also not closely related. The principal amounts recoverable by property insurers in tort cannot be greater than the amounts paid by those subrogating insurers to their insureds, and are often mere fractions of those amounts. To the

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 16

extent the subrogees can recover on behalf of their subrogors, they cannot recover amounts greater than what the subrogors could recover themselves. Moreover, subgrogees and subrogors cannot both recover on duplicative claims.

The Aviation Defendants are pursuing additional discovery from the subrogated insurers and other business Plaintiffs but do not yet have sufficient information to contrast meaningfully the elements of their insurance recoveries with the damages recoverable under tort law. However, our preliminary review of these Plaintiffs' insurance claims files suggests that the insurers paid more than what actually was required to be paid under their insurance policies, and, therefore, that their legally compensable damages may be significantly less than the amounts they actually paid to their insureds. In addition, it appears that some insureds' claims are not legally supportable because they are duplicative of claims asserted by their insurers.

> **b.    In Limine Motions**

(i)  *Evidentiary Issues.* As highlighted in the Aviation Defendants' Case Management Plan and Proposed Order, we believe motions regarding the admissibility of government reports, including the 9/11 Commission Report, Aviation Monograph, and Staff Statements, and motions regarding the admissibility of prior testimony or statements related to aviation security and the September 11th attacks, should be filed "as soon as practicable." *See* Aviation Defendants' Case Management Plan and Proposed Order, Ex. "A" at 2. These motions are appropriately addressed prior to the end of discovery because their resolution could significantly affect the parties' need for additional discovery.

Issues relating to the timing of various other evidentiary motions, including *Daubert* or other motions related to experts, are addressed by the Aviation Defendants' Case Management Plan and Proposed Order, Ex. "A" at 3-4.

> **c.    Will There Be a Need For Non-Public Trial Sessions?**

The Aviation Defendants assume that the Government will suggest trial procedures that may be appropriate in order to protect Sensitive Security Information ("SSI") from public disclosure. The Aviation Defendants do not presently intend to request non-public trial sessions, but such sessions may be required for a full and fair presentation of evidence depending upon how Plaintiffs' liability theories intersect with any restrictions on the use of SSI.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 17


### d.    Other Issues

Other motions concerning apportionment of liability, the applicable standard of care, and additional evidentiary motions regarding the designation or redaction of SSI for certain documents also may be required.

### X.    LIABILITY ISSUES: DEFINING THE ISSUES TO BE TRIED AND DETERMINING THE SEQUENCE OF TRIALS.

At this stage in the proceedings, the issues to be tried have not been sufficiently defined or narrowed and this Court has not ruled on the relevant standard of care.  Defining the parameters of this litigation by deciding precisely what issues need to be tried and how liability will be apportioned will influence substantially the organization and structure of the trial (or trials).

### a.    Defining the Categories of Defendants

(i – iii) *The Airlines, Security Companies and Airports.*  The final categories of trial Defendants will depend on the resolution of dispositive motions to be filed by the Aviation Defendants and should evolve as Defendants are dismissed from the litigation, either by stipulation or successful motions to dismiss.

At this point in the proceedings, every Aviation Defendant expects to be represented separately at trial to present evidence and examine witnesses if it would be in their interests to do so.  As issues are narrowed and Defendants are dismissed, trial plans would be designed to avoid duplicating efforts.

(iv)  *WTCP and PANYNJ as Defendants.*  The interests of WTCP and PANYNJ are not aligned with those of the Aviation Defendants.  Due to the recent settlement of the *Cahill* case, WTCP is a Ground Defendant in only one remaining personal injury case (*Merrill*) and we expect that case also will settle.  PANYNJ is only a Cross-Claim Plaintiff because it is not a Ground Defendant in any remaining personal injury cases.

### b.    Organizing the Plaintiffs

The final categories of Plaintiffs also are likely to evolve as continued discovery helps narrow the pool of Plaintiffs to those with reasonable legal and factual bases for recovery of damages.  The Aviation Defendants' Case Management Plan and Proposed Order provides for the continuation of the parties' ongoing discovery efforts, and provides for the exchange of

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 18

contention interrogatories by the parties. *See* Aviation Defendants' Case Management Plan and Proposed Order, Ex. "A" at 3. The use of these interrogatories, in conjunction with other discovery, should allow the parties a better sense going forward of whether and how to resolve the parties' disputes in an efficient and manageable way.

(i – ii) *Wrongful Death and Personal Injury Plaintiffs.* As noted above, the Aviation Defendants continue to pursue settlement of these actions.

(iii) *Subrogated Property and other Business Plaintiffs.* Pending and anticipated discovery will provide additional information concerning whether the remaining subrogated insurers and other business Plaintiffs seeking recovery for property damage may be treated as a single group, whether subgroups must be created, or whether separate treatment for each such Plaintiff will be necessary. The Aviation Defendants are continuing to pursue discovery to help resolve these issues.

(iv) *WTCP and PANYNJ as Plaintiffs.* As explained above, the Aviation Defendants anticipate a motion will be filed to dismiss all claims of WTCP and PANYNJ as Plaintiffs in this litigation based on their receipt of more-than-full indemnification for their incurred losses from their insurers. *See Fisher v. Qualico Contracting Corp.,* 98 N.Y.2d 534 (2002); CP LR § 4545(c).

c.    **Will One Trial Suffice?**

It is difficult at this stage of the proceedings to decide conclusively the number of trials necessary or appropriate to resolve the parties' various disputes efficiently. The parties' disputes involve a wide range of factual and legal issues that are not common to all Plaintiffs or all Defendants.

(i) The Aviation Defendants anticipate that they can organize themselves into a trial team (or trial teams) that can participate effectively at trial. Such trial teams necessarily would include separate counsel for each Defendant, considering the various claims that have been asserted and the contribution and apportionment issues that will require resolution. If the issues to be tried were narrowed and some Defendants were dismissed, this issue could be addressed later in the proceedings. In any event, some arrangement dividing trial responsibilities among the parties' respective counsel will be necessary.

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 19

### d.    Setting a Trial Date

Issues relating to the scheduling of trial and final pretrial matters are addressed in the Aviation Defendants' Case Management Plan and Proposed Order, Ex. "A" at 4-5. Under the Aviation Defendants' proposal, final pretrial proceedings would begin in January 2010 with the final pretrial conference on June 15, 2010 and a liability trial scheduled to begin July 15, 2010. Plaintiffs' proposed trial date in October of this year is nothing more than unrealistic posturing.

## XI.    DAMAGES ISSUES: NUMBERS OF TRIALS WILL BE REQUIRED TO FOLLOW TRIAL OF LIABILITY ISSUES

Trial of liability and damages together would be confusing to the jury, unfairly prejudicial to some parties, result in an excessively lengthy trial, and cause serious trial management problems. The Aviation Defendants believe that bifurcation of liability and damages for trial is appropriate, with liability to be tried first. The liability issues and evidence are separate and distinct from the damages issues and evidence, and bifurcation of damages from liability would make the trials less burdensome on the jury or juries and more manageable for the Court and counsel.

The final decision on the shape of separate damages trials may have to wait for additional discovery, narrowing and clarification of claims, and rulings on the Aviation Defendants' dispositive motions. As indicated above, the identity of the proper Plaintiffs to be involved in a liability trial is also dependent on damages discovery. Accordingly, such discovery must be substantially completed before a liability trial could commence.

### a.    Individual trials for each wrongful death and personal injury plaintiff whose cases have not yet settled

Separate, individual damages trials for each unsettled wrongful death and personal injury case at this point seem appropriate, because the particular facts and evidence relevant to each individual case make consolidation inappropriate.

### b.    Subrogated Property Damage Plaintiffs (if damages cannot be fixed by motion before trial)

For similar reasons, a consolidated damages trial of the various claims asserted by the subrogated insurers and other businesses seeking recovery for property damage also would seem inappropriate. The subrogated and other business Plaintiffs are not homogenous; the size and the nature of their claimed losses vary dramatically from business-to-business. While it is still early

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 20

in the evaluation process, the Aviation Defendants' legal defenses against the subrogated and other business Plaintiffs' claims also may vary.

### c.    World Trade Center Plaintiffs

As noted above, if the expected motion to dismiss all WTCP and PANYNJ damage claims is successful, a damages trial would not be necessary. If the WTCP and PANYNJ claims are not dismissed pretrial, all of the other defenses pled by the Aviation Defendants would apply to these claims, including that WTCP and PANYNJ were required under CPLR § 4545 to mitigate their damages, and that they assumed the risk of terrorist attacks.

### XII.    THE ATSSSA PROVISIONS PROVIDING LIMITATIONS OF LIABILITY

**a.    What additional proceedings are or may be necessary?**
**b.    What if any impact should these provisions have on preceding schedules?**

The Aviation Defendants are not aware of any ATSSSA liability limitation proceedings other than those already established for court approval of settlements. All parties have been conducting themselves with respect to the approval of existing settlements of the wrongful death and personal injury cases under a procedure designed specifically to address the applicability of the liability cap created by § 408 of the ATSSSA.

We look forward to discussing these issues with Your Honor at the March 18, 2008 status conference.

Respectfully yours,

Desmond T. Barry, Jr.
Aviation Defendants' Liaison Counsel

Via Email

cc :    Marc S. Moller, Esq.
        Brian S. Alexander, Esq.
        Kreindler & Kreindler LLP
        Wrongful Death/Personal Injury Plaintiffs' Co-Liaison Counsel

CONDON & FORSYTH LLP

Honorable Alvin K. Hellerstein
March 14, 2008
Page 21


      Donald A. Migliori, Esq.
      Motley Rice LLC
      Wrongful Death/Personal Injury Plaintiffs' Co-Liaison Counsel

      Robert A. Clifford, Esq.
      Timothy S. Tomasik, Esq.
      Clifford Law Offices, P.C.
      Property Plaintiffs' Liaison Counsel

      Richard A. Williamson, Esq.
      M. Bradford Stein, Esq.
      Flemming Zulack Williamson Zauderer LLP
      Ground Defendants' Liaison Counsel

      Beth Jacob, Esq.
      Schiff Hardin LLP
      WTC 7 Ground Defendants' Liaison Counsel

      Beth E. Goldman, Esq.
      Sarah S. Normand, Esq.
      Jeannette A. Vargas, Esq.
      U.S. Attorney's Office

      Aviation Defendants' Counsel

# EXHIBIT 2

83I7SEPC.txt

83I7SEPC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  IN RE:
3  SEPTEMBER 11 LITIGATION                    21 MC 101 (AKH)
4
4  ------------------------------x
5
5                                             March 18, 2008
6                                             1:00 p.m.
6
7
7  Before:
8
8                        HON. ALVIN K. HELLERSTEIN
9
9                                             District Judge
10
10                           APPEARANCES
11
11  FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
11        Attorneys for WTC Plaintiffs
12  BY:   RICHARD A. WILLIAMSON
12        M. BRADFORD STEIN
13
13  ZELLE HOFMANN VOELBEL MASON & GETTE
14        Attorneys for Plaintiff PDPEC
14  BY:   STEVEN J. BADGER
15        JOHN MASSOPUST
16  KEITH HARRIS
16        Attorney for Port Authority Cross Claim
17
17  CLIFFORD LAW
18        Attorneys for Plaintiff IRI
18  BY:   ROBERT CLIFFORD
19        TIM TOMASIK
20  MOTLEY RICE
20        Attorneys for Motley Rice Plaintiffs
21  BY:   DONALD MIGLIORY
21
22  WARDEN TRIPLETT GRIER
22        Attorneys for
23  BY:   JAMES M. WARDEN
23
24  GREGORY JOSEPH
24        Attorneys for Plaintiff IRI
25  BY:   DOUG PEPE
25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

                                                              2

83I7SEPC
1                        APPEARANCES (Continued)
2  GREENBAUM ROWE
2        Attorneys for Plaintiff Con Edison
3  BY:   FRANKLIN M. SACHS
3
4  KREINDLER & KREINDLER
4        Attorneys for Plaintiff ONG
5  BY:   JUSTIN GREEN
5
                              Page 1

8317SEPC.txt

```
 6    SIMPSON THACHER & BARTLETT
 6         Attorneys for Defendant P. Argenbright
 7    BY:  JOSEPH WAYLAND
 7
 8    DEBEVOISE & PLIMPTON
 8         Attorneys for Defendant American Airlines
 9    BY:  ROGER E. PODESTA
 9
10    SUSMAN GODFREY
10         Attorneys for Defendant Huntleigh USA
11    BY:  LEE GODFREY
11
12    CONDON & FORSYTH
12         Attorneys for Defendant American Airlines
13    BY:  DESMOND T. BARRY
13
14    UNITED STATES ATTORNEY'S OFFICE
14         Attorneys for Defendant TSA
15    BY:  BETH GOLDMAN
15         SARAH NORMAND
16         JEANNETTE VARGAS
16
17    SCHIFF HARDIN LLP
17         Attorneys for Defendant The Port Authority of NY & NJ
18    BY:  BETH D. JACOB
18
19    O'MELVENY & MYERS
19         Attorneys for Defendant Massport
20    BY:  MARK WOOD
20
21    CLEARY GOTTLIEB STEEN & HAMILTON LLP
21         Attorneys for
22    BY:  TOM MALONEY
22         CHRIS MOORE
23
23    QUIRK & BAKALOR
24         Attorneys for Defendant United Airlines
24    BY:  JEFFREY J. ELLIS
25
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    3

8317SEPC

```
 1              (Case called)
 2              (In open court)
 3              THE COURT:  Hello, everyone.  Good afternoon.  Thank
 4    you for all of your submissions.  If only you could supply time
 5    as well as submissions, I might do better, but it is impressive
 6    how you were separately able to organize all the materials that
 7    you sent to me and all the reports.  I'm very grateful to you
 8    for that.
 9              For the sake of creating a complete record, I will ask
10    you to summarize some of the points that you have made in
11    writing.  I think others might benefit from getting this
12    report, and we could have an intact public record as well.
13              So, I will go down the outline.  Do you all have
14    copies of the outline?  I will go down the outline, and you get
15    the reports from the various people who have reported to me.
16              Why don't we start with Mr. Clifford to tell us from
17    the plaintiff's perspective what has been accomplished to date
18    in discovery in some quantified way and what in his opinion has
19    to be done.
20              MR. CLIFFORD:  Thank you, your Honor.  Robert
```

                                Page 2

8317SEPC.txt

21   Clifford, for the record.  With your permission, we have
22   divided up these categories so that you get the most concise
23   statement, so I would like Messrs. Tomasik, Pepe and Badger, if
24   they can, to collectively do this in a succinct way for you.
25          THE COURT:  OK, but let's be concise.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

8317SEPC

1    MR. CLIFFORD:  Yes.
2          MR. TOMASIK:  Thank you, your Honor.
3          Good afternoon, your Honor.  Tim Tomasik on behalf of
4    the coordinated plaintiffs, and with your permission I would
5    like to speak to Roman numerals 1 and 2 if I could.
6          To date the parties have propounded interrogatories
7    and requests to produce as reported in all of the submissions,
8    and I am happy to report that most all of the disputes have
9    been worked out in the meet and confer process.  We are still
10   meeting, conferring.  There is no real issue to bring to your
11   Honor's attention at this time.
12          Along with the written discovery there is the issue of
13   requests to produce.  There still remains at the TSA a number
14   of documents as reported, and the TSA is working very hard in
15   terms of getting those over to us.  We have asked the TSA to
16   prioritize the production of those documents to the coordinated
17   plaintiffs with concentrating as much as possible on United and
18   American and then the other defendants that they are presently
19   reviewing.
20          The subrogated carriers have produced hundreds of
21   thousands of documents related to the claims that have been
22   paid.  That is the total reported damages and the damage
23   disclosure forms of approximately 4.55 billion.  That
24   production is substantially complete.  There are some items
25   that will be finally produced this week and certainly I would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

8317SEPC

1    think by April 1st.
2          Finally, your Honor, in terms of future written
3    discovery and requests to produce, the plaintiffs really won't
4    know if there will be any further requests to produce until we
5    see the final production coming from the TSA, but certainly
6    that will be something that we will meet and confer with the
7    defendants once those productions are finally made.
8          In terms of the depositions, there have been 119
9    depositions to date.  91 of those depositions have been
10   depositions of aviation defendant witnesses.  The plaintiffs in
11   primarily the wrongful death actions have produced 23 damage
12   witnesses, and there have been five nonparty government
13   witnesses which also include the 30(b)(6) witnesses produced by
14   the government:  Mr. Carmaroto and Mr. Peterson.
15          Presently we have I believe some 25 witnesses noticed
16   for deposition.  We are working with the defendants to schedule
17   those depositions.  But as we stand here now, we believe in
18   terms of liability discovery there remain approximately 40 to
19   50 depositions that will likely be noticed and taken.  Of
20   course we worked very hard to cut that list down.
21          THE COURT:  Including the 25?
22          MR. TOMASIK:  Including the 25.
23          THE COURT:  So, in all those which have been noticed
24   and which still have to be noticed from the plaintiffs'
25   perspective you think approximately 50 depositions.

Page 3

8317SEPC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

8317SEPC
1     MR. TOMASIK:  That's right.  There is an issue as it
2   pertains to the deposition of damage fact witnesses, and
3   perhaps I could ask Mr. Badger to maybe briefly speak to the
4   potential discovery that remains in regards to property damage
5   fact witnesses.
6     THE COURT:  Before we get on to that, just to
7   summarize, 119 depositions have been taken by all parties so
8   far.
9     MR. TOMASIK:  That's correct.
10     THE COURT:  And of that, 91 have been taken by the
11   plaintiffs of the aviation defendants, 23 have been taken by
12   the defendants of the damage witnesses, that is, to ascertain
13   how much damage was rightfully claimed by the various property
14   damage plaintiffs, and five government witnesses have been
15   taken.  Do I have those facts right?
16     MR. TOMASIK:  I would say two government witnesses,
17   three nonparty, third-party witnesses.
18     I would also point out that the defendants have
19   noticed, I believe, 25 damage witnesses they are interested in
20   taking.  Many of those are witnesses that are related to WTCP's
21   claim.
22     THE COURT:  We will get into that in a moment.  So,
23   let Mr. Barry or others bring that out.
24     MR. TOMASIK:  Finally, your Honor, I think the parties
25   are in agreement that going forward discovery depositions can
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

8317SEPC
1   proceed simultaneously on two tracks, one track being liability
2   depositions, the other track being depositions that are related
3   to property damages.
4     And I will turn things over to Mr. Badger who can
5   speak further to the property damage discovery.
6     THE COURT:  One minute.  Mr. Migliory, do these
7   numbers account for the activities that you have pursued?
8     MR. MIGLIORY:  Don Migliory for the wrongful death
9   plaintiffs.  The 23 damages depositions include cases that were
10   specifically worked up for damage trial in the fall that
11   resulted in the various settlements, and there are only seven
12   claims that remain in that area.  So, the parallel track would
13   work fine within our wrongful death design as well.
14     MR. BADGER:  Thank you, your Honor.  Steven Badger
15   also for the coordinated plaintiffs.  Just to give you a little
16   bit of background, the history of the damages discovery, we
17   began the damages discovery process back in 2005.  This was not
18   a case where we all focused on liability and did nothing on
19   damages, but the work began back in 2005 when every single
20   property plaintiff submitted a damage disclosure form that the
21   parties created that identified what the total damage claim
22   number was for that specific plaintiff for each claim that the
23   subrogated insurers were pursuing as well.  So, that number was
24   quantified early on in a form that we put together with the
25   defendants.  So, the defendants have had that number for some
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

8317SEPC
1   time, and we can share with the court total damage numbers that
Page 4

8317SEPC.txt
```
 2   have been submitted at some point today if you'd like.
 3        Subsequent to that, in early 2007, we began the
 4   process of producing either claim files -- all the subrogated
 5   insurers produced their claim files -- which as you know for
 6   insurance companies that's pretty much where it's at, all of
 7   the relevant information relating to the insurance company's
 8   adjustment, where it took the large total claims submitted by
 9   its insured for its damage, adjusted that claim down to a
10   number that was owed under the terms of its policy, and that's
11   the file we are producing and have produced for all of the
12   subrogation claims.  There are a couple that are still in the
13   works because a couple of the files were still opened, that we
14   delayed production of those because of concerns over production
15   of matters that were still in litigation.
16        But the bulk of the documents have been produced for
17   the subrogated insurers and also for what we refer to as the
18   uninsured loss plaintiffs.  Those are the ten plaintiffs that
19   are part of our group that are claiming an uninsured loss or an
20   underinsured loss.  And what they have been required to do is
21   produce all documents they believe are relevant to their
22   damages claim.
23        So, the body of documents that's been produced is
24   huge.  Depositions have just begun.  Of the 23 depositions only
25   a couple of them were specifically for property damage claims.
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  9
8317SEPC
```
 1        So, we have been working very cooperatively with the
 2   defendants to get them information quickly.  There are some
 3   loose ends.  There is some work that needs to be done.  But to
 4   quantify a number, the defendants have substantial information
 5   on damages.  If we were to go forward and prepare for trial,
 6   there is work that needs to be done.  There is a lot of work
 7   that needs to be done to put the damages cases in a trial ready
 8   package, and we understand that.  But to understand the nature
 9   of our claims, what those claims are, there is a substantial
10   body of information the defendants already have.
11        THE COURT:  I note from Mr. Barry's proposal that
12   there are sharp issues in terms of valuation that I'm sure we
13   will explore.
14        MR. BADGER:  Thank you, your Honor.
15        MR. CLIFFORD:  Your Honor, may I add a footnote that I
16   think adds to the discussion?  And it's on this point of the
17   damage depositions.
18        Certainly one of the sharp contrasts in our respective
19   positions is that the property damage plaintiffs -- and I
20   believe for the wrongful death plaintiffs as well -- certainly
21   believe that a bifurcated trial with liability going first
22   obviates the necessity of many of these damage depositions
23   going in tandem and on multiple tracks and will substantially
24   shorten the amount of time necessary to prepare the case for
25   trial.
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                 10
8317SEPC
```
 1        THE COURT:  Spell that out.
 2        MR. CLIFFORD:  Well, our position --
 3        THE COURT:  I think you are probably assuming that
 4   first there will be a liability trial or trials.
 5        MR. CLIFFORD:  Right, yes, we are advocating that.
 6        THE COURT:  And then after that there will be further
```
                          Page 5

8317SEPC.txt

7  discovery.
8              MR. CLIFFORD:  Sure, because if there is no liability
9  then why bother with the damages.  I keep hammering that point
10 to them in my conversations, and they say, oh, no, we need to
11 work on multiple tracks and continue to do all of this damage
12 work, and I say why.
13             THE COURT:  I think I'm inclined to agree with
14 defendants here, because if we are going to try them, I would
15 probably favor something that's rather concentrated.  And my
16 unformed plan is to enlist other judges in terms of what will
17 have to come on.
18             MR. CLIFFORD:  That would work.
19             THE COURT:  Pardon?
20             MR. CLIFFORD:  That would work for us.
21             THE COURT:  The value of this meeting is that you are
22 forced to think comprehensively, and as I tried to think
23 comprehensively it seemed to me that there would be few
24 liability trials, maybe one, maybe two, but not many.
25             Now, we know from experience that there is nothing
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                               11

8317SEPC

1  like trials that focus the mind and promote settlement.  If we
2  delay the damage discovery, people may not be in good positions
3  to think in a comprehensive way about settlements.  So, I think
4  there is merit in addressing these various issues in discovery
5  in a relatively concentrated period.
6              Furthermore, it's going to be a major effort to
7  organize everybody into a trial discipline, and I think it's
8  better not to lose the discipline once we have it, and to try
9  as many issues as possible in as concentrated a time period as
10 possible, and I think I could try with my colleagues to
11 organize judicial resources in order to accommodate what we
12 have to do.  So, I think I would favor getting everything ready
13 at simultaneous times.
14             MR. CLIFFORD:  OK.  Frankly, Judge, our concern about
15 it is the length of time.  I mean they're talking, you know,
16 late 2010.
17             THE COURT:  Experience teaches that often time can be
18 managed so that there are efficiencies and that shorter time
19 spans are available.  I think we can do it.  It's going to take
20 a lot of time no matter what we do.  I would like to explore
21 the possibility of doing everything in a coterminous period.
22             MR. CLIFFORD:  OK, Judge.
23             THE COURT:  Thank you, Mr. Clifford.  Do you want to
24 add anything, Mr. Migliory?
25             MR. MIGLIORY:  I guess just a point of clarification.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                               12

8317SEPC

1  The court is raising the concept of not losing steam on the
2  damages track and the liability track, but I understand -- I
3  guess if the court is saying though that the liability will be
4  concentrated on a coordinated basis and bifurcated while we
5  maintain parallel discovery tracks, I think that's something
6  that's very workable among the group.
7              From my perspective on the wrongful death side, our
8  ability to put all of these competing plaintiff interests
9  together with a limited fund out there for our clients, and to
10 come up with a consensus document like we did, required us to
11 think together as a team, and the only way we can do that
                            Page 6

83I7SEPC.txt

12    without being competitors on that limited fund is if we are
13    able to focus on a liability trial together.
14          That is, if we are focusing on liability only for
15    trial purposes, not discovery, then we're really not in
16    competition with each other, in fact we all help each other and
17    can move forward, and that makes the organization process a lot
18    more workable, feasible, expeditious.
19          So, if the court's position is that we should keep
20    both discovery tracks moving forward, liability and damages, we
21    do also agree with Mr. Clifford that that's very workable, but
22    we would not like to lose sight of the fact that our common
23    liability basis actually keeps us all working very productively
24    together and not as competitors for the same limited fund.
25    That's the only observation.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    13

83I7SEPC
1          THE COURT:  It's an important observation, and I don't
2    have any solution for it.  I think we have to be ready for a
3    number of different paths, and it's hard to know at this point
4    where we need to strike off under the paths.  And I think
5    people as we approach an end date will want to think not only
6    of issues of liability but issue of damage as well.
7          Now, there are a lot of legal issues that have to be
8    confronted, and Mr. Barry's submission identifies a number of
9    them, and I've got to deal with all of them as we go along.
10          I think it's important to lay out what our problems
11    are, what our issues are, and what our challenges are and see
12    how best we can deal with them.  But, as I said, the advantage
13    of thinking comprehensively is that we tend to be able to
14    identify them maybe better than we would just stumbling along.
15          Anybody on the plaintiffs' side want to add anything
16    at this point?
17          MR. WILLIAMSON:  Your Honor.
18          THE COURT:  Mr. Williamson?
19          MR. WILLIAMSON:  Richard Williamson for the World
20    Trade Center Properties claimants and also the Port Authority
21    of New York and New Jersey as a property damage claimant.
22          In the joint submission that we worked on with
23    Mr. Clifford's group and Mr. Migliory's group we also
24    identified the amount of the claims on the damage disclosure
25    forms that Mr. Badger alluded to earlier filed by both the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    14

83I7SEPC
1    World Trade Center Properties plaintiffs and also the Port
2    Authority.  And in terms of a status report on discovery, on
3    behalf of the World Trade Center Properties we produced over a
4    million pages of documents, substantially completed all
5    document discovery on damages by the end of November,
6    recognizing the continuing duty to supplement.  We will and are
7    working on continuing to supplement as additional documents
8    become available.
9          But the document production for damages has been
10    substantially complete since last November for World Trade
11    Center Properties.
12          The Port Authority has also completed a substantial
13    document production and is engaged in -- as a result of meet
14    and confers with aviation defendants -- supplementing its
15    damages disclosures in terms of documents.  Any depositions
16    that were noticed of our clients, we have provided them.
                          Page 7

83I7SEPC.txt
17        With respect to these over 20 nonparty witness bevvy
18   of subpoenas that the aviation defendants have issued, those
19   are outstanding, and none of the depositions have taken place
20   yet, but I think we are going to be addressing those later.
21        THE COURT:  Thank you, Mr. Williamson.
22        Anybody else on plaintiffs' side?
23        There are a number of personal injury claims that are
24   represented not by Motley Rice but by others.  Is there anybody
25   here to speak for those?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    15

83I7SEPC
1        MR. BARRY:  Apparently two, your Honor.
2        THE COURT:  Just two?  All right.  Mr. Barry, do you
3   want to address this?
4        MR. BARRY:  Thank you, your Honor.  Dennis Barry on
5   behalf of the aviation defendants.  Excuse me.
6        Your Honor, I believe that the statistical summary
7   given to you by Mr. Tomasik and Mr. Badger were basically
8   accurate.  There are no current disputes ready for your Honor
9   to deal with.  We still believe that there are documents and
10   depositions that we have to take of the property plaintiffs,
11   particularly not so much on the quantum of damages but whether
12   or not the various plaintiffs actually have a cognizable legal
13   claim.  That's both in respect of the subrogated property
14   plaintiffs, World Trade Center Properties and the Port
15   Authority of New York/New Jersey.
16        THE COURT:  When would those motions be ripe to be
17   made?
18        MR. BARRY:  There is a motion --
19        THE COURT:  I see you have identified the renewal of
20   the motion raising the issue of duty.
21        MR. BARRY:  Yes.
22        THE COURT:  One of the things I ruled on at the outset
23   of the case was that it was early at that point to think
24   comprehensively about duty.  I did not preclude you from
25   raising the issue again when either we were well through
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    16

83I7SEPC
1   discovery or at some later point.  I think we're well through
2   discovery, and if you wanted to raise that issue it would be
3   ripe.
4        You have also raised the issue in terms of the measure
5   of damage, of whether it should be the amount the insurers paid
6   for loss or whether it might be some lower amount that was more
7   reflective of the market value of either the leasehold or the
8   fee that was lost on 9/11, and I don't know whether that is
9   ready now or that has to wait.  That would be by way of a
10   summary judgment issue.
11        MR. BARRY:  That has to wait, your Honor, that motion.
12        THE COURT:  But there is a lot of discovery that you
13   say you want on that issue.
14        MR. BARRY:  There has to be.
15        THE COURT:  I'm not sure there is a lot of discovery,
16   and I would like to talk about that with you on that point.
17        What other motions are there that you think are
18   properly made in this pretrial phase of the case?
19        MR. BARRY:  At the moment we are contemplating a
20   motion for summary judgment and the Administrative Procedures
21   Act complaint filed to be filed in respect to the five F.B.I.
                      Page 8

83I7SEPC.txt

22  witnesses whose depositions we have requested in a Touhy
23  request.
24              THE COURT:  That would force me to rule on the issue
25  that you raised in your reply papers, namely whether allegedly
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                17
83I7SEPC
 1  negligent inattention by the government in preparation for 9/11
 2  to avoid 9/11 is an intervening cause or could be an
 3  intervening cause in relation to the potential liability of the
 4  aviation defendants.  That would be the ground of relevance,
 5  wouldn't it?
 6              MR. BARRY:  Well, it's not exactly --
 7              THE COURT:  Mr. Podesta is anxious --
 8  You have a tough time, Mr. Barry.
 9              MR. BARRY:  Yes, well, they have their problems at
10  that table, and I've got mine.
11              MR. PODESTA:  Your Honor, Roger Podesta.  He has
12  always used a quick hook on us when we argued.
13              MR. BARRY:  It's not quite so simple as intervening
14  cause, your Honor, and I think the issue really comes down
15  to -- and it's a legal one, but it's combined with evidence
16  that we're going to have to develop -- and that is who was in
17  the best position to prevent the attack on the United States of
18  September 11, 2001.
19              THE COURT:  Let's say arguably the government was.
20              MR. BARRY:  We're heading in the right direction.
21              THE COURT:  But if your clients, your liaison clients,
22  all of them or some of them, were also negligent, were would
23  the government's negligence be a defense?
24              MR. BARRY:  I think there are two different areas of
25  negligence that you have to look at.  One is whether a screener
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                18
83I7SEPC
 1  in passing through the terrorists may have missed something and
 2  whether that screener and that airline owed a duty -- and I
 3  would like to concentrate just on the property plaintiffs
 4  here -- owed a duty to the property plaintiffs to protect them
 5  from a criminal terrorist act.
 6              THE COURT:  That's a legal issue raised by the motion
 7  to dismiss the cases on the ground there is no duty.
 8              MR. BARRY:  Or a motion for summary judgment which
 9  included evidence that we obtained from the government that
10  they were unable to prevent this attack.
11              THE COURT:  That wouldn't say anything about duty, I
12  don't think, Mr. Barry.
13              MR. BARRY:  Well, I think it does, your Honor.
14              THE COURT:  Well, anyway, this is not the right forum
15  for me to make rulings on these issues, because I need to be
16  informed by your briefs.  And what you have told me is that now
17  that there are two aspects to what you are thinking about
18  making motions.  One is in the Freedom of Information Act case
19  that you have brought.
20              MR. BARRY:  Administrative Procedures Act.
21              THE COURT:  Yes, where the government has raised the
22  issue of what you call the Touhy case, the case of United
23  States v. Ragen, 340 U.S. 462, decided 1951, and later glosses
24  on the case by the Second Circuit.  That's one stated motion.
25              MR. BARRY:  That's one motion, a motion for summary
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          Page 9

8317SEPC.txt
(212) 805-0300

19

8317SEPC
1  judgment in respect of our Administrative Procedures Act
2  complaint.  OK?
3          THE COURT:  And that would raise the issue, would it
4  not, whether or not your inquiries of the government seeking to
5  prove the government's negligence was relevant to the cases
6  here.
7          MR. BARRY:  I think that motion at least in part would
8  present that issue toward your Honor.  I'm not sure that it
9  presents it totally in the whole way because it really is
10 confined to whether or not the government was correct in
11 denying our request for those depositions.
12         THE COURT:  Well, among the grounds the government has
13 to review is the government's view of relevance and
14 materiality.
15         MR. BARRY:  Relevance and burden I think is what they
16 have raised as their objections.
17         THE COURT:  Now, if I were to say it's too burdensome
18 and the relevance is small, I guess you would want another shot
19 at an argument of relevance in this case.  But if I held that I
20 could see no relevance, and therefore there was no need for the
21 government to produce information, that would relate, it seems
22 to me, to the tasks we have before us here.
23         MR. BARRY:  That very well could.
24         THE COURT:  I mean Ms. Goldman has raised this in her
25 papers in commenting on why such a motion has not been made.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

20

8317SEPC
1  Shouldn't such a motion be made rather quickly?
2          MR. BARRY:  We're prepared to file that motion by
3  April 1.  We're prepared to file by April 1 a motion to have
4  you declare that the 9/11 Commission report, the staff
5  statements and the aviation monograph are not hearsay under
6  Federal Rule of Evidence 803(8)(C).
7          THE COURT:  8038, you mean.
8          MR. BARRY:  (8)(C).
9          MR. MIGLIORY:  May I ask, just in toto?  Are you
10 saying --
11         THE COURT:  Let me deal with this, Mr. Migliory.
12         I would like you for that motion to identify precisely
13 what statements you want me to consider relevant.  That's a
14 large book, and I don't think you're interested in having the
15 jury --
16         MR. BARRY:  We're interested in specific sections of
17 that book.
18         THE COURT:  But more than sections, more precise than
19 sections, I want you to identify particular assertions that you
20 believe should be admissible without further proof.
21         MR. BARRY:  All this motion is dealing with, your
22 Honor, is the hearsay issue.
23         THE COURT:  I understand.
24         MR. BARRY:  OK.  Not relevance or any other grounds
25 that the plaintiffs might have to object, just hearsay.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

21

8317SEPC
1          THE COURT:  Mr. Barry, I read the book, as I'm sure
2  you have -- you've probably read it more times than I have --
                         Page 10

83I7SEPC.txt
3   but there are a lot of things in that book. There is history,
4   there is chronology, there are descriptions of people. There
5   are all sorts of things, some of which may better qualify and
6   some of which may lesser qualify for 803(8) admission, and if I
7   want to get involved in that, I want to be invested
8   productively, and I will call upon you to identify precisely
9   what it is you want admitted, and there are many ways to do it.
10          But I think what you need to do is probably get a copy
11  of the book and mark by page numbers and paragraph numbers and
12  the like particular things that need to be done. Whatever way
13  you want to do it, it should be possible for adverse parties to
14  focus exactly on what it is you want to advance and for me to
15  rule on it.
16          MR. BARRY: We tried to do it with the plaintiffs
17  before.
18          THE COURT: You don't need them, Mr. Barry.
19          Don't react. Forget about them. They're not
20  interested; you are interested. I want you to identify that
21  which you are interested in moving in specifically --
22          MR. BARRY: I understand.
23          THE COURT: -- so I can rule item by item if I have to
24  without being distracted. Do you want to comment on that, Mr.
25  Migliory?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    22
83I7SEPC
1           MR. MIGLIORY: Only that I'm not aware we have
2   disagreed on that. There are precise things from the aviation
3   monograph that we would like, and we propose a briefing
4   schedule where we could maybe tee it up at the same time.
5           THE COURT: OK. Mr. Clifford?
6           MR. CLIFFORD: I agree with Mr. Migliory, but up until
7   this point in time we understood that they want to take the
8   whole book on and ask your Honor to put it into evidence.
9           MR. BARRY: That's not it.
10          THE COURT: We now know what we have to do. All
11  right? So, why don't you identify that which you want to do
12  first and then give it to Mr. Migliory and Mr. Clifford to add
13  their sections.
14          MR. BARRY: Fine. We will proceed in that fashion.
15          THE COURT: And you can annotate it so I would have a
16  handy way of finding out what it is I have to rule on.
17          MR. BARRY: We will proceed in that manner.
18          MR. CLIFFORD: Your Honor, may I ask for a point of
19  clarification?
20          THE COURT: Yes.
21          MR. CLIFFORD: Forgive me if I'm getting off of the
22  issue, but two things. One, with respect to this motion that
23  they are going to file in the APA case pertaining to the
24  government knowledge and the relevancy of that, note that none
25  of these plaintiffs, of course, are party to that case, and a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    23
83I7SEPC
1   request or a consideration we would ask the court to give is to
2   have that motion filed in MC 101 so that at the very least all
3   of the plaintiff parties will have an opportunity to give you
4   their input about the relevancy issue.
5           THE COURT: Let me ask Miss Goldman on that issue.
6           The parties here have an interest in presenting their
7   views on the Touhy issue. What's the best way to do that?
                                Page 11

8317SEPC.txt

8      MS. GOLDMAN:  I think, your Honor, we certainly --
9      THE COURT:  This is Beth Goldman.
10     MS. GOLDMAN:  Thank you.  We wouldn't object to the
11 plaintiffs weighing in on the issue of relevance.  The way we
12 understand how this APA case would proceed is that what your
13 Honor is looking at is whether the agencies acted arbitrarily
14 and capriciously in making a decision to deny this particular
15 discovery.
16     One of the elements of the decision that was made by
17 the agency had to do with relevance, as Mr. Barry said, and
18 burdens and other privileges, but that's not -- that's one way
19 of approaching the relevance issue, but that decision that you
20 would make in that case is whether the agencies acted
21 appropriately.
22     Whether your Honor wants this whole area to be part of
23 the case, whether your Honor relies on prior rulings or
24 otherwise about whether this is a relevant area of inquiry
25 here, is something your Honor could decide separate and apart

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        24

8317SEPC
1  from this case, or --
2      THE COURT:  No, I want to decide it integral to the
3  case.
4      Look, Mr. Barry's motivations and his colleagues'
5  motivations in bringing this on is to obtain information for
6  use in this case, so that's my focus.
7      MS. GOLDMAN:  And that's fine.  One suggestion we
8  have, your Honor, is it might be productive if the motion
9  that's going to be made about the Commission report and the
10 monographs is made first, because to the extent that material
11 is going to be used at trial, it might obviate the need for
12 some of the discovery that the defendants are seeking from the
13 government.
14     THE COURT:  I think that should be brought on
15 together.
16     MR. BARRY:  I agree.
17     THE COURT:  I think that should be brought on
18 together.  I think the notices should be given in both cases,
19 both notices should be given in both cases.  And I will invite
20 interested parties to present their views in both cases.  And
21 whether I have it argued at the same time or in close sequence,
22 I don't know, but I certainly have to keep both cases in mind,
23 both sets of cases in mind, in ruling.
24     MR. BARRY:  That's the position the defendants would
25 take, your Honor.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        25

8317SEPC
1      THE COURT:  I would encourage you to give me a
2  briefing schedule on this.
3      MR. BARRY:  We will do that.  I mentioned April 1
4  before, but in view of your Honor's direction as to how you
5  want the 9/11 Commission report motion handled, I think we are
6  going to have to move that out a bit.
7      THE COURT:  Could you in the next week consult with
8  all interested parties on this and give me a joint letter
9  proposing the schedule?
10     MR. BARRY:  Certainly.  As a follow-on --
11     THE COURT:  Mr. Clifford?
12     MR. CLIFFORD:  I have one other point of
                        Page 12

83I7SEPC.txt

13  clarification, truly one.  I think we misheard Mr. Barry when
14  he was speaking to our damage issues, and your Honor asked him
15  about the propriety of a dispositive motion relating to --
16          THE COURT:  He is not on that.  We will come back to
17  it.  I'm more at this point interested in -- because I think it
18  affects more people -- I'm interested in the combination of the
19  Touhy and the 9/11 motions.
20          MR. BARRY:  And I think it certainly has the potential
21  of affecting how much discovery is going to have to be done or
22  not done.
23          THE COURT:  Right.
24          MR. BARRY:  One follow-on to the APA motion would be
25  if that motion were to be denied, and deposition testimony of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                26
83I7SEPC
1   those witnesses from the F.B.I. that we want were not
2   permitted, we intend to bring a motion under Federal Rule of
3   Evidence 807 to have their prior testimony and statements once
4   again not excluded on the basis of hearsay.
5           THE COURT:  Who are these people?
6           MR. BARRY:  They are the same F.B.I. witnesses that we
7   want to depose.  We have also got a similar motion in respect
8   of Khalid Sheikh Mohammed and bin al-Shibh, two of the
9   masterminds who are detainees down at Guantanemo, and whose
10  statements were used in the Moussaoui trial.
11          THE COURT:  Ms. Goldman, that also affects the Touhy
12  approach, doesn't it?
13          MS. GOLDMAN:  I'm sorry?
14          THE COURT:  That also affects the APA case.
15          MS. GOLDMAN:  Well, from what I understand --
16          THE COURT:  A lot of differences as well.
17          MS. GOLDMAN:  Are you talking about -- I mean there
18  has been no action with respect to Khalid Sheikh Mohammed.  You
19  are not talking about that.  Those witnesses are unavailable,
20  and they won't be made available.
21          MR. BARRY:  Yes, but they provided testimony in
22  statements that were used in the Moussaoui trial.  Correct?
23          MS. GOLDMAN:  Correct.
24          MR. BARRY:  And under Rule 807 we would like to get an
25  order that that is not hearsay so that that testimony and
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                27
83I7SEPC
1   statements could be used in our trial.
2           MS. GOLDMAN:  Right, and that's --
3           THE COURT:  What's the volume of those statements?
4           MR. BARRY:  I don't think -- it's not enormous, your
5   Honor.
6           THE COURT:  And does everybody have access to those
7   statements?
8           MR. BARRY:  Yeah.
9           MS. GOLDMAN:  Yes.  That's not an issue for us.
10  That's an issue between the defendants and the plaintiffs.  But
11  again if that was something you could do first, agree to use
12  that, then we wouldn't have to go through these depositions.
13          MR. BARRY:  We want the deposition testimony of the
14  witnesses, your Honor.  That's what we want first.  If we don't
15  get the deposition testimony of the witnesses, our fall-back is
16  to get their statements admitted.
17          THE COURT:  It seems to me there can't be any real
                        Page 13

8317SEPC.txt
18  issue concerning the inaccessibility of these witnesses.
19      MR. BARRY:  Well, the F.B.I. is accessible.  It's the
20  detainees that are not accessible.
21      THE COURT:  I would be very surprised that the
22  government would consent to a deposition and then
23  cross-examination of F.B.I. agents.  Ms. Goldman?
24      MS. GOLDMAN:  Well, let's draw a line between the
25  government witnesses who they want -- the five F.B.I. agents
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            28

8317SEPC
1   and the two CIA agents -- and it's about them that they filed
2   their APA action.  And both the F.B.I. and the CIA have
3   declined to produce them for the reasons set forth in the Touhy
4   decision, and that's what they are now challenging.  The
5   government has no intention of producing those witnesses.
6       With respect to the two detainees who are not our
7   employees, there is no Touhy decision, it's just that they will
8   not be made available, and that's it.
9       MR. BARRY:  On national security grounds.
10      MS. GOLDMAN:  Correct.
11      THE COURT:  Mr. Barry, with regard to those two
12  witnesses, I would like you to do the same thing as I'm asking
13  you to do with the 9/11:  Identify precisely what it is you
14  want offered into evidence, and I will rule on that.  And I
15  think it makes sense to bring those three subjects on at the
16  same time:  The APA summary judgment, the 9/11 evidentiary
17  point and these two deposition evidentiary points.
18      MR. BARRY:  Fine, your Honor, we will do it that way.
19      THE COURT:  All right.  And you will try to do that as
20  promptly as you can.  I'm looking forward to the filing of the
21  motion sometime in April and a briefing schedule turned in to
22  me next week.
23      MR. BARRY:  A schedule, and perhaps meet with the
24  plaintiffs and try and get some agreement in respect of the
25  KSM, Khalid Sheikh Mohammad, and bin al-Shibh issues.
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            29

8317SEPC
1       THE COURT:  I would suggest to you that you proffer to
2   them what it is you want them to do --
3       MR. BARRY:  Exactly, so similar to the 9/11.
4       THE COURT:  -- and they should react.  But I would
5   like to have you file your motion in April.
6       MR. BARRY:  Very well, your Honor.
7       MR. CLIFFORD:  Your Honor, just point of
8   clarification.  The APA summary judgment includes also being
9   filed in MC 101 so that we can respond?
10      THE COURT:  What's the difference where it's filed?
11      MR. CLIFFORD:  We are not parties to the APA case.
12      THE COURT:  You are getting notice.
13      MR. CLIFFORD:  Let us intervene.
14      THE COURT:  You know, we're going to start a lot of
15  intervention pleadings and the like.  Mr. Clifford, I'm going
16  to make a ruling that's affecting all the cases.
17      How can he make a motion that is summary judgment in
18  an APA case and file it in 101?
19      MR. CLIFFORD:  Because they are known for taking two
20  bites at the same apple.
21      THE COURT:  I'm ruling that you are going to be
22  treated as a party in that motion.
                    Page 14

83I7SEPC.txt
23          MR. CLIFFORD:  Thank you, sir.
24          THE COURT:  You are going to get notice.  You don't
25  have to ask me for permission to file briefs.  You can file
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

83I7SEPC
1   oppositions.  Mr. Barry is going to talk about the briefing
2   schedule with you as well as with others, and I'm going to ask
3   all of the people in opposition to try to file as much a common
4   brief as you can.
5          MR. CLIFFORD:  We will.
6          THE COURT:  And the same with the parties filing the
7   motion.  It is not going to help anybody if I have to read
8   multiple briefs.  I would like to read one brief on each side.
9          Let's talk about the valuation issues.
10          MR. BARRY:  Your Honor, if I can just -- I think
11  Mr. Ellis wants to say something to clarify something that may
12  have been said.
13          MR. ELLIS:  Just real quickly, your Honor.  We are not
14  claiming the government is negligent.  Quite frankly, what we
15  are picking up on is language that you put in your duty
16  decision.
17          THE COURT:  You will quote me.
18          MR. ELLIS:  Right.  It's who is in the best position,
19  your Honor, to prevent this kind of attack.  We are not
20  claiming the government is negligent.
21          THE COURT:  And I have made the observation previously
22  that no matter whether the government is in a better position
23  or not as good a position, I don't believe it affects your duty
24  not to act negligently if you have a duty.  And the duty is not
25  going to be informed by what the government did or didn't do.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

83I7SEPC
1          MR. ELLIS:  Respectfully, your Honor --
2          THE COURT:  Let's not argue.  My views don't count
3   now.  I have not been briefed.
4          Mr. Barry, when is a good time to bring on this
5   overall motion of duty?  After this spate of motions?
6          MR. BARRY:  I think, your Honor, we have to make these
7   motions, see what evidence we've got as a result of these
8   motions, and then we will consider the appropriate time to --
9          THE COURT:  I agree.  So we will postpone that motion.
10  I will know it's coming at some point.
11          Let's talk about the issues of setting values.  Let's
12  do it first with the subrogated plaintiffs.
13          Now, we know -- and there are three categories:
14  Subrogated plaintiffs that have been paid all that they're
15  going to be paid; parties that have not been paid or not been
16  paid in full, one category; and the World Trade Center parties.
17          Let's take the subrogated plaintiffs that insurance
18  companies have paid in full all that they're going to pay,
19  they're subrogated and they are suing.  You have two categories
20  of arguments, and I think one is the amount that's been paid,
21  and the second is whether there is a value in terms of market
22  value that is less.
23          We all know that we can take out insurance for more
24  than market.  We can insure replacement value.  There may be
25  other insurable interests.  You have raised in your papers the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 15

8317SEPC.txt

8317SEPC
1   notion that the law pays if less market value, and you want to
2   establish market value. And you said that you need to have all
3   of the files that will enable you to discover that. But I'm
4   wondering about that.
5           It would seem to me that the best way of proving
6   market value is to have experts who will express opinions on
7   market value as of September 11, 2001. And, indeed, a lot of
8   values have already been subjected to a bargaining by adverse
9   parties when the Silverstein interest bought the leaseholds.
10          MR. BARRY:  Well, I'm glad you raised that.
11          THE COURT:  And Westfield bought the leaseholds.
12          MR. BARRY:  If we are looking at the subrogated
13  plaintiffs or the Clifford group, if I can call it that, which
14  has got not only subrogated insurers but certain other
15  businesses that are plaintiffs within his group of plaintiffs,
16  they've got their own issues on damages. The Port Authority
17  has its own issues.
18          THE COURT:  I would like you to stick with the
19  Clifford group and the part of that group that deals with
20  subrogation.
21          MR. BARRY:  Well, we have retained experts to review
22  the documents that they have produced in order to determine
23  whether or not the amounts they've paid were more than what
24  they are legally entitled to recover. So, we've got people
25  that we have retained.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8317SEPC
1           THE COURT:  Legally entitled to recover in a suit.
2           MR. BARRY:  In a third-party lawsuit from the aviation
3   defendant. There are certain other businesses within that
4   group that --
5           THE COURT:  Let me hold you there. Wouldn't it make
6   sense to exchange those expert reports? I would bet at the end
7   of the day it would not be of great interest on Mr. Clifford's
8   part to contest values. I think I would guess that he would
9   accept the notion that if market value is less, all that he can
10  recover is market value. And there may not be that great area
11  of dispute as to what market value was.
12          MR. BARRY:  That's one aspect of it. And expert
13  reports can only be developed after the experts have reviewed
14  the evidence, upon which the statements are based.
15          THE COURT:  I don't believe that. Claims are based on
16  an insurance policy mostly having to do with replacement value
17  and other things. And how much insurance companies pay in
18  relationship to replacement value, if your theory is correct,
19  is not important. It's what the market value is. What's the
20  best way to prove market value?
21          MR. BARRY:  Once again, as I say, that's only one
22  aspect of it though. Some of these insurance plaintiffs we
23  believe -- and reinsurance plaintiffs, because they have those
24  as well -- may not be entitled to make a claim.
25          THE COURT:  Because?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

8317SEPC
1           MR. BARRY:  Your Honor, I have to --
2           THE COURT:  Because?
3           MR. BARRY:  Because they have no right to bring a
                        Page 16

8317SEPC.txt
4  claim as reinsurers on behalf of -- they may not have a right
5  to bring the claim as a reinsurer if their reinsurer didn't
6  bring a claim. But, your Honor, I have to tell you we are
7  just --
8             THE COURT:  That would be a legal issue.
9             MR. BARRY:  That could be, but we have to develop some
10 facts in which to present the issue to your Honor.
11            THE COURT:  It seems to me that there is an easy way
12 to do this and a hard way to do this. I think Mr. Clifford has
13 a great interest in making things easy, and it may be that the
14 defendants have a different motivation.
15            I strongly believe that if you were to delegate
16 someone in your group to work closely with someone in
17 Mr. Clifford's group, possibly with the aid of a special
18 master, you could arrive at values without the expense and
19 burden.
20            MR. BARRY:  Your Honor, that's exactly what we're
21 doing, but I have to tell you that this process has just
22 started basically a few months ago.
23            THE COURT:  I understand that, and I want to push it.
24            MR. BARRY:  Well, we're pushing it. We have groups
25 designed to deal with Mr. Badger and his colleagues as well as
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    35

8317SEPC
1  the other two property claims groups.
2             MR. CLIFFORD:  Your Honor, we can stipulate to market
3  value numbers, and we're prepared to do so. At our luncheon
4  meeting -- Mr. Badger, with your permission, can give you a
5  very succinct statement about this and where we can put it
6  together in very quick fashion.
7             THE COURT:  I'm more interested in starting the
8  process than hearing it now, Mr. Clifford.
9             MR. CLIFFORD:  OK.
10            THE COURT:  The point I want to make and I want to
11 stress is that we should look for the easiest and least costly
12 way of pursuing this avenue of discovery. And my strong notion
13 is that it should be done in across-the-table discussions, and
14 I would be very happy to appoint a special master expert in
15 insurance and property values to help you.
16            MR. BARRY:  Your Honor, I think that's a good idea
17 eventually, but we're not ready for that yet. We are doing
18 exactly what you have asked in terms of a special group of
19 lawyers on the defense side has been tasked with doing exactly
20 what you described, and we are working with Mr. Badger, but
21 it's going to take more time. And I appreciate Mr. Clifford's
22 offer of a stipulation, but I'm certainly not convinced that
23 that's what all of his plaintiffs are entitled to recover.
24            MR. BADGER:  Your Honor, Steven Badger again for the
25 plaintiffs. We believe we are there. We have given them a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    36

8317SEPC
1  substantial body of documents that they have had now for at
2  least a year with the bulk of the documents. They have
3  substantial information on the World Trade Center Properties
4  claim, and they are getting documents now in both the Port
5  Authority claim as well, and then one other claim, Taunus,
6  which was an open claim.
7             THE COURT:  Spell that.
8             MR. BADGER:  T-A-U-N-U-S.  So the bulk of the
                            Page 17

83I7SEPC.txt
```
 9    documents are there.  We are also prepared to sit down and meet
10    with them and show them our market value numbers.
11          We have developed a preliminary measure.  We have the
12    work done.  We are prepared to share that with them, the
13    context of a dialogue to reach a stipulation.  So the property
14    damage plaintiffs on the 21 MC 101 are at that point where we
15    can do that now.
16          THE COURT:  And you should add the standing points as
17    well so that Mr. Barry can know the status of each of the
18    plaintiffs.
19          MR. CLIFFORD:  So, if there are reinsurers, to his
20    point, we should address that.
21          MR. BADGER:  Your Honor, they are aware of who the
22    reinsurance claimants are.  We have given them detailed
23    breakdowns; and the DDFs, the Damage Disclosure Forms we gave
24    them back in 2005, identified that so they could tell which
25    parties were reinsurance plaintiffs, so if they have
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
                                                                    37
83I7SEPC
```
 1    dispositive motions on those issues, on recoverability of
 2    claims, let's get them done so we don't spend time on claims
 3    that are not recoverable.
 4          THE COURT:  Mr. Barry, could you develop a protocol of
 5    what needs to be done on this issue?
 6          MR. BARRY:  Yes, your Honor.
 7          THE COURT:  Working with Mr. Badger and Mr. Clifford?
 8          MR. BARRY:  We will do just that.
 9          THE COURT:  And give that to me, and let me know if
10    you need the court's assistance in appointing someone to work
11    with you on that.
12          MR. BARRY:  We will do that, your Honor.
13          THE COURT:  I am not urging you to give up any right
14    that you have or waive any motion that you think you have.
15          My interest is to avoid the expensive and protracted
16    discovery that goes on in these cases.  I know what they have
17    to do because I have been through them, and they are
18    unnecessary.  And I think you all know that they are
19    unnecessary.
20          None of us in this kind of magnitude is looking for
21    the last penny, whether to gain it or save it.  I think what we
22    need to do is arrive at substantial justice under the law.  And
23    you will make your motions, but I think this is a good way of
24    posting up what you need to do.  Everyone should have the same
25    interest in economy.  So, would you please develop that
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
                                                                    38
83I7SEPC
```
 1    protocol and within a couple of weeks report it to me?
 2          MR. BARRY:  Yes, your Honor, I will do so.
 3          THE COURT:  Anything to add, Mr. Clifford?
 4          MR. CLIFFORD:  No, sir.
 5          THE COURT:  All right.  Let me hear from
 6    Mr. Williamson.
 7          MR. WILLIAMSON:  Yes, your Honor.
 8          THE COURT:  Is Ms. Jacob going to have a separate
 9    interest?
10          MS. JACOB:  Your Honor, we represent the Port
11    Authority in the World Trade Center 7 litigation as a
12    defendant, so we are just an interested bystander to this
13    particular dispute.  Mr. Harris is here for the Port Authority.
```
                      Page 18

8317SEPC.txt

```
14              MR. HARRIS: As a cross-claim plaintiff.
15              THE COURT: So mr. Williamson should start,
16     representing the Silverstein interests.
17              MR. WILLIAMSON: Yes, your Honor. For the first time
18     the aviation defendants have said in the submission to your
19     Honor in many places, but quoting from page 9, that it's their
20     view that "The aviation defendants believe that WTCP has been
21     fully indemnified by its insurers for all its legally
22     recoverable damages." We think that's wrong as a matter of
23     law.
24              They then go on to say in many places but also at page
25     15, the motion on this will be filed in the near future.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
                                                                        39

8317SEPC

```
1              We welcome such a motion so that your Honor can guide
2      all parties with your decision as to whether in fact there is
3      anything to it. We think --
4              THE COURT: What's the nature of your recovery,
5      Mr. Williamson?
6              MR. WILLIAMSON: For damages suffered by the events of
7      9/11, not value. Damages.
8              THE COURT: The loss of a leaseholds?
9              MR. WILLIAMSON: Let me be specific. There are
10     numerous components to the damages claims suffered by the WTCP
11     businesses. It doesn't matter which one you take first, but
12     let me put one first.
13             You have leasehold payments that WTCP, our clients,
14     were obligated to continue making after 9/11, every month to
15     the present. That's a damage caused by the events of 9/11,
16     out-of-pocket, you have to keep paying the Port Authority the
17     rent. To this day our clients still pay rent with no rent
18     coming in.
19             The converse of that element of damages is of course
20     the loss of money coming in. No rent is coming in because
21     there are no buildings.
22             THE COURT: If you walked away from the obligation,
23     what would be the consequence? The loss of the lease, or money
24     damages as well?
25             MR. WILLIAMSON: Well, I think the answer is both, but
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
                                                                        40

8317SEPC

```
1      you can't do it because you are obligated to keep paying rent
2      and you you're obligated, the next element I was going to come
3      to, to replace the buildings that are there to the Port
4      Authority's satisfaction. So, you can't just walk away, you
5      have to contractually under the leasehold's terms replace the
6      buildings.
7              THE COURT: There was no personal obligation, was
8      there?
9
10             MR. WILLIAMSON: I don't know off the top of my head,
11     but there were certainly other obligations in the leases.
12     Whether there were cost guarantees or not, I don't know that
13     off the top of my head.
14             THE COURT: But I think what Mr. Barry will be coming
15     up to say is that bottom line if you walked away the only
16     damage would be the lost value of the leaseholds.
17
18             MR. WILLIAMSON: Well, it's not so simple, because
```
                             Page 19

8317SEPC.txt

19    under ATSSA, as your Honor knows and will recall --
20         THE COURT: A-T-S-S-A.
21         MR. WILLIAMSON: Sorry. Under ATSSA, as we discussed
22    in the past, there is a cap on the liability for the aviation
23    defendants, for the Port Authority and for our clients.
24         THE COURT: But you can't get more than your damage,
25    and the question is what is the maximum amount of damages you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    41
8317SEPC
 1    can get.
 2         MR. WILLIAMSON: Absolutely. And the question is:
 3    Under the law of the State of New York what are the elements of
 4    recoverable damages? That's what I was addressing.
 5         THE COURT: And so I'm putting to you if you walked
 6    away from the lease, you would lose the value of the lease.
 7    Would you have a further obligation to pay money?
 8         MR. WILLIAMSON: You have to examine that question,
 9    but to me that's not the test of what are our damages. Our
10    damages are what have we gone out of pocket so far, paying
11    rent; what have we failed to take insofar, not collecting rent;
12    what is it going to cost us to live up to our obligations and
13    replace the buildings. And one of them is done obviously, 7
14    World Trade Center is up. And then what are the mitigation
15    costs involved in dealing with the events of 9/11 which but for
16    9/11 would not have happened. In short, what does it take to
17    make our clients whole? That's the measure of damages.
18         THE COURT: Mr. Barry, would it make sense for
19    Mr. Williamson to deliver a set of contention responses in
20    terms of the elements of damage, and for you to have limited
21    discovery on that issue, and then to put this issue to a
22    motion?
23         MR. BARRY: I think that's a perfect solution. It's
24    what we have asked of them, your Honor. We have asked them to
25    identify how they calculate their claim.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    42
8317SEPC
 1         THE COURT: Can I make a suggestion? There are not
 2    going to be any heros here. Nobody is going to get a gold
 3    star. I don't think I need to hear all of the good things you
 4    have done and all the bad things the other fellow has done. It
 5    won't help anything, so just think about that going forward.
 6         MR. BARRY: Well, but that's what we've asked for, and
 7    we welcome the production of that information. We also think
 8    it's a legal issue.
 9         THE COURT: Mr. Williamson, how do we do this in as
10    economic and efficient way as possible?
11         MR. WILLIAMSON: If I may make a suggestion. If they
12    want to make a motion, they don't know what our damages are,
13    they don't understand that, let us tell them. Let us do what
14    you just said: Here are the elements of the damages we are
15    claiming, forget about the dollar amounts, it doesn't matter
16    for the analysis as a matter of law. Either we have a right to
17    claim those elements as components of our damages claim or we
18    don't. We will tell you what the components are; you want to
19    make a motion against any or all of those components, do it.
20    Do it soon. You don't need any contention elements either.
21         THE COURT: I think you made your point.
22         MR. WILLIAMSON: Yes, your Honor.
23         THE COURT: The reason of my saying about the
                              Page 20

8317SEPC.txt
24  contention elements is that it's a very good way of fixing your
25  point so that they can be a standing target for a motion.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

8317SEPC
1           MR. BARRY:  It's not just the contentions.  What their
2  claim is and how much they are claiming for each element of
3  damage.  They give us that, we can then proceed.
4           THE COURT:  I don't think it's necessary to know the
5  precise amount.  I think some order of magnitude would be
6  appropriate, approximate amount would be useful because it's --
7           MR. BARRY:  I think their claim is 12.3 billion, so as
8  long as it adds up to that that's OK.
9           THE COURT:  More or less.
10           MR. WILLIAMSON:  Plus prejudgment interest.
11           THE COURT:  We shouldn't forget that.  How about a
12  protocol on this issue?
13           MR. BARRY:  I'm becoming a protocol expert.
14           THE COURT:  Yes, it's a fancy word when you don't know
15  what to do, you say protocol.
16           MR. WILLIAMSON:  We would be happy to give Mr. Barry a
17  proposed breakdown, if you will, of the categories and types of
18  damages in our claim.
19           THE COURT:  But he also needs to know some facts as
20  well in terms of leasehold obligations, the various natures and
21  terms of the character of the constituants of your party.
22  There may be other things as well that I can't think about now.
23           MR. BARRY:  Including their first-party adjustment
24  procedure that they went through with their insurers.
25           THE COURT:  But you don't care about the insurance
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

44

8317SEPC
1  claim, Mr. Barry, at this point, because whatever their
2  insurance claim is, you are thinking there is a lower amount
3  that would be the appropriate standard.
4           MR. BARRY:  The lower amount is what they paid for six
5  weeks before 2001.  We know what they were paid totally, but if
6  in their negotiations they made certain admissions, I think it
7  would be important to know that.
8           THE COURT:  Like what?  What are you thinking about?
9           MR. BARRY:  Sorry?
10           THE COURT:  What are you thinking about?  What kinds
11  of admissions?
12           MR. BARRY:  I don't know.
13           THE COURT:  Well, they might have made admissions?
14           MR. BARRY:  Yeah.
15           MR. BADGER:  Your Honor, that claim production is
16  already substantially complete.  They have the subrogated
17  insurers' claims file for some of them.
18           THE COURT:  We're not talking about your clients.
19  We're talking about the World Trade Center.
20           MR. BADGER:  But I believe theirs is substantially
21  complete as well.  The claim file documents are there.
22           THE COURT:  Mr. Barry is saying that there is a lot
23  still in negotiation and they haven't given that information,
24  and I'm trying to develop a short way through this.
25           MR. WILLIAMSON:  May I offer a thought?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

45

Page 21

83I7SEPC.txt
83I7SEPC

1    THE COURT:  Yes.
2        MR. WILLIAMSON:  We are telling the aviation
3   defendants that we are claiming mitigation costs of the
4   following types.  They could make a motion, and they could say,
5   oh, you can't claim mitigation costs at all.  Or they can as a
6   matter of law --
7        THE COURT:  I'm going to stop you, Mr. Williamson.
8   I'm not interested in piecemeal motions.  If I wanted to have a
9   motion, I want it sufficiently comprehensive to make it
10  sensible.
11        MR. WILLIAMSON:  We will break it down.
12        THE COURT:  I have more than I can do.  I've got
13  everybody else's calendar plus 9/11, and I'm finding it
14  daunting, to tell you the truth.  So, if I want to invest time
15  and energy, I want it to have practical and large use;
16  otherwise I will just dismiss it, as I did with a couple of
17  other motions that have been made, and I will let you do more.
18        I'm interested in a comprehensive approach to the
19  issue of damages.  Mr. Barry has made a suggestion that your
20  claim is not worth anything.  You have made a suggestion that
21  your claim was worth $12 billion.  I'm not interested in
22  splitting anything.  I'm very much interested in the legal
23  basis of the various components of the claim where you can
24  sustain them.  And if Mr. Barry is right that the components
25  are something different from what an insurance company pays,
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              46

83I7SEPC
1   that's important, and if he has some basis for saying that how
2   much you paid in a monthly lease, and given the circumstances
3   of this case, are irrelevant, that's important.  And I want to
4   see if the two of you can get together on this approach.  If
5   you can't get together to my satisfaction, I'm just going to
6   let you spin this thing out, and you may be last of all the
7   people here.
8        So, I think you've got an interest, and Mr. Barry's
9   got an interest.  So, I would like to hear again -- using this
10  fancy word protocol -- what methods that you think you can put
11  up together to avoid a lot of expensive discovery and put an
12  important legal issue to meet the rule.  And on this issue I
13  may ask for the help of a magistrate judge to work through this
14  before it comes to me.
15        I think it is an important issue, but I have to figure
16  out ways to move this overall case and not get bogged down in
17  various kinds of particulars.
18        All right.  So, that's what you are going to do.
19        MR. WILLIAMSON:  We will, your Honor.  Thank you.
20        MR. HARRIS:  Port Authority, Judge?
21        THE COURT:  Yeah, Mr. Harris, thank you.  I was
22  thinking of what I left out, and you supplied the.
23
24        MR. HARRIS:  We are in a little bit of a different
25  situation here, I believe.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              47

83I7SEPC
1        THE COURT:  I'm sorry there is standing room here.  I
2   didn't know there would be this popularity for this occasion.
3   Are there no seats?  Sorry, folks.
4        MR. HARRIS:  Keith Harris for the Port Authority.
                        Page 22

8317SEPC.txt
```
 5   Judge, I agree with you that we should save the expense of --
 6            THE COURT:  There are some chairs in the jury room
 7   that you can bring out.  They're already used?
 8            UNIDENTIFIED SPEAKER:  I think we already took them
 9   out.
10            MR. CLIFFORD:  With an admonition by your clerk to put
11   them back.
12            THE COURT:  All right.  Let's go.
13            MR. HARRIS:  Judge, again, as I said, we agree, at
14   least the Port Authority does, in the economies in production.
15   We are in the midst of producing many documents to the aviation
16   defendants, in fact this week also.
17            Our claim is very limited though.  Most of our claim
18   for the World Trade Center is going to be covered by insurance,
19   with the exception of some business interruption claims and for
20   the 6 World Trade Center which was the federal building on the
21   site and for the PATH station.  As you know, just about
22   everything is going to be rebuilt by the Silverstein entities.
23            Those claims that I talked about, those uninsured
24   claims, right now are subject of litigation with the insurers
25   before Barbara Jones in this courthouse.  In addition to that,
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```
                                                                    48

8317SEPC
```
 1   it's currently being adjusted with the insurers as we speak.
 2   That adjustment process has not been completed yet, although
 3   the insurers have made a preliminary payment of close to $950
 4   million.
 5            My view is to let this adjustment process play out
 6   unhindered, and if it does it could very well be we are in a
 7   much better position at that time to assess just what our
 8   damages are, namely the difference between what the claim was
 9   adjusted for and what we think our actual damages are in that
10   case.  So, that's where we stand.  I would propose that we let
11   that adjustment process play out on the part of the Port
12   Authority and its insurers.
13            THE COURT:  Sounds like good news to me.
14            MR. BARRY:  And I think we are working towards a
15   stipulation, I might add, along those lines.
16            MR. HARRIS:  Yeah, we have proposed a stipulation
17   along those lines with a pop-up date to see where the Port
18   Authority is on the adjustment process.
19            As I indicated to you on one of our -- well, I will
20   leave that aside.  I mean it could very well be that our claim
21   may not be as great as we thought it was at the end of the
22   adjustment process, and rather than have those expenses I would
23   propose that we can continue discovery, OK, but without the
24   hard terminus as you have indicated earlier on.
25            THE COURT:  What you are telling me is I shouldn't
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```
                                                                    49

8317SEPC
```
 1   worry about you, Mr. Harris, and I am glad to respond.
 2            MR. HARRIS:  Yeah, at least for now.  If I have to, I
 3   will come back, but right now I think let us play it out with
 4   our insurers.
 5            MR. BARRY:  We are working out a stipulation, and I
 6   think it will work out to Mr. Harris' satisfaction.
 7            THE COURT:  With regard to the protocol I suggested
 8   for you and Mr. Clifford to get to and for you and
 9   Mr. Williamson to get to, I have been assuming that market
```
                         Page 23

8317SEPC.txt

10  value is less than insurance payments.
11          MR. BARRY:  That's correct.
12          THE COURT:  Is that a safe assumption?
13          MR. BARRY:  That is our understanding, your Honor.
14          THE COURT:  Because I don't want to make you turn
15  hoops and then find out that it's not valuable.
16          MR. BARRY:  No, that's --
17          THE COURT:  Mr. Williamson?
18          MR. WILLIAMSON:  Not the measure of damages is our
19  point.  It relates to in this instance the amount of insurance
20  claims.  That's our view.
21          THE COURT:  You told me that.
22          MR. WILLIAMSON:  Yes.  Yes, your Honor.
23          THE COURT:  All right.
24          Ms. Jacobs, something to tell me about number 7?
25          MS. JACOB:  Your Honor, with respect to World Trade
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                50

8317SEPC
1   Center 7, first our issues are quite different from the issues
2   that have been discussed for today.  We have taken, both sides,
3   about two dozen depositions.  We have exchanged about a million
4   pieces of paper.  We believe I think that for both sides we
5   would need another maybe as many as 50 or 60 depositions.
6           Your Honor, we have issues, engineering issues, fire
7   analysis issues, just with respect to why World Trade Center 7
8   collapsed at the end of the day.  Then this report with respect
9   to World Trade Center 7 has not yet been issued.  It appears
10  from some of the statements that NIST has made when they make
11  their public reports, that they have some information that's
12  not available at the moment.
13          THE COURT:  Who is?
14          MS. JACOB:  NIST, the federal agency which is
15  investigating the cause of the collapse.
16          MR. SACHS:  National Institute of Standards and
17  Technology.
18          THE COURT:  Thank you, Mr. Sachs.
19          MS. JACOB:  And, your Honor --
20          MR. SACHS:  Sorry.  Franklin Sachs from Con Edison.
21          MS. JACOB:  And, your Honor, we cannot get that
22  information that NIST has until they file their formal report
23  or final report.  So, I think --
24          THE COURT:  When is that supposed to come?
25          MS. JACOB:  The latest date they say is this summer.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                51

8317SEPC
1           MR. SACHS:  We wouldn't hold our breath either of us.
2           MS. JACOB:  They have missed deadlines they have set
3   for themselves before.  So on December 18 they made a report.
4   On December 18 they said they were hoping to file the final
5   report this summer.  We don't have any further information.
6           I think that both sides on World Trade Center 7 are in
7   agreement that our deadlines should be set separately from the
8   deadline of the rest of the litigation.
9           THE COURT:  And I am really hearing your cases
10  separately.
11          MS. JACOB:  In effect, yes, your Honor.
12          THE COURT:  OK.  Thank you.
13          MR. SACHS:  I didn't even have to stand up.
14          THE COURT:  Thank you.  Let me focus on the TSA and
                            Page 24

8317SEPC.txt
```
15   the various aspects of the work that Ms. Normand and
16   Ms. Goldman have been doing.
17          There are a number of problems here, Ms. Normand, that
18   have been outlined in the letter that you and Ms. Goldman sent
19   to me, and I would like you to touch upon those.
20          MS. NORMAND:  Thank you, your Honor.  Just to
21   articulate for the record where we stand in terms of documents
22   and discovery that either is pending at TSA for SSI purposes or
23   is being produced by the government.
24          The vast majority -- starting with the SSI review
25   issues.  The vast majority of the documents that are still at
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
                                                                    52
8317SEPC
```
 1   TSA were produced to TSA by the parties within the last year,
 2   and you have the numbers in the letter that we submitted to the
 3   court.  Roughly 65,000 pages remain of documents that were
 4   produced by the parties to TSA for SSI review.  Approximately
 5   120,000 pages were submitted in addition to the 65,000 pages by
 6   Boeing in the last several months.  There are also some
 7   nonparty documents that are pending SSI review.
 8          In addition to that, TSA has attended 95 depositions
 9   for SSI purposes and has reviewed the transcripts of those
10   depositions following the depositions, to redact SSI as
11   necessary.  So that's the current status in terms of what's
12   pending from the document front.
13          In terms of documents that have been requested of the
14   government, we have made tremendous progress.  As outlined in
15   our letter, TSA has produced almost 12,000 pages of documents
16   to the parties in response to their various requests for
17   documents.  These come in two general categories:  First,
18   documents that TSA gathered and produced to the 9/11 Commission
19   that was investigating the September 11 attacks; and, secondly,
20   TSA has gathered and produced a large number of documents in
21   response to the 30(b)(6) requests and topics that were
22   proffered to TSA.  So, roughly 12,000 pages have been produced
23   by TSA.
24          There are additional requests for documents that are
25   outstanding that we're continuing to work on, but I would say
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
                                                                    53
8317SEPC
```
 1   generally speaking we're at the tail end of the TSA affirmative
 2   document production.
 3          Similarly, for F.B.I., they have expended over 3,000
 4   hours and produced more than 33,000 pages of documents from
 5   their PENTTBOM investigation, which is the post 9/11
 6   investigation of the attacks.
 7          THE COURT:  On the Pentagon or New York as well?
 8          MS. NORMAND:  The entire -- both, your Honor, or all
 9   aspects of the plot.  Those documents fall under a number of
10   categories including interview reports of personnel at the
11   various airports, other witness interviews, information that
12   the F.B.I. has gathered about the hijackers, the kinds of
13   weapons they purchased prior to 9/11, the types of flights they
14   took prior to 9/11.  And perhaps most significantly, the F.B.I.
15   has produced tens of thousands of pages of photographs and
16   information concerning evidence collected by the F.B.I. and
17   processed at the F.B.I. laboratory, which I think will prove
18   useful in many cases to the parties.  So, they have done an
19   enormous amount of work.
```
                                 Page 25

8317SEPC.txt

20          There are some pending requests that they are
21  continuing to work on, but similar to TSA's situation, the
22  F.B.I. is really nearing the end of its document production in
23  the case, and so the end is in sight.
24          THE COURT:  I had the impression from reading your
25  letters that there were recent waves that were causing you a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                54

8317SEPC
1  lot of work.
2          MS. NORMAND:  Well, that's certainly true from the
3  TSA's points of view.  The Boeing order that the court issued
4  in October of last year, as a result of that order we
5  understand Boeing has produced I think all totaled 150,000
6  pages or so of documents to TSA for review, and we understand
7  that that production is continuing.  We got another production
8  as recently as February 11th from Boeing.
9          Prior to about a week or two ago we had been asked to
10  prioritize those Boeing documents for SSI review because among
11  other things there were depositions that were proceeding in
12  Seattle and so forth, and we attempted to give some priority to
13  those documents while continuing to review documents for other
14  purposes including for the FAA 30(b)(6) deposition that took
15  place in February.
16          So, TSA has finished roughly somewhere between 25 and
17  30,000 pages of the Boeing production, but that clearly is
18  going to present a major issue for TSA going forward.  We are
19  going to try to work with the parties to come up with some kind
20  of a solution.  A proposal was put forward recently by the
21  plaintiffs for trying to reduce those numbers.  We're looking
22  at that.  But it's clearly an issue, how TSA would view that
23  large a volume of documents.
24          THE COURT:  What problems are there aside from the
25  legal problems in the APA case?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                55

8317SEPC
1          MS. NORMAND:  Well, putting aside the APA-requested
2  depositions, that is the depositions that were requested of
3  F.B.I. and CIA witnesses, there are a number of I'm not sure I
4  would term it problems but a number of additional requests for
5  depositions that have been made of TSA.
6          In particular, the defendants have sought a number
7  of -- have sought a further Rule 30(b)(6) deposition on a very
8  long list of topics.  We produced a witness on February 11 and
9  12 for two days, Mr. Camaratto, who testified as to a great
10  number of those topics, but many more remain.
11          TSA has determined, based on its experience with the
12  Camaratto deposition, and just the enormous burden that that
13  experience put on TSA and its resources, as well as FAA, that
14  in the future it doesn't intend to provide Rule 30(b)(6)
15  depositions but rather to produce in some cases individual
16  witnesses with subject matter expertise on some of the topics
17  that the defendants have sought, a limited number; and as to
18  other topics that have been sought for Rule 30(b)(6) testimony,
19  TSA and FAA intend to produce documents in lieu of deposition
20  testimony.
21          We had a meet and confer or a status conference the
22  other day at which TSA explained its plan going forward.  While
23  the parties may have some additional Touhy requests for
24  individual witness testimony, and TSA is willing to consider
                            Page 26

83I7SEPC.txt
25    that, we think there really is a very limited number of TSA and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                            56
      83I7SEPC
 1    FAA depositions that are going to take place in the recent or
 2    near future.
 3                THE COURT:  What's the plaintiff's gloss on this?  Who
 4    wishes to speak?  Mr. Clifford?
 5                MR. CLIFFORD:  Thank you, your Honor.  As counsel
 6    described, there has been communication between the Justice
 7    Department and plaintiffs.  One idea for trying to shorten
 8    their commitment is to focus less on Boeing and more on the
 9    aviation defendants, and to that end we are trying to be -- we
10    are cutting as much as we can from what we want, and we are
11    trying to make it easier for them.  We're not sure where the
12    court might go with respect to settings, so we are trying to
13    work with them and understand their problems.
14                THE COURT:  Mr. Migliory, anything to add?
15                MR. MIGLIORY:  This is gratuitous, but the government
16    has been working very, very closely with us to prioritize with
17    things that are coming up, so to that extent the government has
18    been extremely helpful in streamlining.
19                We have some ideas about how we can streamline some of
20    the pending requests, but our general observation is that once
21    we receive the government production -- by that I mean the
22    things asked of the government, not things being vetted by TSA
23    from the defendants -- once we receive those few remaining
24    items that are pending, we think we are in a position to say
25    we're ready from a wrongful death perspective.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                            57
      83I7SEPC
 1                THE COURT:  Mr. Barry?
 2                MR. BARRY:  Your Honor, as Ms. Normand indicated, we
 3    met last week, and I think she outlined the procedure that
 4    basically will be acceptable, but we want to wait and see their
 5    final decision and how they're going to present their protocol.
 6    So, other than that I think we're just waiting and seeing.  It
 7    should be all right.
 8                THE COURT:  We have not talked about the case against
 9    Boeing, and I get the sense that that case is not being pressed
10    the same way that other cases are being pressed.
11                MR. CLIFFORD:  Actually just the opposite.  And
12    Ms. Hesson could speak to that.
13                MS. HESSON:  Yes, may I speak to that, your Honor?
14                THE COURT:  Cathy Hesson.
15                MS. HESSON:  The case against Boeing has been and is
16    being pressed, your Honor.  We have had some difficulty with
17    the documents because of the way they are being produced by
18    Boeing.  Apparently they come to the lawyers coded, they are
19    decoded and then just shipped off to the government.
20                We agree with the government that the volume is
21    intolerable, and we have a proposal pending with them to work
22    with them, to have somebody come in and cut through it so they
23    are not reviewing all of those documents.  We have already I
24    think ten Boeing witness depositions, and we are just waiting
25    to have the document issue resolved so we can complete the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                            58
      83I7SEPC

                              Page 27

8317SEPC.txt

1  depositions. But the Boeing case has been pressed very
2  dilligently since last fall, your Honor.
3           THE COURT: How is it that you speak to this issue,
4  Ms. Hesson, and not Mr. Clifford?
5           MR. CLIFFORD: As you have heard earlier today, not
6  withstanding several of our differences, we really have tried
7  to be --
8           THE COURT: I see.
9           MR. CLIFFORD: So, for lack of a better term, we put
10  Cathy on, Ms. Hesson on point, and so she has been doing that
11  laboring oar.
12           THE COURT: Is there anyone from Boeing here?
13           MR. MCLAUGHLIN: Yes, your Honor. Tom McLaughlin from
14  Boeing. I think Cathy has accurately described it, and she has
15  been pressing ahead with the case against Boeing, and we are
16  producing lots of documents.
17           MS. HESSON: And we are trying to work together to cut
18  that down because the number is not a practical number let
19  alone a useful number, and we are hopeful that we can work
20  something out with the government that everybody will be
21  satisfied with.
22           THE COURT: All right. With regard, Mr. Migliory, to
23  the remaining wrongful death cases, where do we stand with the
24  Hayden case?
25           MR. MIGLIORY: If I may, first of all, I think my
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

59

8317SEPC

1  partner Joe Rice is here, who can talk particularly about the
2  actual process. But we have had an arbitration, and now it's
3  just a matter of --
4           THE COURT: Yeah, but that's what I have been hearing
5  now for a couple of months.
6           MR. RICE: Your Honor, in the last month Mr. Barry and
7  I and Mr. Podesta have had three meetings to discuss, and we
8  refer to Mr. Barry as the mediator for all the defendants and
9  myself in this meeting as he referred to it. I have provided
10  them with all of the information they have requested, and I
11  believe I'm waiting to hear back from them.
12           MR. BARRY: I think that summarizes the situation
13  pretty well, Judge. Rather than getting into specific numbers,
14  and I think -- and there is a specific meeting between the
15  principles without the mediator perhaps scheduled for later
16  this afternoon. I understand there has been an invitation.
17           THE COURT: It's just that that case has been around
18  for sometime, and every time I hear a status report, it's
19  reported in not precisely but approximately the same words as I
20  hear today, and there doesn't seem to be any progress. I don't
21  know, I guess I leave you alone.
22           Let's move on.
23           MR. MIGLIORY: Your Honor, I'm sorry. Before we
24  leave, because on that very flight there is an issue that I
25  want to make sure the record is clear about. In our submission
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

60

8317SEPC

1  and in Mr. Barry's submission there is only one sort of
2  inconsistency on the cases that are pending from '97, and that
3  is that the Peters case, which is also the Ranzmeyer case is
4  listed on the defendant's submission because there is a pending
5  appeal of a motion to intervene in the case.
                           Page 28

8317SEPC.txt

6        As I reported last time, the probate court in New
7  Hampshire actually did rule since our last meeting on the
8  authority of the legal representative to effectuate a
9  settlement and in fact found that the legal representative,
10 Mr. Ranzmeyer, did have authority to resolve the case.
11       The problem with effectuating it and finalizing that
12 case is in settlement is that there is a pending appeal in the
13 Second Circuit on the motion to intervene that this court
14 denied. So, we are in that stage, so it should be considered
15 here for that purpose. I don't know what the course will be of
16 that appellate issue.
17            THE COURT: We can't do anything about that.
18            There's six or seven FELA cases that are mixed in with
19 the property damage cases. What am I to do with those?
20            MR. WILLIAMSON: Your Honor, they have been quiescent
21 and may have brought themselves back to light in light of your
22 decision to migrate the remaining cases in the 21 MC 97 docket
23 to this docket. So, we have had some renewed expression of
24 interest from plaintiffs counsel in scheduling depositions. We
25 are ready to take the depositions of the plaintiffs whenever
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              61
8317SEPC
1  they are ready to schedule them.
2            THE COURT: They never show up here. Is anybody
3  representing the plaintiffs here?
4            MR. WILLIAMSON: They haven't come in years.
5            THE COURT: If they don't show up, I'm going to
6  dismiss them. Tell them.
7            MR. WILLIAMSON: Yes, your Honor.
8            THE COURT: I think we have gone through all of the
9  discovery issues. I'm sure I have missed some things, but I
10 can't remember anything more.
11           Mr. Clifford has been pressing me and others to
12 schedule trial dates, and I have been resisting mainly because
13 I thought that setting a date would be fictitious given the
14 uncertainty of all that we have to do, but it probably is
15 worthwhile to try to set a date for the close of discovery.
16           Mr. Clifford and other plaintiffs have told me that
17 they should be through when, Mr. Clifford?
18           MR. CLIFFORD: We believe that, as we set out in our
19 proposed CMO, your Honor, that the fact discovery can be
20 completed by -- your Honor, we believe that we can complete
21 factual discovery by the fall of this year. Specifically we
22 think that it could be accomplished by August 1, with experts
23 working on a simultaneous track in terms of designation and
24 reports and completion of their depositions by the beginning of
25 September.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              62
8317SEPC
1            THE COURT: And, Mr. Barry, you are into 2009.
2            MR. BARRY: July 1, your Honor, fact discovery.
3            MR. CLIFFORD: Your Honor, we always thought too --
4  when I was talking to Mr. Barry in preparations for these, to
5  see if we could reach a common ground, which we could not --
6  that if we had an end date in terms of the actual setting for
7  trial, that we could work back from there and reach an amicable
8  agreement about the various settings. That's certainly one
9  thought that the court may wish to entertain.
10           THE COURT: I can't do that today because I think I
                            Page 29

8317SEPC.txt
11   need to have a better definition of what the trial will look
12   like, and we need some meetings on that.
13           The large problem about setting a discovery closure
14   date is that it would be better done after I ruled in the APA
15   case.
16           Assuming the protocols I have recommended work to some
17   satisfaction, I think those cases could be set up for motion
18   practice by the early summer.  If there is more discovery to be
19   done under the APA case, or a combination of the APA case and
20   the 9/11 issues and the terrorist deposition issues, we're
21   reasonably into 2009.  If there is not much more discovery, I
22   think we can think of the end of this year as a realistic date
23   to end discovery, both fact and expert.  But certainly a
24   fact -- and then I need to have a meeting to develop the
25   experts, and I don't know what you want to do with that.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                63
8317SEPC
1            I think the first step in this is to have submission
2    of the motions that we talked about, Mr. Barry, and there is
3    another big motion following, a motion on duty and other
4    smaller motions with regard to various aspects of property that
5    will take up a lot of energy for the remaining months of this
6    year.
7            Subject to enlargement, according to my rulings in the
8    cases that Mr. Barry is going to be putting up for motions in
9    April, I would like to fix December 31, 2008 as the fact
10   closure date.
11           I would think our next meeting would be the time that
12   I hear the motions, the APA motion, the 9/11 motion and the
13   terrorist motion.  And I would propose at that time, depending
14   on my rulings, to see if that December 31, 2008 date could be
15   accommodating to the further fact issues, or adjust that date,
16   and possibly also to fix another date where I could hear
17   proposals on other motions and on experts.
18           I'm not going to set a trial date today.  Mr. Harris?
19           MR. HARRIS:  Yes, Judge just a point of clarification.
20   In fact we are talking about liability and damages or just
21   liability?
22           THE COURT:  We are talking about liability and
23   readiness for damages.  My thinking is to start with the
24   liability trials, with a notion that the damages issues will
25   have been sufficiently explored in discovery to identify some
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                64
8317SEPC
1    of the cases that go into trial of damages, probably with
2    different juries.
3            But it's hard to do that, Mr. Harris.  It's hard to
4    know what to do until I get a better size of how long it takes
5    to do a liability trial, what kinds of issues I can think
6    about, how exhausted we will all be.  It's going to be some of
7    the same people.  But my idea is once we start trying things,
8    I'm not going to be doing much else but trying these cases, and
9    I will have to work with my other colleagues to get cooperation
10   in helping in these cases and helping with my other
11   responsibilities.
12           So those are my proposals.  I'm reminded that I missed
13   one thing and that is the issue that I have to put up for
14   argument with regard to the confidentiality that is to be given
15   to various of the discoveries that we've done.  Who wants to
                            Page 30

8317SEPC.txt
16  speak first?
17         MR. MIGLIORY:  Your Honor, it's our motion, Don
18  Migliory for the plaintiffs.  We have, as we promised, been
19  working to try to resolve it, and we have come up with a plan
20  where plaintiffs are willing to withdraw the motion today
21  without prejudice to any of the issues raised in the briefing.
22  There will be an interim process started, and we will see how
23  productive it is, and if not by July 1 we will either be back
24  with the motion or we will have established a protocol, if you
25  will.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                65

8317SEPC
1          THE COURT:  What about the intervener?
2          MR. MIGLIORY:  The reporters committee?
3          THE COURT:  Yes.
4          MR. MIGLIORY:  They actually concur with our position.
5          THE COURT:  All right.  So I'm going to issue an order
6   tomorrow letting the withdrawal of the motion.
7          MR. MIGLIORY:  Without prejudice.
8          THE COURT:  Without prejudice and with consent.  Thank
9   you.  That takes care of that.
10         Does anybody have anything I've missed?
11         MR. CLIFFORD:  Only to ask that your Honor consider as
12  kind of a check-in in the late summer or early fall.
13         THE COURT:  Well, I'm going to see you all with this
14  motion.
15         MR. CLIFFORD:  Oh, that's true.
16         THE COURT:  And I am thinking that the argument day is
17  going to be before the summer.
18         MR. CLIFFORD:  OK, thank you.
19         THE COURT:  I hope that the briefing schedule can
20  accommodate that.  I think you are all going on useful courses.
21  You all have in mind that my target date is that fact discovery
22  finishes by the end of this year.  And you all know that I
23  don't liberally give adjournments.  So you are going to do what
24  you have to do to move all the cases forward, damages and
25  liability.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                66

8317SEPC
1          I think we will know a lot more about what we have to
2   do when I decide these motions, and I think you will be able to
3   tell me different things.
4          I would like to either have a status conference
5   immediately following that argument or to schedule another
6   one -- probably the latter -- within a couple of weeks
7   following the argument, and I think you should start thinking
8   about what experts you are going to use, get more thoughts
9   together on what kind of trial we are going to have, how long
10  the trial will be, talk to each other about these ideas.
11         Mr. Mueller, as a point of personal privilege, you
12  have been so silent, so I am not used to that.
13         MR. BARRY:  He gets another gold star.
14         THE COURT:  I hope you're well, your family is well.
15         MR. MUELLER:  I was just having withdrawal symptoms
16  not being in the courtroom often enough, so I showed up.
17         THE COURT:  On Peruno we've got a case management
18  order that's been attached to the papers.
19         MR. MIGLIORY:  That is by consent.
20         MR. BARRY:  By consent.
                        Page 31

83I7SEPC.txt

```
21          THE COURT:  And I will just sign that.  Frankly I
22  haven't looked at it.  Will you summarize it, Mr. Migliory?
23          MR. MIGLIORY:   Essentially we have set up a schedule
24  where information will be exchanged up to the point of -- to
25  make the Peruno case at the same level with all of the other
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

83I7SEPC

```
 1  wrongful death cases in terms of ability to assess it on a
 2  damages and move forward in the group.  So, it will get the
 3  case up to speed by I think September 1.
 4          MR. BARRY:  By September.
 5          THE COURT:  OK.  And I think that covers everything we
 6  have to do.  I will sign the Peruno order, and I thank you all
 7  for your attendance and your attention.  Have a good evening.
 8                        - - -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————  X
                                :

IN RE SEPTEMBER 11TH LITIGATION      :

IN RE SEPTEMBER 11 PROPERTY DAMAGE  :
AND BUSINESS LOSS LITIGATION.       :

                                  :

—————————————————  X

No. 21 MC 97 (AKH) and
No. 21 MC 101 (AKH)

## AVIATION DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A DETERMINATION OF THE LAW APPLICABLE TO FLIGHT 11, 77 AND 175 PUNITIVE DAMAGES CLAIMS

CONDON & FORSYTH LLP
7 Times Square
New York, NY 10036
(212) 490-9100
Desmond T. Barry, Jr. (DB 8806)

*Aviation Defendants' Liaison Counsel*

*Of Counsel:*

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Terrianne Muenzen

Dated: April 30, 2007
      New York, New York

Harbor, 2006 U.S. Dist. LEXIS 27387, at *90. Here, Plaintiffs' claims did not arise until

Flights 11 and 175 crashed into the World Trade Center.[6] The "last event" was the crash

into the World Trade Center resulting in death, personal injury, and property damage – all

of which occurred in New York. Applying of New York substantive law is especially

appropriate for the property damage claimants, and ground victims, who would have no

expectation that any law other than New York's would conceivably apply. See, e.g.,

2006 U.S. Dist. LEXIS 27387, at 96-97 ("Unlike the passengers, the ground victims had

no relationship with the Defendants until tragedy struck and [debris caused injury to]

their property."). Indeed, this Court has already determined that the question of whether

a duty was owed to the ground victims is a question that must be resolved under New

York law. In re Sept. 11 Litig., 280 F. Supp. 2d 279, 280 (S.D.N.Y. 2003).

     As shown in Part II, New York public policy against the insurability of punitive

damages awards is designed to complement the New York substantive law of punitive

damages by ensuring that the objectives of punishment and deterrence are fulfilled. See,

e.g., Soto, 83 N.Y.2d at 724, 635 N.E.2d at 1225; Biondi, 94 N.Y.2d at 663-64, 731 N.E.

---

Massachusetts law applied, the Court would not even have to reach the issue of insurability of
punitive damages for such claims since no claim for punitive damages would exist. Massachusetts
does provide for punitive damages in wrongful death cases. Mass. Gen. Stat., Ch. 229, § 2 (2007).
However, the Massachusetts Supreme Judicial Court most likely would refuse to permit insurance
coverage for punitive damages awards. In the case most closely on point, the high court refused to
allow the insurability of a punitive damages award under the state underinsured motorist statute.
Santos v. Lumbermen's Mut. Cas. Co., 408 Mass. 70, 82, 556 N.E.2d 983, 990 (Mass. 1990). In
doing so, the court employed reasoning nearly identical to that of the New York Court of Appeals.
The court stated that requiring an insurer to pay for punitive damages "would not serve to deter
wrongdoing or punish the wrongdoer; rather it would result in payment of punitive damages by a
party who was not a wrongdoer." Id.

[6]  Flight 11 passenger Daniel Lewin was reportedly killed before the plane crashed into the World Trade
Center. However, claims relating to his death have already been resolved and are not at issue on this
Motion.

Respectfully submitted,

CONDON & FORSYTH LLP

By: _____
      Desmond T. Barry, Jr. (DB-8806)
Times Square Tower
7 Times Square
New York, NY 10036
(212) 490-9100

*Aviation Defendants' Liaison Counsel*

*Of Counsel:*

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Terrianne Muenzen

Dated: April 30, 2007
      New York, New York

16

# EXHIBIT 4

Westlaw.

50-DEC RESG 21                                                                                   Page 1
50-DEC Res Gestae 21

Res Gestae
December, 2006

Feature

**\*21 RECOVERING DAMAGES FOR TORTIOUS INJURY TO HISTORIC BUILDINGS AND OTHER 'SPECIAL PURPOSE' PROPERTY IN INDIANA: DRAWING THE LINE BETWEEN 'FAIR MARKET VALUE' AND 'COST OF REPAIR' IN CASES OF PERMANENT DAMAGE**

Matthew D. Barrett [FNa1][FNa1]

Starr Austen Tribbett Myers & Miller Logansport, Ind. barrett@satmlaw.com

Copyright © 2006 by the Indiana State Bar Association; Matthew D. Barrett

I. Introduction

The fundamental goal of tort damages is to make an injured party whole and restore the injured party, as nearly as reasonably possible, to the position in which he or she would have held absent the injury. [FN1][FN1] This goal applies with equal force in cases involving damage to real property. There is no fixed formula for measuring damages to real property since property is often unique. Under Indiana law, the general measure of damage is the cost of repair where the damage to property is repairable. If the damage to the property is permanent, then the measure of damage is the fair market value. However, calculating damages for certain types of permanently damaged property often requires evidence of value beyond the usual means. Consider the following hypothetical: A driver fails to exercise proper control over his semi-truck as he makes a turn and crashes into the side of a historic building. The crash causes permanent damage to the building's structure. [FN2][FN2] What is the proper measurement of compensation to the building's owner in such a situation? If property, like the historic building, is used for or constructed with special features, or located in a place that bestows unique value on its owner, then the owner may not be adequately compensated on what the market may pay the owner after the injury or destruction since no such market exists. At the same time, no injured party should receive more than has been lost based on sentimental value and other factors. This is the question that the Indiana Court of Appeals addressed in *Warrick County v. Waste Management of Evansville*, 732 N.E.2d 1255 (Ind. Ct. App. 2000).

In *Warrick County*, the court appeared to relax the general rule when it considered other factors in addition to the fair market value. The court held that a jury could consider the cost of repair and other considerations beyond the fair market value when determining compensation for a permanently damaged bridge. Similarly, courts from other jurisdictions have recognized that fair market value does not always afford a correct measure of indemnity in other types of cases involving permanently damaged property. This is most often the case with "special purpose" properties, such as properties of historic significance as landmarks, grave-yards, churches, government buildings and schools where no active market exists from which the diminution in market value may be determined. [FN3][FN3] Rather, the measure of damages in such cases is the cost of restoring the structure to its prior condition. This approach reflects that upholding the principle of fair and reasonable compensation requires flexibility in measuring the appropriate damages to account for the unusual or specialized character of real property and any special value it may hold for the owner. Although there are valid arguments on both sides as to whether a "special purpose" property exception to the general rule should be recognized in Indiana, the more appropriate measurement of damage to historic and special purpose property should be the cost of repair approach, rather than the property's fair

market value.

   This article analyzes the "special purpose" exception to the general rule of measuring loss to permanently damaged historic and other unique property, focusing on the Indiana Court of Appeals' decision in *Warrick County* and case law from other states. Part II presents a general overview of Indiana case law concerning the measurement of permanently damaged property and a discussion of the *Warrick County* case. Part III provides a sampling of case law from other states that have examined the special purpose exception. Finally, Part IV discusses the advantages and disadvantages of adopting the special purpose exception to the general rule and ultimately recommends the holding in *Warrick County* be extended to require the cost of repair to be the measurement of damages in all cases involving permanently damaged historic and other "special purpose" property in Indiana.

## II. General measurement of damages in Indiana for permanently damaged property and *Warrick County v. Waste Management of Evansville*

   Under Indiana law, there are two different methods of measuring damages with respect to tortious injury to property attached to real estate. [FN4][FN4] In the case of a "permanent" injury to property, *i.e.*, where the cost of the restoration exceeds the fair market value of the property before the injury, the measure of damages is the fair market value of the property before the injury. [FN5][FN5] Fair market value is defined as the value a willing seller will accept from a willing buyer for a good. [FN6][FN6] However, in cases where the injury is temporary or repairable, the measure of damages is the cost of repair. [FN7][FN7] A temporary injury is one that is not defined as permanent. [FN8][FN8]

   The issue of which of the two measures of damages should apply to historic buildings and other **\*22** special purpose-type property that have sustained permanent damage has not been addressed in Indiana. However, as mentioned, the Indiana Court of Appeals addressed the proper measurement of damages in a case involving a permanently damaged bridge in *Warrick County v. Waste Management of Evansville*. In *Warrick County*, a county brought a lawsuit against a truck driver and his employer, alleging that the driver negligently operated a heavy truck on a county bridge. The bridge collapsed as the truck drove over it, and the truck fell through the wooden floor. The bridge was completely destroyed. The defendants filed a motion for summary judgment on the issue of damages, arguing that the destroyed bridge had no value and that the county did not suffer any damages because the bridge needed to be replaced. The trial court granted defendants' motion, and the county subsequently appealed.

   The Court of Appeals reversed and held that a genuine issue of material fact existed as to the value of the bridge. [FN9][FN9] The court noted that the question of the measure of damages for the destroyed bridge was a case of first impression in Indiana, and the court "limited" its holding to the facts of this specific case. [FN10][FN10] The court then observed that "the measure of damages developed by Indiana law [is] ill-equipped to handle situations involving bridges because there is no market for determining the fair market value of the bridge." [FN11][FN11] As such, the court examined case law from other jurisdictions that involved permanently damaged bridges. These cases recognized the cost of repair to be the proper measure of damages. [FN12][FN12] The court in *Warrick County* also examined several cases involving damaged bridges from other state courts in which different results were reached. [FN13][FN13] In these cases, the courts concluded that the proper measure of damages for the destruction of a public bridge was the fair market value of the bridge. [FN14][FN14] Against this background of precedent, the court in *Warrick County* adopted the cost of repair approach and concluded that a public bridge has value, and that the method of measuring damages should be the fair market value plus other factors such as "the original cost, the age of the property, its use and utility from both an economic and social viewpoint, its condition, and the costs of restoration or replacement." [FN15][FN15] The court remanded the case back to the trial court because the bridge's value was a question of fact for determination by the jury. [FN16][FN16]

## III. Measurement of damages in other jurisdictions for permanently damaged historical and 'special purpose' property: cost of repair

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Courts in other states have consistently held that the measure of damages to permanently damaged historic buildings and other "special purpose" property should be the cost of repair rather than the fair market value. [FN17][FN17] The identifying features of a "special purpose" property include: (1) the property has physical features peculiar to its use; (2) the property has no apparent market; and (3) it has no feasible economic alternate. [FN18][FN18] The Restatement (Second) of Torts also recognizes the concept of special purpose property and provides that whenever there is injury to land, damages should include "the difference between the value of the land before the harm and the value after the harm, or at [the owner's] election in appropriate case, the cost of restoration that has been or may be reasonably incurred ...." [FN19][FN19]

For example, in the case of *Trinity Church in City of Boston v. John Hancock Mutual Life Insurance Co.,* [FN20][FN20] a church brought an action against a neighbor and others to recover damages resulting from an excavation. The church was designed by a famed architect in 1872, and it was considered by scholars to be one of the architect's greatest works. The church was a national historic landmark, as well as a functioning church. The church sought compensation for the cost of repairing the interior and the exterior areas of the church, as well as for the structural damages sustained. The Supreme Judicial Court of Massachusetts held that the church was entitled to be compensated for the reasonable costs of restoring the structure to the condition it was in prior to the excavation. [FN21][FN21] The court observed:

> The general rule for measuring property damage is diminution in market value. However, "market value" does not in all cases afford a correct measure of indemnity, and is not therefore "a universal test." For certain categories of property, termed "special purpose property" (such as the property of nonprofit, charitable, or religious organizations), there will not generally be an active market from which the diminution in market value may be determined. The parties agree that [the church] falls within the definition of special purpose property and that the damage to the church could not be measured on the basis of fair market value. In such cases, this court has been cognizant of the need for greater flexibility in the presentation of evidence relating to damages and has provided "[s]pecial opportunities for proof of value ... where it is felt that there is no market value. ... The courts in these cases ... may be doing no more than recognizing that more complex and resourceful methods of ascertaining value must be used where ordinary methods will produce a miscarriage of justice. ...
>
> Replacement or restoration costs have also been allowed as a measure of damages in other contexts where diminution in market value is **\*23** unavailable or unsatisfactory as a measure of damages. [The church] is entitled to be compensated for the reasonable costs of restoring the church to the condition it was [in] prior to the [neighbor's] excavation. [FN22][FN22]

In the case of *Roman Catholic Church Archdiocese of New Orleans v. Louisiana Gas Service Company,* [FN23][FN23] a church sued a gas company for damages arising out of a fire in an apartment complex owned by the church. The gas company admitted that it was legally liable for the damages sustained by plaintiffs as a result of the fire. The case went to trial solely to determine the amount of damages. The trial court ruled that since the cost of restoration exceeded the market value of the building before the damage, the church's recovery was limited to the amount expended to restore the building to its pre-fire condition reduced by depreciation. The church appealed, and the Supreme Court of Louisiana held that the church was entitled to recover the full cost of restoring the building. [FN24][FN24] The court disagreed with an overly restrictive limit on recovery for tortiously damaged property and observed the trend to recognize the cost of restoration as the appropriate measure of damage:

> Recently, courts and commentators have criticized these types of simplistic tests which require the automatic application of limitations on an owner's recovery of the cost to restore or repair his damaged property. Such ceilings on recovery not only seem unduly mechanical but also seem wrong from the point of view of reasonable compensation. If the plaintiff wishes to use the damaged property, not sell it, repair or restoration at the expense of the defendant is the only remedy that affords full compensation. To limit repair costs to diminution in value is to either force the landowner to sell the property he wishes to keep or to make repairs partly out of his own pocket. Rules governing the proper measure of damages in a particular case are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

guides only and should not be applied in an arbitrary, formalistic, or inflexible manner, particularly where to do so would not do substantial justice. Limiting the costs of repairs to the diminution in value of the property appears to fly in the face of the rule requiring that the injured party be restored to his former position. [FN25][FN25]

In the case of *Leonard Missionary Baptist Church v. Sears, Roebuck and Company*, [FN26][FN26] a church sued the manufacturer of a space heater after the space heater started a fire in the church. The fire engulfed the entire church and completely destroyed it. The church had been erected around 1900 and was apparently beloved by most of the community. At trial, the manufacturer of the space heater objected to the trial court's submitting the issue of damages to the jury in two instructions. The manufacturer argued that it was improper for the jury to decide whether the cost of replacement or fair market value was the proper measure of damages for the loss of the church. The manufacturer contended that the trial court should have submitted only one damage instruction to the jury, namely the one that related to fair market value. On appeal, the Missouri Court of Appeals held that the proper measure of damages to the church property was the cost of replacement rather than the fair market value of the church. [FN27][FN27] The court recognized the general rule that the measure of damage for tortious injury to real property is the difference in fair market value of the property before and after the injury or the cost of restoring the property, whichever is the less. [FN28][FN28] However, the court stated that rules governing the measure of damages in a particular case are only guides and should not be applied in an arbitrary and inflexible manner, especially where to do so would result in substantial injustice. [FN29][FN29] Where expenditures to restore or to replace to pre-damage condition are used as the measure of damages, a test of reasonableness is imposed. The court reasoned as follows:

> For certain categories of property, termed "special purpose property" (such as the property of nonprofit, charitable, or religious organizations), there will not generally be an active market from which the diminution in market value may be determined. This is true of such properties as school yards, college campuses, buildings under construction, and cemeteries Permitting the injured party to recover replacement costs as damages in some cases is the only way to put that party in as good a position pecuniarily as if the property had not been taken or destroyed. Here there was evidence that the church was a special purpose property and that there was not an active market from which the fair market value of the church could be determined. The testimony was that the church was old, dating from the turn of the century, but was in good condition. Members of the congregation testified that the church was "special." The pastor testified that the church was a "majestic" and "awesome" structure and that it was a "community church." [The church's] expert testified that he viewed the church as "historic" and a landmark in the community; and that in his opinion there was no fair market value for a building of the church's nature. ... Under these circumstances, the proper measure of damages was not determined by reference to the fair market value of the church before and after the fire. The appropriate measure of damages, one that would put [the church] in the same position as it was before the fire, was cost of replacement. [FN30][FN30]

Finally, in the case of *Massachusetts Port Authority v. Sciaba Construction Corporation*, [FN31][FN31] the Massachusetts Port Authority filed a negligence action against a construction company, seeking **\*24** damages from a fire that occurred while the company was in the process of improving a wooden pier on waterfront property. The trial court allowed evidence to be admitted concerning the cost of repairs or replacement of the pier. The construction company objected on the ground that the only relevant evidence on the question of damages was the difference in fair market value caused by the fire. The Appeals Court of Massachusetts affirmed the trial court's admission of the evidence and held that the jury instruction allowing the restoration and replacement cost methods for calculating the damages was warranted. [FN32][FN32] The court provided the following commentary concerning its holding:

> The body of case law that has developed in this area reflects that upholding the principle of fair and reasonable compensation requires flexibility in measuring the appropriate damages so as to account for the unusual or specialized character of real property and any special value it may hold for the particular owner. For this reason, in awarding damages the finder of fact should take into consideration all relevant evidence bearing on the nature of the property, the extent of the injury or loss, and the amount of money that will fairly compensate its owner for its injury or loss.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Generally, the appropriate measure of damages in actions for negligent injury to property is the difference between the fair market value of the property prior to the loss and its fair market value after the loss caused by the tortfeasor. ... Certain types of property have been recognized as often requiring evidence of damages beyond the usual means: for example, if the property is used for a special purpose, or constructed or improved with special features, or located in a particular place which bestows unique value on its owner and the owner would not be fairly compensated by the diminution in what the market would pay the owner after the injury or destruction. [FN33][FN33]

In summary, as the above case law indicates, a special purpose property becomes such either by its use for a unique function or by its distinctive specially designed structural details. The market value of such properties cannot be determined in the ordinary manner since market value presupposes a willing buyer and a willing seller, and neither exists in such a case.

## IV. Conclusion: Indiana courts should measure damages to permanently damaged historic buildings and other 'special purpose' property in terms of 'cost of repair' rather than 'fair market value'

Permitting the cost of repair to be the measure of compensation for permanently damaged historical buildings and other special purpose property is the proper measure of indemnity. Such property often carries with it a personal value to the owner that goes far beyond its purported fair market value. In such a case, the only way to make the injured party whole is to restore the property to the conditions before the tortious conduct. [FN34][FN34] Fair market value is often too narrow and excludes other considerations specific to uniquely situated property. Anything less would not adequately compensate the owner for the loss.

## A. Advantages of 'special purpose' exception

Historic buildings and other similar structures provide a tangible link to our past. This link allows us to establish a sense of orientation about our place in time. [FN35][FN35] Such cultural attributes bestow a unique and special value on such structures well beyond the fair market value of its brick and mortar, and, thus, an alternate method of calculating damage other than fair market *25 value is required. Indeed, these types of structures often receive special status as historical property under Indiana statute. [FN36][FN36] To strictly apply the fair market measure of damages could result in excluding great historical and architectural significance of such structures. Moreover, to designate the fair market value as the proper measure of damages would imply proof of sales of similar property in the community as a means of fixing the value. As the court in *Warrick County* noted, such property most often does not have an ascertainable fair market value as that term is ordinarily used. [FN37][FN37] That is, there is no market value in the sense of a steady stream of sales of similarly situated property. Unlike buildings constructed for general dwelling (*e.g.*, a typical ranch-style home) or commercial use (*e.g.*, a warehouse), one-of-a-kind historical buildings and special purpose-type properties are rarely, if ever, bought or sold on the open market. Thus, the real value of such property cannot be shown by any market data since such data does not exist. A consideration of damages for the destruction of an inherently unmarketable structure in the context of market value represents a contradiction in terms. In this type of situation, the court in *Warrick County* bluntly stated that fair market valuation is "ill equipped" to provide a proper measurement of damages. [FN38][FN38]

## B. Disadvantages of 'special purpose' exception

However, legitimate reasons exist for not recognizing the cost of repair as the measure of compensation for permanently damaged historical buildings and other special purpose property. Especially troubling here is the potential expansive definition of "special purpose" property. Since almost all property exhibit some peculiarities of use and design specific to the owner, the definition could be broadly interpreted by courts and easily apply to almost any property, leaving ample room for abuse. For example, sentimental value often defines what particular property will be designated as being historical or a landmark. Sentimental value is highly subjective and often assigns a higher value to the property in question. Realistically, the value of such nebulous sentiments will vary back and forth over a wide range of degree. [FN39][FN39] Translating sentimental value into dollars and cents involves no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

clearly defined mathematical formula; the figure that emerges is unavoidably distorted by the number of possible translations. The concern is that a plaintiff could receive a windfall in compensation based solely on nothing more than his or her personal fondness of the property. [FN40][FN40] Without a doubt, *all* types of property carry the potential to be sentimentalized and, therefore, could be designated as "special purpose" property. To that end, it could be argued that the cost of repair approach adopted in *Warrick County* actually overcompensated the plaintiff in that case. It seems ludicrous that an inherently faulty bridge should be restored back to its previous, faulty condition. Creating a safe, new structure would exceed, by far, the present value of the previously existing dangerous structure.

Furthermore, buildings and structures often receive their special statutory "historical" status based on one individual's or group's wishes without any input from the public at large. The decision to designate such property as historical or a landmark could be viewed as arbitrary because it is often a matter of taste to a small percentage of the population. One person's treasure may be a hundred persons' junk. As such, fair market value would offer a more objective and consistent measure of damages. Essentially, compensation under the cost of repair approach would likely enhance the permanently damaged property and make it more valuable than before the injury.

## C. 'Special purpose' exception should be recognized in Indiana

The law in Indiana governing damage claims to real property is still evolving. Despite the potential problems associated with adopting the cost of repair approach as the measurement of damages, the great weight of case law has concluded that damage to historical and other special purpose property (*e.g.*, landmarks, graveyards, churches, government buildings and schools) should be measured in terms of the cost of repair rather than fair market value. This same principle can be and has been applied with equal force in a variety of other types of cases involving tax valuations, [FN41][FN41] takings, [FN42][FN42] bankruptcies [FN43][FN43] and even cases involving the wrongful death of a pet. [FN44][FN44] Although the Indiana Court of Appeals' decision in *Warrick County* involved a permanently damaged bridge, the court held that the proper measure of damages was the cost of repair and should include a number of other factors beyond the bridge's fair market value. Fair and reasonable compensation requires flexibility in measuring the appropriate damages so as to fit the unusual or specialized nature of the damaged subject matter. [FN45][FN45] Given these considerations, the cost of repair approach utilized in *Warrick County* should be applied to all cases involving claims for permanently damaged historic and other special purpose-type property.

[FNa1]. *Matthew D. Barrett is a graduate of Indiana University-Bloomington, B.A. 1998, and Valparaiso University School of Law, J.D. 2002. He is an attorney with the Logansport firm of Starr Austen Tribbett Myers & Miller. Matthew's practice focuses primarily in the areas of personal injury litigation, securities arbitration, civil rights and criminal defense. He is a member of the ISBA and more than a dozen other legal and professional associations.*

[FN1]. *See, e.g.*, David M. Hampton, *Damages for Injury to Real Property*, 42 AM. JUR. PROOF OF FACTS 2d 247 (2004) ("As a broad principle, one whose interest in realty has been injured by the tortious act or omission of another is entitled to those damages that will compensate him for the injury sustained.").

[FN2]. This scenario is based on similar facts from an actual case filed in the Cass Superior Court 1 in Logansport, Ind. In that case, a semi-truck driver drove his truck down an alley and attempted to turn on an adjacent street. In so doing, the truck crashed into the facade of a building commonly known as the "Todd Bank Building," causing the facade to be pulled away from the building. The building sustained other permanent structural damages as well. The building was built shortly after the Civil War in the 1860s. A United States president purportedly made a speech from the balcony of the building during a train stop in the early 1900s. The building's facade was recently recognized by the Historic Landmarks Foundation of Indiana as one of the "most outstanding" examples of Italianate architecture remaining in the state. Likewise, the Historic Landmarks Foundation of Indiana, along with the Wabash Valley Trust for Historic Preservation, provided substantial funding for restoration costs prior to the truck accident. At the time of the accident, the building was owned by the Cass County Historic Preservation Foundation ("Foundation"). The Foundation filed a lawsuit against the driver and the truck company who employed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the driver. Your author's law firm represented the Foundation in this lawsuit. The parties filed separate motions for partial summary judgment and requested the trial court to determine the proper measure of damages. The Foundation argued that the "cost of repair" should be the proper measure of damage. However, the defendants argued that the "fair market value" should be the proper measure of damage, which was exceedingly less than the estimated cost of repair. Relying on *Warrick County* and on some of the out-of-state cases discussed in this article, the trial court granted the Foundation's motion and held that the cost of repair should be the proper measure of damage since the building qualified as "special purpose" property. The case was subsequently settled out of court in the fall of 2005. Your author would like to express his appreciation and thanks to his colleague, Scott L. Starr, for all of his helpful guidance during the course of that litigation.

[FN3]. N.B. Boyce, *Real Estate Appraisal Terminology*, 194 (1995) ("A property devoted or available for utilization for a special purpose, such as a clubhouse, a public museum, a public school, and so on. It also includes other buildings having value, such as hospitals, theaters, breweries, etc., which cannot be converted to other uses without large capital investment.").

[FN4]. *Terra-Products, Inc. v. Kraft General Foods, Inc.*, 653 N.E.2d 89, 91 (Ind. Ct. App. 1995).

[FN5]. *Neal v. Bullock*, 538 N.E.2d 308, 309 (Ind. Ct. App. 1989); *General Outdoor Advertising Co., Inc. v. La Salle Realty Corp.*, 218 N.E.2d 141, 151 (Ind. Ct. App. 1966); *but see, Baumolser v. Amax Coal Company*, 630 F.2d 550 (7th Cir. 1980) ("[In *General Outdoor Advertising Co.*], in fashioning a flexible measure of damages appropriate to the facts of the case before it, the court defined permanent injury as injury exceeding the cost of restoration. However, the court specifically stated that this measure of damages would not necessarily be equally applicable in all situations.").

[FN6]. *Campins v. Capels*, 461 N.E.2d 712, 729 (Ind. Ct. App. 1984).

[FN7]. *Neal*, 538 N.E.2d at 309.

[FN8]. *General Outdoor Advertising Co., Inc.*, 218 N.E.2d at 151.

[FN9]. *Warrick County*, 732 N.E.2d at 1260.

[FN10]. *Id.* at 1258.

[FN11]. *Id.*

[FN12]. *Id.* at 1258-59; *see, also, Shippen Township v. Portage Township*, 575 A.2d 157, 158 (Pa. 1990) (holding that the proper measure of damages is the replacement cost of the bridge when a garbage truck, exceeding the load capacity of a bridge, was driven across the bridge; reasoning that "[w]here concepts of value in a commercial sense cannot be applied because a particular structure in the public domain simply doesn't have any such value, speculative or otherwise, the measure of damages must be reasonable cost of replacement by a similar structure consistent with current standards of design."); *Tuscaloosa County v. Jim Thomas Forestry Consultants, Inc.*, 613 So.2d 322, 323 (Ala. 1992) (holding that the cost of repair was the proper method of valuing a bridge in a lawsuit against a truck driver for damage to compensate county for destruction of a bridge; the court rejected a measure of damage based on the value of the damaged bridge).

[FN13]. *Warrick County*, 732 N.E.2d at 1258-59; *see, also, Vlotho v. Harden County*, 509 N.W.2d 350, 357 (Iowa 1993) (affirmed the trial court's award of damages for the actual or real value of the bridge when a county engineer demolished a bridge without proper authorization); *Town of Fifield v. State Farm Mutual Automobile Insurance Co.*, 349 N.W.2d 684, 691 (Wis. 1993) (finding that sufficient evidence supported jury's award of damages to a bridge,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

when jury considered the testimony of various witnesses with regard to the bridge's value).

[FN14]. *Warrick County*, 732 N.E.2d at 1260-61.

[FN15]. *Id.* at 1260.

[FN16]. *Id.* at 1260.

[FN17]. *See, e.g., Religious of the Sacred Heart of Texas v. City of Houston*, 836 S.W.2d 606 (Tex. 1992). ("Where a building is a specialty, and, in a sense, unique, constructed for a special purpose, the valuation cannot be predicted on the same basis as a building constructed for general or usual dwelling or commercial use. In the case of a specialty there is a limited market, and the customary testimony of market price is not available. It has been held under such circumstances that reproduction cost, minus depreciation, may be considered. It may even be the only method of calculation in some situations."); *Culver-Stockton College v. Missouri Power and Light Company*, 690 S.W.2d 168 (Mo. 1985) (college brought suit against electric utility, claiming that utility's negligence in failing to inspect and properly maintain a power line resulted in a fire in its music building; held, that the appropriate measure of damages was not the difference in fair market value of building before and after the fire because there was no fair market value for building because of its location and thus replacement cost should be utilized); *Puerto Rico v. The SS Zoe Colocotroni*, 628 F.2d 652 (1st Cir. 1980) (cost of restoring area affected by an oil spill); *Heniger v. Dunn*, 101 Cal.App.3d 858 (1980) (cost of replacing trees and vegetation); *Mayer v. McNair Transport*, 384 So.2d 525 (La. App.2d Cir. 1980) (finding of the jury, assessing the loss of a large, older and well-kept home, inhabited by older couple for approximately 30 years, at a sum greater than the market value, was not in error); *Reorganized School District No. 2 v. Missouri Pacific Railroad Company*, 503 S.W.2d 153 (Mo. 1973) (held that proper measure of damages for taking of school property was replacement value less depreciation and not the fair market value since there was no market data available); *County of Cook v. City of Chicago*, 228 N.E.2d 183 (Ill. Ct. App. 1967) (noting that in the matter of valuation of property, the market value is not the basis for valuation when "special use property" is involved, and concluding that school playground was "special use property" not subject to the fair market value); *Maloof v. United States*, 242 F.Supp. 175 (D. Md. 1965) (cost of replacing trees and vegetation); *Hayward v. Carraway*, 180 So.2d 758 (La. App. 1st Cir. 1965) (awarded, due to the unique "historic, architectural and aesthetic value," the full cost of restoring mantels vandalized in Belle Helene plantation when replacements could have been salvaged from materials); *Samson Construction Company, Inc. v. Brusowankin*, 147 A.2d 430 (Md. Ct. App. 1958) (action for trespass and negligence for damages to plaintiffs' homesites caused by stripping of trees by bulldozers; held that the trial court properly instructed the jury that if jury found plaintiffs had reasons personal to them for restoring the lots as nearly as reasonably possible to their original condition, the jury could allow the reasonable cost of so doing, even though greater than the value of the lots).

[FN18]. J.D. Eaton, *Real Estate Valuation In Litigation*, 162 (1982).

[FN19]. Restatement (Second) of Torts §929 (1977).

[FN20]. 502 N.E.2d 532 (Mass. 1987).

[FN21]. *Trinity Church in City of Boston*, 502 N.E.2d at 536.

[FN22]. *Id.* at 535-36.

[FN23]. 618 So.2d 874 (La. 1993).

[FN24]. *Roman Catholic Church Archdiocese of New Orleans*, 618 So.2d at 879.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN25]. *Id.* at 877-78.

[FN26]. 42 S.W.3d 833 (Mo. Ct. App. 2001).

[FN27]. *Leonard Missionary Baptist Church*, 42 S.W.3d at 836-37.

[FN28]. *Id.* at 836.

[FN29]. *Id.*

[FN30]. *Id.* at 837.

[FN31]. 766 N.E.2d 118 (Mass. 2002).

[FN32]. *Massachusetts Port Authority*, 766 N.E.2d at 123-25.

[FN33]. *Id.*

[FN34]. *See* D. Dobbs, *Handbook on the Law of Remedies*, 5.1 (1973) (where damages calculations under fair market value formulas are inapplicable or otherwise fail to compensate the owner of a destroyed structure adequately for his injury, the owner may recover the cost of its replacement).

[FN35]. *See, e.g.*, Indiana Department of Natural Resources, Indiana Division of Historical Preservation and Archaeology, at *http:// www.state.in.us/dnr/historic/registers.html* (last visited April 9, 2006) ("Indiana landmarks are guideposts to our past. Our historic buildings, sites, and neighborhoods provide us with a tangible connection to the past which cannot be experienced in an old photograph or individual artifact. These landmarks, perhaps more than any other physical element, make our communities and rural areas distinct and special places. They provide us with an invaluable sense of place.").

[FN36]. *See* Indiana Code §36-7-11-3 - "Legislative intent. The historic district regulation provided in this chapter is intended to preserve and protect the historic or architecturally worthy buildings, structures, sites, monuments, streetscapes, squares, and neighborhoods of the historic districts."; *see, also*, Indiana Department of Natural Resources, Indiana Division of Historical Preservation and Archaeology, at *http:// www.state.in.us/dnr/historic/registers.html* (last visited April 9, 2006) ("Eligibility - Not every old building is eligible for listing in the National Register. In order to be eligible for listing, a property should be at least 50 years old, maintain a certain degree of architectural integrity, and have significance at the local, state, or national level in one of the following four categories: (i) *Events* - Properties associated with events that were important to our history; (ii) *Persons* - Properties associated with the lives of persons significant in our history; (iii) *Architecture/Design* - Buildings, structures, or objects with architectural or engineering importance. They may be the work of a master, or possess high artistic value. Groupings of properties may share a common heritage, such as a historic district; and (iv) *Information* - Resources that have yielded, or may yield in the future, important information about our prehistory or history."); *see, also, Penn. Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) ("Over the past 50 years, all 50 states and over 500 municipalities have enacted laws to encourage or require the preservation of buildings with historic and aesthetic importance. These nationwide legislative efforts have been precipitated by two concerns. The first recognition that, in recent years, large numbers of historic structures, landmarks, and areas have been destroyed without adequate consideration of either the values represented therein or the possibility of preserving the destroyed properties for use in economically productive ways. The second is a widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

life for all. Not only do these buildings and their workmanship represent the heritage, they serve as examples of quality for today. Historic conservation is but one aspect of the much larger problem, basically an environmental one, of enhancing - or perhaps developing for the first time - the quality of life for people.").

[FN37]. *Warrick County*, 732 N.E.2d 1259.

[FN38]. *Id.* at 1258.

[FN39]. M. Rayburn, *Texas Law of Condemnation*, 93 (1960) ("Churches, colleges and public institutions, although hard to sell, do have a market value. ... There is nothing actually that does not have a market value, for the fact remains, that if by reason of its location, existence or surroundings, it had no marketability, it by the same token has no intrinsic worth, except as some sentimental bauble of its owner.").

[FN40]. *See, e.g., Romine v. Gagle*, 782 N.E.2d 369, 382-83 (Ind. Ct. App. 2003) ("To support an award of compensatory damages, facts must exist and be shown by the evidence which afford a legal basis for measuring the value, establishing experience, or direct inference from known circumstances.").

[FN41]. *See, e.g., American Express Financial Advisors v. County of Carver*, 573 N.W.2d 651 (Minn. 1998) (conference center designed to meet corporation's internal training needs was not a special purpose property in context of assessed tax value); *F & M Schaeffer Brewing Co. v. Lehigh County Bd. of Appeals*, 610 A.2d 1 (Penn. 1992) (using replacement cost approach contingent upon subject property's use as a brewery and value of property for that use in calculating fair market value for property tax purposes was not justified on basis that property fell into "special purpose" property category; consideration of value in use was no more relevant under guise of "special purpose" property than it was for any other property); *Ford Motor Company v. Township of Edison*, 604 A.2d 580 (N.J. 1992) (held auto-assembly plant was "general-purpose property," not "special-purpose property" for purposes of tax assessment); *Federal Reserve Bank of Minneapolis v. County of Hennepin*, 1983 WL 1108 (Minn. Tax Ct. 1983) (held Federal Reserve Bank building, which was specifically designed to meet only needs of bank, was a "special purpose building" for tax valuation purposes); The American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 36-37 (8th ed. 1983) ("Special Problems in Defining Value. When a property being appraised is of a type not commonly exchanged or rented, it may be difficult to determine whether a market or a use value estimate is called for. Such properties, called limited market properties, can cause special problems for the appraiser. A limited market property is a property for which, at a particular time, there are relatively few potential buyers. ... Examples of such properties include churches, schools, public buildings and clubhouses.").

[FN42]. *See, e.g., County of San Diego v. Rancho Vista Del Mar*, 16 Cal. App. 4th 1046 (Ca. Ct. App. 1993) (special use properties for which there is no relevant market, such as schools, churches, cemeteries, and utilities, may be valued for eminent domain purposes on any basis that is just and equitable); *City of Meriden v. Highway Commissioner*, 363 A.2d 1094 (Conn. 1975) (state highway commissioner condemned portions of two public parks located in a city; court rejected a strict application of the fair market valuation of property since parks are of a kind seldom exchanged on the open market and, therefore, lack "market price"); *Graceland Park Cemetery Co. v. City of Omaha*, 114 N.W.2d 29 (Neb. 1962) (City of Omaha brought an eminent domain proceeding against a cemetery to condemn 14,760 square feet of cemetery land and a grading easement; held, the measurement of damages for taking of land used for cemetery purposes is not the fair market value of the land for the simple reason that such property has no fair market value); *Newton Girl Scout Council v. Massachusetts Turnpike Authority*, 138 N.E.2d 769 (Mass. 1956) (the Newton Girl Scout Counsel filed a petition for the assessment of damages caused to it by the taking of a wide strip across its camp land by the Massachusetts Turnpike Authority for the construction of a toll express motor vehicle highway and underpass; held, trial court should have instructed the jury that assessing damages for a taking of property included "special purpose of property"); Hugh B. Horton, *Condemnation of Rural Property for Highway Purposes*, 8 AM. JUR. TRIALS 57 (2006) ("When the government takes property which has a preexisting special use it may be required to compensate the owner for taking or damaging the owner's use. The law recognizes there are some special purpose properties such as schools, churches, cemeteries, parks, and utilities for which there is no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

relevant market and therefore these properties may be valued on any basis which is just and equitable."); R. A. Epstein, *Takings: Private Property and the Power of Eminent Domain*, 183 (1985) ("The central difficulty of the market value formula for explicit compensation, therefore, is that it denies any compensation for real but subjective values"); J.G. Durham, "Efficient Just Compensation as a Limit on Eminent Domain," 69 *U. Minn. L. Rev.* 1277, 1278-79 (1985) (just compensation requirement is essential check on eminent domain powers because market value "often does not adequately measure all the costs that the property owner" suffers); 4 Nichols, *Eminent Domain*, §12.32(1), 542 (3d ed. 1978) ("It has been said that if the character of the property absolutely precludes any ascertainment of the market value, consideration may be given not only to the value peculiar to the owner, but to the cost of cure, replacement cost minus depreciation, capitalized cost of inconvenience, or any other manner which would be a fair method of eminent domain."); 29A C.J.S., *Eminent Domain*, §136(3), 551-552 ("There are ... exceptional cases where the market value cannot be the legal standard of compensation, as for example, where the property is a specialty, and in a sense, unique, and of a nature and applied to such a special use that it cannot have a market value, such as a church, college, cemetery, or clubhouse.").

[FN43]. *See, e.g., Walters v. Hatcher*, 41 B.R. 511 (W.D. Mo. 1984) (held that in restoring value of property taken by violation of automatic stay, law of damages recognizes that, while fair market value is usual and ordinary measure of damages, court may consider special or heirloom value which property may have and that injured party should be made whole, not only by recovery of "intrinsic or market value" of personal property, but also its "special and extrinsic value.").

[FN44]. *See, e.g., Mitchell v. Heinrichs*, 27 P.3d 309 (Alaska 2001) ("We agree with those courts that recognize that the actual value of the pet to the owner, rather than the fair market value, is sometimes the proper measure of the pet's value. In determining the actual value to the owner, it is reasonable to take in account the services provided by the dog or account for zero market value. ... Thus, an owner may seek reasonable replacement costs - including such items as the cost of purchasing a puppy of the same breed, the cost of immunization, the cost of neutering the pet, and the cost of comparable training. ... But while these damages may more accurately reflect the animal's actual value to the owner, Mitchell may not recover damages for her dog's sentimental value as a component of actual value to her as the dog's owner."); *Hyland v. Borras*, 719 A.2d 662 (N.J. Ct. App. 1998) (court affirmed an award of damages beyond market value for the negligent attack on plaintiff's dog, but distinguished pets from other personal property and stated that most companion animals have no calculable market value and the value of the animal arises from the owner's subjective relationship with the pet.); *Nichols v. Sukaro Kennels*, 555 N.W.2d 689 (Iowa 1996) ("We reject the Nichols' argument that the intrinsic value of a dog should be considered in awarding damages for injury to the dog. The Nichols still enjoy the companionship of their pet, and there is no evidence of the dog's special purpose."); *Broussea v. Rosenthal*, 443 N.Y.S.2d 285 (N.Y. City Civ. Ct. 1980) (court allowed award beyond market value where the pet had some special value beyond that of an "average pet" in the case of a mixed breed dog's market value for the protective value the dog provided to a widow); Restatement (Second) of Torts §911, Comment c, at 474 (1965) (recovery in the death of a pet is premised upon a common law theory of a pet as an item, albeit unique, of personal property, method of computing damages does not account for the instances where the pet has no market value and, thus, it would be unjust to limit damages to the fair market value; instead, use of the so-called "value of the owner" should be used as the measure of damages, which is left largely to the discretion of the trier of fact).

[FN45]. *See, e.g., Ryan v. Brown*, 827 N.E.2d 112, 120-21 (Ind. Ct. App. 2005) ("It is well established Indiana law that damages are awarded to compensate an injured party fairly and adequately for [his/her] loss, and the proper measure of damages must be flexible enough to fit the circumstances. In tort actions generally, all damages directly related to the wrong and arising without an intervening agency are recoverable. It is hornbook law that a tortfeasor takes the injured person as he finds [him/her]."); *Remington Freight Lines, Inc. v. Larkey*, 644 N.E.2d 931, 941 (Ind. Ct. App. 1994) ("A measure for tort damages, however, must be flexible enough to fit all circumstances.").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

50-DEC RESG 21
50-DEC Res Gestae 21

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.