UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                   :    21 MC 101 (AKH)
                                   :
IN RE SEPTEMBER 11 PROPERTY DAMAGE   :    This document also relates to:
AND BUSINESS LOSS LITIGATION           :
                                   :    08 CIV 3719
                                   :    08 CIV 3722
---------------------------------------------------------------X

**DECLARATION OF SHELDON GOTTLIEB**
**IN OPPOSITION TO THE AVIATION DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT BASED ON CPLR 4545(c)**

SHELDON GOTTLIEB, declares, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a MAI designated appraiser, meaning that as a MAI member I am certified by the Appraisal Institute as qualified and experienced in the valuation and evaluation of commercial properties. I submit this declaration in connection with the Aviation Defendants' Motion for Summary Judgment Based on CPLR 4545(c) ("Summary Judgment Motion"). This declaration is not intended to serve in lieu of an Expert Report, prepared pursuant to Fed. R. Civ. P. 26. A formal Rule 26 report may be prepared and provided at the appropriate time in this litigation.

**Professional Background and Qualifications**

2.    I am the Senior Vice President and Chief Appraiser of the real estate and consulting firm Jerome Haims Realty, Inc. I have been with the firm for more than 30 years and have been its Chief Appraiser for 20 years. I am a former president of the Greater New York Chapter of the Society of Real Estate Appraisers (one of the two founding appraisal organizations that formed the Appraisal Institute). I currently serve as a member of the Appraisal Education Committee of the Real Estate Board of New York.

3. I have appraised over a thousand properties for companies, governmental agencies and private individuals. These appraisals have valued all types of property interests, including fee simple, leased fee and leasehold. I have appraised well over 100 commercial office buildings in the New York City metropolitan area as well as in other parts of the Northeast United States. I have given deposition and trial testimony in numerous judicial proceedings as an expert witness.

4. I am a graduate of City College of New York, Bernard M. Baruch School of Business and Public Administration, specializing in Real Estate and Economics.

5. I had inspected the World Trade Center complex before it was destroyed, had visited the property on various occasions and am familiar with the construction features, design, and rental amenities of the property. I have submitted appraisals and critiques of appraisals regarding the World Trade Center in insurance litigation involving the World Trade Center. This work was done pursuant to specific provisions in the insurance contracts and the insurance litigation.

6. An official certification, more comprehensive professional history, and a partial client list of my firm are attached as Exhibits 26, 27 and 28, respectively.

**Scope of Engagement**

7.  I have been retained by the World Trade Center Properties plaintiffs ("WTCP") to provide my professional opinion of the valuation opinions contained in the Defendants' Summary Judgment Motion. I have reviewed the Summary Judgment Motion. My analysis is based on the value of the subject property, as a world class commercial office building complex with added value as an iconic property operated for the public benefit in accordance with its highest and best use. The date of my valuation is as of the date of the total destruction of the complex, September 11, 2001.

8.  The original complex represented the highest and best use for the land. The buildings within the complex were maintained in excellent condition, having undergone a significant program of major capital improvements in the late 1990s. This included the alarm system, the elevator systems, the electrical system and other mechanical parts of the building and the integrated mechanical systems that served the buildings and other components of the complex. The property was well-suited for the special, dual, legislative purposes of (a) providing modern, iconic, office space for the downtown community, and (b) spurring the revitalization of lower Manhattan and the New York-New Jersey region. The property was essentially fully leased and Lower Manhattan had been substantially revitalized.

**The Summary Judgment Motion Does Not**
**Properly Value the World Trade Center Buildings**
**(1, 2, 4 and 5) Themselves or WTCP's Leasehold Interests**

9.  The valuation of World Trade Center buildings 1, 2, 4 and 5 in the

    Summary Judgment Motion at $2.8 billion is overly simplistic and just

    plain wrong because, among other reasons, it neglects to include the value

    of WTCP's leasehold interests.  The value of a building or complex of

    buildings cannot be determined by an analysis of the net present value of

    the income stream from a net lease.  Accordingly, with regard to the

    World Trade Center buildings 1, 2, 4 and 5, the value of the buildings is

    not fully reflected by any calculation of just the net present value of the

    stream of rentals to be paid by the leaseholders, WTCP.

10. The $2.8 billion value suggested in the Summary Judgment Motion

    reflects only the net present value (based on chosen discount rates) of

    rental payments that WTCP committed to make to the Port Authority as

    one aspect of the lease transaction.  The $2.8 billion included the up-front

    payment, fixed lease payments and the contingent supplemental lease

    payments.  This amount is only part of one element of a portion of the

    commercial component of the World Trade Center.  This is because the

    net present value of these rental payments to the Port Authority reflects

    only the leased fee position.  In valuing a property subject to a long-term

    lease, the entire property value is comprised of the leased fee (here,

    belonging to the Port Authority), the leasehold interest (here, belonging to

4

WTCP), plus the reversionary interest (here, belonging to the Port Authority).[1]

11. Although the Aviation Defendants fail to take it into account, it is obvious that WTCP would not have assumed the huge burden of the lease contract, with an up-front payment of about $500 million plus long-term required payments of billions of dollars and various other obligations, unless there was a substantial likelihood of a significant return on their investment, via their leasehold interest, substantially above and beyond whatever rent WTCP had to pay to the Port Authority. That leasehold interest enables WTCP to capture increases in market rental rates as each subtenant lease periodically expires. That factor is a primary driving force behind WTCP entering into the lease.

12. Therefore, the value of the buildings themselves is obviously much greater than any $2.8 billion net present value of lease payments to the Port Authority because the $2.8 billion does not reflect the value of the WTCP's leasehold interest, which is obviously in addition to whatever rent WTCP had to pay to the Port Authority. Accordingly, the $2.8 billion amount used in the Summary Judgment Motion is wrong because (a) it does not accurately value the buildings themselves (as discussed further below), (b) it does not include the value of the WTCP's leasehold interest, and (c) it does not include the value of the reversionary interest.

13. I have reviewed the documents upon which the Aviation Defendants rely in suggesting that buildings 1, 2, 4 and 5 World Trade Center have a value

---

[1] Appraisal Institute. *The Appraisal of Real Estate*, 13th ed., Chicago, 2008; pp. 113-114, 526-528.

of only $2.8 billion.  I did not see anything suggesting that the Port

Authority, JP Morgan or anyone else valued these buildings at $2.8

billion.

14. The $2.8 billion is also inadequate because it does not include the value of

the Port Authority's reversionary interest.  The lease expires in 2100 (see

lease § 3). (Copies of the leases are attached as Exhibits L-O to the

Aviation Defendants' Declaration of Desmond T. Barry, Jr.)  The useful

life of the property would extend beyond the term of the leases, based on

the original construction, the improvements made to property, and

WTCP's obligations to maintain and repair the property (see leases §§ 6.4,

13.1, 15.1, 19.11).

15. Further, the net present value ascribed to the leased fee rental payments of

$2.8 billion is based on the use of specific discount rates.  Selection of a

different discount rate in the calculation of the net present value amount

would result in a significantly different total net present value calculation.

The selection of an appropriate discount rate is a very complex task

involving the consideration of many factors.  Different appraisers or

economists looking at the same transaction could determine that different

discount rates are appropriate.  I have not seen anything in the Summary

Judgment Motion stating how the discount rates used to calculate the net

present value of the leased fee rental payments were determined or

demonstrating that the discount rates were proper.

16. Another reason why the $2.8 billion is the wrong value is because it is based on the wrong valuation date. It considers the value of leased fee rental payments as of April 2001, or earlier. Pursuant to generally accepted valuation procedures, the valuation date is the date of the event at issue, here the date of loss, September 11, 2001.[2] This might not seem like such a big difference in time, but it could make a significant difference in the net present value of the lease rental payments because it is highly dependent on financial conditions and monetary rates as of a specific period when the discount rate is selected for the net present value calculations and which could impact on the selection of an appropriate discount rate.

17. The $2.8 billion that the Summary Judgment Motion touts also does not reflect the value of the 1, 2, 4 and 5 World Trade Center buildings themselves because it does not take into account additional obligations and increments to the leased fee rentals reflected in the net leases. These include:

   a. An obligation under §§ 5.1 through 5.4, and §§ 5.6 through 5.9, to pay the lease base rental under any and all conditions, regardless of the circumstances that might impact collection of the sub-lease rentals by the tenant; *i.e.*, the WTCP plaintiffs;

   b. An obligation to pay certain potential additional base rent, via § 5.3 and § 5.4, if Gross Revenues exceed the levels considered in arriving at the $2.8 billion amount;

   c. An obligation to make a certain stipulated payment in lieu of taxes (PILOT), via § 6;

---

[2] Appraisal Institute. *The Dictionary of Real Estate Appraisal*, 4th ed., p. 305. Value 1., Chicago, 2002

    d. An obligation to pay for all care, maintenance or rebuilding of the improvements, via § 13;

    e. An obligation to procure and maintain insurance, via § 14;

    f. An obligation to rebuild, restore, repair, and replace the premises, via § 15;

    g. A restriction on signage, including that the lessee shall not erect, maintain or display any signs, lettering, advertising, posters, displays or similar devices on the exterior of the premises or elsewhere at the World Trade Center, via § 17; and

    h. A restriction, absent Port Authority approval, on erecting any structures, making any improvements or conducting any other type of construction work on the premises, via § 19.

In sum, the use of $2.8 billion as the barometer of value improperly excludes the value of these considerations running from WTCP to the Port Authority in determining value.

18. The Aviation Defendants' most egregious error in their analysis is that they ignore entirely the public benefit and other non-commercial value of the World Trade Center complex and all of its constituent elements. The property enjoyed significant additional economic and other value, known as the public benefit value of the World Trade Center. The property also enjoyed value from other non-commercial benefits that it bestowed on the Port Authority and the New York-New Jersey region. None of the $2.8 billion, nor the combined value of the leased fee (belonging to the Port Authority), the leasehold interest (belonging to WTCP), and the reversionary interest (belonging to the Port Authority) reflect these enormous values. These values were incorporated into the original planning, design and iconic nature of the buildings and the complex, but

are of a non-commercial nature, although providing additional economic

and non-economic value to the City of New York and to the states of New

York and New Jersey. The buildings were designed to reflect and enhance

the economic vitality, strength and stature of New York City and of the

states of New York and New Jersey, as the locus of world trade. They

were also intended to promote the resurgence of the lower Manhattan

office district and serve as a generator and incubator of jobs in the

financial and other industries. The World Trade Center complex provided

a place for people to work in lower Manhattan and served as a tourist

attraction as well. All of this fueled the economy of downtown

Manhattan, the City of New York and the states of New York and New

Jersey and gave the Port Authority and the New York and New Jersey

region great prestige.

**The Full Fair Market Value of the WTC Cannot be Determined**
**Through the Use of Traditional Appraisal Techniques**

19. Where appropriate, an appraiser uses three basic valuation methodologies

   in estimating the market value of real estate. These three approaches

   analyze data from the market to develop independent value indications for

   a property. The three approaches are the Income Capitalization Approach,

   the Direct Sales Comparison Approach, and the Cost Approach.

20. The Income Capitalization Approach analyzes the property's earnings

   potential and the rate of return on the investment that would be demanded

   in the marketplace by prudent investors.

9

21. The Direct Sales Comparison Approach utilizes data from other properties of similar design, utility, and features that have been recently sold on the open market.

22. The Cost Approach is based on the premise that an informed buyer will pay no more for a property than the cost of constructing a comparable property of similar utility.[3]

23. The market value of WTC 1, 2, 4, and 5 cannot be accurately measured using these standard appraisal methodologies. The unique, iconic nature of the buildings, their public benefit purpose and their status as part of the specifically located entire unique World Trade Center complex cannot be ascertained by using any of the three market valuation methodologies.[4] The definition of "fair market value" does not recognize the existence of other economic effects and non-economic effects.

24. The Income Capitalization Approach cannot be used because it could reflect only a portion of the commercial rental value of the buildings and not the public benefit and other non-commercial values.

25. The Direct Sales Comparison Approach cannot be used because there are no comparable properties both because the World Trade Center complex

---

[3] Appraisal Institute. *The Appraisal of Real Estate*, 13th ed., Principle of Substitution, p. 380, Chicago, 2008
[4] The Port Authority never leased the non-commercial, public purpose, and public benefit part of the properties or their operation to WTCP. The Port Authority retained its ownership and control over the public aspects of these buildings. For example, the net leases do not let the entirety of the World Trade Center buildings to plaintiffs, but only "portions of the World Trade Center while continuing to own, control and operate the World Trade Center pursuant to the World Trade Center Legislation" (lease recitals, p.3); WTC Legislation Sec. 6610 – "the effectuation of the World Trade Center [is] and will be in all respects for the benefit of the people of the states of New York and New Jersey, for the increase of their commerce and prosperity and for the improvement of their health and living conditions; and the port authority … shall be regarded as performing an essential government function in undertaking the effectuation thereof, and in carrying out the provisions of law relating thereto."

was unique, was specifically situated at a site prescribed by law, and also because leases or sales of purely commercial properties would not reflect the public benefit and other non-commercial values of the World Trade Center. There simply are no comparable properties anywhere in the World. In addition, the great involvement that the Port Authority continued to have in the World Trade Center and the great deal of control that the Port Authority retained during the lease period (see footnote 4) is another reason the amount of certain rental payments WTCP had agreed to make cannot be considered to constitute the fair market value of, or a recent "sales price" for, World Trade Center buildings 1, 2, 4 and 5.

26. The Cost Approach would also be an imperfect, albeit the best of the three methodologies for use as a barometer of the value of the World Trade Center buildings 1, 2, 4 and 5. The Cost Approach is considered to be the best choice for a highly specialized design and/or utility for which there exist few or no market sales comparisons.[5] That is the case here. However, even the Cost Approach cannot adequately reflect the total value of the World Trade Center buildings 1, 2, 4 and 5 taking into consideration their public benefit and non-commercial values as part of the entire World Trade Center complex.

27. In my professional opinion, I would value the 1, 2, 4 and 5 World Trade Center buildings at an amount at or in excess of the replacement cost. The fact of the matter is that the only way to obtain a comparable property is to

---

[5] Appraisal Institute. *The Appraisal of Real Estate*, 13th ed., p. 382, Chicago, 2008.

rebuild the World Trade Center complex at the World Trade Center site.
It is also obvious that since September 11, 2001, no buildings comparable
to the World Trade Center buildings within the World Trade Center
complex have been available for lease or purchase.

28. In the appraisal that I submitted in the insurance litigation, I valued the
purely commercial value of the property at replacement cost minus
depreciation because the other appraisal methods were not appropriate. I
did not quantify the broad public benefit and non-commercial value to the
Port Authority and the New York and New Jersey region because that
would not be quantifiable by an appraiser using traditional appraisal
techniques. The prior appraisal was also done pursuant to certain
restrictions and limitations imposed on my appraisal from the insurance
contracts and insurance litigation.

29. Moreover, what is supposed to be appraised is what is alternatively called
"market value" or "fair market value." A definition of market value
within the context of a *sale* of a real property, as stated in the Advisory
Opinions of the most recent edition of the Uniform Standards of
Professional Appraisal Practice, is:

> "The most probable price which a property should bring in a
> competitive and open market under all conditions requisite to a fair
> sale, the buyer and seller each acting prudently and
> knowledgeably, and assuming the price is not affected by undue
> stimulus. Implicit in this definition is the consummation of a sale
> as of a specified date and *the passing of title from seller to buyer*
> under conditions whereby:
>
>   1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."[6],[7]

30. In my professional opinion, a "market value" of the WTC buildings 1, 2, 4 and 5 prior to September 11, 2001, cannot be determined using traditional appraisal methods because there would be no commercial purchaser (or for that matter prospective lessee) who would offer to pay for the full value, including the public benefit and other non-commercial value of the buildings as part of the complex.

31. In addition, even if the transaction involving the leasehold interest were thought to be a "market" transaction, that amount, as discussed above, had little bearing on the full "market value" of the World Trade Center buildings leased by WTCP. Finally, it is not clear from the record presented in the Summary Judgment Motion that the lease transaction was a "market" transaction because it is not clear that the landlord and lessee were typically motivated. The landlord (the Port Authority) created a process whereby it limited the number of prospective lessees and used an auction method with closed bids. Further, given the artificial time

---

[6] Uniform Standards of Professional Appraisal Practice, 2008-2009 ed., Advisory Opinion 22, A-76.
[7] Appraisal Institute *Dictionary of Real Estate Appraisal*, pp. 177-178, Chicago, 2002.

constraints created by the Port Authority for entering into leases, it is also
not clear that a reasonable time was allowed for exposure in the open
market. These and other factors make this an aberrant transaction.

32. Furthermore, there is no market or measure by which a post-destruction
market value could be determined for the buildings themselves or for the
net leases (other than a negative value for the net leases after September
11, 2001)[8]. After September 11, 2001, there was no market for the
assignment of the net leases if WTCP had tried to assign the leases (even
assuming WTCP could have gotten the Port Authority's consent).
Because of the leaseholds' substantial burdens (including the rebuilding
obligations), any assignee of the net leases would have required an
enormous payment by WTCP to the assignee of the leases.

**Conclusion**

33. What is being built at the World Trade Center site now reasonably and
appropriately replaces what was destroyed, in terms of total rentable area,
height, stature, function and iconic nature and as the driver for the

---

[8] A leasehold estate may have a positive or negative value depending upon whether the contract rent, plus
the cost of performing other leasehold obligations, is less than or greater than the current economic or
market rent. In my practice, I myself have seen leaseholds with a negative value and have done appraisals
on them reaching the conclusion that the leasehold has a negative value. If the contract rent plus cost of
performance of other leasehold obligations is less than current market rent, the leasehold estate has a
positive value; if the contract rent plus cost of performance of other leasehold obligations is greater than
current market rent, the leasehold estate has a negative value. In the case of the World Trade Center, the
leasehold obligations relate to the entire cost of operating, maintaining and insuring the property for the
term of the lease. The market rent reflects the rentals received by WTCP from the WTCP sub-tenants,
including existing lease rents, future new and renewal rents, etc. Because of the enormous replacement and
lease payment obligations while there are no buildings and the complete absence of market rents, there was
a negative value to the WTCP's leasehold interests following the destruction of the property on September
11, 2001.

economic engine for New York City (especially downtown Manhattan) and the states of New York and New Jersey.

34. Although a precise amount cannot be determined, the value of what was destroyed on September 11, in my professional opinion, should be at least in excess of the billions it will take to replace the buildings that were destroyed.


I declare under the penalty of perjury that the foregoing is true and correct.

Dated: August 14, 2008
New York, New York

*Sheldon Gottlieb*

SHELDON GOTTLIEB, MAI
SENIOR VICE PRESIDENT
  AND CHIEF APPRAISER
Certified New York State
General Real Estate Appraiser
Certificate No. 46000000579

**EXHIBIT 26**

## CERTIFICATION

I certify that, to the best of my knowledge and belief,

- The statements of fact contained in this declaration are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

- My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in, or the use, of this report.

- My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) and the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, I, Sheldon Gottlieb, have completed the requirements of the continuing education program of the Appraisal Institute.

- I have made a personal inspection of the property that is the subject of this report.

- No one other than the undersigned prepared the analyses, opinions, and conclusions concerning the value of the real estate set forth in this declaration.


Sheldon Gottlieb, MAI
Certified New York State
General Real Estate Appraiser
Certificate No.  46000000579

Dated: August 14, 2008
       New York, New York

16

# EXHIBIT 27

<u>Qualifications – Sheldon Gottlieb, MAI</u>

I am the Senior Vice President and Chief Appraiser of the real estate appraisal and consulting firm of Jerome Haims Realty, Inc. I have been with the firm for more than 30 years and have served as the chief appraiser for more than 20 years. The firm occupies the entire 22nd floor at 630 Third Avenue in Manhattan and has a full time staff of 15 people.

As a means of presenting my qualifications in a concise manner to the reader, I have grouped my various activities into several sections. These are presented directly below:

PROFESSIONAL
AFFILIATIONS:          Member of the Appraisal Institute with the MAI designation
                               Former President – Greater New York Chapter No. 3 of the
                               Appraisal Institute (now merged with the New York
                               Metropolitan Chapter)
                       Real Estate Board of New York – Broker C Member
                               Currently serving as a member of the Appraisal Education
                               Committee
                       American Arbitration Association
                               Former Member - National Real Estate Valuation Council
                               Real Estate Arbitration Panel
                       Urban Land Institute – Associate Member
                       Rho Epsilon Real Estate Fraternity

EDUCATIONAL
BACKGROUND:          Graduate of City College of New York,
                               Bernard M. Baruch School of Business and Public
                               Administration, specializing in Real Estate and Economics

                       Successfully completed numerous courses, seminars and lectures on
                       real estate valuation and advanced appraisal topics.

Qualifications – Sheldon Gottlieb, MAI (Cont'd.)

LECTURER:    Qualified and approved by the State of New York as an instructor for all courses required for New York State General Appraisal Certification.

Qualified as and taught numerous courses as an approved Instructor for the Appraisal Institute.

Guest lecturer at the New York University School of Continuing Education on capitalization and discounted cash flow analysis.

Presented numerous real estate valuation and investment analysis lectures at the Real Estate Division of the New School for Social Research.

Presented real estate brokerage and appraisal courses at the Eastern School of Real Estate.

CERTIFIED:    State of New York Certified Real Estate General Appraiser, Certificate No. 46000000579.

State of New Jersey Certified Real Estate General Appraiser, No. 42RG00178500.

Presently certified with the Appraisal Institute under its program of periodic recertification.

EXPERIENCE:    Real estate appraiser providing appraisal service to various firms, governmental agencies and private individuals.  The scope of these appraisals has covered all phases of valuation including: mortgage loans, certiorari, condemnation, urban renewal, estates and others. They have included hundreds of apartment houses (including rental, condominium and cooperative), all types of retail (including department stores, regional and strip malls, and "big boxes"), office buildings, industrial properties, shopping centers, subdivisions, etc, in the New York City metropolitan area as well as other parts of the Northeast.

Specialized experience includes numerous appraisals of nursing homes, hotels and motels, churches and synagogues, golf courses and marinas, large truck terminals, gasoline stations, movie theatres, large utility properties (i.e. natural gas distribution and processing facilities), railroads and railroad rights of way.

Licensed Real Estate Broker

18

Qualifications – Sheldon Gottlieb, MAI (Cont'd.)

COURT
TESTIMONY:    Have represented clients and have been qualified to testify as a real
estate valuation expert in the United States District Court, United
States Bankruptcy Court, New York State Supreme Court, New York
State Court of Claims, New York City Civil Court and Landlord and
Tenant Court, as well as before the New York City Tax Commission
and New York City Board of Standards and Appeals on complex
assessment, zoning and planning issues.

Within the past six years, I have given deposition or trial testimony as
an expert in the judicial proceedings, listed below:

1.    New York City Tax Commission:
Hearing, re certiorari tax appeal, Co-op City v.
New York City, October 2002.

2.    United States Bankruptcy Court:
Trial:  Re:  425 West 26th Street, LLC
Judge Stuart Bernstein, January 2003.

3.    New York State Supreme Court – Brooklyn:
Trial:  Re: 2653 Ocean Avenue, Brooklyn, New York.
Certiorari tax appeal.
Judge Pesce, June 2003.

4.    New York State Supreme Court – Queens:
Trial:  Re:  118-11 84th Avenue, Queens,
New York.
Certiorari tax appeal.
Judge Giola, June 2003

5.    New York City Tax Commission
Hearing:  Re:  Certiorari tax appeal.
Co-op City v. New York City, August 2003.

6.    New York State Supreme Court – Manhattan
Trial:  Re:  Bradhurst Avenue
Shlomo v. City of New York
Condemnation; Judge Paula Omansky, September 2004.

7.    New York State Supreme Court – Manhattan
Trial:  Re:  125 Park Avenue
Certiorari tax appeal.
Judge Leland DeGrasse, April 2006.

8.    New York State Supreme Court – Manhattan
Trial:  Re:  305 East 40th Street
Certiorari tax appeal.
Judge Walter B. Tolub, August 2008.

# EXHIBIT 28

QUALIFICATIONS

## REAL ESTATE APPRAISER FOR AGENCIES OF NEW YORK CITY

Department of General Services
New York City Law Department - Office of the Corporation Counsel
Division of Real Property
Economic Development Corporation
Department of Housing Preservation and Development
Housing Authority
Office of the Comptroller - Pension Fund
Public Development Corporation
Department of Ports and Terminals
School Construction Authority
Department of Citywide Administrative Services
Primary Care Development Corporation
Lower Manhattan Development Corporation

## REAL ESTATE APPRAISER FOR AGENCIES OF NEW YORK STATE

Power Authority
Office of Parks, Recreation, and Historic Preservation
Department of Transportation
State University of New York
City University of New York
Empire State Development Corporation
  (formerly known as Urban Development Corporation)
Queens West Development Corporation
Department of Environmental Conservation
Facilities Development Corporation
Metropolitan Transportation Authority
Office of the Nassau County Atty Bureau of Real Estate
Dormitory Authority
Office of the Attorney General
The Port Authority of New York & New Jersey
Housing Finance Agency

## REAL ESTATE APPRAISER FOR AGENCIES OF FEDERAL GOVERNMENT

National Park Service
General Services Administration
Department of Housing and Urban Development
Federal Home Loan Bank Board (now Federal Housing Finance Board)
Federal Deposit Insurance Corporation
Federal Savings & Loan Insurance Corporation
Department of Justice
Department of the Navy
United States Postal Service
Federal National Mortgage Association (now Fannie Mae)
Federal Asset Disposition Association
Resolution Trust Corporation (now Savings Association Insurance Fund)
Internal Revenue Service

QUALIFICATIONS

## PARTIAL LIST OF CLIENTS

National Cold Storage Company
H.R.H. Development Corporation
Swingline, Inc.
Plaza Realty Investors, Inc.
Jack Kent Cooke (JKC Realty, Inc.)
Integrated Resources, Inc.
Helmsley Enterprises, Inc.
Coronet Capital Company
Metromedia, Inc.
Western Electric
Transamerica Insurance Group
Manhattan East Hotels and Apartments
Battery Park City Authority
Equitable Life Assurance Society of the United States
Kurzman Karelsen & Frank, LLP
Ditchik & Ditchik, LLP
Weil, Gotshal & Manges LLP
Raymond, Parish & Pine, Inc.
De Forest and Duer
CBS Inc.
Loeb and Loeb LLP
Columbia-Presbyterian Medical Center
Cullen and Dykman LLP
Podell, Schwartz, Schechter & Banfield, LLP
Kaufman Astoria Studios, Inc.
Kalikow Realty & Construction Corporation
The Zeckendorf Company
Shea & Gould
Continental Assurance Company
The ADCO Group
Kaufman Management Company, LLC
Brown, Raysman & Millstein LLP (now Thelan Reid Brown Raysman & Steiner LLP)
The Stillman Group
Grand Metropolitan, Inc.
Cohen Brothers Realty Corporation
Goodstein Development Corporation
Colonial Funding Corporation
Lord Day & Lord, Barrett Smith
Krass & Lund, P.C.
New York Life Insurance Company
The Travelers Companies - Travelers Realty Investment Company
Fink Baking Corporation
Kelley Drye & Warren LLP

**JEROME HAIMS REALTY, INC.**
**REAL ESTATE APPRAISERS & CONSULTANTS**

## QUALIFICATIONS

Simpson Thacher & Bartlett LLP
Jewish Board of Family and Children's Services, Inc.
John P. Engel & Associates
Asher Dann
EURAM Management, Inc.
Columbia University
Richards & O'Neil LLP (after mergers, now Bingham Dana LLP)
Sonneschein, Sherman & Deutsch LLP
American Broadcasting Companies, Inc.
International Business Machines Corporation
Fairway Operating Corporation
Penn Central Transportation Company
Federal Home Loan Mortgage Corporation
New York University
S. J. Landau Corporation
United Nations Development Corporation
Robinson, Silverman, Pearce, Aronsohn & Berman LLP (now Bryan Cave LLP)
Battle Fowler LLP
Madison Equities
New School for Social Research
Milstein Properties Corporation
Northcorp Realty Advisors, Inc.
The Trump Organization
Rosenman & Colin LLP (now Katten Muchin Rosenman LLP)
Merrill Lynch & Company
Herzfeld & Rubin, P.C.
Jeffrey Management Corporation
Goldman & Stein
Skidmore, Owings & Merrill LLP
Kinney Systems, Inc.
Kraus Enterprises, Inc.
Phipps Houses
John Hancock Mutual Life Insurance Company
Arlen Realty & Development Corporation
P & J Joint Venture
Peter Kimmelman Asset Management Company
Chatwal Hotels & Restaurants, Inc.
J. W. Mays, Inc.
Gerosa, Inc.
Time Equities, Inc.
The Durst Organization
National Railroad Passenger Corporation (Amtrak)
Gandin, Schotsky & Rappaport, P.C.
Young & Rubicam, Inc.
Maryland Casualty Company

QUALIFICATIONS

United Nations, Secretary-General for General Services
Herrick, Feinstein LLP
Meringoff Properties
HRO International Ltd.
Prudential Insurance Company of America
Nelson Equities, Inc.
International Bank Note Company
Pottish Freyberg Marcus & Velazquez LLP
Harry Otterman
Inter-Continental Hotels Corporation
Ben Heller
Mark Stuart Goldberg & Associates
Kirkpatrick & Lockhart LLP
Loews Corporation
Takashimaya Fifth Avenue Corporation
New York Telephone Company (now Verizon)
Consolidated Edison Company of New York, Inc.
American Telephone & Telegraph Company
Greenfield Eisenberg Stein & Senior LLP (now Greenfield Stein & Senior LLP)
Property Resources Corporation
New York-Presbyterian Hospital / Columbia University Medical Center
Mark Perlbinder
Newmark & Company Real Estate Inc.
Carol Management Corp.
Philip A. MacTaggart (Western Management Corporation)
Crescent Equities
Kiska Developers, Inc.
The Ford Foundation
Patterson, Belknap, Webb & Tyler LLP
Kew Management Corporation
Boston Properties, Inc.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
World-Wide Holdings Corporation
The DeMatteis Organizations
White & Case LLP
The Solomon R. Guggenheim Museum
Minskoff Equities, Inc.
Wagner, Davis & Gold, P.C.
Scala and Scala
Stroock & Stroock & Lavan LLP
Richard E. Talmadge
Spengler Carlson Gubar Brodsky & Frischling
Consolidated Rail Corporation
DiLorenzo Associates
Sive Paget & Riesel, P.C.

QUALIFICATIONS

MDFC Loan Corporation
Jonathan Woodner Company
Walter & Samuels
Mitsubishi Estate Company, Ltd.
Dewey Ballantine LLP (now Dewey & LeBoeuf LLP)
The Macklowe Organization
Schulte Roth & Zabel LLP
New York Plaza Building Company
Equitable Real Estate Management, Inc.
Credit Suisse First Boston (formerly known as First Boston Corporation)
CIGNA Real Estate Investors (Times Square Real Estate Investors)
Consolidated Asset Recovery Corporation
Rudin Management Company, Inc.
Squadron, Ellenoff, Plesent & Sheinfeld, LLP (now Hogan & Hartson LLP)
Milbank, Tweed, Hadley & McCloy LLP
Goldberg Weprin & Ustin LLP
Greenthal/Harlan Realty Services Company
CRT Asset Management, Inc.
J. E. Robert Company of New England
Rodman Management
O'Melveny & Myers LLP
Brown & Wood LLP (now Sidley Austin LLP)
Ford Land Service Corporation (subsidiary of Ford Motor Company)
Morrison, Cohen, Singer & Weinstein LLP (now Morrison Cohen LLP)
Beatie and Osborn LLP
Home Holdings, Inc.
Sterling Forest Corporation
Phillips, Nizer, Benjamin, Krim & Ballon LLP (now Phillips Nizer LLP)
Millennium Partners
Emmet, Marvin & Martin LLP
Gibson, Dunn & Crutcher LLP
Winthrop, Stimson, Putnam & Roberts LLP (now Pillsbury Winthrop Shaw
Pittman LLP)
Brandt, Steinberg & Lewis LLP
Williams Real Estate Company, Inc.
PEF Israel Endowment Fund
Rosenthal Appraisal Company
David Tarlow & Company
Danziger & Markhoff LLP
Rapaport Brothers, P.C.
Kalkines, Arky, Zall & Bernstein, LLP
Greiner-Maltz Company, Inc.
Leahy, Nyberg, Curto & D'Apice LLP (now Curto, Schwarts, Curto Bond &
Vomolakis, LLP)
Skadden, Arps, Slate, Meagher & Flom LLP

**JEROME HAIMS REALTY, INC.**
**REAL ESTATE APPRAISERS & CONSULTANTS**

QUALIFICATIONS

Goldstein, Goldstein, Rikon & Gottlieb, P.C.
Sloyer-Forman, Inc.
Emmes Asset Management Corporation
Ford Models, Inc.
South Cove III Associates
Bachner Tally Polevoy & Misher LLP
Boulanger, Hicks & Churchill, P.C.
Vornado Realty Trust
L & L Wings, Inc.
Downtown Realty Management LP
Alan Fox, Esq.
Alliance for Downtown New York
Atlan Management Corporation
Stafford Toner & Schwartz
Nathan Halegua
UNITE
Blank Rome LLP
Alice Alexiou
Paramount Group, Inc.
Parker Chapin Flattau & Klimpl LLP
Royal Charter Properties, Inc.
Friedman Management Company
Pavia & Harcourt LLP
Romarco Realty Corporation
Builders Group LLC
Greenberg Traurig LLP
Garfield Development Corporation
Crocco & Demaio, P.C.
Manhattan Eye, Ear and Throat Hospital
Reboul, MacMurray, Hewitt, Maynard & Kristol
Baldwin & Haspel, LLC
Sutton Hill Associates
Theodore W. Kheel
Ronald McDonald House of New York, Inc.
Children's Oncology Society of New York
Graubard Mollen & Miller LLP
Carter Ledyard & Milburn LLP
'21' Club, Inc.
The Feil Organization
Steinberg & Pokoik Management Corporation
Shapiro & Shapiro
Jonathan Marks, PC
Bernard Spitzer, P.E.
Empire Management
Brill & Meisel
Goldfarb & Fleece

QUALIFICATIONS

Rosen & Reade, LLP
Trammel Crow Corporate Services, Inc.
Richard S. Wolkoff, Esq.
Kramer, Levin, Naftalis & Frankel LLP
Rockefeller Center Management Corporation
The Shubert Organization
Kaye, Scholer, Fierman, Hays & Handler, LLP
Koeppel Management Company LLC
Koeppel Tener Real Estate Services, Inc.
Proskauer Rose LLP
Metropolitan Life Insurance Company
L. B. Management Company & Affiliates
Sabin, Bermant & Gould LLP
Nixon Peabody LLP
Association of the Bar of the City of New York
Willow Funding Company, LP
LCOR Incorporated
Jankoff & Gabe, P.C.
Lampf, Lipkind, Prupis & Petigrow, P.C.
Jerald Rosenbloom, Esq.
International Union AFL-CIO, CLC
S. Rudy Gatto and Associates Development Corporation
Becker Ross Stone DeStefano & Klein, LLP
Clarendon Management Corporation
First Sterling Corporation
J. P. Morgan & Company, Inc.
Johnson, Matte & Hobgood, LLP
Maidman & Mittelman, LLP
Mercedes–Benz USA, Inc.
Mount Sinai Medical Center
Ness, Motley, Loadholt, Richardson & Poole, P.A. (now Motley Rice LLC)
New York Medical College
Bryan Cave Robinson Silverman LLP (now Bryan Cave LLP)
Rosenbloom, Hofflich & Feuer, LLP
Sheraton Manhattan Hotel
Rockefeller Group International, Inc.
Two Trees Management Company
United States Attorney's Office
U. S. Generating Company
UBS AG
Walker, Malloy & Company, Inc.
YMCA of Greater New York
Wofsey Rosen Kweskin & Kuriansky LLP
Arnold S. Penner
Dorsey & Whitney LLP
Edward Isaacs & Company
Irwin, Lewin, Cohn & Lewin, P.C.

QUALIFICATIONS

Kronish Lieb Weiner & Hellman, LLP
Manhattan East Suite Hotels
Midwood Management Corporation
Orient-Express Hotels, Inc.
Ponte Equities, Inc.
Risk Entreprise Management, Ltd.
Rockrose Construction, LLC
Shatz Meier Franzino & Scher, LLP
Wien & Malkin, LLP
Hamilton, Rabinovitz & Alschuler, Inc.
Forest City Ratner Companies
C. Lawrence Paine, LLC
Jenkens & Gilchrist Parker Chapin LLP
PSEG Services Corporation
The Jack Parker Corporation
St. Thomas P.E. Church
Stadtmauer Bailkin LLP
115-87 Owners Corporation
Group Health Incorporated
Solomon, Zauderer, Ellenhorn, Frischer & Sharp LLP (merged with Proskauer Rose LLP)
Washington Square Partners, Inc.
Finkel Goldstein Berzow Rosenbloom & Nash, LLP
Friedman & Gotbaum, LLP
The Moinian Group
Zomba Recording Corporation
Saint Mary's Episcopal Center, Inc.
Arent Fox Kintner Plotkin & Kahn, PLLC
Robert S. Katz, Esq.
Manatt, Phelps & Phillips, LLP
Wank Adams Slavin Associates LLP
Silverstein Properties, Inc.
New York College of Podiatric Medicine
Fifth Avenue Hotel Suites, LLC
Club Quarters, Inc.
Phillips Nizer LLP
Proskauer Rose, LLP
Ponte Gadea Florida, Inc.
Akin, Gump, Strauss, Hauer & Feld, LLP
Balber Pickard Battistoni
Rollinson Law Firm
Robert Cronheim
The Related Companies, Inc.
Coach, Inc.
Banif Mortgage company
Forbes Inc.

QUALIFICATIONS

The Doe Fund, Inc.
Kaye Scholer LLP
Janvey, Gordon, Herlands, Randolph & Cox Realty Corp.
Thelen Reid & Priest LLP
Bryan Cave LLP
Helmsley-Spear, Inc.
Goldberg Weprin & Ustin LLP
Alterman & Boop LLP
Wachtel & Masyr, LLP
Hutner Klarish LLP
THE Tunnel Partnership
Amerimar Enterprises, Inc.
Smith, Buss & Jacobs, LLP
Blesso Properties Corporation
Rinzler & Rinzler
Alfa Development Management, LLC
BLDG Management Company, Inc.
Dominion Management Company
Jeffries Morris, Inc.
Mann Realty Associates
Samson Management LLC
Starwood Hotels & Resorts Worldwide, Inc.
Coalition for the Homeless, Inc.
International Brotherhood of Teamsters, Local 810
Laboratory Institute of Merchandising
Marcus Rosenberg & Diamond LLP
Montclare & Wachtler, LLP
New York City Terminal Market
Orient Express Hotels, Inc.
The Salzhauer Company
The Abramson Law Group, PLLC
Troutman Sanders LLP
United American Land, LLC
Extell Development Company
Rockrose Development Corporation
Helen Hayes Theatre
Sylvan Corporation, N.A.
Vanlan Corporation, N.A.
Abi Kalimian
DLA Piper US LLP
Stein Riso Mantel, LLP
Cynthia Broan Gallery
Goelet, LLC
City Center Real Estate, Inc.
Ralph Zirinsky Realty Company
Schwartz & Blumert LLP

## QUALIFICATIONS

Stellar Management Company, Inc.
Norris, McLaughlin & Marcus, P.A.
Ultimate Realty New York, LLC
Scheichet & Davis, P.C.
Mitchell Silberberg & Knupp LLP
Fish & Richardson P.C.
York Resources LLC
Metro Loft Management, LLC
Why Partners, LLP
Koch Family, LLC
Dechert LLP
Citi-Urban Management Corporation
Law Office of Peter D. Hoffman, PC
The American Numismatic Society
The Colley Group
Law Office of Herbert H. Chaves, Esq.
DMJM Harris, Inc.
Alston & Bird LLP
Marcus Attorneys
Garson Brothers Development Corporation
Starr & Company
Bally Total Fitness Corporation
Target Corporation
Cambridge Systematics, Inc.
Quinlan Economic Development Corporation
Samsung Texas Construction, Inc.
United Management LLC
Perlbinder Realty Corporation
Wasserman Grubin & Rogers, LLP
Atco Properties & Management, Inc.
Holland & Knight, LLP
Himmel Meringoff Properties, Inc.
Goldberg Rimberg & Friedlander, PLLC
Maimonides Medical Center
Smith, Buss & Jacobs, LLP
Brack Capital Real Estate-USA
The Riese Organization Corporate Group
Denham Wolf Real Estate Services, Inc.
Buckingham Hotel
Plaxall, Inc.
Katten Muchin Rosenman LLP
Sony BMG

## REAL ESTATE APPRAISER FOR FINANCIAL INSTITUTIONS

Sumitomo Trust & Banking Company, Ltd.
The Dai-Ichi Kangyo Bank
Dollar Dry Dock Savings Bank
Chase Manhattan Bank, N.A.
CorEast Savings Bank
Yasuda Trust and Banking Company, Ltd.
Mitsui Trust & Banking Company
Bankers Trust Company
Bank of Montreal
Nissho Iwai American Corporation
Thrift Associations Service Corporation
Long-Term Credit Bank
Beacon Federal Savings & Loan Assoc.
Manufacturers Hanover Trust Company
Bayside Federal Savings & Loan Assoc.
National Westminster Bank, USA
Washington Federal Savings & Loan Assoc.
Hudson Valley Federal Credit & Union
Morsemere Federal Savings & Loan Assoc.
Barclays Bank International Ltd.
Flushing Federal Savings & Loan Assoc.

South East Bank & Trust
Deutsche Bank A.G.
Mitsubishi Trust and Banking Corporation
Crestmont Federal Savings & Loan Assoc.
Bank of New York

Bank Leumi le Israel B.M.

Saitama Bank, Ltd.
United States Trust Company
DG Bank (Switzerland) Ltd.
Shawmut Bank Connecticut, N.A.
Amsterdam-Rotterdam Bank, N.V.
East New York Savings Bank
Citicorp North America, Inc.
City & Suburban Federal Savings Bank

Greater New York Savings Bank
Crossland Savings

Riggs National Bank of Washington, D.C.

River Bank America
Bank of Yokohama, Ltd.
Taiyo Kobe Bank, Ltd.
Chuo Trust & Banking Company
Hokkaido Takushoku Bank, Ltd.
Daiwa Bank
Citibank N.A.
Toyo Trust & Banking Company
Morgan Guaranty Trust
Bank of Tokyo, Ltd.
Lincoln Savings Bank
Mitsubishi Bank, Ltd.
Long Island Savings Bank
Nippon Credit Bank Ltd.
Tokai Bank Ltd.
Hokuriku Bank, Ltd.
Kumagai Gumi Company
Swiss Bank Corporation
Chiba Bank
American Savings Bank
Irving Trust Company (now
Bank of New York)
Hachijuni Bank
Chemical Bank
Goldome Bank
Hyakujushi Bank
European American Bank (aka
EAB)
Bowery Savings Bank (now State
Bowery Savings Bank)
Kyowa Bank, Ltd.
UniBank
LBS Bank
GE Capital
East River Savings Bank
Continental Bank
Emigrant Funding Corporation
Connecticut National Bank (now
Shawmut Bank Conn.)
The Asahi Bank, Ltd.
The Ramapo Bank (now Valley
National Bank)
Marine Midland Bank (now

Astoria Federal Savings Bank

Bank of America
Wells Fargo Bank
Suncoast Savings and Loan Association

Sterling National Bank & Trust Company of New York
Caisse Nationale de Credit Agricole
York
Republic National Bank of New York
Northern Trust Bank
First Republic Bank
CHB America Bank
New Bank

HSBC)
NationsBank (now Bank of
America)
Bayerische Vereinsbank AG
Banco Bilbao Vizcaya, S,A.
Guaranty Bank and Trust
Company
Fleet Bank
Federal Reserve Bank of New

Heartland Bank
Apple Bank
First Bank of Beverly Hills
Morgan Stanley
Nara Bank
People's Bank