UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                        :

IN RE SEPTEMBER 11 PROPERTY DAMAGE  :
AND BUSINESS LOSS LITIGATION         :
                        :
                        :
-------------------------------------------------------------X

21 MC 101 (AKH)

This document also relates to:

08 CIV 3719
08 CIV 3722

## WTCP PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE AVIATION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON CPLR 4545(c)

FLEMMING ZULACK WILLIAMSON
    ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Attorneys for Plaintiffs
World Trade Center Properties LLC
1 World Trade Center LLC
2 World Trade Center LLC
3 World Trade Center LLC
4 World Trade Center LLC

Of Counsel:

    Richard A. Williamson, Esq.
    Cathi A. Hession, Esq.
    Elizabeth A. O'Connor, Esq.
    Gregg H. Kanter, Esq.
    Wolfgang A. Dase, Esq.
    Jason T. Cohen, Esq.

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

The Port Authority's Public Mission .......................................................................... 2

The WTC Legislation Directing the
Creation of the WTC for the Benefit of the Public .................................................... 3

The World Trade Center — A One-of-a-Kind Public-Purpose
Complex and an "Economic Engine of Amazing Power" ........................................... 6

Port Authority's Periodic Analysis of
Options for the WTC After It Opened ........................................................................ 8

The July 2001 Net Leases of the WTC Buildings ..................................................... 9

The Enormous Financial Impact of 9/11 on Both the
Port's and WTCP's Interests in the World Trade Center ........................................... 11

The Public Interest in Rebuilding .............................................................................. 12

The Rebuilding Effort ................................................................................................. 14

ARGUMENT ...................................................................................................................... 17

Summary of Argument ....................................................................................................... 17

I.    SUMMARY JUDGMENT MUST BE DENIED BECAUSE
      DEFENDANTS, AS A MATTER OF LAW, ARE NOT
      ENTITLED TO AN OFFSET NOW UNDER CPLR 4545(c) ................................... 18

      A.    CPLR 4545(c) Does Not Apply Until There Is a Damages "Award" ............... 20

      B.    Defendants Have Not and Cannot Yet Demonstrate
            that Any Collateral Source Payments Correspond
            to Categories of Damages Awarded by the Jury ............................................... 23

II.   SUMMARY JUDGMENT ALSO MUST BE DENIED BECAUSE
      "MARKET" VALUATION METHODS DO NOT APPLY AND MATERIAL
      FACTS SUPPORT WTCP'S CLAIM FOR THE COSTS TO REBUILD
      THE WTC BUILDINGS AND FOR DAMAGE TO WTCP'S LEASEHOLD ............. 27

      A.    WTCP Is Entitled To Recover Replacement
            Costs for the Destruction of the WTC Buildings .............................................. 27

            1.    Summary Judgment Must Be Denied Because the
                  Proper Measure and Amount of Damages Are in Dispute ...................... 29

|   | 2. | Replacement Cost Is the Only Appropriate Measure of Damages Because the WTC Buildings Cannot Be Valued by "Market Value" Appraisal Methods | 33 |

| B. | | WTCP Also Is Entitled to Recover Damages for the Injury To Its Leasehold Interest | 50 |

| III. | | EVEN IF "MARKET VALUE" APPRAISAL METHODS COULD BE USED IN THIS CASE, WTCP'S DAMAGES COULD NOT BE DETERMINED ON SUMMARY JUDGMENT | 55 |

| A. | | The Purported Fair Market Value Advanced by Defendants Is Wrong | 55 |

| B. | | Defendants' Right To Try To Prove an Adequate "Lesser" Measure of Damages Does Not Preempt WTCP's Right To Prove Replacement Cost Damages in Its Case-in-Chief | 60 |

| IV. | | NEW YORK STATE LAW DETERMINES THE PREJUDGMENT INTEREST OWING TO WTCP | 62 |

| CONCLUSION | | | 67 |

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*936 Second Ave. L.P. v. Second Corporate Dev. Co.,*
   ___ N.E.2d ___, 10 N.Y.3d 628 (2008)...................................................................58

*Alford v. Niagara Mohawk Power Corp.,*
   115 A.D.2d 924, 496 N.Y.S.2d 820 (3d Dep't 1985)................................56, 60, 61

*Allard v. Arthur Andersen & Co. (USA),*
   924 F. Supp. 488 (S.D.N.Y. 1996) ...................................................................31

*Atlantic Mut. Ins. Co. v. CSX Lines, L.L.C.,*
   432 F.3d 428 (2d Cir. 2005)............................................................................31

*Atlantic Mut. Ins. Co. v. Napa Transp., Inc.,*
   399 F. Supp. 2d 523 (S.D.N.Y. 2005),
   *aff'd,* 201 F. App'x 19 (2d Cir. 2006).......................................................63, 64, 66

*B.F. Goodrich v. Betkoski,*
   99 F.3d 505 (2d Cir. 1996)........................................................................29, 30

*Bates v. Holbrook,*
   89 A.D. 548, 85 N.Y.S. 673 (1st Dep't 1904) .........................................51-53, 54

*Baumann v. City of N.Y.,*
   124 N.E. 141, 227 N.Y. 25 (1919)...............................................................27, 50

*Bly v. Edison Elec. Illuminating Co. of N.Y.,*
   111 A.D. 170, 97 N.Y.S. 592 (1st Dep't 1906),
   *aff'd,* 81 N.E. 1160, 188 N.Y. 582 (1907) .........................................................51

*Boyce v. Soundview Tech. Group, Inc.,*
   464 F.3d 376 (2d Cir. 2006).............................................................................59

*Bryant v. New York City Health & Hosps. Corp.,*
   716 N.E.2d 1084, 93 N.Y.2d 592, 695 N.Y.S.2d 39 (1999)....................................22

*Campbell v. Metropolitan Prop. & Cas. Ins. Co.,*
   239 F.3d 179 (2d Cir. 2001)............................................................................64

*Capece v. State,*
   43 A.D.2d 601, 348 N.Y.S.2d 789 (3d Dep't 1973) ............................................38

*Cashin v. City of New Rochelle,*
   176 N.E. 138, 256 N.Y. 190 (1931)..............................................................33, 53

*Central Pension Fund of Int'l Union of Operating Eng'rs v. Murphy's Tire, Inc.,*
   97-CV-814, 1998 WL 865594 (N.D.N.Y. Dec. 9, 1998) ......................................32

*Chesapeake & Ohio Ry. Co. v. Kelly,*
   241 U.S. 485 (1916) ......................................................................................64

*City of New Rochelle v. Sound Operating Corp.,*
   30 A.D.2d 861, 293 N.Y.S.2d 129 (2d Dep't 1968) ...........................................38

*City of N.Y. v. Salvation Army, Inc.,*
   373 N.E.2d 984, 43 N.Y.2d 512, 402 N.Y.S.2d 804 (1978) .................................35

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*City of N.Y. v. Willcox,*
  115 Misc. 351, 189 N.Y.S. 724 (Sup. Ct. N.Y. Co. 1921) ....................................................3

*City of Rochester v. Ryan & McIntee, Inc.,*
  56 A.D.2d 715, 393 N.Y.S.2d 137 (4th Dep't 1977)..........................................................38

*Clark v. State,*
  25 A.D.2d 893, 269 N.Y.S.2d 197 (3d Dep't 1966) ...........................................................38

*Club St. Agnello Abate of Amsterdam, N.Y., Inc. v. State,*
  68 A.D.2d 264, 417 N.Y.S.2d 21 (3d Dep't 1979)..............................................................38

*Coalition To Defend Affirmative Action v. Granholm,*
  473 F.3d 237 (6th Cir. 2006),
  *motion to vacate stay denied,* 127 S. Ct. 1146 (2007) .........................................................66

*Commonwealth v. Massachusetts Tpk. Auth.,*
  224 N.E.2d 186 (Mass. 1967) ...........................................................................................39

*Commonwealth Dep't of Transp. v. Estate of Crea,*
  483 A.2d 996 (Pa. Commw. Ct. 1977) ..............................................................................42

*County of Nassau v. Colony Beach Club of Lido, Inc.,*
  43 A.D.2d 45, 349 N.Y.S.2d 422 (2d Dep't 1973),
  *aff'd,* 353 N.E.2d 849, 39 N.Y.2d 958, 386 N.Y.S.2d 886 (1976) ................................. 35-36

*County of Suffolk v. C.J. Van Bourgondien, Inc.,*
  392 N.E.2d 1236, 47 N.Y.2d 507, 419 N.Y.S.2d 52 (1979)........................................... 36-37

*Courtesy Sandwich Shop, Inc. v. Port of N.Y. Auth.,*
  190 N.E.2d 402, 12 N.Y.2d 379, 240 N.Y.S.2d 1 (1963)......................................5-6, 44, 45

*Dadourian Exp. Corp. v. United States,*
  291 F.2d 178 (2d Cir. 1961)..............................................................................................30

*Davey Compressor Co. v. City of Delray Beach,*
  639 So. 2d 595 (Fla. 1994) ...............................................................................................42

*Dipson Realty Co. v. State,*
  39 A.D.2d 636, 331 N.Y.S.2d 186 (4th Dep't 1972)..........................................................38

*Eagle Access, LLC v. BHA, Inc.,*
  05 Civ. 2837, 2007 WL 193725 (S.D.N.Y. Jan. 25, 2007)..................................................32

*Ellison v. R&B Contracting, Inc.,*
  32 S.W.3d 66 (Ky. 2000)...................................................................................................56

*Fay v. South Colonie Cent. Sch. Dist.,*
  802 F.2d 21 (2d Cir. 1986).................................................................................................32

*Fieger v. Pitney Bowes Credit Corp.,*
  251 F.3d 386 (2d Cir. 2001) ..............................................................................................39

*Fisher v. First Stamford Bank & Trust Co.,*
  751 F.2d 519 (2d Cir. 1984) ..............................................................................................49

*Fisher v. Qualico Contracting Corp.,*
  779 N.E.2d 178, 98 N.Y.2d 534, 749 N.Y.S.2d 467 (2002).........................22, 23, 34, 46, 61

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Frost v. State,*
29 A.D.2d 898, 287 N.Y.S.2d 903 (3d Dep't 1968) ................................................... 38

*Graceland Park Cemetery Co. v. City of Omaha,*
114 N.W.2d 29 (Neb. 1962) ........................................................................................ 41

*Gramercy Boys' Club Ass'n v. City of N.Y.,*
541 N.E.2d 401, 74 N.Y.2d 678, 543 N.Y.S.2d 372 (1989),
*aff'g,* 141 A.D.2d 365, 529 N.Y.S.2d 476 (1st Dep't 1988) .................................... 36

*Gramercy Boys' Club Ass'n v. City of N.Y.,*
141 A.D.2d 365, 529 N.Y.S.2d 476 (1st Dep't 1988)
*aff'd,* 541 N.E.2d 401, 74 N.Y.2d 678, 543 N.Y.S.2d 372 (1989) .......................... 41

*Great Atl. & Pac. Tea Co. v. Kiernan,*
366 N.E.2d 808, 42 N.Y.2d 236, 397 N.Y.S.2d 718 (1977) ............................. 34-35, 38

*Hartshorn v. Chaddock,*
31 N.E. 997, 135 N.Y. 116 (1892) ............................................................................. 34

*Hess v. Port Auth. Trans-Hudson Corp.,*
513 U.S. 30 (1994) ...................................................................................................... 3

*J.W. Paxson Co. v. Board of Chosen Freeholders of Cumberland County,*
201 F. 656 (3d Cir. 1912) ...................................................................................... 44-45

*Jarvis v. Ford Motor Co.,*
283 F.3d 33 (2d Cir. 2002) .......................................................................................... 22

*Jenkins v. Etlinger,*
432 N.E.2d 589, 55 N.Y.2d 35, 447 N.Y.S.2d 696 (1982) ................................... 60, 61

*Joseph E. Seagram & Sons, Inc. v. Tax Comm'n of N.Y.,*
18 A.D.2d 109, 238 N.Y.S.2d 228 (1st Dep't 1963),
*aff'd,* 200 N.E.2d 477, 14 N.Y.2d 314, 251 N.Y.S.2d 460 (1964) .......................... 38

*Keator v. State,*
244 N.E.2d 248, 23 N.Y.2d 337, 296 N.Y.S.2d 767 (1968) ..................................... 40

*Kihl v. Pfeffer,*
47 A.D.3d 154, 848 N.Y.S.2d 200 (2d Dep't 2007) ................................................. 23

*Leonard v. New York, Albany & Buffalo Electro Magnetic Tel. Co.,*
41 N.Y. 544 (1870) ...................................................................................................... 49

*Leonard Missionary Baptist Church v. Sears, Roebuck & Co.,*
42 S.W.3d 833 (Mo. Ct. App. 2001) .......................................................................... 39

*Levantino v. Insurance Co. of N. Am.,*
102 Misc. 2d 77, 422 N.Y.S.2d 995 (Sup. Ct. Suffolk Co. 1979) ........................... 49

*Levin v. State,*
192 N.E.2d 155, 13 N.Y.2d 87, 242 N.Y.S.2d 193 (1963) ...................................... 57

*Maier-Schule GMC, Inc. v. General Motors Corp.,*
154 F.R.D. 47 (W.D.N.Y. 1994) ................................................................................ 31

*Massachusetts Port Auth. v. Sciaba Constr. Corp.,*
766 N.E.2d 118 (Mass. App. Ct. 2002) .................................... 36, 38-39, 42, 43-44

**TABLE OF AUTHORITIES (cont'd)**

Page(s)

*McAnarney v. Newark Fire Ins. Co.,*
159 N.E. 902, 247 N.Y. 176 (1928) .................................................................34, 40

*Medinol Ltd. v. Boston Scientific Corp.,*
346 F. Supp. 2d 575 (S.D.N.Y. 2004) ....................................................................29

*Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse,*
996 F.2d 506 (2d Cir. 1993).....................................................................................63

*Merck & Co. v. MediPlan Health Consulting, Inc.,*
434 F. Supp. 2d 257 (S.D.N.Y. 2006).....................................................................61

*Merrill Lynch Bus. Fin. Servs. Inc. v. Heritage Packaging Corp.,*
CV-06-3951, 2007 WL 2815741 (E.D.N.Y. Sept. 25, 2007) ..............................32

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.,*
423 F.3d 1056 (9th Cir. 2005),
aff'd, 127 S. Ct. 1513 (2007) ...................................................................................66

*Moriarity v. Small World Adoption Found. of Mo., Inc.,*
5:04-CV-394, 2008 WL 2733820 (N.D.N.Y. July 11, 2008) ...............................21

*MTV Networks v. NVE Pharms.,*
01 Civ. 1699, 2002 WL 1203853 (S.D.N.Y. June 3, 2002).................................31

*Newbro v. Freed,*
409 F. Supp. 2d 386 (S.D.N.Y. 2006),
aff'd, 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007) ...........................66

*Newton Girl Scout Council, Inc. v. Massachusetts Tpk. Auth.,*
138 N.E.2d 769 (Mass. 1956) ...................................................................... 39, 40-41

*New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.),*
266 F.3d 112 (2d Cir. 2001)....................................................................................63

*Nipponkoa Ins. Co. v. Watkins Motor Lines, Inc.,*
431 F. Supp. 2d 411 (S.D.N.Y. 2006).....................................................................65

*In re North Park Urban Renewal Project No. N.Y.R-23,*
67 Misc. 2d 259, 324 N.Y.S.2d 158 (Sup. Ct. Nassau Co. 1971).........................38

*Oden v. Chemung County Indus. Dev. Agency,*
661 N.E.2d 142, 87 N.Y.2d 81, 637 N.Y.S.2d 670 (1995)..................20, 21, 22, 23

*Patterson v. Coughlin,*
905 F.2d 564 (2d Cir. 1990).....................................................................................32

*Patterson v. County of Oneida, N.Y.,*
375 F.3d 206 (2d Cir. 2004).....................................................................................30

*Pennsylvania Dep't of Gen. Servs. v. United States Mineral Prods. Co.,*
898 A.2d. 590 (Pa. 2006) ..........................................................................................42

*Plaza Hotel Assocs. v. Wellington Assocs., Inc.,*
55 Misc. 2d 483, 285 N.Y.S.2d 941 (Sup. Ct. N.Y. Co.),
aff'd, 28 A.D.2d 1209, 285 N.Y.S.2d 267 (1st Dep't 1967),
aff'd, 239 N.E.2d 736, 22 N.Y.2d 846, 293 N.Y.S.2d 108 (1968).........................60

**TABLE OF AUTHORITIES (cont'd)**

Page(s)

*Rochester Urban Renewal Agency v. Patchen Post, Inc.,*
379 N.E.2d 169, 45 N.Y.2d 1, 407 N.Y.S.2d 641 (1978)............................29, 33, 35, 39, 41

*Rogers v. Atlantic, G. & P. Co.,*
107 N.E. 661, 213 N.Y. 246 (1915)..................................................................................28, 50

*Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Serv. Co.,*
618 So. 2d 874 (La. 1993) ...................................................................................36, 39, 41, 45

*Santalucia v. Sebright Transp., Inc.,*
232 F.3d 293 (2d Cir. 2000) .........................................................................................................39

*Schwimmer v. Allstate Ins. Co.,*
176 F.3d 648 (2d Cir. 1999) .........................................................................................................64

*Scribner v. Summers,*
138 F.3d 471 (2d Cir. 1998)..........................................................................................................61

*In re September 11 Litig.,*
265 F. Supp. 2d 208 (S.D.N.Y. 2003)...........................................................................................63

*In re September 11 Litig.,*
280 F. Supp. 2d 279 (S.D.N.Y. 2003)...........................................................................................63

*In re September 11th Litig.,*
494 F. Supp. 2d 232 (S.D.N.Y. 2007).....................................................................................64, 65

*Siradas v. Chase Lincoln First Bank, N.A.,*
98 Civ. 4028, 1999 WL 787658 (S.D.N.Y. Sept. 30, 1999).......................................................31

*Standard Oil Co. of N.J. v. Southern Pac. Co.,*
268 U.S. 146 (1925).................................................................................................................33, 34

*Strobl v. New York Mercantile Exch.,*
590 F. Supp. 875 (S.D.N.Y. 1984),
*aff'd,* 768 F.2d 22 (2d Cir. 1985)...................................................................................64, 65, 66

*Stylianou v. St. Luke's/Roosevelt Hosp. Ctr.,*
902 F. Supp. 54 (S.D.N.Y. 1995) .................................................................................................30

*Teichman by Teichman v. Community Hosp. of W. Suffolk,*
205 A.D.2d 16, 617 N.Y.S.2d 338 (2d Dep't 1994),
*aff'd as modified,* 663 N.E.2d 628, 87 N.Y.2d 514, 640 N.Y.S.2d 472 (1996) ....................21

*Teplin v. National Bank of N. Am.,*
81 Civ. 2369, 1982 U.S. Dist. Lexis 10925 (S.D.N.Y. Jan. 7, 1982) ......................................31

*Terranova v. New York City Transit Auth.,*
No. 13946/02, 2005 WL 2219685 (Sup. Ct. Richmond Co. Aug. 23, 2005) ...............22, 23

*Tondas v. Amateur Hockey Ass'n of U.S.,*
438 F. Supp. 310 (W.D.N.Y. 1977)...............................................................................................30

*Trinity Church of Boston v. John Hancock Mut. Life Ins. Co.,*
502 N.E.2d 532 (Mass. 1987).........................................................................................................34

*Turnbull v. USAir, Inc.,*
133 F.3d 184 (2d Cir. 1998) ....................................................................................................21, 23

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Twin Chimneys Homeowners Ass'n v. J.E. Jones Constr. Co.,*
    168 S.W.3d 488 (Mo. Ct. App. 2005)...................................................................41

*United States v. Union Pac. R.R. Co.,*
    ___ F. Supp. 2d ___, 2008 WL 413765 (E.D. Cal. Feb. 13, 2008),
    *reh'g denied,* 2008 WL 1925244 (E.D. Cal. Apr. 30, 2008)...............................42

*United Traction Co. v. State,*
    33 A.D.2d 1063, 307 N.Y.S.2d 266 (3d Dep't 1970)....................................37, 38

*V.S. Int'l, S.A. v. Boyden World Corp.,*
    90 Civ. 4091, 1993 WL 59399 (S.D.N.Y. Mar. 4, 1993) ...................................31

*Valerina Fashions, Inc. v. Hellman Int'l Forwarders, Inc.,*
    897 F. Supp. 138 (S.D.N.Y. 1995) ...................................................................30

*Wall v. Platt,*
    48 N.E. 270 (Mass. 1897)...................................................................................34

*Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,*
    955 F.2d 831 (2d Cir. 1992)..............................................................................66

*Wolpaw* v. *General Accident Ins. Co.,*
    639 A.2d 338 (N.J. Super. Ct. App. Div. 1994) ...............................................49

*Wooten* v. *State,*
    302 A.D.2d 70, 753 N.Y.S.2d 266 (4th Dep't 2002)...............................20, 21-22

### Statutes & Rules

Air Transportation Safety and System Stabilization Act of 2001,
    Pub. L. No. 107-42, 115 Stat. 230 (2001),
    codified as amended at 49 U.S.C.A. § 40101 note (West Supp. 2008) .......................*passim*

N.J. STAT. ANN. §§ 32:1-1 *et seq.* (West 1990)......................................................2, 3

N.Y. C.P.L.R. 4545(c) (McKinney 2007)....................................................18, 20, 24

N.Y. C.P.L.R. 5001 (McKinney 2007) ...................................................................63

N.Y. C.P.L.R. 5004 (McKinney 2007) ...................................................................63

21 N.Y. COMP. CODES R. & REGS. tit. 21 § 9003.1 (1992)...........................................4

N.Y. PUB. AUTH. LAW §§ 1972-74 (McKinney 1995)..................................................4

N.Y. REAL. PROP. ACTS. LAW § 833 (McKinney 1979).............................................28

N.Y. UNCONSOL. LAW §§ 6401 *et seq.* (McKinney 2000)................................. *passim*

### Other Authorities

147 CONG. REC. S9594 (Sept. 21, 2001) (Statement of Sen. McCain) ......................14

147 CONG. REC. H7649 (Nov. 1, 2001) (Statement of Rep. Sensenbrenner) ............14

**TABLE OF AUTHORITIES (cont'd)**

H.R. CONF. REP. 107-296 (Nov. 16, 2001), *reprinted in* 2001 U.S.C.C.A.N. 589 ..................... 14

Matthew D. Barrett, *Recovering Damages for Tortious Injury to Historic Buildings and Other 'Special Purpose' Property in Indiana: Drawing the Line Between 'Fair Market Value' and 'Cost of Repair' in Cases of Permanent Damage*, 50-DEC RES GESTAE 21 (Dec. 2006) ............................ 39

CALAMARI & PERILLO, THE LAW OF CONTRACTS (2d ed. 1982) ............................................. 49

DAN B. DOBBS, DOBBS LAW OF REMEDIES (2d ed. 1993) ........................................................ 46

MCCORMICK ON DAMAGES (1935) ............................................................................................ 49

36 N.Y. JUR. 2D DAMAGES (2005) ............................................................................................. 21

1B NY PJI3d 2:311 (2008) ................................................................................................... 33, 61

1B NY PJI3d 2:312 (2008) ................................................................................................... 33-34

RESTATEMENT (FIRST) OF TORTS (1939) ................................................................................... 49

RESTATEMENT (SECOND) OF TORTS (1979) ................................................................................ 33

SEDGWICK ON DAMAGES (9th ed. 1912) .................................................................................... 49

## PRELIMINARY STATEMENT

Plaintiffs World Trade Center Properties LLC ("WTCP LLC"), 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC (formerly known as 5 World Trade Center LLC), and 4 World Trade Center LLC (collectively, "WTCP")[1] submit this memorandum of law in opposition to the motion by the Aviation Defendants[2] for summary judgment dismissing WTCP's claims "for the destruction of World Trade Center buildings" based on an attempted premature application of New York CPLR 4545(c), a statutory exception to the common law collateral source rule.

The Aviation Defendants have touted this motion for a long time.[3] But it is a motion that Defendants knew or should have known they could not possibly win, despite their representations to the Court that they could.

Although Defendants received federal statutory protection limiting their liability for damages to their insurance coverage limits, Defendants and their insurers now seek to escape *any* payment for the billions of dollars of damages Defendants caused. They want WTCP — the 9/11 property damage victim who suffered the largest property damage losses — out of the way to facilitate the insurer subrogees' obtaining refunds from the Aviation Defendants' insurers.[4]

---

[1]    The claims of Plaintiff 7 World Trade Company, L.P. are not the subject of this motion. *See* Aviation Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment Dismissing All Claims by World Trade Center Properties for the Destruction of WTC 1, 2, 4, and 5 ("Moving Br.") at 1 n.3.

[2]    The Aviation Defendants joining in the motion are listed in the Moving Br. at 1 n.1.

[3]    *See, e.g.,* Letter from Desmond T. Barry, Jr. to the Hon. Alvin K. Hellerstein (Mar. 14, 2008), at 14-15 (announcing intention to move to dismiss under *Fisher v. Qualico Contracting Corp.* and CPLR 4545(c) on ground that WTCP "has been more-than-fully indemnified for its losses by collateral source payments"), annexed as Exhibit 1 to the accompanying Declaration of Richard A. Williamson, executed August 15, 2008 ("Williamson Decl.").

[4]    Certain subrogated property insurer and other property damage plaintiffs that are part of a group of plaintiffs for which Robert A. Clifford is Liaison Counsel (the "Clifford Group of Plaintiffs") join in Defendants' motion. *See* Certain Plaintiffs' Joinder in the Aviation Defendants' Motion for Summary Judgment Dismissing All Claims of World Trade Center Properties LLC for the Destruction of the WTC 1, 2, 4 and 5 (the "Clifford Group of Plaintiffs' Joinder"). As the Court knows, the Clifford Group of Plaintiffs are competing with WTCP for the limited fund of Defendants' available insurance. *See* note 17, *infra.*

The arguments Defendants have constructed to try to achieve that goal have no basis in law and ignore the material issues of fact which make summary judgment impossible. Having been forced either to back off from their representations to the Court that WTCP has no recoverable damages as a matter of law, or to press ahead with a motion that cannot be won, Defendants have chosen to subject both the Court and WTCP to this futile, time-consuming and expensive exercise.

## STATEMENT OF FACTS

One of the main reasons why Defendants' motion must be denied is that it fails to take into account the legal significance of the statutory public purpose of the World Trade Center ("WTC") and its unique characteristics, specific location and use in determining adequate compensation for (i) the destruction of the WTC buildings leased by WTCP from the Port Authority of New York and New Jersey (the "Port Authority" or the "Port"), and (ii) the injury to WTCP's leaseholds. *See* Point II, *infra*. This statement of facts supplies the critical missing material facts that Defendants' motion deliberately omits.

**The Port Authority's Public Mission**

The Port Authority, formerly known as "The Port of New York Authority," is a nonprofit bi-state agency formed in 1921 by New York and New Jersey in connection with the creation of a Port of New York District. N.Y. UNCONSOL. LAW §§ 6401 *et seq.* (McKinney 2000); N.J. STAT. ANN. §§ 32:1-1 *et seq.* (West 1990).[5] The Port Authority was created to carry out a public trust. To that end, the two states pledged "faithful co-operation in the future planning and development of the port of New York, holding in high trust for the benefit of the nation the special blessings and natural advantages thereof." N.Y. UNCONSOL. LAW § 6402; *see also id.* § 6401 (stating in preamble the "confident [] belie[f]" that "a better co-ordination of the terminal, transportation and other facilities of commerce in, about and through the port of New

---

[5]    The New York and New Jersey statutes discussed in this memorandum of law are substantially the same. Accordingly, after initial citation to the two states' corresponding statutes, we cite thereafter, as appropriate, only to the New York statute.

York, will result in great economies, benefiting the nation, as well as the States of New York and New Jersey"); *City of N.Y. v. Willcox,* 115 Misc. 351, 355-56, 189 N.Y.S. 724, 727 (Sup. Ct. N.Y. Co. 1921) (Port Authority created "to own and operate terminal and transportation facilities, and to operate them not for private gain, but for the welfare and progress of the community").

Twelve Commissioners, six selected by each State, govern the Port Authority. N.Y. UNCONSOL. LAW § 6405. The Port Authority is a governmental agency — not a commercial enterprise or business — and thus the Governor of each State may veto actions of the Port Authority Commissioners from that State. *Id.* Acting jointly, the two state legislatures may augment the powers and responsibilities of the Port Authority, *see id.* § 6408, and specify the purposes for which the Port Authority's surplus revenues may be used. *Id.* § 7002.

Today, the Port Authority operates for the public benefit five airports, six bridges and tunnels, two bus terminals, three major marine terminals, the PATH commuter train system, the AirTrain to JFK and Newark Airports, and the World Trade Center site. Declaration of Alexander Garvin, executed August 14, 2008 ("Garvin Decl.") ¶ 14. The Port Authority is financially self-supporting and relies almost entirely on revenues generated by user tolls, fees and rents. *Id.; see also Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 36 (1994).

**The WTC Legislation Directing the
Creation of the WTC for the Benefit of the Public**

In 1962, in a determined effort to reverse the decline in importance of the Port of New York and the lower Manhattan business district (Garvin Decl. ¶¶ 17-19), New York and New Jersey enacted complementary legislation directing the creation of the World Trade Center at a specific site in lower Manhattan (defined as the "Hudson tubes-world trade center area") centered around the PATH train's terminus. N.Y. UNCONSOL. LAW §§ 6601 *et seq.*; N.J. STAT. ANN. § 32:1-35.50 to 32:1-35.68 (the "WTC Legislation").[6] The states determined that the

---

[6]      The WTC Legislation "authorized and empowered" the Port Authority "to establish, acquire, construct, effectuate, develop, own, lease, maintain, operate, improve and rehabilitate . . . *a facility of commerce* herein referred to as *the world trade center,* to be located *within the Hudson tubes-world trade*

unification of this "facility of commerce" and the PATH train system "will materially assist in preserving for the two states and the people thereof the material and other benefits of a prosperous port community." N.Y. UNCONSOL. LAW § 6601(7). They also determined that the Port's undertaking of the "unified" World Trade Center project "has the single object of preserving, and is part of a unified plan to aid in the preservation of, the economic well-being of the northern New Jersey-New York metropolitan area and is found and determined to be in the public interest." *Id.* § 6601(9); Garvin Decl. ¶¶ 16-19. That public interest objective gave the World Trade Center a far broader purpose than just providing room for tenants. Garvin Decl. ¶¶ 18-19, 21-22, 31, 42, 45.

The unified WTC project contemplated that the Port Authority would (a) operate, improve and extend the PATH public transportation system between New York and New Jersey to permit the transfer of passengers to other facilities; (b) centralize in one location the "servicing

---

center area. . . . ." N.Y. UNCONSOL. LAW § 6603 (emphases added). Thus, the location of the World Trade Center cannot be just anywhere. Its location is fixed. The "Hudson tubes-world trade center" location for the World Trade Center is specifically defined by statute:

> "Hudson tubes-world trade center area" shall mean the area in the borough of Manhattan, city and state of New York, bounded generally by the east side of Church street on the east, the south side of Liberty street and the south side of Liberty street extended on the south, the Hudson river on the west, and on the north by a line beginning at the point of intersection of the Hudson river and the north side of Vesey street extended, running along the north side of Vesey street extended and the north side of Vesey street to the west side of Washington street, then along the west side of Washington street to the north side of Barclay street, then along the north side of Barclay street to the east side of West Broadway, then along the east side of West Broadway to the north side of Vesey Street, then along the north side of Vesey Street to the east side of Church street, together with such additional contiguous area as may be agreed upon from time to time between the port authority and the said city . . .

*Id.* § 6602. The western site boundary later became West Street, not the Hudson River, when landfill from excavation of the WTC's "bathtub" — to protect against flooding from the Hudson River — was deposited at the river's edge to create Battery Park City, a mini-city, between West Street and the new river edge. Battery Park City Authority is a New York State public benefit corporation created by the New York State Legislature in 1968. N.Y. PUB. AUTH. LAW §§ 1971-74 (McKinney 1995). The Battery Park City Authority's mission is to plan, create, co-ordinate and maintain a balanced community of commercial, residential, retail, and park space within its designated 92-acre site. *Id.* § 1971; 21 N.Y. COMP. CODES R. REGS. tit. 21 § 9003.1 (1992). The World Trade Center was Battery Park City's vital link to the rest of New York City — two land bridges provided pedestrian access from Battery Park City to the World Trade Center and from there, to lower Manhattan or subway or PATH train connections to places beyond. Garvin Decl. ¶ 54.

functions and activities connected with the oceanborne and overseas airborne trade and commerce," which were "presently performed in various, scattered locations"; (c) provide for "more efficient and economical facilities for the exchange and buying, selling and transportation of commodities and other property in world trade and commerce" to insure that the Port of New York receives its "rightful share" of "cargo volumes generated by the economy of the nation"; (d) unify at the WTC site "appropriate governmental, administrative and other services connected with or incidental to transportation of persons and property and the promotion and protection of port commerce"; and (e) provide "a central locale for exhibiting and otherwise promoting the exchange and buying and selling of commodities and property in world trade and commerce." N.Y. UNCONSOL. LAW § 6601(2)-(7). As a matter of New York and New Jersey law, the Port's "effectuation"[7] of the World Trade Center at its specific site is "an essential government function" for a public purpose and the public good:

> The effectuation of *the world trade center*, the Hudson tubes and the Hudson tubes extensions, . . . are and will be *in all respects for the benefit of the people* of the States of New York and New Jersey, for the increase of their commerce and prosperity and for the improvement of their health and living conditions; and the port authority and any subsidiary corporation incorporated for any of the purposes of this act shall be regarded as performing *an essential governmental function* in undertaking the effectuation thereof, and in carrying out the provisions of law relating thereto.

*Id.* § 6610 (emphases added).

The New York Court of Appeals long ago decided the issue whether the WTC buildings should be legally viewed as structures that are solely revenue-producing buildings or whether they constitute elements of the unified public-purpose World Trade Center project aiding in the preservation of the economic well-being of the New Jersey-New York metropolitan area. In *Courtesy Sandwich Shop, Inc. v. Port of N.Y. Auth.,* the Court of Appeals specifically held that the operation of revenue-producing WTC buildings is subordinated to the World Trade

---

[7]     "Effectuation" is defined in the WTC Legislation as including the "establishment, acquisition, construction, development, maintenance, operation, improvement (by way of betterments, additions or otherwise) and rehabilitation" of "a project or any facility or part of a facility constituting a portion of a project." N.Y. UNCONSOL. LAW § 6602.

Center's primary public purpose and that the cost of achieving that public purpose would be partially defrayed by "use of [the] property to produce revenue to help finance the operation of those activities that tend to achieve the [public] purpose of the project." 190 N.E.2d 402, 405-06, 12 N.Y.2d 379, 389-90, 240 N.Y.S.2d 1, 6-7 (1963). The court described the World Trade Center's public purpose as "the gathering together of all business relating to world trade that is supposed to be the great convenience held out to those who use American ports and which is supposed to attract trade with a resultant stimulus to the economic well-being of the Port of New York. . . . The history of western civilization demonstrates the cause and effect relationship between a great port and a great city." *Id.* at 404-05, 12 N.Y.2d at 388-89, 240 N.Y.S.2d at 5.

**The World Trade Center — A One-of-a-Kind Public-Purpose Complex and an "Economic Engine of Amazing Power"**

The World Trade Center complex, officially dedicated in 1973, consisted of a 16-acre public site with a street level plaza, street level shopping and an underground shopping mall, a transportation terminal for the New York-New Jersey PATH trains, a subway hub offering direct access to several NYC subway lines, and six buildings, including the Twin Towers. Garvin Decl. ¶ 35. It included what was believed to be the first hotel to open in downtown Manhattan since 1836. Garvin Decl. ¶ 35. The constituent parts of the World Trade Center complex were highly integrated, sharing miles of below-grade space, mechanical systems, common air conditioning and heating ducts, and a common security force — the Port Authority Police Department.[8] Garvin Decl. ¶ 35. Vast public passageways directed persons from the PATH trains into the shopping mall — one of the most successful retail malls in the United States — and out onto the plaza or into one of the many connecting subway lines. Garvin Decl.

---

[8] Electrical service to the World Trade Center complex was supplied by a dedicated Consolidated Edison substation. This service passed through the World Trade Center Primary Distribution Center. The complex also was served by onsite emergency generators and protected by the World Trade Center Fire Protection Systems, an extensive fire detection and voice evacuation paging system that was substantially upgraded after the 1993 bombing. Fire Command Stations, staffed by Fire Safety Directors, were located in the lobbies of each building and an Operations Control Center monitored these systems. Garvin Decl. ¶ 55.

¶ 35.  Land bridges connected the World Trade Center complex to 7 World Trade Center, Battery

Park City, and surrounding City streets.  Garvin Decl. ¶¶ 35, 54.

The WTC complex was "an economic engine of amazing power," bringing to

lower Manhattan a restorative critical mass of workers, business invitees, tourists and eventually

residents, completely altering the downtown economy despite the fact that the mammoth

complex, in its early years, never itself made money.  Garvin Decl. ¶ 33.  During the 1990s,

nearly 400 companies had offices in the World Trade Center complex, including export-oriented

and blue-chip international tenants, financial companies, federal and state agency offices and the

Port Authority.  Garvin Decl. ¶ 46.  Over the years, the World Trade Center, which was so large

that it had its own zip code, 10048, became one of the world's most coveted and best-known

business addresses.  Garvin Decl. ¶ 46.  On a typical weekday, 40,000 people worked in the

towers, with another 200,000 passing through, many visiting the renowned sky-high Observation

Deck or Windows on the World restaurant.  Garvin Decl. ¶ 46.  Workers, residents and visitors

enjoyed a variety of events, from outdoor concerts to art exhibits and outdoor dining, in the

centrally located Austin J. Tobin Plaza, named after the executive director of the Port Authority

who initiated the development of the World Trade Center.  Garvin Decl. ¶ 46.

The height and unique architecture of the Twin Towers of the World Trade Center

complex reshaped the skyline of New York and enhanced New York's status as an international

tourist attraction.  Garvin Decl. ¶ 37.  The towers required use of cutting edge engineering and

design innovations.  Garvin Decl. ¶¶ 39-40.  For example, faced with the difficulties of building

to unprecedented heights, the engineers employed an innovative structural model — a rigid

"hollow tube" of closely spaced steel columns with floor trusses extended across to a central core

to create a structural exoskeleton.  Garvin Decl. ¶ 40.  The columns, finished with a silver-

colored aluminum alloy, were 18-3/4" wide and set only 22" apart, making the towers appear

from afar to have no windows at all.  Garvin Decl. ¶ 40.  This system was entirely new and

different from other conventional high-rise buildings.  Garvin Decl. ¶ 39.  Also unique to the

engineering design were the towers' central cores and lobbied elevator systems which allowed for large, open tenant spaces. Garvin Decl. ¶ 40.

The Twin Towers, at 1,368 and 1,362 feet, respectively, and 110 stories each, were the world's tallest and largest buildings when completed. Garvin Decl. ¶ 37. They became known worldwide, and were shown or depicted in movies, TV shows, postcards, merchandise, magazines and much more, becoming a New York symbol of the same renown as the Empire State Building or Statue of Liberty. Garvin Decl. ¶ 38. To this day, historic images of the World Trade Center and its Twin Towers remain instantly recognizable. Garvin Decl. ¶ 38. The simple soaring towers showed daring and restored confidence in the vitality of the Port of New York and the metro area. Garvin Decl. ¶ 38.

The documented cost of building the original World Trade Center, beginning in 1965, was about $1 billion. Declaration of Kerry D. Vandell, executed August 15, 2008 ("Vandell Decl.") ¶ 8. That cost would be equivalent today to about $10 billion given the inflation in construction costs. Vandell Decl. ¶ 8. No private developer would or could have built the World Trade Center when it was proposed almost fifty years ago. Garvin Decl. ¶ 41. It was not built on a commercial profit model; it was built to confer public benefits. Garvin Decl. ¶¶ 18, 19, 22, 34, 41. Even though the Port Authority faced great opposition, the agency persevered and constructed a first-class complex, which succeeded in revitalizing Manhattan's downtown to the benefit of the wider New York-Northern New Jersey metropolitan area. Garvin Decl. ¶ 43.

### Port Authority's Periodic Analysis of Options for the WTC After It Opened

Long before 2001, the Port Authority periodically undertook, directly and through the use of consultants, to analyze various options for the future of the World Trade Center, including comparisons of the World Trade Center with private-sector operations. *See* "April 26, 2001 Port Minutes" at 161, attached as Exhibit A to Declaration of Desmond T. Barry, Jr., executed June 20, 2008, in support of Defendants' motion ("Barry Decl."). In June of 1984,

despite pressure to sell from New York City, which stood to gain $90 million more in real estate

taxes from a private owner, Governor Cuomo of New York and Governor Kean of New Jersey

publicly announced that the World Trade Center would not be sold. Garvin Decl. ¶ 47. There

would be legal impediments to any sale, including that the WTC Legislation does not authorize

the Port Authority to "sell" the World Trade Center. *See* notes 6-7, *supra*. But, in any event, a

sale was not pursued. The government's overall objective with respect to the World Trade

Center was not just to increase revenues to New York City, but to generate new investment

infrastructure, development and housing, because the World Trade Center was not just a New

York City asset, but an asset of two states and the region. Garvin Decl. ¶ 47.

In 1996, the Port again considered its options "for maximizing the value of the

World Trade Center to the Port Authority *and to the people of the region*, involving the sale, net

lease and asset management of the World Trade Center." April 26, 2001 Port Minutes, at 161

(emphasis added). In 1998, the Commissioners voted to lease the complex or the individual

buildings that comprised the World Trade Center to a private operator. Garvin Decl. ¶ 48. Port

Authority Vice Chairman Charles Gargano explained the public benefits purpose of the Port's

choice to lease certain components of the World Trade Center to private sector management but

to continue ownership and control:

> Private sector management means that the World Trade Center's role as a
> generator of jobs and economic activity will be even stronger. The 40,000
> people who work there, in more than 400 firms from over 25 countries, are
> a vital part of New York's links to the global marketplace. Their wages
> and salaries, and their technical know-how, contribute vastly to the
> regional economy. The retail shopping mall has drawn shoppers to
> downtown, and stimulated residential development. And the World Trade
> Center is one of the biggest tourist attractions in a city with overwhelming
> appeal to tourists.

Garvin Decl. ¶ 48.

### The July 2001 Net Leases of the WTC Buildings

Unlike the Port Authority, WTCP is in the commercial real estate business. *See*

Declaration of Michael L. Levy, executed August 11, 2008 ("Levy Decl.") ¶ 3. WTCP brought

its private sector management and entrepreneurial skills to the public realm of the World Trade

Center in a July 2001 net lease arrangement with the Port Authority whereby WTCP leased the

One, Two, Four and Five World Trade Center buildings (the "WTC Buildings") "and any

replacements thereof," subject to the Port's continuing rights, duties and jurisdiction under the

WTC Legislation.[9]   The net lease arrangement was entered into "in furtherance of the purposes

of the World Trade Center Legislation."  One WTC Lease, Recital, at 1 (Barry Decl. Exh. L).

Each net lease was deemed a lease of "a portion of the World Trade Center." *Id.*, Recital, at 1-2.

Pursuant to the net leases, the Port Authority would continue "to own, control and operate the

World Trade Center pursuant to the World Trade Center legislation, and to review and enforce

compliance with all codes, regulations, orders and rules set forth by the Port Authority." *Id.*,

Recital, at 3.  WTCP is required to comply with the Port Authority Manual, including the Port

Authority's Rules and Regulations and Security Guidelines. *Id.* Secs. 1.215, 1.254, 1.258, 6.2.

WTCP is required to certify, or have the Port Authority determine, that the business conducted

by each of WTCP's tenants at the World Trade Center is permitted under the WTC Legislation.

*Id.* Sec. 9.2.

      The leases provided WTCP with 10 million square feet of office space that had a

very high occupancy rate — One World Trade Center and Two World Trade Center were nearly

fully let and had over 400 tenants on September 11, 2001 ("September 11" or "9/11").  Levy

Decl. ¶¶ 5, 6.  Over 50% of the tenants of the WTC Buildings had long-term leases not set to

expire until 2006 or later. Levy Decl. ¶ 7. As of September 11, WTCP expected to receive from

its tenants approximately $363 million in annual rental income.  Levy Decl. ¶ 8.  That amount

was expected to increase substantially over the years.  Levy Decl. ¶ 9.  On September 11, the

---

[9]    1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5
World Trade Center LLC (now known as 3 World Trade Center LLC) are the lessees on the net leases,
and at all pertinent times World Trade Center Properties LLC was the indirect parent of the lessees.  The
July 16, 2001 net leases and their July 24, 2001 amendments, without schedules or exhibits, are attached
to the Barry Decl. as Exhibits L (One World Trade Center Lease ("One WTC Lease")), M (Two World
Trade Center Lease), N (Four World Trade Center Lease) and O (Five World Trade Center Lease).  The
four net leases are substantially identical.  Where a provision being referred to in this memorandum is
identical in content and is identically numbered in each of the four net leases, citation is made to the
relevant provision in the One WTC Lease only.

two-month old leases, for which WTCP already had paid more than half a billion dollars in rental
payments, had nearly 99 years remaining.  Levy Decl. ¶ 10.

**The Enormous Financial Impact of 9/11 on Both the**
**Port's and WTCP's Interests in the World Trade Center**

        When the WTC Buildings were completely destroyed on September 11 as the
result of the Aviation Defendants' tortious conduct, the tenants' leases with WTCP terminated
and the effect on WTCP's business was devastating.  Levy Decl. ¶ 13.  Since September 11,
WTCP has lost billions of dollars in rental income it would have received from the former
tenants of the WTC Buildings.  Levy Decl. ¶ 14.  WTCP will continue to lose hundreds of
millions of dollars in rental income each year until such time as the replacement buildings are
built, new tenant relationships are established, and the replacement buildings are leased at or near
the occupancy levels of the original WTC Buildings.  Levy Decl. ¶ 15.  The value of prospective
rental income from the replacement buildings is less than the projected rental income for the
original WTC Buildings both because there will be more than ten years with no rental income at
all and because of increased uncertainty and risk once the buildings are replaced.  Levy Decl. ¶
16.  Preliminary April 2007 estimates of lost revenue and consequential damages, including, but
not limited to, leasing and other mitigation costs, totaled approximately $3.9 billion discounted
to net present value as of September 11.  Levy Decl. ¶ 16; *see* Barry Decl. Exh. V (WTCP Cross-
Claim Plaintiffs' Updated Damages Disclosure: 1, 2, 4 and 5 World Trade Center ("WTCP
Updated DDF")).  WTCP's damages expert report, presently in preparation, will refine those
estimates.

        Although the WTC Buildings no longer exist and WTCP has not been receiving
any rent from tenants, WTCP is not relieved of its obligations to continue making rental
payments to the Port Authority.  *See* One WTC Lease Sec. 15.1.4 (Barry Decl. Exh. L).  Over the
last seven years, WTCP has paid the Port Authority nearly $1.2 billion in rental payments, and it
must continue to make rental payments.  Levy Decl. ¶ 12.  WTCP also is obligated under the
leases to build replacement buildings in accordance with the buildings' original plans and

specifications or, if building in accordance with the original plans is not feasible, in accordance with revised specifications approved by the Port Authority. *See* One WTC Lease Sec. 15.1. The April 2007 preliminary estimate of the cost of building the four replacement WTC Buildings (also to be refined in WTCP's expert reports) was approximately $8.4 billion discounted to net present value as of September 11. Levy Decl. ¶ 16; WTCP Updated DDF (Barry Decl. Exh. V).

**The Public Interest in Rebuilding**

Rebuilding the World Trade Center is not just another commercial venture or "investment opportunity" as Defendants contend. Moving Br. at 2. Rather, it is an undertaking of vital public importance to restore the economic and other public benefits of the World Trade Center. Garvin Decl. ¶¶ 57-61, 72. For the public the World Trade Center was built to serve, the Twin Towers were a daily landmark — a directional anchor. For visitors, they were symbols of a dynamic New York. For the rest of the world, they were the immediately recognizable symbols of New York City. Everyone has been touched by the destruction of the World Trade Center and its powerful absence. Garvin Decl. ¶ 71.

On the very day of the September 11 attacks, Mayor Rudolph Giuliani declared: "We will rebuild: We're going to come out of this stronger than before, politically stronger, economically stronger. The skyline will be made whole again." Garvin Decl. ¶ 68. In the days that followed, a determined local, state and federal public policy mandate to rebuild emerged. Garvin Decl. ¶ 72. A consensus was reached among political leaders, legislators, economists, historians, architects, urban planners and countless ordinary citizens involved in the planning process that rebuilding the World Trade Center complex was essential to the City's vitality and economic health, to the preservation of the economic well-being of the Northern New Jersey-New York metropolitan area, and as an expression of public resolve to rebound from the terrorist attacks and restore what was taken from the public. Garvin Decl. ¶ 72. Redevelopment of the World Trade Center site will benefit New York in myriad ways, both in the short and long-

term.[10]  Because of the unique nature of the World Trade Center, the location, importance and

history of the complex, and the circumstances of its destruction, failing to rebuild the World

Trade Center would have been devastating to the public interest.  Garvin Decl. ¶¶ 41, 74.

Congress responded to and supported the public consensus to rebuild the World

Trade Center by providing, in the Air Transportation Safety and System Stabilization Act of

2001, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C.A. § 40101

note) (West Supp. 2008) ("ATSSSA"), that the aggregate liability of any "person with a property

interest in the World Trade Center" for damages arising from the terrorist-related aircraft crashes

of September 11 would be limited to the amount of "the limits of liability insurance coverage

maintained by that . . . person."  ATSSSA § 408(a)(1).  Covered persons included WTCP, as a

person with a "fee simple, leasehold or easement [interest], direct or indirect" in the World Trade

Center.[11]  *Id.*  Among other things, the provision protects the financial health of those engaged in

---

[10]     Garvin Decl. ¶¶ 58-61, citing Appleseed, Inc., Economic Impact of Redeveloping the World
Trade Center Site: New York City, New York State, and the New York-New Jersey Area, 6-7 (Oct. 30,
2003) (among other benefits, (1) rebuilding the World Trade Center will help reassert lower Manhattan's
role as a major center of commerce; (2) "traffic generated by establishment of a regional retail hub at the
World Trade Center site" could over time encourage further investment in commercial development at
other sites in the area; (3) "the new PATH terminal will in the future be able to accommodate substantial
growth in the number of employees commuting to Lower Manhattan from New Jersey"; and (4) "[t]he
development of new public spaces, cultural activities, retail choices and employment opportunities will
make Lower Manhattan a more attractive place to live; it will thus encourage further investment in
residential development in the area and the continued revitalization of Lower Manhattan as a vibrant,
twenty-four-hour live-work community"); McKinsey & Co., Economic Impact of the September 11
Attack on New York City 75-76 (Nov. 2001) (noting that the World Trade Center was in part a
"government-driven remedy for lower Manhattan's stagnation" and that the "events of September 11,
2001 abruptly suspended the lower Manhattan renaissance"; concluding that the "redevelopment of
Ground Zero should be a matter of national resolve" and opportunities cannot be lost to "capture the
positive momentum and the determination shared by business and the general public to rebound from this
terrorist assault on America"); A.T. Kearney, Rebuilding the WTC, Economic Impact Analysis 3 (Jan. 21,
2002) ("The economic impact of rebuilding the WTC extends across numerous sectors of the Downtown
economy and is essential to Downtown's vitality and economic health.  The City, as a whole, will benefit
as well.").

[11]     Section 408(a)(1) of ATSSSA affords the same limitation on liability exposure to the Aviation
Defendants, without any conditions.  *See* ATSSSA § 408(a)(1) (affording protection to "an air carrier,
aircraft manufacturer, airport sponsor . . . or their directors, officers, employees, or agents").
Accordingly, WTCP as a victim, is limited in the amount of its damages that it can collect as a result of
the Aviation Defendants' tortious conduct.  Further, the Defendants themselves will not have to pay any
of WTCP's damages.  Only their insurers will have to pay their coverage amounts.

the rebuilding effort from possible large damage awards which might destroy their ability to rebuild. *See* 147 CONG. REC. S9594 (Sept. 21, 2001) (Statement of Sen. McCain) (noting importance of ensuring that "other potential corporate defendants" not see their property "insurance monies . . . exhausted"); 147 CONG. REC. H7649 (Nov. 1, 2001) (Statement of Rep. Sensenbrenner) ("[W]e can prevent the prospect of unlimited liability damage awards from turning New York from the nation's financial capital into a business graveyard.").

That financial protection was conditioned, in WTCP's case, on WTCP's not willfully defaulting on its obligation under the net leases to rebuild. *See* ATSSSA § 408(a)(2) (liability limits inapplicable if "the person has defaulted willfully on a contractual obligation to rebuild, or assist in the rebuilding, of the World Trade Center"); H.R. CONF. REP. No. 107-296, at 81 (Nov. 16, 2001), *reprinted in* 2001 U.S.C.C.A.N. 589 ("Any person with a property interest in the World Trade Center, as a condition to receiving liability protection under the Act, is required to satisfy all contractual obligations to rebuild or assist in the rebuilding of the World Trade Center."). The condition ensured that WTCP would not do what the Aviation Defendants callously argue here WTCP should do — take the insurance money, "walk away" from its contractual obligation to rebuild, and leave the public with a big hole in the ground. Moving Br. at 20-21.

**The Rebuilding Effort**

WTCP has *not* taken the insurance money and walked away from its contractual obligations under the leases. Nor could it.[12]

---

[12]    If WTCP had "walk[ed] away" as Defendants suggest it should have done (Moving Br. at 21), WTCP — contrary to what Defendants say — would have lost all right to the insurance proceeds covering losses arising from the destruction of the WTC Buildings, because the net leases specifically provide that the insurance proceeds must be available for the payment of the cost of the replacement buildings. One WTC Lease Sec. 15.2 (Barry Decl. Exh. L) ("If such damage or destruction . . . is covered by insurance . . . such proceeds shall be made available for and applied to the payment of the cost of the rebuilding, restoration, repair, replacement and alteration work required to be performed by the Lessee under the provisions of this Agreement."); *id.* Sec. 15.1 ("If the Premises . . . shall be damaged or destroyed . . . the Lessee, at its sole cost and expense, and whether or not such damage or destruction is covered by insurance proceeds sufficient for the purpose . . . shall rebuild, restore, repair and replace the Premises . . . ."); *id.* Sec. 16.1 ("[I]f the Lessee is in breach or default with respect to any obligation undertaken by it hereunder or otherwise under this Agreement, . . . [the Port Authority has the right] to

Immediately after the destruction of the World Trade Center on September 11, WTCP committed itself to replacing the World Trade Center, as WTCP was duty-bound to do under the leases. WTCP has undertaken great construction, engineering, and political challenges to replace the WTC Buildings.[13] WTCP has cooperated with the Port Authority, the States of New York and New Jersey, the City of New York, various federal, state and city agencies and other community and citizen stakeholders to build a new World Trade Center befitting the legacy and importance of the destroyed World Trade Center, in other words, to replace what was lost. Garvin Decl. ¶¶ 62, 64, 66, 73, 85, 95, 112.

A World Trade Center redevelopment plan conceived by Studio Daniel Libeskind was chosen in 2003. Garvin Decl. ¶ 101. A six-acre memorial and a museum are centerpieces of the site. Garvin Decl. ¶ 108. Surrounding the memorial space will be the WTC Transportation Hub, retail development, cultural facilities, new open spaces and the replacements for the WTC Buildings — the Freedom Tower (One World Trade Center) and Towers 2, 3, and 4. Garvin Decl. ¶ 108. The design for the WTC Memorial was selected from more than 5,000 entries. Garvin Decl. ¶ 108. Currently under construction, the WTC Transportation Hub, designed by heralded architect and engineer Santiago Calatrava, will be a world-class gateway to our public transportation system, a downtown grand terminal that integrates the ferries, PATH, and NYC subway lines that carry commuters and millions of visitors to and from lower Manhattan. Garvin Decl. ¶ 108. In addition, two streets (Greenwich and Fulton) will be extended through the site and two new pedestrian ways (Cortlandt and Dey) will be created. Garvin Decl. ¶ 108. Just

---

terminate the Lessee's estate and interest in the Premises and, . . . to collect a judgment or other judicial process or arbitration award requiring payment of money by the Lessee from any Gross Revenues, [and] insurance proceeds . . . thereafter payable to the Lessee with respect to the Premises.").

[13]     Unburdened by the challenges that complicate work at the main World Trade Center site, Plaintiff 7 World Trade Company, L.P. — the net lessee of 7 World Trade Center and also a 9/11 victim — was able to rebuild 7 World Trade Center quickly. Garvin Decl. ¶ 110. The new 7 World Trade Center opened in May of 2006, sparking the post-9/11 downtown office surge. Garvin Decl. ¶ 111. It was the first new office building downtown in 19 years, and its success "validated office rebuilding in Ground Zero itself." Garvin Decl. ¶ 111. Goldman Sachs is constructing their $2.3 billion, 43-story world headquarters across the street. Garvin Decl. ¶ 111.

outside of the 16-acre site, Tower 5 and a Vehicle Security Center will be built after the former Deutsche Bank building at 130 Liberty Street is abated and deconstructed. Garvin Decl. ¶ 108.

The Freedom Tower, like the new 7 World Trade Center, was designed by the world-renowned architect David M. Childs of Skidmore, Owings & Merrill LLP and will be the tallest of four towers replacing the WTC Buildings. Garvin Decl. ¶ 109. When complete, the Freedom Tower will stand 1,776 feet tall, including a 408-foot spire. It will be one of the tallest buildings in the United States, second only to the Chicago Spire, which also is under construction. Garvin Decl. ¶ 109. A restaurant and an observation deck are planned for the top floors. Garvin Decl. ¶ 109. Towers 2, 3 and 4, each also designed by a world-renowned architect (Lord Norman Foster, Lord Richard Rogers and Fumihiko Maki, respectively), will descend in height from the Freedom Tower and, together with the Freedom Tower, encircle the planned memorial. Garvin Decl. ¶ 109.

It may not seem obvious from a view of Ground Zero, but the work of rebuilding the World Trade Center is substantially underway. Hundreds of millions of dollars have been spent on architectural design, engineering and construction work for the replacement WTC Buildings. The foundations and footings for the WTC Memorial and the museum are nearing completion, with steel slated to arrive soon; the Freedom Tower is now rising above street level; the foundation work of the WTC Transportation Hub has begun while the temporary North Access for the PATH Station has already been completed; and excavation or construction for the foundations for Towers 2, 3, and 4 and associated retail space are underway. Two electric power substations destroyed on 9/11 have been replaced. Garvin Decl. ¶ 112.

When the rebuilding of the World Trade Center is completed, it will once again be one of the most important complexes in the world, providing the public benefits that the WTC Legislation mandates and honoring those who lost their lives on 9/11. It will enrich the lives of people in the region and around the world in countless ways. It will stand as a memory of what it once was and as a testament to the public purpose it achieves and the reasons why it was rebuilt. Once again, there will be nothing else like it in the world. Garvin Decl. ¶¶ 113-14.

16

## ARGUMENT

### Summary of Argument

We now demonstrate why Defendants' motion cannot be granted. First, as we show in Point I below, the motion depends on a strictly construed statutory offset which, as a matter of law, cannot be determined until there has been both (i) a damages award by the jury, and (ii) a finding by the Court that a portion or all of the collateral insurance payments "correspond" to particular items of damage awarded by the jury (*i.e.,* cover the same losses). CPLR 4545(c) is not relevant to whether WTCP has damages in the first instance.

We show in Point II that, as a matter of law, WTCP, as the net lessee who is rebuilding, is entitled to recover damages for the destruction of the World Trade Center buildings owned by the Port, as well as damages for the separate injury to its own leasehold interests. Summary judgment cannot be granted because the measure of damages for the destruction of the WTC Buildings is disputed. As we demonstrate, the only appropriate measure of damages is replacement cost; "market value" appraisal methods do not apply. We also show that material facts omitted from Defendants' motion, including evidence of the WTC's statutory public purpose and its unique characteristics, specific, statutorily prescribed location and use, support WTCP's claim for replacement cost damages, as well as WTCP's separate claim for damage to its leasehold, and require denial of the motion.

In Point III, we show that, even if "market value" appraisal methods could be used, the determination of WTCP's damages cannot be made on summary judgment. First, the alleged value of WTCP's rental payments to the Port Authority is not — as Defendants claim — the "fair market value" of the buildings. Second, WTCP is entitled to prove replacement cost damages at trial. It is then Defendants' burden to prove, if they choose, that diminution in market value is less than replacement cost but will still adequately compensate WTCP. But Defendants cannot preempt WTCP's right to prove replacement cost damages at trial.

Finally, Point IV addresses a subsidiary issue raised by Defendants' motion — we show that prejudgment interest on WTCP's damages award is determined by New York substantive law.

## I.

### SUMMARY JUDGMENT MUST BE DENIED BECAUSE DEFENDANTS, AS A MATTER OF LAW, ARE NOT ENTITLED TO AN OFFSET NOW UNDER CPLR 4545(c)

The entire foundation of Defendants' house-of-cards motion is the desire to invoke prematurely CPLR 4545(c)'s exception to the common law collateral source rule. As explained below, without a statutory offset now, Defendants have no motion because they concede that WTCP has at least some damages and the calculation of WTCP's damages is for the jury, not the Defendants.

Defendants have wasted the time of both this Court and WTCP with this motion. A simple reading of CPLR 4545(c) reveals that it does not apply or come into play until after there has been an award of damages by the trier of fact — in this case, the jury — *and* Defendants have proven to the Court that the amounts sought to be offset "correspond" to specific items of damages awarded. A review of the cases applying CPLR 4545(c) would have confirmed that. Defendants' motion fails for this reason — there is no need to examine the rest of their arguments. Defendants have misled this Court that it would be productive for them to make this motion instead of admitting, when challenged, that they had no basis for telling the Court they could obtain summary judgment as a matter of law dismissing WTCP's damages claims.[14] Not only have Defendants wasted the time of both the Court and WTCP, they have put

---

[14]    At the March 18, 2008 status conference, the Aviation Defendants told the Court that they could file their motion for summary judgment if WTCP informed them "[w]hat their claim is and how much they are claiming for each element of damage. They give us that, we can proceed." March 18, 2008 Transcript (Williamson Decl. Exh. 2) at 43:1-3. Of course, the Aviation Defendants already had that information from the April 23, 2007 WTCP Updated DDF (Barry Decl. Exh. V). And they knew or should have known the issues they raise are trial issues which cannot be resolved in summary fashion.

WTCP to considerable expense to debunk their baseless claim and have distracted WTCP from the task of completing fact discovery.[15]

Although Defendants misleadingly frame their motion as presenting the issue "whether the plaintiff has any compensable damages at all" (Moving Br. at 11), Defendants, in fact, concede that WTCP has suffered damages.[16] Their argument is that WTCP's claims should be dismissed because WTCP will have *"no remaining recoverable damages"* if statutory offsets are applied for payments made by WTCP's own insurers.[17] Moving Br. at 4 (emphasis added). The amount of WTCP's damages is in dispute and is for the jury, not for the Aviation Defendants, to decide. *See* Point II, *infra.* But, in any event, summary judgment cannot be granted based on collateral source offsets because any offsets cannot be determined until after a damages "award" is rendered by the jury *and* the Court makes statutorily required findings that specific collateral payments "correspond" to specific categories of damages. Granting summary judgment to tortfeasors based on offsets which have not and cannot yet be determined — as the

---

[15]    Beginning just three days prior to bringing this motion — a motion that claims that WTCP's damages claims can be dismissed as a matter of law and that there are no material issues of fact — and continuing until as recently as August 1, 2008, Defendants issued a barrage of 14 subpoenas directed to non-parties for information about WTCP's damages. The subpoenas impose significant burdens on the non-parties and substantially increase the burden on WTCP to finish fact discovery in a timely manner. Because Defendants claim there are no disputed material issues of fact regarding WTCP's damages, the subpoenas should not have been issued. *See* Memorandum of Law in Support of Motion for Protective Order Granting a Limited Stay of Discovery as to Fourteen Subpoenas Issued to Non-Parties Concerning the WTCP Plaintiffs' Damages Claims, filed on August 14, 2008.

[16]    *See, e.g.,* Moving Br. at 1-4, 10-11, 16-18, 26, 30-32 (referring to WTCP's "damages" and "loss," and arguing that same are not "compensable," "recoverable," or "cognizable" because they allegedly would amount to double recovery).

[17]    Some of WTCP's property insurers also insure defendants in this litigation. Allianz and Munich Re or their subsidiaries or affiliates provided liability insurance to certain Aviation Defendants, including Boeing, Huntleigh, Colgan, US Airways, American Airlines/AMR Corp. and United/UAL. Williamson Decl. ¶¶ 6-7. In an effort to avoid paying claims on behalf of their Aviation Defendant insureds, those insurers have joined Defendants in this motion to dismiss the claims of their WTCP insureds. Although Swiss Re, another of WTCP's insurers, is not itself one of the Clifford Group of Plaintiffs, Swiss Re has purchased IRI which is one of the Clifford Group of Plaintiffs. Williamson Decl. ¶ 8. Swiss Re provided excess insurance to American Airlines/AMR Corp. and an affiliate of Swiss Re insured Boeing. Williamson Decl. ¶ 8.

Defendants are asking the Court to do —would contravene the statute's plain language and purpose.

**A.     CPLR 4545(c) Does Not Apply Until There Is a Damages "Award"**

New York's common law collateral source rule prohibits any reduction or offset of tort damages by amounts of compensation the injured person may have received from sources other than the tortfeasor. *Oden v. Chemung County Indus. Dev. Agency*, 661 N.E.2d 142, 143, 87 N.Y.2d 81, 85, 637 N.Y.S.2d 670, 671 (1995). The rule "is based on the premise that a negligent defendant should not, in fairness, be permitted to reduce its liability by the proceeds of insurance or some other source to which that defendant has not contributed." *Id.* Defendants seek to avail themselves of one of the New York Legislature's limited statutory "incursion[s] on the rule's scope" which are set forth in CPLR 4545. *Id.* The statute applies to actions like this, which are "brought to recover damages for . . . injury to property . . . , where the plaintiff seeks to recover for . . . economic loss," CPLR 4545(c), but when the amount of damages is disputed, the statute is inapplicable in the summary judgment context because any offset arises only *after* a damages award has been rendered. *Id.* ("If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of *the award* by such finding.") (emphasis added).

Here, Defendants ask the Court to find prematurely that specific categories of damages have been or will be paid by insurance before there has been any "award" of such damages. The request is not hypothetical — Defendants seek to have WTCP's claims dismissed on that basis. CPLR 4545(c) may not be used in that manner.

As the heading of CPLR 4545 — "Admissibility of collateral source of payment" — indicates, CPLR 4545 is an evidentiary rule intended to permit the introduction of evidence as to collateral source payments for the court's use in determining after trial whether such payments should offset any part or all of the damages award.[18] *Wooten v. State*, 302 A.D.2d 70, 74, 753

---

[18]     Although the rule permits evidence on the issue of collateral source reimbursement to be introduced at trial, even where the trial is a bench trial, such evidence need not be introduced during trial,

N.Y.S.2d 266, 269 (4th Dep't 2002) (CPLR 4545 is a "statute-based reduction in the verdict, and
. . . [is] presented to and determined by the court after the verdict is rendered rather than during
trial."); *see also Teichman by Teichman v. Community Hosp. of W. Suffolk*, 205 A.D.2d 16, 19,
617 N.Y.S.2d 338, 340 (2d Dep't 1994) (Statutory language "makes it apparent that the
Legislature intended the statute to define an evidentiary rule which is to be applied only where
the matter is tried and *a judgment in favor of a plaintiff has been 'awarded.'*") (emphasis added),
*aff'd as modified*, 663 N.E.2d 628, 87 N.Y.2d 514, 640 N.Y.S.2d 472 (1996); *Turnbull v. USAir,
Inc.*, 133 F.3d 184, 189 (2d Cir. 1998) (citing *Teichman*); *Moriarity v. Small World Adoption
Found. of Mo., Inc.*, 5:04-CV-394, 2008 WL 2733820, at *2 (N.D.N.Y. July 11, 2008) (denying
defendants' request for pre-trial ruling "that they are entitled to an offset" under CPLR 4545(c)
because "any ruling on the collateral-source issue would be premature; section 4545(c) by its
terms contemplates a reduction of damages *after* they are awarded") (emphasis in original).

   The courts' insistence that no offset be made until there has been a damages
"award" is in keeping with the New York Court of Appeals' holding that CPLR 4545(c) "is to be
strictly construed" because it is "a statute enacted in derogation of the common law." *Oden*, 661
N.E.2d at 144, 87 N.Y.2d at 86, 637 N.Y.S.2d at 672.

> Further, it is to be construed in the narrowest sense that its words and
> underlying purposes permit, since the "rules of common law must be held
> no further abrogated than the clear import of the language used in the
> statute absolutely requires" (McKinney's [Cons Laws of NY, Book 1,
> Statutes] § 301[b]).

*Id.; see also* 36 N.Y. JUR. 2D DAMAGES § 130, at 181 (2005) (CPLR 4545 "should receive a strict
interpretation so as to limit the change in common law only to the clear meaning of the words
used.").

   The requirement that there be an award is tied to the statute's goal of eliminating
double recoveries — until there is an award which might result in a double recovery, collateral
source payments have no relevance: "The issue whether there is another source from which

---

but can await post-trial hearing. *Wooten v. State*, 302 A.D.2d 70, 73, 753 N.Y.S.2d 266, 269 (4th Dep't
2002).

claimant is or will be compensated for economic loss *is not relevant to the issues* whether defendant is liable to claimant, *whether claimant is entitled to damages,* or whether the damages may be mitigated." *Wooten*, 302 A.D.2d at 77, 753 N.Y.S.2d at 272 (Scudde, J. & Lawton, J., concurring in part, dissenting in part) (emphasis added); *see also Oden,* 661 N.E.2d at 145, 87 N.Y.2d at 88, 637 N.Y.S.2d at 673 ("The Legislature's goal of eliminating plaintiffs' duplicative recoveries is served by subtracting *from the total award* those collateral source payments that duplicate or correspond to a particular item of economic loss.") (emphasis added).

Defendants do not cite a single case where the amount of damages was in dispute and CPLR 4545(c) was applied *before* damages had been awarded. To the contrary, despite Defendants' misleading and erroneous representation that "WTCP's situation is *identical* to that of the plaintiff in *Fisher* [*v. Qualico Contracting Corp.*]" (Moving Br. at 31 (emphasis added)), the offsets in *Fisher* were made *after* an itemized jury award was rendered.[19] Similarly, *Jarvis v. Ford Motor Co.,* cited at the same page of the Moving Brief, involved an appeal from an order reducing a jury verdict on the basis of collateral disability payments. 283 F.3d 33, 64 (2d Cir. 2002). Because there has not yet been an award of damages here, CPLR 4545(c) is not yet relevant and may not be used prematurely by Defendants to cut off WTCP's right to prove its damages. *See Terranova v. New York City Transit Auth.,* No. 13946/02, 2005 WL 2219685, at *4 (Sup. Ct. Richmond Co. Aug. 23, 2005) (CPLR 4545(c) is not "designed to provide undeserved financial relief to culpable defendants."); *Bryant v. New York City Health & Hosps. Corp.,* 716 N.E.2d 1084, 1092, 93 N.Y.2d 592, 607, 695 N.Y.S.2d 39, 47 (1999) ("CPLR 4545 was intended to eliminate double recoveries, not provide defendants and their insurers with an 'undeserved windfall.'").

---

[19]    In *Fisher v. Qualico Contracting Corp.*, "[t]he jury found the restoration cost of the home to be $1,330,000, and the diminution in market value of the property $480,000, and also awarded the Fishers itemized consequential damages of $362,100." 779 N.E.2d 178, 180, 98 N.Y.2d 534, 537, 749 N.Y.S.2d 467, 469 (2002).

**B.     Defendants Have Not and Cannot Yet Demonstrate
that Any Collateral Source Payments Correspond
to Categories of Damages Awarded by the Jury**

Even if the jury already had made an "award" of damages, Defendants have not

made even a *prima facie* showing of entitlement to a setoff. Defendants assert facilely but

incorrectly that "[u]nder New York's collateral source rule . . . *any amount of recoverable*

*damages must be offset* by the insurance payments received by WTCP." Moving Br. at 4

(emphasis added). To the contrary, "CPLR 4545(c) does not direct the setoff of collateral source

payments against *all* damages awards." *Fisher,* 779 N.E.2d at 181, 98 N.Y.2d at 538, 749

N.Y.S.2d at 470 (emphasis in original). Rather, a "direct correspondence between the item of

loss and the type of collateral reimbursement must exist before the required statutory offset may

be made." *Oden,* 661 N.E.2d at 144-45, 87 N.Y.2d at 87, 637 N.Y.S.2d at 672-73 (statutory

language does not permit treating "all collateral source payments as fungible"; to allow the

"subtraction of all collateral source payments arising from the incident regardless of whether

they duplicate an awarded item of pecuniary loss . . . would confer an undeserved windfall on

tort defendants and their insurers by permitting them to obtain a credit for collateral source

payments that do not correspond to items of economic loss that they are being called upon to

reimburse"); *accord Turnbull*, 133 F.3d at 187 ("[Defendant] was required to show with

reasonable certainty (1) that the judgment includes an award for damages that falls within a

certain category of loss, and (2) that [Plaintiff] receives collateral source payments that

reimburse him for a corresponding category of loss that he suffered as a result of the [tort].").

Whether the necessary correspondence is present to permit the offset of a payment

is "a matter of proof and factual analysis." *Oden,* 661 N.E.2d at 146, 87 N.Y.2d at 89, 637

N.Y.S.2d at 674. "[S]uch determinations can be made more prudently and efficiently after a

[post-verdict] hearing." *Terranova*, 2005 WL 2219685, at \*5. It is Defendants' burden "to

establish [their] entitlement to a collateral source offset with proof of such a high degree of

certainty that it amounts to clear and convincing evidence." *Id.*; *see also Kihl v. Pfeffer*, 47

A.D.3d 154, 163-64, 848 N.Y.S.2d 200, 207 (2d Dep't 2007) ("[The] reasonable certainty"

23

standard of proof in CPLR 4545(c) "is understood as involving a quantum of proof that is greater than a preponderance of evidence but less than proof beyond a reasonable doubt" and has been held to be "akin to the clear and convincing evidence standard, that the result urged by the defendant be 'highly probable.'").

Here, even if the jury already had awarded itemized damages, Defendants offer no proof, let alone clear and convincing proof of a "highly probable" result, from which the Court could find the necessary "correspondence" of any payment by WTCP's insurers to specific categories of those damages (*i.e.,* that the insurance payments cover the same losses). Indeed, Defendants have not addressed their burden of proving correspondence under CPLR 4545(c) and have not offered any proof of such correspondence. Instead, they are trying to put one over on the Court. The sum total of Defendants' "proof" of insurance payments relates to the total amount of payments to WTCP.[20] Without reference to any specific insurance payment, Defendants ask the Court to infer from testimony in the property insurance coverage litigation about the lender GMAC's thinking in insisting on insurance limits of almost $3.6 billion, that WTCP's insurance "was intended to cover the property value of the World Trade Center plus several years of rental income." Moving Br. at 8 (citing testimony of Robert Strachan (Barry Decl. Exh. S)). Of course, it does not matter what someone thought the policies were intended to cover. Under the CPLR 4545(c) "correspondence" requirement, the only issue is whether the insurance payment actually covers a category of the damages award.

Defendants argue further that it does not matter whether WTCP's damages are for diminution in market value or for replacement cost, because "both are measures of the same thing — lost property value." Moving Br. at 13-14 (discussing *Fisher*). Even if WTCP's

---

[20]    *See* Moving Br. at 8-9 (referring to total payments "WTCP has received, or will receive," as summarized by a document (Barry Decl. Exh. T) that is inadmissible and contains no information attributing any payment to any specific category of damages). *See* Memorandum of Law in Support of Cross-Motion To Strike Inadmissible Materials in the Aviation Defendants' Motion for Summary Judgment Based on CPLR 4545(c), dated August 18, 2008 ("Cross-Motion To Strike Br."), at 9-11, 19-21; Declaration in Support of Cross-Motion To Strike Inadmissible Materials in the Aviation Defendants' Motion for Summary Judgment Based on CPLR 4545(c), executed August 18 2008 by Jason T. Cohen ¶¶ 6-7.

insurance covered only property value and lost rental income, Defendants have not offered any proof identifying specific insurance payments as being for property value rather than rental income.[21] But, in fact, the overwhelming majority of WTCP's insurance policies insured not only lost rental income and replacement cost (in addition to the actual cash value coverage), but also a variety of other losses and costs, including business interruption, damage to personal property, and consequential damages, among many others.[22]

The memorandum of law submitted by various subrogated property insurers, including WTCP's subrogated property insurers, confirms that WTCP's insurance coverage was broader in scope than Defendants' characterization of the coverage (Moving Br. at 8):

> In addition to insurance for the "Actual Cash Value" of the property, *this insurance covered additional losses and costs*. It provided for recovery of lost rental income over and above any recovery for the physical damage to the property, and, it provided additional property insurance, in excess of Actual Cash Value, for *certain costs actually incurred to replace damaged property*.

---

[21]     To the extent Defendants are suggesting *(e.g.,* Moving Br. at 4) that a *lessee's* lost rental income is subsumed in, and thus corresponds to, the value of the property to the *owner*, they are wrong. Although rental payments an owner could earn by leasing its property may be reflected in a property's fair market value, a lessee's own lost rental income from its subtenants represents a separate additional profit assumed in a lease transaction. *See* Points II(B) & III(A), *infra*. In any event, "market value" is not an appropriate measure of damages for destruction of these WTC Buildings. *See* Point II (A), *infra*.

[22]     For example, the policy form followed by a number of WTCP's insurers (Levy Decl. Exh. 5) provides the following types of coverage, among others: "Covered Property", including "Building(s) . . . or other structures at the Insured's premises" (Property Coverage Form, MS C1 00 01 00, Sec. B.1.a.); "Business Personal Property", including "furniture and fixtures" (*id.*, Sec. B.1.b.(1)); "Personal Property of Others (including the Insured's employees)" (*id.*, Sec. B.1.b.(7)); "Electronic Data Processing Equipment" (*id.*, Sec. B.1.c.); "Accounts Receivable" (*id.*, Sec. B.1.d.); "Valuable Papers and Records" (*id.*, Sec. B.1.e.); "Personal Effects of Officers and Employees of the Insured" (*id.*, Sec. B.1.i.); "Covered Costs and Expenses," including "Claim Data Expense" for "expenses incurred by the Insured in preparing claim data" (*id.*, Sec. B.2.c.); "The increased cost to repair, rebuild or construct the Covered Property caused by enforcement of building, zoning, land use or any other ordinance or law when the Covered Property is insured for replacement cost" (*id.*, Sec. B.2.f.(3)); "actual loss of Business Income and/or Rental Value sustained by the Insured" (Business Income Coverage Form Excluding Extra Expense Form, MS C1 02 02 00); "Extra expense sustained by the Insured during the 'period of restoration'" (Extra Expense Coverage Form, MS C1 03 07 99); additional expenses, such as "Interest on money borrowed to finance construction or repair," "Real estate and property taxes," "Architect, engineering and consultant fees," "Legal and accounting fees," among others (Soft Costs, MS C3 05 07 99); losses relating to the interruption or failure of services such as water, communication lines and power supply services (Utility Services — Direct Damage, 2 MS C3 27 07 99).

The Clifford Group Plaintiffs' Joinder, at 3-4 (emphases added). Thus, in order to obtain an offset against a damage award for property value, Defendants must show that an insurance payment was not for lost rental income or some other category of covered loss besides property value. They have not done so.

After years of litigation to collect on its policies, WTCP entered into settlement agreements with its insurers[23] pursuant to which the insurers agreed to pay certain amounts to WTCP in settlement of WTCP's insurance claims (the "Settlement Payments"). Levy Decl. Exhs. 6-18. All of the settlement agreements have been provided to Defendants, but Defendants' motion does not refer to them. And for good reason. With one exception, none of the settlement agreements allocate any specific dollar amount of the Settlement Payments or insurance proceeds to any specific category of loss. Levy Decl. Exhs. 6-11, 13-18.[24] Some of the settlement agreements provide that Settlement Payments are to be used for the construction of the office towers and retail component at the World Trade Center, but also permit the funds to be used for other purposes without stating what dollar amount or portion of the insurance funds are to be used for which category of insured loss.[25] Other settlement agreements state that the insureds

---

[23]    A number of the property insurance settlement agreements contain confidentiality provisions. All property insurers other than Employers Insurance of Wausau ("Wausau") have consented to WTCP's production of the property insurance settlement agreements to which they are parties, subject to the February 5, 2004 Confidentiality Agreement and Protective Order in this action. Accordingly, all of the settlement agreements other than the Wausau agreement are attached as exhibits to the Levy Declaration.

[24]    The Settlement Agreement with Allianz Global Risks US Ins. Co. relating to policy no. CLP 3001140, dated July 9, 2007 (Levy Decl. Exh. 12) (the "Allianz Settlement Agreement"), establishes a Letter of Credit in the amount of $329,650,413 and provides that draws on the Letter of Credit may only be undertaken to reimburse costs relating to "the development, design, oversight and construction of the office towers and retail component . . . at the World Trade Center." Allianz Settlement Agreement Sec. 1.c.iii.a.

[25]    E.g., Levy Decl. Exh. 6 (Stipulation of Settlement with Travelers Indemnity Company and Gulf Insurance Company, dated May 18, 2007, Section 3.b (Settlement Amount "shall be withdrawn, disbursed and utilized to pay costs and expenses relating to . . . the development, design, oversight and construction of the office towers and retail component . . . at the World Trade Center, as permitted and described by all terms of the Master Development Agreement . . . as well as for lost rents/business interruption losses (including ground rent and other amounts payable from lost rents/business interruption recoveries.")))·

26

may use the Settlement Payments as the insureds may unanimously agree.[26]  Certain settlement

agreements contain no provisions restricting how the insureds may use the Settlement

Payments.[27]  Neither Defendants nor the Clifford Group of Plaintiffs joining in Defendants'

Motion (*see* notes 4 & 17, *supra*) have produced any contrary evidence establishing payment

allocations — the required "correspondence" evidence.

   In summary, Defendants' motion must be denied because it is predicated on a

premature collateral source offset which, as a matter of law, does not arise until (i) the jury has

rendered an "award" of damages, and (ii) Defendants have proved by clear and convincing

evidence of a "highly probable" result that they are entitled to a collateral offset, including proof

that the insurance payments they seek to subtract from WTCP's damages award correspond to

specific categories of damages awarded by the jury.  Defendants have utterly failed to support

their motion with that required proof.  Because no "award" exists yet, they cannot.

**II.**

**SUMMARY JUDGMENT ALSO MUST BE DENIED BECAUSE
"MARKET" VALUATION METHODS DO NOT APPLY AND MATERIAL
FACTS SUPPORT WTCP'S CLAIM FOR THE COSTS TO REBUILD
THE WTC BUILDINGS AND FOR DAMAGE TO WTCP'S LEASEHOLD**

**A. WTCP Is Entitled To Recover Replacement
Costs for the Destruction of the WTC Buildings**

   The Port Authority, not WTCP, is the owner of the WTC Buildings, but "[w]here

*both landlord and tenant sustain damages by the wrongful act of a third person*, the law

recognizes the right of each to maintain a separate action against the wrongdoer *to redress his*

*individual injury*." *Baumann v. City of N.Y.*, 124 N.E. 141, 142, 227 N.Y. 25, 30 (1919)

(emphases added).  Furthermore, New York law allows WTCP, as the lessee of the WTC

---

[26] *E.g.,* Levy Decl. Exh. 9 (London Market Insurers Agreement with Certain Underwriters at
Lloyd's, Great Lakes Reinsurance (UK) plc, Houston Casualty Company, QBE International Insurance
Ltd., Wurttembergische Versicherung AG, dated September 25, 2002, Section 5.d, providing "Upon
receipt of the funds . . . the Insureds may make such agreements as they unanimously determine with
respect to use of or withdrawal of such funds").

[27] *E.g.,* Levy Decl. Exh. 11 (Settlement Agreement and Release with ACE Bermuda Insurance
Limited, dated February 13, 2002).

27

Buildings, to recover the full damages for tortious injury to the property caused by a third party, including the damages suffered by the fee owner. *See Rogers v. Atlantic, G. & P. Co.*, 107 N.E. 661, 664, 213 N.Y. 246, 258 (1915) ("The tenant has not only possession, but an interest in the premises . . . and there is equal, if not greater, reason for allowing a full recovery by him as for allowing a depositary, who has no interest, but only possession, to recover for the conversion of, or an injury to, the deposit. A bailee, though not liable to the bailor, may recover for the wrongful act of a third party resulting in the loss of, or injury to, the subject of the bailment.") (citations omitted).

Any recovery by the lessee for both the injury to the leasehold and the injury to the fee necessarily bars a second action against the wrongdoer by the fee owner. *Id.* at 664, 213 N.Y. at 259 ("If the bailee recovers, he holds the recovery as trustee for the bailor. A recovery by either bailor or bailee will bar an action by the other."); *see also* N.Y. REAL PROP. ACTS. LAW § 833 (McKinney 1979) ("Recovery of fee damages by the owner of a possessory estate for life or for years"; "When the ownership of land is divided into a possessory estate for life or for years and one or more future interests, . . . the damages recoverable by the owner of such possessory interest from the wrongdoing third person may include damages caused to [other] interests in the affected land . . . when, all living persons who have either a possessory or a future interest in the affected land are parties thereto.").[28]

Accordingly, WTCP has standing to recover for the destruction of the WTC Buildings as well as for the injury to its own leasehold interests, *see Rogers,* 107 N.E. at 664, 213 N.Y. at 258, although WTCP would forfeit those recoveries to the Port if it ever defaulted on its rebuilding obligations under the leases. One WTC Lease Secs. 1.133, 5.7.2, 15.1, 16.1, 27, 38. We show in Point II (A) (2) below that those damages for the destruction of the WTC

---

[28]    The Port Authority is a party to this action and does not object to WTCP's recovery for the damages to the Port Authority's fee interest and use of that portion of the damages attributable to that fee injury to satisfy WTCP's obligation to replace the WTC Buildings. *See* Declaration of Keith E. Harris, executed August 11, 2008, Exh. 31-32 (Port Authority Damage Disclosure Form and Preliminary Proof of Losses).

Buildings are not determined — as Defendants suggest — by an ironclad, unwavering rule to be applied robotically in "property damage cases of all types." Moving Br. at 12. In cases where the destroyed property has a special value to its owner or is otherwise unique, New York's Court of Appeals has recognized that "market value" can be "an unworkable tool" for determining the amount of damages that will make the property owner whole. *Rochester Urban Renewal Agency v. Patchen Post, Inc.*, 379 N.E.2d 169, 172, 45 N.Y.2d 1, 9, 407 N.Y.S.2d 641, 644 (1978). In such cases, the Court of Appeals has endorsed replacement cost as the appropriate measure of damages. *Id.* Use of that method, which "has no relationship to market value as such," reflects the need under such circumstances to use another method of valuation to make the property owner whole. *Id.*

In Point II (A) (2), we show that the World Trade Center's statutory public purpose, its unique characteristics, specific location and use, and the necessity for the rebuilding which is underway all require replacement cost damages here.

### 1.   Summary Judgment Must Be Denied Because the Proper Measure and Amount of Damages Are in Dispute

As the Court knows, summary judgment may not be granted unless "there are 'no genuine issues as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 591 (S.D.N.Y. 2004) (quoting Fed. R. Civ. P. 56(c)). "A 'genuine issue' of 'material fact' exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The party moving for summary judgment has the burden of showing, with admissible evidence, the absence of a genuine issue of material fact. *See B.F. Goodrich v. Betkoski*, 99 F.3d 505, 521, 525 (2d Cir. 1996). Inadmissible evidence will not be considered. *Id.* at 525 ("When deciding a motion for summary judgment, only admissible evidence may be considered.").

The court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004).

> When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the non-movant's favor. The trial court must bear in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."
>
> . . . The trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

*B.F. Goodrich*, 99 F.3d at 521-22 (citations omitted); *see also Valerina Fashions, Inc. v. Hellman Int'l Forwarders, Inc.*, 897 F. Supp. 138, 139 (S.D.N.Y. 1995) ("[A]ll uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party."). Summary judgment is improper "if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party." *Stylianou v. St. Luke's/Roosevelt Hosp. Ctr.*, 902 F. Supp. 54, 56 (S.D.N.Y. 1995).

As we demonstrated in Point I above, CPLR 4545(c) cannot be used to foreclose WTCP's proof of damages. Accordingly, Defendants' claim that "[s]ummary judgment is appropriate where, as here, the issue presented is not how to calculate the plaintiff's damages, but whether the plaintiff has any compensable damages at all" (Moving Br. at 11) is entirely misleading. Defendants have conceded that WTCP has at least *some* damages. *See* note 16 & accompanying text, *supra*. Their deliberately clever phrasing of the question presented endeavors to avoid the reality that summary judgment is rarely available on the issue of damages because damages determinations are fact-driven. "Unless there is no genuine issue of fact with respect to the damages sustained by plaintiff, summary judgment is inappropriate." *Tondas v. Amateur Hockey Ass'n of U.S.*, 438 F. Supp. 310, 315 (W.D.N.Y. 1977); *see also Dadourian Exp. Corp. v. United States*, 291 F.2d 178, 184, 185 (2d Cir. 1961) (reversing summary judgment

30

and "remand[ing] for a trial of the issue of damages" because "it is clear to us that there is a

genuine issue of fact on the question of damages and there must be a trial of this issue").

        Summary judgment must be denied where, as here, there is evidence that the

plaintiff suffered at least *some* damages and the defendant attempts to quantify such damages as

a matter of law. *Atlantic Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 436 n.14 (2d Cir.

2005) (reversing summary judgment; "[T]he existence of *some* damages cannot be disputed.

And that is all that is needed at this point in the proceedings.") (emphasis in original); *Allard v.

Arthur Andersen & Co. (USA)*, 924 F. Supp. 488, 491 (S.D.N.Y. 1996) ("[Fed. R. Civ. P. 56(e)]

does not compel a plaintiff to provide an exact dollar figure for his damages before trial; the

plaintiff need show only that he did in fact suffer some damages."); *V.S. Int'l, S.A. v. Boyden

World Corp.*, 90 Civ. 4091, 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993) (summary judgment

proper "only if plaintiffs have failed to raise a genuine issue of material fact as to the *existence* of

alleged damages"; "even if the precise amount or extent of the damages is still somewhat

uncertain," if genuine issue of fact as to the existence of recoverable damages is demonstrated,

summary judgment is inappropriate and "plaintiff must be given the opportunity to prove the

amount of such damages at trial") (emphasis in original); *MTV Networks v. NVE Pharms.*, 01

Civ. 1699, 2002 WL 1203853, at *6 (S.D.N.Y. June 3, 2002) (cross-motion for partial summary

judgment dismissing plaintiff MTV's claim for damages denied where, although "the amount of

damages is unclear at this point, MTV has presented evidence of damage, and the assessment of

damages requires factfinding that can only take place at trial").[29]

---

[29]    The Aviation Defendants' cases are not to the contrary. In the three cases Defendants cite for the proposition that summary judgment on damages may be appropriate (Moving Br. at 11), the plaintiff had not suffered *any* damages at all. *See Siradas v. Chase Lincoln First Bank, N.A.*, 98 Civ. 4028, 1999 WL 787658 (S.D.N.Y. Sept. 30, 1999) (granting bank's summary judgment motion on claim for unlawful practices in servicing mortgages where allegedly improper interest rate charged by bank was less than interest rate bank should have charged, resulting in no damages to plaintiffs); *Teplin v. National Bank of N. Am.*, 81 Civ. 2369, 1982 U.S. Dist. Lexis 10925 (S.D.N.Y. Jan. 7, 1982) (granting bank's summary judgment motion on negligence claim where plaintiff suffered no damages as a result of bank's two-week delay in processing dishonored check that had been deposited into plaintiff's account); *Maier-Schule GMC, Inc. v. General Motors Corp.*, 154 F.R.D. 47 (W.D.N.Y. 1994) (plaintiff did not offer any proof of antitrust damages in opposition to motion and failed in discovery to identify documents supporting damages).

The amount of a plaintiff's damages cannot be determined by a court on summary judgment where any evidence supports a conflicting inference as to the amount of the plaintiff's damages:

> The evaluation of the injury suffered by a plaintiff, unless damages have been liquidated or otherwise stipulated, is normally a question of fact to be decided by the factfinder after trial, not a matter for summary judgment.

*Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990); *see also Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 33-34 (2d Cir. 1986) ("Where the amount of damages is not in dispute, a court may award damages on summary judgment. In this case, however, . . . it [is] clear that there was no agreement among the parties as to what damages Fay suffered . . . . We remand the action to the district court for further proceedings to determine the amount, if any, of Fay's damages.") (citation omitted); *Eagle Access, LLC v. BHA, Inc.*, 05 Civ. 2837, 2007 WL 193725, at *4 (S.D.N.Y. Jan. 25, 2007) (denying motion for summary judgment as to amount of damages "[g]iven the material dispute as to the value of the repossessed equipment at issue here"); *Merrill Lynch Bus. Fin. Servs. Inc. v. Heritage Packaging Corp.*, CV-06-3951, 2007 WL 2815741, at *7 (E.D.N.Y. Sept. 25, 2007) ("Although the dispute over the amount owed does not preclude summary judgment on the issue of liability, it does preclude summary judgment on the issue of damages."); *Central Pension Fund of Int'l Union of Operating Eng'rs v. Murphy's Tire, Inc.*, 97-CV-814, 1998 WL 865594, at *8-9 (N.D.N.Y. Dec. 9, 1998) ("Thus, the proper question in deciding the Fund's motion for summary judgment is whether defendant has submitted evidence that raises a factual dispute as to the amount of damages owing the Fund. . . . The Court finds that these affidavits assert facts that would cast doubt upon the auditor's calculation . . . . Thus, the Fund's motion for summary judgment is denied as genuine issues of material fact preclude the entry of summary judgment on damages.").

Here, where the existence of at least *some* damages is conceded and there is no stipulation as to the amount of WTCP's damages, summary judgment must be denied.

2.     **Replacement Cost Is the Only Appropriate Measure**
**of Damages Because the WTC Buildings Cannot**
**Be Valued by "Market Value" Appraisal Methods**

The fundamental goal of tort damages is to make an injured party whole and restore the party, as nearly as possible, to the position the party would have been in absent the injury. RESTATEMENT (SECOND) OF TORTS § 901 (1979); *see also Standard Oil Co. of N.J. v. Southern Pac. Co.*, 268 U.S. 146, 155 (1925) ("Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed."); *Cashin v. City of New Rochelle*, 176 N.E. 138, 140, 256 N.Y. 190, 198 (1931) ("In general, injuries to property, unattended by any species of aggravation, are followed by damages proportioned to the actual pecuniary loss sustained. This may be a nominal or a substantial amount. The question is, What amount will restore the owner to his original position?").

The Aviation Defendants do not dispute that, if liability is found, WTCP is entitled to full compensation for all of its damages. Instead, the Aviation Defendants argue incorrectly that the so-called "lesser of two" rule is "the *only* measure" of all of WTCP's damages in this case (Moving Br. at 12 (emphasis in original)) and falsely claim that to be the "rule that has applied to *every other New York property owner for more than 100 years.*" *Id.* at 1 (emphasis added). In fact, it is *not* the "only" measure of damages and it has *not* been applied to New York property owners whose property, like the World Trade Center, has a special purpose, features, specific location or other characteristics that make "market value," in the words of New York's Court of Appeals, an "unworkable" basis for determining adequate compensation for the property's destruction. *Rochester Urban Renewal Agency,* 379 N.E.2d at 172, 45 N.Y.2d at 9, 407 N.Y.S.2d at 644.

As we demonstrate below, the appropriate measure of damages in this case is the measure for property with "no reasonable market value" set forth in NY (Civil) PJI 2:312 and not, as Defendants claim, the measure for "property with market value" set forth in NY (Civil) PJI 2:311. *See* Moving Br. at 14. The former pattern jury instruction requires the jury to take

33

into account "the value to plaintiff of the property," including its "utility" and "the use it has received." NY (Civil) PJI 2:312. [30]

Under New York law, as the Court of Appeals confirmed in *Fisher*, "[r]eal property losses incurred as a result of a defendant's negligence may be measured in different ways." 779 N.E.2d at 181, 98 N.Y.2d at 539, 749 N.Y.S.2d at 470; *see also Great Atl. & Pac. Tea Co. v. Kiernan*, 366 N.E.2d 808, 812, 42 N.Y.2d 236, 242, 397 N.Y.S.2d 718, 723 (1977) ("[T]he ordinary or general rule should not blind us to the fact that the ultimate purpose of valuation, whether in eminent domain or tax certiorari proceedings, is to arrive at a fair and realistic value of the property involved."); *Hartshorn v. Chaddock*, 31 N.E. 997, 998, 135 N.Y. 116, 121 (1892) (although "diminution in the value of the land is the general rule" for measuring damages for injury to real property, the "rule is subject to some exceptions, as it would in some cases be incapable of application"); *accord Wall v. Platt,* 48 N.E. 270, 273 (Mass. 1897) ("[M]arket value does not in all cases afford a correct measure of indemnity [for property damage], and is not, therefore, a 'universal test.'"); *Trinity Church of Boston v. John Hancock Mut. Life Ins. Co.*, 502 N.E.2d 532, 535 (Mass. 1987) (same); *Standard Oil Co. of N.J. v. Southern Pac. Co.,* 268 U.S. at 156 ("The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.").

In overturning a tax assessment based on an appraisal which set a value $5.3 million higher than the owner's valuation of one of the world's largest food processing plants, located in Horseheads, New York, the Court of Appeals recognized that the same valuation rule does not apply to all types of properties:

---

[30]    Although NY (Civil) PJI 2:312 refers to "personal property," it also applies to "other property for which there may be no ready market, *see McAnarney v. Newark Fire Ins. Co.,* 247 N.Y. 176, 159 N.E. 902 [(1928)]." 1B NY PJI 3d 2:312, cmt. at 1576 (2008). The comment to the instruction notes that PJI 2:312 is based on *McAnarney*, a case involving brewery buildings destroyed by fire. *Id.* In *McAnarney,* the Court of Appeals noted that "[the subject] buildings peculiarly adapted to the manufacture of malt . . . have lost value when they are no longer used or usable for such purposes." 159 N.E. at 905, 247 N.Y. at 186.

34

> To reject a sound and valid approach to valuation where the normally
> applicable rule has no relevance under the circumstances of a particular
> case, is to abandon the economic realism which should characterize
> valuation and embrace a rigid, dogmatic approach which will not yield fair
> and equitable results. As we recently stated in *G.R.F., Inc. v. Board of
> Assessors of County of Nassau, supra,* 41 N.Y.2d p. 515, 393 N.Y.S.2d p.
> 968, "[p]ragmatism . . . requires adjustment when the economic realities
> prevent placing . . . properties in neat logical valuation boxes."

*Great Atl. & Pac. Tea Co.*, 366 N.E.2d at 813, 42 N.Y.2d at 243, 397 N.Y.S.2d at 723

(omissions in original).  The Court of Appeals confirmed its repugnance for inflexible "black

letter" application of valuation rules in *Rochester Urban Renewal Agency*, where it cautioned

that "the quest for an objective criterion must not be so relentless that the special value of the

property to its owner is ignored in deciding whether another method of evaluation is

appropriate." 379 N.E.2d at 172, 45 N.Y.2d at 9, 407 N.Y.S.2d at 644.

The tax assessor whose property valuation was ruled on by the Court of Appeals

in *Great Atl. & Pac. Tea Co.* had valued the food processing plant as a "specialty" property —

the value of such properties being the replacement cost. 366 N.E.2d at 810, 42 N.Y.2d at 239,

397 N.Y.S.2d at 721.[31]  Specialty properties are deemed "sufficiently unique" to warrant such

valuation.  Four criteria of a specialty property were enunciated by New York's Appellate

Division in *County of Nassau v. Colony Beach Club of Lido, Inc.*:

> (a)    The improvement must be *unique* and must be specially built for
> the specific purpose for which it is designed;
>
> (b)    There must be a *special use* for which the improvement is designed
> and the improvement must be so specially used;

---

[31]    New York's Court of Appeals has held that the calculation of replacement-costs-less-
depreciation, sometimes referred to as the "summation method," must include all costs to be expected in
rebuilding:

> Implementation of the summation method requires the inclusion not only of payments for
> material, equipment, labor and other obvious physical ingredients which go directly into
> construction, but also of those charges which may be termed indirect or less direct, such as
> architects' fees, contractors' profits, interest and taxes on land value during the period of
> construction, cost of procuring necessary licenses and the miscellany of other essential
> overhead or incidental expenses.

*City of N.Y. v. Salvation Army, Inc.*, 373 N.E.2d 984, 985, 43 N.Y.2d 512, 516, 402 N.Y.S.2d 804, 805-06
(1978).

    (c)    There must be *no market* for the type of property (here, a beach and cabana club) and no sales of property for such use; and

    (d)    The improvement must be an appropriate improvement at the time of the taking and its use must be *economically feasible and reasonably expected to be replaced.*

43 A.D.2d 45, 49, 349 N.Y.S.2d 422, 427 (2d Dep't 1973) (emphasis in original) (rejecting specialty treatment where cabana club improvements were not economically feasible and had no expectation of replacement given residential development of surrounding area and no recent building of new beach clubs despite availability of suitable business-zoned acreage), *aff'd*, 353 N.E.2d 849, 39 N.Y.2d 958, 386 N.Y.S.2d 886 (1976). The *Colony Beach Club* criteria have been approved by the New York Court of Appeals for use in determining compensation for condemned or destroyed properties. *See County of Suffolk v. C.J. Van Bourgondien, Inc.,* 392 N.E.2d 1236, 1238, 47 N.Y.2d 507, 512, 419 N.Y.S.2d 52, 54-55 (1979) (eminent domain); *Gramercy Boys' Club Ass'n v. City of N.Y.,* 541 N.E.2d 401, 74 N.Y.2d 678, 543 N.Y.S.2d 372 (1989), *aff'g,* 141 A.D.2d 365, 366-67, 529 N.Y.S.2d 476, 478 (1st Dep't 1988) (applying, in tort action, specialty criteria developed in eminent domain cases).[32]

    In *County of Suffolk,* the court upheld specialty treatment of a 19-acre property on which a flower-growing nursery business was conducted. *Id.* at 1237-39, 47 N.Y.2d at 510-14, 419 N.Y.S.2d at 53-56 (finding greenhouses were unique structures, owner had not abandoned the specialized use, there had been no sales of property fully-equipped to run a flower-growing business, other former nursery property sales had been for residential development, business was

---

[32]    *See also Massachusetts Port Auth. v. Sciaba Constr. Corp.,* 766 N.E.2d 118, 125 n.6 (Mass. App. Ct. 2002) ("Although many of the cases involving 'special purpose property' are eminent domain cases, their teachings have been applied to negligence actions.") (citing *Trinity Church,* 502 N.E.2d at 536). The use of replacement cost damages in these cases is purely a matter of fairness. Indeed, in condemnation cases, the government is paying, courts are looking out for the public fisc, and property value is measured conservatively but consistently with the constitutional requirement of just compensation. It would make no sense for courts to award the replacement cost of special purpose property against the government in eminent domain cases but not against a private tortfeasor who causes the special purpose property's destruction. *See Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Serv. Co.,* 618 So. 2d 874, 876-80 (La. 1993) ("justice, reason, and the principle of full reparation . . . require that where an individual's property is damaged unlawfully by a tortfeasor for no good reason, he be compensated at least as fully as when his property is damaged by the state for a public purpose pursuant to the owner's obligation of good citizenship to the community") (citations omitted).

profit-making and purpose to which land had been put was neither outmoded nor unworkable).

The property included a large greenhouse complex, a main residence also used as the business

headquarters and to house greenhouse-monitoring equipment, and three smaller houses. *Id.* at

1237, 47 N.Y.2d at 510, 419 N.Y.S.2d at 53-54. Although it was argued that the main residence

did not warrant the same valuation as a specialty, the court rejected that argument, finding that

the residence "was an integral part of the nursery complex" based on contiguity, unity of use and

unity of ownership. *Id.* at 1239-40, 47 N.Y.2d at 514, 419 N.Y.S.2d at 56. *See also United*

*Traction Co. v. State*, 33 A.D.2d 1063, 1064, 307 N.Y.S.2d 266, 267 (3d Dep't 1970) (upholding

determination that buildings integrated into transportation complex were a specialty).

When, as here, property owned by a governmental agency on behalf of the public

is damaged by a tortfeasor, an award of replacement cost damages is appropriate. *See* pp. 42-44,

*infra.* To the extent the *Colony Beach Club* criteria can be applied in the context of a

governmental property which is committed by statute for use in the service of a specific public

purpose, the World Trade Center meets them. Indeed, the World Trade Center may be the

quintessential specialty property. It was unique in its size, design, specific location and public

purpose and was specially designed, built and used for its statutory public benefit purpose — as

an economic engine for the revitalization of downtown Manhattan. There is no "market" for the

World Trade Center. Indeed, the World Trade Center cannot be converted to other uses while

owned and operated by the Port Authority pursuant to the WTC Legislation enacted by New

York and New Jersey. It has never been offered for sale, and there has never been a sale of any

property for the World Trade Center's statutorily-determined use, nor could there be since the

WTC site was specifically selected by the State legislatures and is integral to the WTC's

purpose. The WTC was an appropriate and successful statutory use on 9/11. Its replacement is

not only feasible and "reasonably expected," it is actually in progress. Because the WTC

Buildings are an integral part of the complex, they must be treated in the same manner as the

complex. *See County of Suffolk*, 392 N.E.2d at 1240, 47 N.Y.2d at 514, 419 N.Y.S.2d at 56

(replacement cost — the summation approach — was proper method to value building given

"contiguity, unity of use and unity of ownership," even though if "considered separately its 'special features' would not warrant use of the summation approach").

Many other properties have been found to qualify as specialty properties, including community service buildings (a social club), *Club St. Agnello Abate of Amsterdam, N.Y., Inc. v. State*, 68 A.D.2d 264, 266, 417 N.Y.S.2d 21, 22-23 (3d Dep't 1979); a funeral home with a chapel, *City of Rochester v. Ryan & McIntee, Inc.*, 56 A.D.2d 715, 715, 393 N.Y.S.2d 137, 137 (4th Dep't 1977); a detergent manufacturing plant with silos, conveyers and mixers, *Capece v. State,* 43 A.D.2d 601, 601, 348 N.Y.S.2d 789, 791 (3d Dep't 1973); a laundry building, *City of New Rochelle v. Sound Operating Corp.*, 30 A.D.2d 861, 861, 293 N.Y.S.2d 129, 130 (2d Dep't 1968); a sawmill, *Clark v. State*, 25 A.D.2d 893, 894, 269 N.Y.S.2d 197, 199 (3d Dep't 1966); gasoline storage tanks, *Frost v. State*, 29 A.D.2d 898, 898, 287 N.Y.S.2d 903, 904 (3d Dep't 1968); a retail lumber yard, *In re North Park Urban Renewal Project No. N.Y.R-23,* 67 Misc. 2d 259, 262, 324 N.Y.S.2d 158, 162 (Sup. Ct. Nassau Co. 1971); a drive-in theater, *Dipson Realty Co. v. State*, 39 A.D.2d 636, 636, 331 N.Y.S.2d 186, 187 (4th Dep't 1972); and prestige properties that promote the economic interests of the owner unrelated to the receipt of rental income, *Joseph E. Seagram & Sons, Inc. v. Tax Comm'n of N.Y.*, 18 A.D.2d 109, 112-13, 238 N.Y.S.2d 228, 231-32 (1st Dep't 1963), *aff'd*, 200 N.E.2d 477, 14 N.Y.2d 314, 251 N.Y.S.2d 460 (1964).[33] *See also United Traction Co.,* 33 A.D.2d at 1064, 307 N.Y.S.2d at 267 ("It might be well to observe with reference to 'specialties' that each action must depend upon its own factual situation.").

Other jurisdictions have also eschewed "market value" as a measure of adequate compensation for property "used for a special purpose, or constructed or improved with special features, or located in a particular place which bestows unique value on its owner and the owner would not be fairly compensated by the diminution in what the market would pay the owner after

---

[33]    *See Great Atl. & Pac. Tea Co.*, 366 N.E.2d at 811, 42 N.Y.2d at 240, 397 N.Y.S.2d at 721 ("Property has been categorized as a specialty where some intangible element such as the owner's prestige or good will inheres in its value.").

the injury or destruction." *Massachusetts Port Auth. v. Sciaba Constr. Corp.*, 766 N.E.2d 118,

124 (Mass. App. Ct. 2002); *see also Leonard Missionary Baptist Church v. Sears, Roebuck &*

*Co.*, 42 S.W.3d 833, 837 (Mo. Ct. App. 2001) (properties that have special architectural or

historic value or that function as a landmark in the community); *Commonwealth v.*

*Massachusetts Tpk. Auth.*, 224 N.E.2d 186, 190 (Mass. 1967) (properties "owned by the State,

public agencies, or public utilities" where the "principal usefulness . . . is to their respective

owners for a particular [public] purpose").[34]

   Indeed, "the great weight of case law has concluded that damage to historical and

other special purpose property (*e.g.*, landmarks, graveyards, churches, government buildings and

schools) should be measured in terms of the cost of repair rather than fair market value."

Matthew D. Barrett, *Recovering Damages for Tortious Injury to Historic Buildings and Other*

*'Special Purpose' Property in Indiana: Drawing the Line Between 'Fair Market Value' and*

*'Cost of Repair' in Cases of Permanent Damage*, 50-DEC RES GESTAE 21, 25 (Dec. 2006)

("Barrett") (reviewing cases and authorities from many states; not limited to Indiana) (copy

attached as Exh. 4 to the Williamson Decl.); *see also Roman Catholic Church of Archdiocese of*

*New Orleans v. Lousiana Gas Serv. Co.*, 618 So. 2d 874, 876-80 (La. 1993) (reviewing case law

on specialty buildings and adopting flexible standard set forth in RESTATEMENT (SECOND) OF

TORTS § 929 (1979)).

   The rationale for awarding replacement cost damages in cases involving

"specialty" properties relates to the inappropriateness or unavailability of "market" valuations —

because market value may give "inadequate attention to important elements of value" or because

there is no "market value" for the property "in the sense of a steady current of sales of similarly

used properties in the vicinity." *Newton Girl Scout Council, Inc. v. Massachusetts Tpk. Auth.*,

138 N.E.2d 769, 772, 775 (Mass. 1956); *see Rochester Urban Renewal Agency*, 379 N.E.2d at

---

[34] *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 399 (2d Cir. 2001) (court may consider
cases from other jurisdictions on similar issues); *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297
(2d Cir. 2000) ("'We may also consider "decisions in other jurisdictions on the same or analogous
issues."'") (citation omitted).

171, 45 N.Y.2d at 8-9, 407 N.Y.S.2d at 644 (Market value method of valuation "is premised on

the existence of a viable market for the property . . . . But when the property is of a kind seldom

traded, it lacks a 'market price' and there must accordingly be recourse to some other method of

evaluation."); *Keator v. State,* 244 N.E.2d 248, 249, 23 N.Y.2d 337, 339-40, 296 N.Y.S.2d 767,

770 (1968) ("While [condemned clubhouse] might be worth to the owners all that it cost, it

would not be 'marketable' in the accepted sense of the word because there is no similar group in

the area which would offer to buy the clubhouse for its reproduction value. Since the character

of the property is such as not to be susceptible to the rule of fair market value, an award based on

the actual or intrinsic value would be proper, i.e., the current cost of reproduction less

depreciation.") (citations omitted); *see also McAnarney v. Newark Fire Ins. Co.*, 159 N.E. 902,

904, 247 N.Y. 176, 181-82 (1928) ("No principle, obtaining in the law of damages, requires that

the recovery be restricted to the market value of the buildings. . . . The reason for the [so-called

'lesser of two'] rule is this: The loser of the article, if awarded the prevailing price therefor, may

enter the market and, with the sum awarded, replace the article lost with a substitute identical in

kind and quality. Replacement in kind necessarily accomplishes complete indemnity. However,

the rule presupposes the existence of a broad market with frequent trading in articles of an

identical character with the article lost.").

In *Newton Girl Scout Council, Inc.*, an appeal from an assessment of damages for

the Turnpike Authority's taking of a strip of land across a Girl Scout camp for construction of an

expressway, the Girl Scouts objected to the trial judge's failure to charge the jury with respect to

the camp's special purpose, as well as to the trial court's exclusion of evidence offered to show

the extent and character of the damage to that use. 138 N.E.2d at 771. In upholding the Girl

Scout's objections, the Massachusetts Supreme Judicial Court explained why justice requires

more complex methods of ascertaining the value of unusual or specialized properties:

> It is not to be expected that the properties adapted for such a
> specialized use will have a very active market or that their market value
> can be shown by sales of nearby comparable property. Once developed,
> such properties are rarely abandoned or sold. . . . The properties may be
> of a type, not frequently bought or sold, but usually acquired by their

40

owners and developed from the ground up, so that the cost of the land plus the reproduction cost (less depreciation where appropriate) of improvements may be more relevant than in the ordinary case.

The practical problems inherent in the valuation of such properties have been recognized in the Massachusetts decisions, as well as in the authorities generally. Special opportunities for proof of value have long been afforded in cases where it is felt that there is no market value, in the sense in which, in most communities, market value is at all times reflected by a steady volume of sales of ordinary commercial and residential properties. The occasion for this difference in type of proof . . . has been expressed in terms of absence of market value, or of market. The courts in these cases, however, may be doing no more than recognizing that *more complex and resourceful methods of ascertaining value must be used where the property is unusual or specialized in character and where ordinary methods will produce a miscarriage of justice.* In such cases, it is proper to determine market value from the intrinsic value of the property and from its value for the special purposes for which it is adapted and used.

*Id.* at 773-74 (citations omitted; emphasis added).

Damage to the public benefit purpose of a property owned by a nonprofit organization or otherwise operated for the benefit of the public has been found to warrant replacement cost damages. *E.g., Rochester Urban Renewal Agency*, 379 N.E.2d at 171, 45 N.Y.2d at 9, 407 N.Y.S.2d at 644 ("Churches, hospitals, clubhouses and like structures held by nonprofit agencies as centers for community service"); *Gramercy Boys' Club Ass'n v. City of N.Y.*, 141 A.D.2d 365, 366, 529 N.Y.S.2d 476, 477, 478 (1st Dep't 1988) (facility used "to provide educational, social and recreational services to neighborhood children"), *aff'd*, 541 N.E.2d 401, 74 N.Y.2d 678, 543 N.Y.S.2d 372 (1989); *Twin Chimneys Homeowners Ass'n v. J.E. Jones Constr. Co.*, 168 S.W.3d 488, 503-04 (Mo. Ct. App. 2005) (common grounds to real estate development owned by homeowners' association for the benefit of the community); *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*, 618 So. 2d at 880 (apartment building used by church for low-income families); *see also Graceland Park Cemetery Co. v. City of Omaha*, 114 N.W.2d 29, 31-32 (Neb. 1962) (formula other than fair market value must be devised to value properties such as "school yards, church yards, college campuses, buildings under construction, and cemeteries").

When, as in this case, the "public purpose" property is owned by a governmental entity on behalf of the public, the rationale for awarding replacement cost damages is even stronger. Diminution in market value only reflects the private interests at stake in a transaction, leaving that damages measure unable to account for any social or public purpose losses caused by the destruction of the property. *See* Vandell Decl. ¶¶ 25-35, 41. Replacement is the only way to restore the important social benefits created by these properties, making that measure of damages appropriate. *See, e.g., Commonwealth Dep't of Transp. v. Estate of Crea*, 483 A.2d 996, 998, 1002 (Pa. Commw. Ct. 1977) (affirming award for the "reasonable cost of replacement by a similar structure consistent with current standards of design" in trespass action against estate of motorist who drove automobile into state bridge's superstructure, causing bridge to collapse); *United States v. Union Pac. R.R. Co.*, ___ F. Supp. 2d ___, 2008 WL 413765, at \*5 (E.D. Cal. Feb. 13, 2008) (holding, as a matter of law, that diminution in market value was not a proper measure for determining damages where defendant negligently "burned thousands of acres of protected government forest lands"), *reh'g denied*, 2008 WL 1925244 (E.D. Cal. Apr. 30, 2008); *Pennsylvania Dep't of Gen. Servs. v. United States Mineral Prods. Co.,* 898 A.2d. 590, 598 n.6 (Pa. 2006) ("[S]pecial-purpose valuation and/or the relevance of replacement or reproduction costs [is not limited] to instances in which market valuation is impossible. . . . [I]n light of the unique attributes of the [government building], chief among which are its public purposes and location on the Capitol campus, the structure could fairly be deemed by a fact finder to represent a special-purpose property.") (citation omitted); *Davey Compressor Co. v. City of Delray Beach*, 639 So. 2d 595, 596, 597 (Fla. 1994) (approving, as a matter of public policy, award of restoration costs exceeding diminution in value of land for contamination of city groundwater; "[u]nlike a private landowner, a municipality responsible for supplying drinkable water to a city of over 50,000 residents is not justly compensated by the diminution in value" of real property on which wells were located); *Massachusetts Port Auth. v. Sciaba*, 766 N.E.2d at 121, 125-26 (affirming replacement cost damages in action against construction company for negligently damaging wooden pier owned by Massachusetts Port Authority).

In *Sciaba*, plaintiff Massachusetts Port Authority ("Massport"), which is also a defendant here, sought the exact same measure of damages for itself that it now says cannot be awarded for the destruction of the Port Authority's buildings. In that case, Massport, acting under legislative direction to create a waterfront park "for the recreational benefit of the public in general and the residents of East Boston in particular," hired defendant contractor to renovate a wooden pier that would serve as the base for the park. 766 N.E.2d at 121. The pier was thereafter severely damaged in a fire caused by the defendant's negligence. After a jury trial on liability and damages issues, Massport obtained a judgment against the defendant for damages based on the cost of removing the fired-damaged pier and replacing it with a new concrete structure. *See id.* at 122-23.

On appeal, the defendant argued that the measure of damages should have been the difference between the fair market value of the pier "before" and "after" the fire, and that the trial court had erred in allowing Massport to present evidence of the cost of repair and replacement. *See id.* at 122, 125. The Massachusetts Court of Appeals (and Massport) disagreed:

> The judge did not err in admitting evidence other than diminution of fair market value on the issue of damages in this case because diminution in fair market value would not have been a fair and reasonable measure. The authority was *committed by statute to using the property to construct a park.* See St.1986, c. 349, § 4. There was evidence presented at trial that the *pier was well suited for this purpose.* Testimony was elicited describing the pier as "in generally good condition," and needing only modest repairs to adequately support a public park for approximately twenty-five years.
>
> Even assuming, therefore, that comparable sales of similar piers were available, or that expert testimony could have established the property's approximate fair market value before and after the fire, the judge had discretion to determine that the resulting figure would not compensate the authority for the special value the property held as a place to build a park, and would not have fairly represented the actual injury suffered by the authority as a result of the fire. Accordingly, it was reasonable for the judge to allow for alternative methods of calculating the damages in this case.

*    *    *

> . . . Moreover, *the authority was not in a position to sell the property and to find a new location on which to construct a park. Not only was this property part of a larger plan taking into account the surrounding area, but the authority was acting under legislative direction to build a park on this specific location.*
>
> *      *      *
>
> Under the circumstances presented by the *unique position of the authority, as well as the distinct qualities of the property itself,* the pier possessed a value to its owner that could not be properly weighed by using the ordinary methods of damage calculations. The fire had caused substantial damage to the pier. Therefore, it was reasonable to allow the jury to hear evidence of restoration and replacement costs and to instruct them on the availability of those methods. *See Trinity Church [of Boston v. John Hancock Mut. Life Ins. Co.],* 502 N.E.2d 532[, 535-37 (1987)].

*Id.* at 125-26 (emphases added).

For the reasons articulated in *Sciaba* with respect to Massport's claim in that case, and based on the unique facts pertaining to the World Trade Center, the costs of restoring the WTC Buildings owned by the Port Authority for the benefit of the people of New York and New Jersey is the only measure of damages that will adequately compensate for the destruction of the buildings. *See* Vandell Decl. ¶¶ 25-35, 41. Such damages are the only non-speculative, reasonable remedy for the actual injuries caused to the public benefit value of the property by Defendants' tortious conduct.

As was true of Massport in *Sciaba,* the Port Authority is *committed by statute* to using the underlying public purpose land for a specific public purpose, in this case, as the site of the World Trade Center — a project which, as New York's Court of Appeals has confirmed in *Courtesy Sandwich Shop* (*supra* at 5-6), was created at the direction of the legislature for the public purpose of aiding and preserving "the economic well-being of the northern New Jersey-New York metropolitan area." N.Y. UNCONSOL. LAW § 6601(9). Indeed, the Port Authority had recently completed a significant capital improvement program of nearly all the major building systems. Moreover, the World Trade Center was ideally situated and suited to serve the public purpose for which it was conceived and built. *See* Declaration of Sheldon Gottlieb, executed August 14, 2008 ("Gottlieb Decl.") ¶ 8; *see also* Garvin Decl. ¶¶ 32, 43-45. The public did not need a new World Trade Center. But it needed the World Trade Center it had. As the Court of

Appeals for the Third Circuit explained in upholding an award of replacements costs for the

destruction of a County-owned drawbridge in a navigational accident:

> The plaintiff was compelled, by the negligence of the defendant, to build a
> new structure. . . . But the old structure sufficed for the purposes of the
> plaintiff, and the plaintiff was damaged by being compelled to procure a
> new structure in place of the old one, for the contract price of which it was
> obliged to pay. The sufferer by the negligence of the defendant cannot be
> compelled to perform the impossible task of re-creating the old span,
> without buying a new one, or make a nice computation of the difference in
> value between the old one and the new. The plaintiff did not need a new
> span. The old one was sufficient, and the county was damaged by being
> compelled to incur the cost of a new one.

*J.W. Paxson Co. v. Board of Chosen Freeholders of Cumberland County*, 201 F. 656, 663 (3d

Cir. 1912); *see also Roman Catholic Church of Archdiocese of New Orleans*, 618 So. 2d at 880

("Plaintiff should not be required to finance in part the premature replacement of the housing

unit.").

The inapposite private-landowner cases cited by Defendants (Moving Br. at 12-

15), are not the least bit instructive as to the proper measure of the damages resulting from the

Aviation Defendants' tortious acts that caused the destruction of the truly unique, iconic WTC

Buildings. That is because the cases cited by Defendants do not address the kinds of facts at

issue here — a complex conceived, built and owned by the Port Authority, and funded through

the public fisc, for the legislatively-determined public purpose, affirmed by New York's Court of

Appeals, of aiding and preserving "the economic well-being of the northern New Jersey-New

York metropolitan area," N.Y. UNCONSOL. LAW § 6601(9), on a legislatively-selected 16-acre

parcel in lower Manhattan acquired for that specific public purpose by exercise of the power of

eminent domain. *See id.* § 6614; *Courtesy Sandwich Shop*, 190 N.E.2d at 405, 12 N.Y.2d at 389,

240 N.Y.S.2d at 6.

Needless to say, the Aviation Defendants cannot and do not point to a single case

where the "lesser of two" rule was held to provide the proper measure of damages for the

tortious destruction of a specialty or public purpose building situated on a specific parcel of

public land selected by the legislatures of two states, so ideally situated to the service of that

45

public purpose as to have justified its taking by eminent domain. Nor can the Aviation

Defendants point to a single case where the so-called "lesser of two" rule was applied in

determining the damages arising from the tortious destruction of a national symbol, much less a

case involving the tortious destruction of a national symbol that is being restored in furtherance

of a public policy of such paramount importance that Congress passed legislation ensuring that

the financial ability of those undertaking the restoration would not be impaired by the risks of

litigation against them, as long as they did not default in rebuilding.

      As the Aviation Defendants do not really seem to appreciate, the "lesser of two"

rule is simply a way of expressing several public policy decisions: (1) a plaintiff should be fully

compensated for its loss; but the damages award should not (2) provide an opportunity for the

plaintiff to reap a "windfall"; or (3) encourage or reward the plaintiff for undertaking

"uneconomical efforts" (sometimes referred to as "economic waste"). *See Fisher*, 779 N.E.2d at

182, 98 N.Y.2d at 539-40, 749 N.Y.S.2d at 471. In his authoritative treatise, Professor Dan B.

Dobbs offers the following useful discussion of the advantages and disadvantages of the

"diminution in market value" measure and the repair-cost (restoration-cost) measure of tort

damages:

> The repair-cost measure may best provide full compensation in many
> cases, but if the value of the property is reduced very little by the tort and
> the repairs would cost a great deal, *the most economic thing for the
> landowner to do would be to sell the property rather than to repair it*. If
> the plaintiff takes this route [*i.e.*, sells the property], an award of repair
> cost damages can be seen as a *windfall* since the plaintiff will not have
> suffered the costs of repairs but only the smaller loss represented by the
> diminished value. On the other hand, if the plaintiff actually makes the
> more expensive repairs, an award of repair costs as damages does not
> provide a windfall, but it does seem uncomfortably like *economic waste*.

DAN B. DOBBS, DOBBS LAW OF REMEDIES §5.2(1), at 714-15 (2d ed. 1993) (emphases added;

footnotes omitted). Professor Dobb's discussion demonstrates that the so-called "lesser of two"

rule presumes the injured property owner has the ability to sell its damaged property and receive

the diminished value in the exchange. However, if the plaintiff cannot sell its damaged property,

46

then a tort award for the "diminution in value" would not make the plaintiff whole, leaving rebuilding cost as the only fully compensatory option.

The Aviation Defendants' supposed concern that replacement cost damages sought by WTCP would somehow "grant WTCP a windfall" (Moving Br. at 19) ignores all the following irrefutable and dispositive facts: (1) WTCP does not own the buildings; (2) WTCP does not own (or even lease) the land on which the buildings are situated; (3) the Port cannot sell the World Trade Center and build or buy it elsewhere because its site is statutorily committed for use as the World Trade Center; (4) WTCP is in fact restoring the public purpose value of the buildings, which will remedy the injuries the Aviation Defendants' tortious conduct caused to the fee owned by the Port Authority for the benefit of the people of New York and New Jersey (and, in turn, also will restore the usable value of WTCP's leasehold interests, *see* Point II(B), *infra*); (5) the Port Authority has the right under the leases to recover from WTCP any restoration cost award should WTCP ever default on the rebuilding obligations in its leases; and (6) any increase in expected net rental income from the restored buildings beyond the expected net rental income from the original buildings can be an offset in the "diminution in usable value" component of WTCP's damages calculation. *See* Point II(B), *infra*. In short, an award of replacement costs for restoring these public purpose buildings on public purpose land will not result in any "windfall." At a minimum, as discussed above, on this motion for summary judgment, the law requires that WTCP be given the benefit of all reasonable inferences on that point. *See* Point II(A)(1), *supra*. Further, WTCP's experts will make it clear in their damages reports that their calculations do not include any windfall. *See* Vandell Decl. ¶ 22.

The Aviation Defendants also repeatedly suggest in a conclusory way, without explanation or supporting evidence, that it is "uneconomical" — *i.e.,* "wasteful" — for WTCP to restore the WTC Buildings. Moving Br. at 13, 19. The argument that rebuilding the World Trade Center amounts to "economic waste" asks this Court to ignore entirely the irrefutable fact that the World Trade Center was conceived, and thereafter built and operated by the Port Authority, for an important public purpose — to enhance the Port of New York and the

47

economic well-being of the people of New York and New Jersey — and not, as the Defendants
pretend, as a private commercial real estate investment or business opportunity.  Vandell Decl.
¶¶ 25-35, 41.  The Aviation Defendants' "economic waste" argument also requires the Court to
disregard the fact that the rebuilding effort being undertaken has been determined by the
President and Congress of the United States to be a matter of utmost national importance.
Garvin Decl. ¶ 69; pp. 13-14, *supra*.

       Defendants' "economic waste" argument also ignores the fact that failure to
rebuild would have been a breach of WTCP's contractual obligations to the Port Authority.
Indeed, Defendants argue that because the leases were non-recourse, WTCP could willfully
default on its rebuilding obligation "without any exposure to an out-of-pocket loss" because "all
that could happen would be that the Port Authority would have a potential claim . . . against a
Special Purpose Entity whose only asset was the leasehold."  Moving Br. at 20-21.  To the
contrary, if WTCP had failed to honor its lease obligation to pay rent and rebuild, not only would
WTCP and its owners have suffered the substantial harm to reputation that naturally would flow
from such a breach, they also would have suffered nearly incalculable adverse financial
consequences.  Vandell Decl. ¶¶ 36-41.

       First, WTCP would have forfeited almost half a billion dollars in Initial Rent
Payments to the Port Authority.  *See* One WTC Lease Sec. 5.5 (Barry Decl. Exh. L) (WTCP has
no entitlement "to any . . . refund" of the Initial Rent Payments).  Second, the Port Authority
would have terminated the 99-year lease.  *Id.* Sec. 16.1, 21.  Third, the Port also would have a
"cause of action" entitling it to recover both "Gross Revenues" *and* "insurance proceeds."  *Id.*
Sec. 16.1.  "Gross Revenues" include all of WTCP's rental income and all insurance payments
covering rental income.  *Id.* Secs. 1.133, 5.7.2(a).  Thus, WTCP would have forfeited the billions
of dollars in recoveries from property insurance policies that it purchased.  *Id.* Sec. 16.1; *see also*
note 12, *supra*.  And, under ATSSSA's terms, WTCP and its members, constituent investors,
directors, employees, agents and others would have lost the limited liability protection afforded
under ATSSSA and faced unlimited personal liability in litigation directly traceable to the

Aviation Defendants' tortious conduct. *See* ATSSSA § 408(a)(1) (protections extend not only to person with property interest but also to "their directors, officers, employees and agents").[35] The law does not require an injured party to breach its contractual obligations, render itself insolvent, or file for bankruptcy to minimize damages and shield the wrongdoer from the consequences of its wrong.[36] And, in all events, a breach by WTCP would not have "minimized" any losses, but only shifted the loss to the Port, which would then be pursuing the very same claims against the Defendants that are at issue here. Vandell Decl. ¶¶ 39-40; Harris Decl. Exhs. 31-32.

---

[35]     Defendants downplay this enormous potential liability by claiming falsely that WTCP "was named as a defendant *in only a handful* of wrongful death and personal injury suits in the former 21 MC 97." Moving Br. at 25 n.13 (emphasis added). In fact, Aviation Defendants were co-defendants with WTCP in approximately 1,200 wrongful death actions and the WTCP Plaintiffs and their affiliates were defendants in *thousands* of state and federal lawsuits arising out of the events of 9/11 and claims alleging respiratory and other injuries at and around the WTC site, including a pending class action on behalf of more than 10,000 persons. Williamson Decl. ¶ 3. WTCP spent almost seven years defending those actions and the potential liability was enormous. Williamson Decl. ¶ 3. Most of the wrongful death plaintiffs ultimately received multi-million dollar awards from the Victim Compensation Fund (totaling over $6 billion) and settlements by Defendants in other cases have been for similar amounts per plaintiff or higher. Williamson Decl. ¶ 4. Certain plaintiffs' attorneys continue to sue WTCP in new actions alleging respiratory injuries despite WTCP's October 2006 dismissal from the 21 MC 100 docket. Williamson Decl. ¶ 5. Accordingly, Defendants cannot show as a matter of law or fact that WTCP has "no realistic exposure." Moving Br. at 25 n.13. Moreover, the argument that WTCP should have "walked away" on September 11 because it was "not likely to be subjected to any liability arising out of the September 11 attacks" (*id.*) improperly resorts to hindsight. Defendants are saying injured parties should not have worried about their own potential liability because Defendants now see everything seems to have worked out. The Aviation Defendants gave no such assurances to WTCP when the lawsuits were being filed. Moreover, "[h]indsight may not serve as a basis to decrease damages plaintiff is otherwise entitled to recover." *Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 524 (2d Cir. 1984).

[36]     *See, e.g., Leonard v. New York, Albany & Buffalo Electro Magnetic Tel. Co.*, 41 N.Y. 544, 566 (1870) (raising question, and answering in the negative: "[a]nd what right did the defendants have to ask [plaintiffs' agent] to violate his contract with that third party, in order to shield it from the consequences of its own wrong"); RESTATEMENT (FIRST) OF TORTS § 918 cmt. j (1939) (injured party not generally required to surrender right of substantial value in order to minimize loss); MCCORMICK ON DAMAGES § 38, at 141 (1935) ("[T]he victim cannot reasonably be expected, in order to minimize damages, to act unlawfully or in violation of his duties to third persons."); SEDGWICK ON DAMAGES § 225, at 426 (9th ed. 1912) ("[a]nd so, generally, the plaintiff is not required to take any measures to reduce the damages which are not within his legal rights; *e.g.*, he could not be called upon to violate a contract with a third party"); CALAMARI & PERILLO, THE LAW OF CONTRACTS § 14-15, at 540 (2d ed. 1977) (a party "need not commit a wrong, as by breaching other contracts, in order to minimize damages"; injured party need not "jeopardize his credit rating"); *Levantino v. Insurance Co. of N. Am.*, 102 Misc. 2d 77, 87, 422 N.Y.S.2d 995, 1002 (Sup. Ct. Suffolk Co. 1979) ("Nor should a plaintiff be required to undergo a bankruptcy in order to benefit the wrongdoer who has caused his financial distress in the first place."); *Wolpaw v. General Accident Ins. Co.*, 639 A.2d 338, 343 (N.J. Super. Ct. App. Div. 1994) (in insurer breach of contract case, "[p]laintiff is not obliged to become a bankrupt to mitigate damages").

Simply put, this case, like the other special property cases cited above and like the World Trade Center itself, is *sui generis*. The measure of damages therefore must reflect application of the underlying principles of tort law to the factual circumstances of the case, taking into account the unique character of the property, how it was used, the many interests harmed by the Aviation Defendants' tortious conduct — including harm to the World Trade Center's public purpose, the serious adverse consequences to the people of the City and State of New York, the State of New Jersey, and the nation of failing to undertake and complete the rebuilding, and the amount of money that will fairly and adequately compensate the interest holders for their injuries. Vandell Decl. ¶¶ 25-41. Adequate compensation is not, as the Aviation Defendants urge, determined by inflexible adherence to general damages rules derived from those tort principles.

**B.     WTCP Also Is Entitled to Recover
Damages for the Injury To Its Leasehold Interest**

The Aviation Defendants' tortious conduct injured two distinct, legally protected interests in the WTC Buildings:  (1) the Port Authority's fee interest, and (2) WTCP's leasehold interest. As demonstrated above, WTCP — as lessee of the WTC Buildings — is entitled to sue for the replacement cost damages required to redress the injuries to the Port Authority's fee interest. *See Rogers v. Atlantic, G. & P. Co.*, 107 N.E. at 664, 213 N.Y. at 258. WTCP also has the right to recover, as an additional, separate component of its damages, the amount required to redress the injuries to the "usable value" of its own leasehold interests. *See Baumann v. City of N.Y.*, 124 N.E. at 143, 227 N.Y. at 33 ("To deny the plaintiff damages to the usable value of the 3-acre plot of land [under lease] was error.  The defendant was a trespasser, and as such invaded the possessory rights of the plaintiff and materially diminished the value of the use of the premises for the purposes for which the same were adapted and had been used.  For damage sustained to such usable value the plaintiff was entitled to redress.").[37]

---

[37]     Of course, in this case, neither insurance proceeds nor tort damages will compensate WTCP for the injuries to its leasehold interests if WTCP does not replace the public purpose value of the WTC Buildings owned by the Port for the benefit of the people of New York and New Jersey.  If WTCP does

Defendants' brief is devoted primarily to flawed arguments concerning the supposed "fair market value" of the WTC Buildings that are owned by the Port Authority for the benefit of the people of New York and New Jersey. As shown in Point III, *infra,* Defendants incorrectly argue that the "fair market value" of those buildings can be no greater than the alleged net present value of rental payments to be made to the Port by WTCP under the July 2001 net leases. *See, e.g.,* Moving Br. at 28 ("fair market value of the [WTC Buildings] is capped by the $2.8 billion net lease deal"). But Defendants have nothing to say about the injuries to WTCP's leasehold interest — and have not cited a single authority concerning the proper measure of damages for leasehold injuries. If Defendants' argument is that WTCP's damages for the injuries to its leasehold are limited to the net present value of the rental payments due to the Port under the leases, that argument would be wrong as a matter of law.

For well over a century, New York courts have expressly recognized that general rules for measuring the damages of a landowner injured by a tortfeasor's wrongful act should not and cannot be blindly applied to a lessee, such as WTCP, which has been injured in connection with the carrying on of a business directly associated with the premises it has leased. *See, e.g., Bates v. Holbrook,* 89 A.D. 548, 85 N.Y.S. 673 (1st Dep't 1904) (lessee's hotel business lost patronage as a result of unauthorized structure built in front of hotel by contractor constructing subway; damages awarded in the sum of $54,000 for loss of receipts for room rent that would have been paid by hotel guests kept away by the defendant's tortious conduct plus the sum of $30,000 for lost profits on the furnishing of refreshments to such guests, together with interest); *Bly v. Edison Elec. Illuminating Co. of N.Y.,* 111 A.D. 170, 97 N.Y.S. 592 (1st Dep't 1906) (lessee's boarding house business suffered loss of boarders from nuisance), *aff'd,* 81 N.E. 1160, 188 N.Y. 582 (1907).

In fact, in *Bates v. Holbrook,* New York's Appellate Division, First Department, specifically and unequivocally *rejected* the argument — seemingly resurrected by the Aviation

---

not replace the WTC Buildings, it will forfeit such recoveries to the Port. *See* note 12 and pp. 28, 48, *supra.*

Defendants here – that the damages sustained by a lessee, such as WTCP, should be measured

solely by reference to the rent stipulated in the lease between the owner-lessor and the lessee.  As

the Appellate Division explained in *Bates* — making a point that Defendants have completely

missed:

> *It is the tenant that has sustained damage, and that damage has no*
> *relation to the amount of rent that he has paid to the landlord.*

89 A.D. at 554, 85 N.Y.S. at 677 (emphasis added).

      In rejecting the argument that the lessee's damages should be measured by the

rent due from the lessee to the landlord under the lease, the *Bates* court held that the proper

measure of a lessee's damages is the *"diminution in the usable value"* of the premises to the

lessee.  *Id.* (emphasis added).  Because the court's careful analysis is particularly relevant to the

issues presented in this case, a portion of the *Bates* opinion is set forth at length as follows:

> Where an owner of real property which is rented has suffered from
> a nuisance . . . and has thereby lost a tenant or the opportunity of renting
> his property, to award him as damages the rental value of the property, or
> the amount of rent that he would have received but for the maintenance of
> the nuisance would give him the compensation which the law awards to a
> person injured by the wrongful act of another. . . . The payment of the
> rental that he would have received but for the nuisance would place him in
> the same position that he would have been in but for the wrongful act of
> the defendants; but it is apparent that there are a class of cases where such
> a rule would not give compensation, and this case is one of that class.
> Here the rental value of the property is the amount of rent the plaintiff
> pays to the owner of the property.  *Where by reason of the wrongful act of*
> *another a tenant's business is interfered with, guests are prevented from*
> *coming to the hotel, and the business that he has established affected, the*
> *rent that he has paid to his landlord would not be compensation for the*
> *wrong that has been done him.  The damage that a tenant has sustained*
> *because of the wrongful acts of another which have interfered with his*
> *business and prevented him from carrying it on in the building that he has*
> *leased for that purpose, bears no relation to the amount of rent that he has*
> *paid to the landlord for the property leased.  The damage . . . . might be so*
> *serious as to destroy his business, and . . . might vastly exceed the amount*
> *of rent that he has paid.*  The owner of the property has sustained no
> damage by this nuisance, for he has received his rent from his tenant, and
> the same amount was payable whether the nuisance was maintained or not.
> *It is the tenant that has sustained damage, and that damage has no*
> *relation to the amount of rent that he has paid to the landlord.*  In such a
> case the plaintiff could not leave the building that he had leased and
> procure other property in which to carry on his business . . . and in the
> absence of evidence that there is no presumption that a building of the
> same character could have been procured by the plaintiff; nor would the

plaintiff have been excused from the payment of the rent because of the maintenance of the nuisance. The nature of the business carried on and the relation between the plaintiff and his landlord are such that the rental value of the premises can bear no relation to the amount of damage that the plaintiff sustained by reason of the wrongful act complained of. *Therefore, it is the diminution in the usable value of the premises, to the occupant caused by the wrongful act that is the measure of damages, and thus it has been said that the party injured by the nuisance is entitled to recover the diminution of rental or usable value of the premises affected. It must be apparent that "usable value" means the value of the use of the premises to the occupant, as distinct from the rental of the premises reserved in the lease by the owner to the tenant.*

89 A.D. at 553-54, 85 N.Y.S. at 676-77 (emphases supplied).

Here, as in *Bates,* the Aviation Defendants have not proven that WTCP could have procured leases for "building[s] of the same character," *id.* at 554, 85 N.Y.S. at 677, and have not proven (and cannot prove) that the Defendants' tortious acts resulting in the destruction of the buildings in any way excused WTCP from its obligation to pay rent. *See id.* With respect to the former point, in opposition to Defendants' motion, WTCP has come forward with admissible evidence that no buildings comparable to the WTC Buildings have been available for purchase or lease since September 11, 2001. Gottlieb Decl. ¶ 27. With respect to the latter point, the leases themselves establish that WTCP's obligation to pay rent continued unabated notwithstanding the destruction of the buildings caused by the Defendants' tortious conduct.[38] One WTC Lease, Sec. 15.1.4 (Barry Decl. Exh. L); *see also* Levy Decl. ¶ 12. In short, the Aviation Defendants have not met (and cannot meet) their burden of establishing that WTCP has failed to mitigate damages with respect to the injuries to its leasehold.

Defendants' only theory on this motion — that WTCP's damages cannot be greater than the alleged net present value of the rental payments due to the Port Authority under the leases — is plainly wrong under long-settled New York law. *See Bates,* 89 A.D. at 554, 85 N.Y.S. at 677. Therefore, the question that must be posed to the jury is "[w]hat amount will restore" WTCP, as the lessee of the WTC Buildings, to its "original position?" *Cashin v. City of*

---

[38]    As the injured party, WTCP is neither required nor expected to breach its contractual obligations to the Port Authority to shield Defendants from the consequences of their own tortious conduct. *See* note 36 and accompanying text, *supra.*

*New Rochelle*, 176 N.E. at 140, 256 N.Y. at 198.

> *Bates* instructs that an award based on the "diminution in the usable value" of the WTC Buildings to WTCP, as lessee, will put WTCP in the same financial position as it would have been in but for the Defendants' tortious conduct. The proper methodology for calculating WTCP's damages would be to compare the economic value of the leasehold to WTCP as if the events of 9/11 had not occurred and as it presently exists, expressed in present value terms discounted at risk-adjusted rates as of that date. Vandell Decl. ¶ 17. With the aid of expert testimony, WTCP is entitled to present to the jury evidence of both (1) the substantial, positive cash flows expected from WTCP's collection of rent from the subtenants of 10 million square feet of *existing* office space, less its costs, over the term of the 99-year leases, and (2) the dramatically changed circumstances after 9/11 when, as a result of the Defendants' tortious conduct, WTCP's obligation to restore the public purpose WTC Buildings was triggered, WTCP's obligation to pay rent to the Port continued unabated, notwithstanding that it had no prospect of collecting any rent from building subtenants for the many years it would take for the buildings to be restored, and WTCP's business would continue to suffer from the devastating effects of 9/11.[39]  Vandell Decl. ¶¶ 17-24.

> In short, Defendants are not entitled to summary judgment based on a damages theory that is wrong as a matter of law.

---

[39]    *See Bates*, 89 A.D. at 562, 85 N.Y.S. at 683 ("The evidence is substantially undisputed that during the years that this nuisance was maintained this plaintiff sustained serious damage.  His business was seriously interfered with; his receipts declined to much less than half what they had been before; his obligation to pay rent continued; and it having been adjudged that the defendants were wrongdoers and illegally caused this damage, they should not escape liability because, from the nature of the injury that they caused, it is difficult to arrive at an exact computation of the amount of damage.").

### III.

### EVEN IF "MARKET VALUE" APPRAISAL METHODS COULD BE USED IN THIS CASE, WTCP'S DAMAGES COULD NOT BE DETERMINED ON SUMMARY JUDGMENT

Even if there were a "market value" for the WTC Buildings, there is a material factual dispute concerning the correctness of the value proposed by Defendants and, in any event, Defendants' efforts to prove that such amount would adequately compensate WTCP cannot preempt WTCP's right to prove, in its case-in-chief, replacement cost damages — the damages to which Defendants' valuation would be compared. Pursuant to the holdings of the New York Court of Appeals discussed in Point II(A)(2), the determination whether the World Trade Center's statutory public purpose and unique characteristics, specific location and use entitle WTCP to recover replacement costs for the destruction of the WTC Buildings requires factual analysis which is the jury's province. Defendants' simplistic and flawed arguments afford no basis for preempting WTCP's right to have the jury determine adequate compensation for the destruction of the WTC Buildings as well as for WTCP's other damages.[40] Thus, summary judgment must be denied.

### A. The Purported Fair Market Value Advanced by Defendants Is Wrong

Based on the notion that "'a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value,'" Moving Br. at 29, Defendants contend that the fair market value of the WTC Buildings on September 11 is conclusively established by what they say is the net present value of rental payments to be made to the Port by

---

[40]    Defendants go so far in trying to make their "lesser of two" argument as to claim, incorrectly, that had they tortiously caused the destruction of the World Trade Center before July 2001, "the Port Authority would undeniably have been governed by the 'lesser of two' rule. . . . Any recovery would have been capped at the lost market value." Moving Br. at 21. As we showed in Point II, that argument is wrong. However, by making that argument, Defendants in effect concede that WTCP's damages should, in all events, be no less than the damages to which the Port Authority would be entitled for the Defendants' tortious destruction of the World Trade Center. As we showed in Point II, WTCP is entitled to recover the full damages for destruction of the WTC Buildings and those damages depend on controverted issues of fact requiring resolution by a jury.

WTCP under the July 2001 net leases. *See* Moving Br. at 28 ("fair market value of the [WTC Buildings] is capped by the $2.8 billion net lease deal" (citations omitted)).[41] Defendants' argument, which is not supported by the opinion of an expert in real estate appraisal or valuations or any expert at all, is wrong.[42]

The July 2001 transaction, of course, was not a recent market sale of the property — it was a lease subject to the Port's continued public benefit operation of the World Trade Center. The alleged net present value of rental payments to the Port Authority does not include the public benefit and other non-commercial value of the WTC Buildings because those benefits were retained by the Port. Thus, the World Trade Center's substantial economic and non-economic benefits to the New York-New Jersey region and to the Port Authority, including the World Trade Center's positive impact on the local and regional economy and its value as an international icon and a reflection of the strength and stature of the financial district and the Port Authority, are not reflected in rental payments to the Port. Gottlieb Decl. ¶¶ 18, 23; Vandell Decl. ¶¶ 24-35.

---

[41]    Defendants also discuss an inadmissible "fairness opinion presentation" (Barry Decl. Exh. B). *See* Moving Br. at 5, 6, 30. That exhibit is an unsworn collection of what appears to be slides from a Power Point presentation. The opinion presentation is an unauthenticated, unsworn document prepared by a third-party, offered for the truth of the matters contained therein and, therefore, is inadmissible and cannot be considered on this motion. *See* Cross-Motion To Strike Br. at 3-4, 15-16. That inadmissible presentation related to the fairness of the financial terms of the net lease transaction to the Port Authority. The presentation did not state that the "fair market value" of the WTC Buildings was $2.8 billion. *See* Barry Decl. Exh. B.

[42]    Obviously, Defendants could not submit expert affidavits and still maintain that there are no material issues of fact – as is required in order to obtain summary judgment. Accordingly, lacking any expert support for any of the assumptions underlying their claims, Defendants effectively ask the Court to just take on faith their predicate assumption that $2.8 billion is the fair market value of the WTC Buildings before 9/11. *See* Moving Br. at 3 ("this Court should rule that the diminution in market value cannot be more than $2.8 billion"). Such a ruling would improperly deprive WTCP of its right to challenge, and have the jury assess, the credibility of the expert through whom Defendants will have to offer that valuation opinion at trial. *See Alford v. Niagara Mohawk Power Corp.*, 115 A.D.2d 924, 925, 496 N.Y.S.2d 820, 822 (3d Dep't 1985) (jury had right not to credit testimony of defendant's expert on market value); *Ellison v. R&B Contracting, Inc.*, 32 S.W.3d 66, 76 (Ky. 2006) (reinstating jury verdict despite fact that plaintiffs offered no expert to rebut defendants' appraiser's opinion; "Evaluation of the weight which should be given to expert testimony is the exclusive province of the jury, and a jury may properly conclude that indirect evidence gives it a better sense of the fair market value of a piece of property than does an 'expert's' opinion.") (footnote omitted).

Accordingly, even if an ordinary commercial building's fair market value could be determined solely by the value of rental payments to the lessor under a long-term net lease (which it cannot (Gottlieb Decl. ¶¶ 9-14, 17)), the market value of a public benefit property if the public use were abandoned and the property sold into the commercial market cannot be determined from a lease of the property subject to its public use. Gottlieb Dec. ¶¶ 18, 24, 30; Vandell Decl. ¶¶ 25-34. Indeed, where the property retains its public benefit purpose, no commercial "market" exists. The World Trade Center has never been offered for commercial sale, the WTC Legislation does not say that the Port Authority has the right to "sell" the World Trade Center,[43] and there are and can be no similar property sales to compare because the World Trade Center's enormous size and integration with the PATH trains and subways at a location expressly selected by statute to enable the World Trade Center to serve as an economic engine for lower Manhattan, make it unique. Gottlieb Decl. ¶ 25; Vandell Decl. ¶¶ 25-35; Garvin Decl. ¶¶ 32-33, 35, 44. Leaving aside the World Trade Center's specifically selected location, there are no comparable commercial properties of that size anywhere in Manhattan. Gottlieb Decl. ¶¶ 25, 27.

Defendants' argument that the alleged $2.8 billion net present value of lease payments to the Port constitutes the fair market value of the WTC Buildings has the following other flaws:

1.    The alleged net present value of rental payments to the Port does not reflect the full rental value of the commercial office space available for sublease to the WTC Buildings' subtenants. A prospective net lessee would never agree to make rental payments to an owner lessor in an amount equal to the worth of a building's total net rental income, "for then, he would be paying an amount which would preclude any profit." *Levin v. State*, 192 N.E.2d

---

[43]    *See* N.Y. UNCONSOL. LAW § 6603 (authorizing and empowering the Port Authority "to establish, acquire, construct, effectuate, develop, own, lease, maintain, operate, improve and rehabilitate" the World Trade Center).

155, 156, 13 N.Y.2d 87, 91, 242 N.Y.S.2d 193, 195 (1963); Gottlieb Decl. ¶¶ 9-12; Vandell Decl. ¶¶15-16.

       2.     The net lease payments were not the entire consideration paid for the net leases. WTCP disputes the Aviation Defendants' contention that "the price [WTCP] paid to acquire its net leasehold interests" was $2.8 billion. Moving Br. at 30. This $2.8 billion figure, cited repeatedly by Defendants, *e.g.,* Moving Br. at 3-4, 17, 28, 30-34, is nothing more than the Port Authority's calculation of what it thought was the net present value to the Port Authority of rental payments specified in the leases based on the application of a particular discount rate selected by the Port Authority in or around April 2001. Levy Decl. ¶ 11. However, the valuation of a property under lease requires an understanding and appraisal of all the benefits and burdens of the lease. *See, e.g., 936 Second Ave. L.P. v. Second Corporate Dev. Co.,* __ N.E.2d __, 10 N.Y.3d 628, 633 (2008) ("In valuing real property '[s]pecial attention must be given to limitations on ownership rights, which include easements, encroachments, leases, and the disposition of air or subsurface rights' and an appraiser must 'analyze all of the economic benefits or disadvantages created by the lease.'") (quoting APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 55, 82 (12th ed. 2001)). Defendants ignore entirely that this contract rent is only a *portion of the total consideration* WTCP agreed to pay the Port Authority to acquire the leasehold interests. Gottlieb Decl. ¶ 17; Vandell Decl. ¶ 13. Under the net leases, WTCP incurred a substantial monetary obligation to rebuild the buildings in the event that they were destroyed, whether or not WTCP's property insurance covered the whole cost. One WTC Lease, Sec. 15.3 (Barry Decl. Exh. L). WTCP also undertook valuable non-monetary obligations and afforded other non-cash benefits to the Port. Gottlieb Decl. ¶ 17; Vandell Decl. ¶ 13. That non-monetary consideration must be taken into account. Gottlieb Decl. ¶ 17; Vandell Decl. ¶¶ 13-14.

       3.     Even if evidence of a "recent lease price" were evidence of "sale price" — which it is not (Gottlieb Decl. ¶ 25) — WTCP disputes the Defendants' contention that the "fair market value of [the WTC Buildings] was definitively established" by the July 2001 net lease

transaction price. Moving Br. at 30. For a transaction price to be considered a "market value,"
the transaction must meet certain criteria not present in the net lease transaction between WTCP
and the Port. Vandell ¶ 10. Although there are several definitions of "market value," it is
generally understood to mean the price for which a property should be exchanged between
typically motivated willing buyers and sellers in an arm's length transaction where neither party
is under undue duress. Vandell Decl. ¶ 11 (citing APPRAISAL INSTITUTE, THE APPRAISAL OF
REAL ESTATE 22, 23, 305 (13th ed. 2008).[44]

      WTCP contends, based on admissible expert evidence, that the July 2001 net
lease transaction would not qualify as a "market value" transaction because the Port Authority
was not a profit-maximizing lessor; it was under political pressure to lease certain portions of the
WTC complex; and the Port had, and has, broader goals in the lease transaction than maximizing
its income, including promoting the public interest benefit in the World Trade Center complex to
the Port and the people of New York and New Jersey. Vandell Decl. ¶ 11. Inasmuch as the Port
Authority was not a "typically motivated" lessor, the lease transaction price would not constitute
"market value." Vandell Decl. ¶ 11.

      4.     An arbitrary discount rate and wrong valuation date (for purposes of this
lawsuit) were used to arrive at the alleged net present value of $2.8 billion. The $2.8 billion
figure was computed by the Port Authority's "Advisors" in or around April 2001 to value —
from the Port's standpoint — certain rental payments to be made to the Port by WTCP under the
leases based on three different discount rates selected by the "Advisors." *See* Barry Decl. Exh. A
at 164-65; Levy Decl. ¶ 11. The selection of a discount rate significantly affects the calculation.
Gottlieb Decl. ¶ 15. Defendants have presented no evidence concerning how or why any of the

---

[44]     In any event, even a "recent sale price" would not foreclose the jury's consideration of other
relevant evidence of value. *See Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 387 (2d Cir. 2006)
("While it is true that an arm's length transaction — the so-called "willing buyer-willing seller" test — is
the best evidence of (and often the easiest method to determine) fair market value, it is, by no means, the
only such evidence. Indeed, determining value is a factual inquiry. That is precisely why we noted that a
valuation determination "is one that is entitled to be made on all the elements of the particular case.")
(quoting *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976); citations omitted).

three discount rates were selected by the Port's "Advisors" or demonstrating that any of the selected rates was appropriate. Gottlieb Decl. ¶ 15. In addition, the "Advisors" calculation was made using a different valuation date than is required in this tort action. The correct valuation date is as of September 11, 2001, not the April 2001 date used as the basis of Defendants' valuation argument. Gottlieb Decl. ¶ 16. Selection of the correct valuation date affects the selection of the proper discount rate and changes the net present value calculations. Gottlieb Decl. ¶ 16; Vandell Decl. ¶ 14 n.16. *See Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 55 Misc. 2d 483, 488-89, 285 N.Y.S.2d 941, 946 (Sup. Ct. N.Y. Co.) (appraisers' use of wrong valuation date not presumed immaterial), *aff'd,* 28 A.D.2d 1209, 285 N.Y.S.2d 267 (1st Dep't 1967), *aff'd,* 239 N.E.2d 736, 22 N.Y.2d 846, 293 N.Y.S.2d 108 (1968).

In short, for all of the above reasons, there is no evidentiary or legal support for Defendants' contention – another linchpin of their motion — that the diminution in fair market value of the WTC Buildings is $2.8 billion. As we have demonstrated here, the material facts underlying such a determination are in sharp dispute, requiring that summary judgment be denied.

**B.    Defendants' Right To Try To Prove an Adequate "Lesser" Measure of Damages Does Not Preempt WTCP's Right To Prove Replacement Cost Damages in Its Case-in-Chief**

The so-called "lesser of two" measure of damages for injury to real property does not necessarily come into play at all, and certainly imposes no evidentiary burden on WTCP:

> Simply stated, the plaintiff need only present evidence as to one measure of damages, and that measure will be used when neither party presents evidence going to the other measure.

*Jenkins v. Etlinger*, 432 N.E.2d 589, 591, 55 N.Y.2d 35, 39, 447 N.Y.S.2d 696, 698 (1982) (citations omitted); *see also Alford v. Niagara Mohawk Power Corp.*, 115 A.D.2d at 925, 496 N.Y.S.2d at 822 (plaintiff, having proved one measure of damages, need not offer evidence to dispute defendant's proof of some other measure of damages).

Indeed, Defendants fail to disclose that it is their burden to prove, after Plaintiff has put on its damages proof, that any "lesser" measure will adequately compensate the injured

plaintiff. *See* 1B NY PJI 3d 2:311, cmt. at 1573-74 (2008) (defendants bear the burden of

proving "that the lesser amount will adequately compensate plaintiff"); *Jenkins,* 432 N.E.2d at

591, 55 N.Y.2d at 39, 447 N.Y.S.2d at 698 ("[T]he burden falls upon the defendant to prove that

a lesser amount than that claimed by plaintiff will sufficiently compensate for the loss."); *Alford,*

115 A.D.2d at 925, 496 N.Y.S.2d at 822 (plaintiff who proved only cost of restoration had no

burden to offer evidence to dispute defendant's expert's testimony as to market value or to

"prove injury under every potentially applicable measure"). Even though cases which

Defendants cite in their Moving Brief discuss how "lesser of two" proof comes into play,

Defendants fail to disclose that procedural context to the Court. *E.g., Scribner v. Summers,* 138

F.3d 471, 472 (2d Cir. 1998) (cited in Moving Br. for other purposes at 12 n.8, 15 n.9) ("The

Plaintiff, however, need only prove one of the two measures and it becomes the defendant's

burden to prove 'that a lesser amount . . . will sufficiently compensate for the loss.'") (quoting

*Jenkins*); *Fisher,* 779 N.E.2d at 181, 98 N.Y.2d at 539, 749 N.Y.S.2d at 470 (defendant must

"prove that 'a lesser amount than that claimed by [a] plaintiff will sufficiently compensate for the

loss'") (quoting *Jenkins*).

   In rejecting the defendants' argument in *Jenkins* that, in addition to proving

restoration costs, the plaintiff had the burden to present evidence of diminution in market value,

New York's Court of Appeals explained why that burden falls instead on the defendants:

> The nature of the claim that a different measure of damages would
> yield a lesser award raises a question somewhat akin to mitigation of
> damages or avoidable consequences; i.e., is the plaintiff receiving no more
> than is reasonably necessary to remedy fully the injury while avoiding
> uneconomical efforts. As a "mitigation" issue, the burden falls upon the
> defendant to prove that a lesser amount than that claimed by plaintiff will
> sufficiently compensate for the loss.

*Jenkins v. Etlinger*, 432 N.E.2d at 591, 55 N.Y.2d at 39, 447 N.Y.S.2d at 698. Accordingly,

invocation of the "lesser of two" measure is premature until WTCP has had an opportunity to

present evidence of replacement costs. *See Merck & Co. v. MediPlan Health Consulting, Inc.*

434 F. Supp. 2d 257, 265-66 (S.D.N.Y. 2006) (denying summary judgment on patent

infringement damages; although damages not awardable for infringement after patent expired,

plaintiffs "are entitled to try to prove" damages on theory of "accelerated market entry").

## IV.

## NEW YORK STATE LAW DETERMINES THE
## PREJUDGMENT INTEREST OWING TO WTCP

In a subsidiary point, Defendants argue that federal law, not CPLR 5001, governs WTCP's claim for prejudgment interest. Moving Br. at 33. Defendants also argue that WTCP is not entitled to prejudgment interest in any event because any damage award will be offset by insurance payments made by WTCP's insurers. Defendants further argue that "there is simply no base against which to accrue interest" because those insurance payments "properly valued as of September 11, 2001 exceed [WTCP's] loss as of that date." *Id.* at 32.

We have already addressed Defendants' second argument. We showed in Point I that collateral source offsets cannot be made until there has been a damages award and correspondence of the payments to particular items of damages awarded has been proven, and that, in any event, the collateral source offset statute is not intended to benefit Defendants or their insurers, as this motion tries to do, by invoking the statute prematurely at this stage of the proceedings. WTCP also has come forward with evidence, sufficient to defeat summary judgment, that its damages exceed the amount of insurance payments it has received and disputing Defendants' claim that the alleged $2.8 billion net present value of rental payments to the Port Authority constitutes the fair market value of the WTC Buildings as of September 11, 2001. *See* Point III(A). Accordingly, both as a matter of law and because there are disputed issues of material fact, Defendants' claim that there will be no damages on which to award prejudgment interest cannot be sustained.

Defendants' argument that federal law governs WTCP's entitlement to prejudgment interest is wrong as a matter of law. Defendants contend that prejudgment interest should be governed by federal law because (1) claims brought under ATSSSA are "federal law" claims, and (2) federal law on prejudgment interest is, in any event, "inconsistent with" New

York law because an award of prejudgment interest might carry a different rate under federal law.[45]  Moving Br. at 33-34.  Neither argument is correct.

First, Defendants' superficial argument that WTCP's claims are "federal law" claims because they are brought in this Court under ATSSSA misconstrues ATSSSA by ignoring the plain language of the statute and this Court's prior decisions interpreting the statute.  To enable all 9/11 litigation to be brought in this District Court so that the statutory liability cap could be administered fairly given the limited fund available for all claims, ATSSSA of necessity created a federal cause of action.  But ATSSSA does not create any new rights, other than the right (and requirement) to bring state law claims such as WTCP's claims in this Court.  *See In re September 11 Litig.*, 280 F. Supp. 2d 279, 287 (S.D.N.Y. 2003)  (ATSSSA "provides that those who bring suit 'for damages arising out of the hijacking and subsequent crashes' must bring their suits in the United States District Court for the Southern District of New York.").

Indeed, because ATSSSA does *not* create *substantive rights*, the cause of action created is described in the statute as "a Federal cause of action for damages," which "shall be the exclusive remedy for damages arising out of the hijacking and subsequent crashes" on September 11, 2001.  ATSSSA § 408(b)(1) (emphasis added).  ATSSSA relies on state substantive law to put flesh on the bones of that cause of action for damages, providing that "[t]he substantive law for decision in any such [damages suit brought under ATSSSA] shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law."  ATSSSA § 408(b)(2); *see In re September 11 Litig.*, 265 F. Supp. 2d 208, 210 (S.D.N.Y. 2003) (Although ATSSSA claims

---

[45]     Under New York's CPLR, prejudgment interest at the rate of 9% per annum is recoverable as a matter of right in actions stemming from "an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property."  CPLR 5001, 5004.  By contrast, under federal law, "the rate of pre-judgment interest is within the broad discretion of the district court."  *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 520 (2d Cir. 1993); *see also Atlantic Mut. Ins. Co. v. Napa Transp., Inc.*, 399 F. Supp. 2d 523, 527 (S.D.N.Y. 2005) ("the appropriate rate of [prejudgment] interest is left to the discretion of the district court") *aff'd*, 201 F. App'x 19 (2d Cir. 2006); *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001) ("'[T]he rate of pre-judgment interest is within the broad discretion of the district court.'") (citation omitted).

are "federal claims, . . . . the substantive law governing these claims 'shall be derived from the law, including choice of law principles, of the state where the crash occurred,' except to the extent inconsistent with federal law.") (quoting ATSSSA § 408(b)); *In re September 11th Litig.*, 494 F. Supp. 2d 232, 238-39 (S.D.N.Y. 2007) (ATSSSA's references to "punitive damages" are "in the context of a limitation on a defendant's liability, not in the context of creating a right or remedy"; ATSSSA "leaves the issue of punitive damages to the state in which the crash occurred, for both choice of law and substantive law principles").[46]

Accordingly, although Defendants argue that "this is not a diversity case" (Moving Br. at 33) it, in fact, is very much like a diversity case insofar as claims brought under ATSSSA are claims under state law. By contrast, the inapposite cases Defendants cite, Moving Br. at 33, involve federal prejudgment interest on awards for violations of federal statutes — *Strobl v. New York Mercantile Exch.*, 590 F. Supp. 875, 881-82 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985), involved a Commodity Exchange Act claim, and *Atlantic Mut. Ins. Co. v. Napa Transp., Inc.*, 399 F. Supp. 2d 523 (S.D.N.Y. 2005), *aff'd*, 201 F. App'x 19 (2d Cir. 2006), involved a claim under the Carmack Amendment, 49 U.S.C. § 14706.

As shown above, under ATSSSA, the substantive law of New York governs claims involving the World Trade Center crashes. "The awarding of prejudgment interest is considered a question of substantive law." *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999); *accord Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (New York law "governs the substantive issues in this diversity action, including that of the availability of prejudgment interest."); *see also Chesapeake & Ohio Ry. Co. v. Kelly*, 241

---

[46]    When it has suited their purposes, the Aviation Defendants have forcefully advocated that ATSSSA requires the application of New York substantive law to these property damage actions. *See* Aviation Defendants' Memorandum of Law in Support of Their Motion for a Determination of the Law Applicable to Flight 11, 77 and 175 Punitive Damages Claims, filed April 30, 2007, at 11 (arguing that "[a]pplying of New York substantive law is especially appropriate for the property damage claimants, and ground victims, who would have no expectation that any law other than New York's would conceivably apply . . . Indeed, this Court has already determined that the question of whether a duty was owed to the ground victims is a question that must be resolved under New York law.") (citation omitted).  For the Court's convenience, the pertinent excerpt from that memorandum of law is provided as Exhibit 3 to the Williamson Decl.

U.S. 485, 491 (1916) ("[T]he proper measure of damages is inseparably connected with the right of action.").

Because prejudgment interest is a substantive law issue, ATSSSA requires the application of New York law unless that law is "inconsistent with or preempted by Federal law." *See Strobl*, 590 F. Supp. at 881-82 (cited in Moving Br. at 33) ("general rule that the issue of prejudgment interest on federal claims is to be resolved within the sound discretion of the district court" applies only "*in the absence of a statutory directive* or controlling case law") (emphasis added); *see also In re September 11th Litig.*, 494 F. Supp. 2d at 238 (where ATSSSA "neither bars nor provides for" a specific remedy, it leaves the issue "to the state in which the crash occurred").

Defendants do not argue that federal law on prejudgment interest preempts state law. Nor do they argue squarely that New York law is "inconsistent" with federal law. Moving Br. at 33-34. However, their argument might be that federal law is "inconsistent with" state law because the District Court, if it were to apply federal law, might, in its discretion, use a rate lower than the 9% rate required by CPLR 5004. *See id.* That argument is meritless — the federal courts in New York have actually applied New York's prejudgment interest law in fixing prejudgment interest on federal law claims — something they would not have done if New York's law were inconsistent with federal law. *See, e.g., Nipponkoa Ins. Co. v. Watkins Motor Lines, Inc.*, 431 F. Supp. 2d 411, 420 (S.D.N.Y. 2006) (adopting "the New York method of calculating [prejudgment] interest, which is nine percent per annum" where court had federal question jurisdiction); *Strobl*, 590 F. Supp. at 881-82 ("As to the specific rate of interest [on Commodity Exchange Act claim where statute was silent on the issue of prejudgment interest], we may look to the law of New York as a suitable guide;" awarding 6% New York statutory rate from the time the cause of action existed until the effective date of rate increase, and then 9% New York statutory rate thereafter because prejudgment interest provisions of CPLR "reasonably and equitably compensate plaintiff for the loss of the use of his money").

As the quoted language from *Strobl* suggests, both New York and federal law on prejudgment interest have the same goal of fully compensating a plaintiff for his loss and making the plaintiff whole. *See Newbro v. Freed*, 409 F. Supp. 2d 386, 401-02 (S.D.N.Y. 2006) ("Prejudgment interest is awarded as a matter of right under 'New York's prevailing policy, interwoven into § 5001, that "interest must be added [in actions where persons are deprived of the use of money] if we are to make the plaintiff whole."'") (quoting *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 695 (2d Cir. 1983); citation omitted), *aff'd*, 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007). Discretionary awards of prejudgment interest are allowed "under a variety of federal laws, despite the silence of the laws on the subject" for the same purpose that the CPLR allows it — "to fully compensate the wronged party for actual damages suffered." *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 955 F.2d 831, 833-34 (2d Cir. 1992); *accord Atlantic Mut. Ins. Co.*, 399 F. Supp. 2d at 525 ("The awarding of prejudgment interest [under federal law] 'ensure[s] that an injured party is fully compensated for its loss.'") (citation omitted). Pre-judgment interest does not over-compensate a plaintiff unless the federal statute under which an award of prejudgment interest is sought "itself already provides for full compensation" or the obligation on which interest is sought is punitive or a penalty. *Wickham,* 955 F.2d at 834-35.

Thus, because both New York and federal law on this issue have the same goal in awarding prejudgment interest, they cannot be said to be "inconsistent." Indeed, courts have interpreted the phrase "inconsistent with" in the context of preemption clauses to require a showing "either that 'compliance with both federal and state regulations is a physical impossibility' or that 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Coalition To Defend Affirmative Action v. Granholm*, 473 F.3d 237, 251 (6th Cir. 2006) (citation omitted), *motion to vacate stay denied*, 127 S. Ct. 1146 (2007); *accord Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.,* 423 F.3d 1056, 1073 (9th Cir. 2005) ("In fact, our analysis of whether state requirements are 'inconsistent' with the federal regulations within the meaning of [the Communications Act,

66

47 USC] § 276(c) is substantially identical to the analysis of implied conflict preemption: whether 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (citation omitted), *aff'd*, 127 S. Ct. 1513 (2007).  New York's CPLR §§ 5001 and 5004 pose no "obstacle" to Congress's objective of awarding full compensation — they have the same objective.  Accordingly, because federal law is not "inconsistent with" New York law, ATSSSA requires its application here.

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment based on CPLR 4545(c) should be denied.

Dated:  August 18, 2008
New York, New York

FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP

By:
Richard A. Williamson, Esq.
One Liberty Plaza
New York, New York  10006
(212) 412-9500

Attorneys for Plaintiffs
World Trade Center Properties LLC,
1 World Trade Center LLC,
2 World Trade Center LLC,
3 World Trade Center LLC,
4 World Trade Center LLC