```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/1/13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
:
IN RE SEPTEMBER 11 LITIGATION :
:
------------------------------------------------------------------
:
: **FINDINGS OF FACT AND**
WORLD TRADE CENTER PROPERTIES LLC, et al., : **CONCLUSIONS OF LAW**
: **SUPPORTING JUDGMENT**
Plaintiffs, : **FOR DEFENDANTS**
:
-against- : 21 MC 101 (AKH)
:
UNITED AIRLINES, INC., et al., : 08 Civ. 3719
:
Defendants. : 08 Civ. 3722
:
------------------------------------------------------------ :
:
WORLD TRADE CENTER PROPERTIES LLC, et al., :
:
Plaintiffs, :
:
-against- :
:
AMERICAN AIRLINES, INC., et al., :
:
Defendants. :
:
------------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

    On July 15-19, 2013, the parties appeared before me for a bench trial on the issue of whether there was correspondence between the World Trade Center developer's insurance recoveries and the tort damages that might be awarded if the case proceeded to a liability trial. I listened to the testimony, carefully considered the evidence, and delivered my findings of fact and conclusions of law at the end of trial. These written findings and conclusions restate and expand on my decision.

## FINDINGS OF FACT

<u>Plaintiffs' Leases for the World Trade Center Buildings (One, Two, Four, Five and Seven)</u>

1.  In the early 1960s, the Port of New York was suffering economically, and the states of New York and New Jersey sought to revitalize the area. The two states directed that the World Trade Center be built in lower Manhattan with the goal of making the area a center for international trade and finance. See N.Y. Unconsol. Law § 6601 (describing plans to establish the World Trade Center as "as the nation's leading gateway for world commerce"); N.J. Stat. Ann. § 32:1-35.50.

2.  The Port Authority of New York and New Jersey was granted authority over the site. Construction began in 1965. The Twin Towers opened to the public and its tenants in 1973.

3.  On December 31, 1980, the Port Authority entered into a ground lease with 7 World Trade Company, L.P. ("7WTCo."), a company associated with the developer Silverstein Properties, Inc. ("Silverstein") and one of the plaintiffs in this action, for the development and construction of 7 World Trade Center ("Tower 7"). Upon its completion in 1987, the Port Authority leased Tower 7 to 7WTCo., and Tower 7 opened to the public and its tenants. Tower 7 was located north of the main site of the World Trade Center, across Vesey Street. See In re September 11 Litig., 908 F. Supp. 2d 442, 444 (S.D.N.Y. 2012).

4.  In 1998, the Port Authority decided to privatize the World Trade Center. It conducted a worldwide competitive bidding process to sell 99-year leases of the buildings on the main site of the World Trade Center; the commercial stores in the concourse of the buildings were included in the properties. When Vornado Realty Trust, the high bidder, was not able to complete its negotiations with the Port Authority, the Port Authority accepted the second-place

2

bid from Silverstein and Westfield America, Inc. ("Westfield") in April 2001. On July 16, 2001, the Silverstein affiliates—World Trade Center Properties, LLC ("WTCP") and related companies—executed four 99-year leases for the four buildings on the main site, World Trade Center One, Two, Four and Five. WTCP and Westfield paid to the Port Authority the equivalent of $3.211 billion—partly in cash, partly in the form of continuing payments. WTCP paid $2.805 billion of that amount to lease the office buildings. Westfield paid the balance to lease the mall in the concourse. See Joint Stipulation at ¶ 1; In re September 11th Litig., 590 F. Supp. 2d 535, 536-37 (S.D.N.Y. 2008).

5. The leases to both the main site and Tower 7 required the lessee to rebuild if the buildings were destroyed. The main site lease provides:

> If the Premises . . . or any structures, improvements, fixtures and equipment, furnishings and physical property located thereon, or any part thereof, shall be damaged or destroyed . . . the Lessee, at its sole cost and expense, and whether or not such damage or destruction is covered by insurance proceeds sufficient for the purpose, shall remove all debris resulting from such damage or destruction, and shall rebuild, restore, repair and replace the Premises . . . and any structures, improvements, fixtures and equipment, furnishings and physical property located thereon substantially in accordance, to the extent feasible, prudent and commercially reasonable, with the plans and specifications for the same as they existed prior to such damage or destruction or with the consent in writing of the Port Authority, which consent shall not be unreasonably withheld, conditioned, or delayed, make such other repairs, replacements, changes or alterations as is mutually agreed to by the Port Authority and the Lessee.

Net Leases § 15.1; Joint Stipulation at ¶ 2. A similar provision applied to Tower 7.

6. The leases also required the lessee to insure the buildings against loss from fire and other causes for the lesser of $1.5 billion or "actual replacement cost." In re September 11th Litig., 590 F. Supp. 2d 535, 538 (S.D.N.Y. 2008).

3

Plaintiffs' Insurance Programs

7. The main site of the World Trade Center was insured in layers of coverage for business interruption (lost rentals) and the replacement costs of the buildings if damaged or destroyed, up to $3.5468 billion per occurrence, without distinction between the two categories of coverage (i.e., blanket coverage). Twenty-four different insurers, plus a number of Lloyd's of London syndicates, participated in the insurance program. Def. Ex. B4; Joint Stipulation at ¶ 3.

8. At the time of the September 11 attacks, WTCP was still negotiating with its insurers for coverage for the main site. With one exception, none of the insurers had issued a final insurance policy to WTCP as of the time of the buildings' destruction. The insurers had instead issued temporary binders or slips, which provided interim coverage. SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 113 (2d Cir. 2006).

9. Industrial Risk Insurers ("IRI") insured Tower 7, providing coverage for business interruption (called time element), replacement costs and extra expense, up to $860 million per occurrence, without distinction as to categories of coverage, but subject to a sub-limit of $1,000,000 per occurrence for extra expense. Joint Stipulation at ¶ 29.

10. The insurance coverage for both the main site and Tower 7 was independent of Plaintiffs' lease obligation to repair or replace the leased premises if damaged or destroyed. The insurance agreements made no reference to these obligations. Tr. 239:6-11.

The September 11 Attacks

11. On the morning of September 11, 2001, Mohamed Atta and Abdul Aziz al Omari cleared security at Portland International Airport in Maine and caught an early morning flight to Boston's Logan Airport. At Logan, they rendezvoused with three others, and together the five boarded American Airlines Flight 11, en route to Los Angeles. Five other Al-Qaeda

4

associates cleared security at Logan and boarded United Airlines Flight 175, also headed for Los Angeles. See The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks upon the United States, at 1-2 (2004) ("9/11 Report").

12. Flight 11 and Flight 175 took off from Logan at 7:59 a.m. and 8:14 a.m., respectively. Shortly afterwards, the terrorists aboard took control of the two planes and turned them towards New York City. Flight 11 crashed into Tower 1 of the World Trade Center (the North Tower) at 8:46 a.m. Flight 175 crashed into Tower 2 (the South Tower) at 9:03 a.m. Both World Trade Center towers became infernos and collapsed: Tower 2 at 9:59 a.m. and Tower 1 at 10:28 a.m. 9/11 Report at 4, 7, 285.

13. The falling debris from the Twin Towers caused fires to erupt in the neighboring World Trade Center buildings. Towers 4 and 5 were damaged beyond repair. Tower 7, across Vesey Street to the north, burned for several hours and collapsed at 5:20 p.m. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., 865 F. Supp. 2d 370, 378 (S.D.N.Y. 2011); Federal Emergency Management Agency, World Trade Center Building Performance Study, at 5-1 (2002).[1]

### WTCP's Insurance Claims and Recoveries, Main Site

14. WTCP submitted claims to its insurers to recover the damages it and Westfield suffered from the September 11 attacks and, following the insurers' refusal to pay the full amount of the claims, filed suit against them. WTCP alleged that the insurers had acted in bad faith, and thus sought to recover more than the policy limits.

15. WTCP and the insurers litigated the issue of whether the September 11 attacks constituted one occurrence or two occurrences under the terms of Plaintiffs' insurance

---

[1] World Trade Center 6, located between Tower 1 and Tower 7, was also severely damaged, but it is not the subject of this litigation because Plaintiffs did not lease the building. Tr. 514:23-515:8.

5

coverages. As judicially determined, the outcome varied with the terms extended by each insurer: under some coverages, the attacks were considered a single occurrence; under others, two occurrences. See SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 138 (2d Cir. 2006). The sum of Plaintiffs' blanket insurance coverage, instead of being $3.5468 billion for a single occurrence, became $4,678,906,257. Def. Ex. B4.

16. WTCP submitted proofs of loss for the main site of approximately $8.531 billion in two categories: $7,183,441,908 (84.2%) for the cost of replacing the four buildings, and $1,347,805,679 (15.8%) for business interruption, i.e., the cost of rental payments that sub-lessees of the main site failed to pay WTCP as a result of the buildings' destruction. Joint Stipulation at ¶ 21; Def. Ex. C4.

17. The insurers objected to WTCP's damage estimates, considering them inflated. An appraisal panel was appointed, consisting of one member chosen by each side and a neutral umpire chosen by the two appointed members. The appraisal panel conducted 99 days of hearings to determine the insured loss. The panel determined in February 2007 that the reasonable cost of replacing the core and shell of the four buildings (not including tenant improvements, such as non-essential walls and floor coverings) was $4,159,460,085. The appraisal panel did not evaluate WTCP's claim of lost rental income for the buildings. Def. Ex. C4; Tr. 81:1-8; Joint Exhibit 95.

18. In February 2002, several of the insurers settled with WTCP, and other settlements followed. By July of 2007, all of the insurers had settled, paying $4,581,794,675 (some of which had been advanced as interim payments) in total, of which $4,091,364,040 was allocated to WTCP, and the balance to Westfield. Many insurers paid the exact amounts of their

policy limits; some paid slightly more, others paid slightly less. Thus, the insurers' total payment was close to the sum total of their policy limits, $4,678,906,257. Def. Ex. B4.

19. WTCP's loss was considered a "policy limits loss," meaning that the extent of its insured damages exceeded the amount it could recover from insurance. Tr. 79:11-17.

20. Under the insurance settlements, all claims were released. The insurers did not allocate how their payments were being applied to each claimed loss. Joint Stipulation at ¶24; Tr. 328:16-24.

21. The insurance recovery to WTCP—net of $10,352,540 in claims preparation fees, $31,030,471 in fees and costs of the appraisal, and $5,898,714 in two years of insurance premiums—was $4,044,082,315. Joint Stipulation at ¶ 4, 26-27.

### 7WTCo.'s Insurance Claims and Recoveries, Tower 7

22. 7WTCo. submitted proofs of loss for the Tower 7 site of approximately $1.497 billion in three categories: $1,053,399,635 (70.4%) for the cost of replacing Tower 7, $441,698,256 (29.5%) for business interruption, and $1,846,139 (.12%) for personal property. Joint Stipulation at ¶ 42-43, 49.

23. 7WTCo. filed suit against IRI on June 12, 2003, claiming that IRI had not sufficiently compensated it for its losses. The parties entered into a settlement on January 3, 2005, in which IRI agreed to pay $819 million to 7WTCo. On December 2, 2011, IRI paid 7WTCo., pursuant to their settlement agreement, an additional $11,936,584 in connection with IRI's subrogation recovery for Tower 7. Thus, in total, IRI has paid approximately $831 million to 7WTCo. Joint Stipulation at ¶ 51; In re September 11 Litig., 908 F. Supp. 2d 442, 445 (S.D.N.Y. 2012).

24. The insurance recovery to 7WTCo.—net of $1,587,410 in claims preparation fees and $482,793 for two-years of insurance premiums—was approximately $829 million. Joint Stipulation at ¶ 32, 53.

25. 7WTCo. also insured two Frank Stella paintings with AXA Nordstern Art Insurance Corporation under a fine arts insurance policy. The paintings were destroyed in the fires and collapse of Tower 7. 7WTCo. submitted a proof of claim to AXA, and AXA paid $700,000. The parties stipulate that up to $300,000 is still owed for the destruction of the paintings, the difference between the insurance payment and the alleged $1 million value of the paintings. Joint Stipulation at ¶ 54.

### The Value of Plaintiffs' Economic Losses

26. The market value of the leases for the main site of the World Trade Center immediately prior to the events of September 11, 2001 was $2.805 billion, the price paid by Silverstein Properties to acquire the leases. In re Sept. 11th Litigation, 21 MC 101, 2009 WL 1181057 (S.D.N.Y. 2009). Market value for an income-producing asset, generally, is equal to the present value of the net income generated by the asset being purchased. See Tr. 186:17-23 (Fischel); Tr. 405:8-13 (Shavell). Because, at the very least, the cost of replacing the buildings was the $4.159 billion estimated by the appraisal panel, the cost to replace the properties was greater than the market value of the leases.

27. The market value of the Tower 7 lease immediately prior to the events of September 11, 2001 was $737 million, the value estimated by Plaintiffs' expert, Kerry Vandell. In re September 11 Litig., 908 F. Supp. 2d 442, 448 (S.D.N.Y. 2012). While an appraisal panel did not estimate the cost of replacing Tower 7, that cost was almost certainly greater than the market value of the lease, given the claimed replacement cost of $1.053 billion.

8

28. The market value of the Tower 7 lease did not include the value of the two Frank Stella paintings and other personal property owned by Plaintiffs that were destroyed in the collapse of Tower 7. The market value of the paintings is estimated by the parties as up to one million dollars, and Plaintiffs estimate that the value of other personal property losses was $1,846,139. Joint Stipulation at ¶ 49, 54.

## CONCLUSIONS OF LAW

### Previous Conclusions Relevant to the Case

29. Plaintiffs' potential tort recovery for the main site is limited to the lesser of the fair market value of the leases or the replacement cost of the buildings. In re Sept. 11th Litigation, 590 F. Supp. 2d 535, 544 (S.D.N.Y. 2008), applying Fisher v. Qualico Contracting Corp., 98 N.Y.2d 534 (2002). Since the market value of Plaintiffs' leasehold, $2.805 billion, was less than replacement cost, the limit of Plaintiffs' potential tort recovery against Defendants is the destroyed market value of the leases. In re Sept. 11th Litigation, 590 F. Supp. 2d 535, 544 (S.D.N.Y. 2008); see also In re Sept. 11th Litigation, 21 MC 101, 2009 WL 1181057 (S.D.N.Y. 2009). Plaintiffs are not entitled to recover damages arising from their contractual duty to replace the leased buildings, for duties arising from contract are not "the natural and probable result of [Defendants'] negligence, nor the foreseeable consequence of [Defendants'] acts and omissions." In re Sept. 11th Litigation, 590 F. Supp. 2d 535, 544 (S.D.N.Y. 2008).

30. Plaintiffs' potential tort recovery for the destruction of Tower 7 also is limited to the fair market value of the destroyed Tower 7 leasehold as of September 11, 2001. In re September 11 Litig., 908 F. Supp. 2d 442, 447-48 (S.D.N.Y. 2012). Plaintiffs are not entitled to recover the higher cost of replacement of Tower 7, nor for other costs arising from their contractual obligations. Id. However, as I held, the losses associated with the Frank Stella

9

paintings and Plaintiffs' other personal property in Tower 7, since they are a separate loss from the loss of the Tower 7 lease, were "unrelated to the replacement of the leasehold," and are "recoverable in tort." Id. at 448.

### Legal Standard of Correspondence to Avoid Double Recoveries

31. New York's C.P.L.R. Section 4545 provides that if a plaintiff has been compensated for an economic loss by some "collateral source" such as insurance that relates to the same loss sought in a tort lawsuit, the collateral source recovery must be deducted from the tort damages.

32. The statute, as it read at the time these actions were filed, provided:

> In any action brought to recover damages for personal injury, injury to property or wrongful death, where the plaintiff seeks to recover for . . . loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source such as insurance (except for life insurance). If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to the projected future cost to the plaintiff of maintaining such benefits.

N.Y. C.P.L.R. § 4545(c) (2008).

33. Pursuant to Section 4545(c), "reduction [from an award of damages for a tort] is authorized only when the collateral source payment represents reimbursement for a particular category of loss that corresponds to a category of loss for which damages were awarded." Oden v. Chemung County Indus. Dev. Agency, 87 N.Y.2d 81, 84 (1995).

34. Defendants have the burden to show correspondence to a "reasonable certainty" in order to gain a damages offset. Turnbull v. USAir, Inc., 133 F.3d 184, 187 (2d Cir. 1998); Oden, 87 N.Y.2d at 89.

10

35.     The purpose of Section 4545 is to eliminate "double recoveries for the same loss." Fisher v. Qualico Contr. Corp., 98 N.Y.2d 534, 537 (2002). However, courts should not subtract non-duplicative payments, because doing so would "produce results beyond those necessary to remedy the [double recovery to plaintiffs] at which the legislation was aimed" and "would confer an undeserved windfall on tort defendants and their insurers. . . ." Oden, 87 N.Y.2d at 88.

### Correspondence of Replacement Cost Recovery

36.     In order to obtain sufficient coverage for a potential economic loss, Plaintiffs purchased two primary categories of insurance: replacement cost insurance, to cover the cost of restoring the assets to their condition and value immediately prior to the loss; and business interruption insurance (also called, in the insurance for Tower 7, time element insurance), to cover the period reasonably required to effect replacement and re-tenanting. Both of these insurance recoveries, and Plaintiffs' potential tort recoveries, were intended to remedy the same economic loss: the destroyed value of their leases and the stream of net income the leases were expected to generate, as measured by the market values of those leases immediately prior to the total destruction of the leased assets on September 11, 2001. As Professor Daniel Fischel testified, Plaintiffs experienced one economic loss on September 11, 2001: the "destruction of the value of [their] leasehold interest." Tr. 181:18-19.

37.     I hold that Plaintiffs' blanket coverage, insuring replacement costs and business interruption, corresponds completely to Plaintiffs' potential tort recoveries related to the lost value of their leaseholds, and that the insurance recoveries should be set off against such potential tort recoveries, reducing them to zero.

38.     Prior to the terrorist attacks, Plaintiffs had a leasehold interest in the main site of the World Trade Center worth $2.805 billion. Both the business interruption and the replacement cost recoveries compensated Plaintiffs for that loss. The business interruption insurance compensated Plaintiffs with rental payments that no longer would be paid for a temporary period of time, the reasonable time needed to replace the leasehold assets and re-tenant them. The replacement cost insurance provided Plaintiffs with funds to restore the leasehold assets that Plaintiffs had lost. As "two sides of the same coin," the two categories of insurance recompensed the same loss. Fisher v. Qualico Contracting Corp., 98 N.Y.2d 534, 540 (2002).

39.     The Fisher decision addressed the very same issue. There, the plaintiff homeowners lost their home in a fire that was negligently started by contractors working in the residence. The home had had a fair market value of $480,000, but the replacement cost of the home was much higher, approximately $1,330,000. The insurer paid $862,770 to replace the home, which left the plaintiffs with an uninsured balance of $467,230. Nevertheless, the Court of Appeals held that the plaintiffs' potential tort recovery against the contractors had been fully recompensed. First, the court ruled that under the "lesser of two" rule, plaintiffs were not entitled to both replacement costs and the fair market value of the home; instead, they could be awarded only the lesser of these two amounts, or the fair market value, $480,000. Id. at 539. Second, the court held that the replacement cost proceeds corresponded to the plaintiffs' loss of property, because "replacement cost and diminution in market value are simply two sides of the same coin. Each is a proper way to measure lost property value, the lower of the two figures affording full compensation to the owner. Thus, the collateral source payment—the Fishers'

replacement cost insurance proceeds—corresponds to their property loss, and was properly offset against the damages award." Id. at 540.

40. While our case involves a commercial lease, not residential property, the economic principles are the same. The plaintiffs in Fisher lost a home worth $480,000; the replacement cost proceeds were intended to compensate them for the loss of the enjoyment of their home. Here, Plaintiffs lost a commercial lease worth $2.805 billion; the replacement cost and business interruption proceeds, both, are similarly designed to compensate Plaintiffs for the loss of the use and value of their lease. In Fisher, it was irrelevant that the replacement cost insurance proceeds were insufficient to meet the actual costs of replacement. All that mattered was that those proceeds exceeded the fair market value of the home. Here, it is the same. The question is not whether Plaintiffs have received full compensation for the cost of rebuilding the World Trade Center, but only whether their business interruption and replacement costs insurance proceeds exceeded the fair market value of their lease.

41. Oden v. Chemung County Indus. Dev. Agency, 87 N.Y.2d 81, 84 (1995), which Plaintiffs rely on, is not to the contrary. There, the plaintiff was injured in a construction accident and was awarded damages that included $66,000 for lost pension benefits and $80,000 for future lost earnings. Separate from the tort case, the plaintiff received $141,330 in disability pension benefits. The Court of Appeals held that while there was correspondence between the disability retirement benefits and the $66,000 award for lost pension benefits, there was no correspondence between the disability payment and the plaintiff's future lost earnings. The court reasoned that the disability pension payment was paid to replace the pension benefits that the plaintiff would no longer earn due to his injury. The disability payment, however, was not duplicative of the award for future lost earnings because it corresponded to a different category

of loss, as plaintiff, if he had been uninjured and retired, "would have been free to earn income from his labor in other capacities without loss of his disability retirement pension benefits." Id. at 88-89. In Oden, the plaintiff suffered two distinct types of losses: the loss of retirement benefits and a separate loss of the ability to earn future income. Here, Plaintiffs have suffered only one real property loss: the destruction of the value of their leaseholds.

    42. The expert testimony in this case supports this conclusion. Professor Fischel testified that "if you're trying to calculate market value or lost market value [of the leases], what you're really calculating is the present value of a lost rental stream." Tr. 186:20-21. Professor Fischel observed that "replacement cost involves not only the physical cost of rebuilding but also compensation [in the form of business interruption insurance] for the interim period between the time of loss and the time of rebuilding. But once rebuilding occurs, there's no more business interruption; business has resumed in a sense and, therefore, if you add the two together, that fully compensates a plaintiff. . . ." Tr. 206:12-17. Similarly, Defendants' insurance expert, Michael Beach, noted that "the property damage coverage responded to the physical loss or damage to the building, which would enable them to retenant, return their revenue streams." Tr. 116:20-22.

    43. Professor Steven Shavell, Plaintiffs' economic expert witness, testified to the contrary. He expressed his opinion there were "two major categories of economic loss," those being "replacement costs and rental incomes losses." Tr. 381:16-18. However, on further questioning, Professor Shavell acknowledged that the two were related. He testified that "you can't begin to enjoy an [] income stream unless you fork out the money for replacement," thus constituting, as the Court of Appeals in Fisher categorized it, "two sides of the same coin." Tr. 424:13-15; 98 N.Y.2d at 540. Professor Shavell recognized that insurance proceeds spent on

14

replacing a destroyed property, together with business interruption for the period of time to engage in replacement, allow Plaintiffs to recover the net income stream that they purchased by acquiring the leased asset.

44. I therefore find that Professor Shavell's differences with Professor Fischel are differences without a substantial distinction, and that Professor Fischel's stance is the more credible viewpoint.

45. The fact that Plaintiffs were obligated to rebuild, rather than chose to rebuild, does not change my conclusion. Even under an obligation to rebuild, the new World Trade Center buildings will provide rental income to Plaintiffs (and in the case of Tower 7, the new building already does so). Whether the rebuilding was optional or obligatory, the replacement cost proceeds still compensated Plaintiffs for the destruction of their leases.

46. I therefore find that Defendants have shown to a "reasonable certainty" that Plaintiffs' replacement cost recovery addresses the same category of loss as Plaintiffs' potential tort recovery, that is, damages to the value of Plaintiffs' leasehold interests.

<u>Plaintiffs' Arguments With Respect to Other Losses</u>

47. Plaintiffs argue that even if the replacement cost insurance recoveries correspond to their tort losses, Defendants still have not shown full correspondence. With a minor exception relating to art and personal property losses, I disagree.

48. First, Plaintiffs contend that some of their insurance recoveries relate to extra-contractual claims against their insurers. Plaintiffs asserted that their insurers acted in bad faith and owed them prejudgment interest, and Plaintiffs say that some of their insurance recoveries must be viewed as payments for settling these claims. However, these extra-contractual claims were never quantified, and are rather dubious. The recovery against nearly

15

every insurer was at, or near, the policy limits. Any damages that might have been paid for bad faith claims were insignificant at most and not quantifiable or material in relation to the amounts at stake.[2]

49. Second, Plaintiffs argue that some of the insurance recoveries relate to re-tenanting expenses, tenant improvements, and mortgage carrying costs, expenses that I already have held are not themselves recoverable in tort. See In re September 11 Litig., 908 F. Supp. 2d 442, 448 (S.D.N.Y. 2012). Rebuilding inner walls and finding new tenants, however, are an essential part of reconstructing new, operable buildings, and therefore tenant improvements and re-tenanting costs are just examples of replacement costs, payable, according to fixtures agreements between landlords and tenants, by either of them. Id. Thus, insurance recoveries for tenant improvements and re-tenanting should be treated the same way as insurance recoveries for replacement costs: all correspond to Plaintiffs' loss to their leaseholds. As to mortgage carrying costs, they were a recurring expense payable by the Plaintiffs regardless of the buildings existence and are not a category of damage recoverable in tort, and there is no evidence that the insurance payments were made to cover these costs. Id.

50. As to the Frank Stella paintings in Tower 7, Plaintiffs' insurance recovery, pursuant to separate insurance, reimbursed $700,000 for the two destroyed paintings. The parties have indicated that they will settle the balance, according to an agreed upon valued of the paintings of up to one million dollars. In addition to the art loss claim, Plaintiffs filed a claim with IRI for $1,846,139 for other lost personal property in Tower 7. Assuming that Plaintiffs'

---

[2] For example, ACE Bermuda Insurance Ltd. faced an exposure of $298 million, and it paid a total equaling that amount. The fact that the insurer paid the exact amount of its policy limits strongly suggests its payment was only for claims made under the policy, and not extra-contractual claims. Employers Insurance of Wausau paid $67,500,000, slightly more than its exposure of $64,894,000. Def. Ex. B4. While it is logically possible that this additional $2.6 million payment over-and-above Wausau's exposure was made to settle extra-contractual claims, the relatively small value of this difference is not determinative given the billions of dollars in recoveries at play here.

16

insurance recovery for Tower 7 should be allocated according to the proportion of claims filed, $1,022,218 of that insurance recovery (.1233%) compensated Plaintiffs' for personal property losses. Thus, Plaintiffs may still be owed a small amount for personal property, an amount that cannot exceed $823,921 (and may be less if Plaintiffs inflated their losses).

51. As to prejudgment interest, Plaintiffs' claim relates to the period from the time of their loss to the date they were fully compensated, that is, the date their insurers paid all of their claims. Plaintiffs were paid by IRI for Tower 7 on January 3, 2005, approximately 3 years and 4 months after the date of their losses. Plaintiffs received their final insurance payment for the main site on July 13, 2007, approximately 5 years and 10 months after their loss. The insurers, however, made substantial payments well before these dates, as IRI paid more than $516 million for Tower 7 prior to the final settlement and other insurers paid more than $1.3 billion for the main site by April 2003. See Joint Stipulation at ¶ 51; Def. Ex. B4. Applying the federal interest rate under 28 U.S.C. § 1961, the insurance payments of $4.873 billion (for both the main site and Tower 7) adequately compensated Plaintiffs for any prejudgment interest that might have been owed relating to Plaintiffs' damages of $3.542 billion. See Thomas v. iStar Fin., Inc., 652 F.3d 141, 150 (2d Cir. 2011), cert. denied, 132 S. Ct. 856 (2011).

## CONCLUSION

52. Accordingly, for the reasons stated, the business interruption and replacement cost insurance recoveries for the main site of the World Trade Center, which comprised all, or nearly all, of the $4.044 billion in total insurance recoveries, correspond to Plaintiffs' potential tort recovery and constitute a total offset to Plaintiffs' maximum potential tort recovery of $2.805 billion.

53. Similarly, for the reasons stated, the business interruption and replacement cost proceeds for Tower 7, totaling nearly $829 million, correspond to Plaintiffs' possible tort recovery and thus completely offset Plaintiffs' maximum tort recovery of $737 million for the loss of the Tower 7 lease. These insurance proceeds, however, have not fully compensated Plaintiffs for art losses and personal property losses related to the destruction of Tower 7, and Plaintiffs may be owed up to $300,000 and $823,921 for these two types of losses, respectively. I shall confer with counsel at a conference on August 26, 2013, at 2:30 p.m. to discuss how these claims can be speedily resolved.

SO ORDERED.

Dated: August /, 2013
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge